# Nos. 23-2168, 23-2170, 23-2171, 24-2039

IN THE

## United States Court of Appeals

FOR THE TENTH CIRCUIT

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*

*v.*

**SIRAJ IBN WAHHAJ, HUJRAH WAHHAJ, SUBHANAH WAHHAJ, AND LUCAS MORTON**

*Defendants-Appellants*

On Appeal from the United States District Court
for the District of New Mexico
D.C. No. 1:18-cr-02945-WJ (The Hon. William P. Johnson)

## ANSWER BRIEF FOR THE UNITED STATES

ORAL ARGUMENT IS REQUESTED

December 2025

TODD BLANCHE
*Deputy Attorney General*

RYAN ELLISON
*Acting United States Attorney*
*District of New Mexico*

TIFFANY L. WALTERS
*Assistant U.S. Attorney*
201 3rd St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274

**TABLE OF CONTENTS**

**PAGE**

TABLE OF CASES AND OTHER AUTHORITIES .......... vii

PRIOR OR RELATED APPEALS .......... xx

ISSUES PRESENTED .......... 1

STATEMENT OF THE CASE AND THE FACTS .......... 2

I. Defendants kidnap Abdul Ghani and conceal him in a compound in New Mexico, and Siraj and Lucas prepare for an FBI raid and the war that they believe will follow Abdul Ghani's resurrection. .......... 2

A. Abdul Ghani lives with Hakima, who ensures that he receives appropriate medical treatment. .......... 2

B. Defendants abduct Abdul Ghani from Hakima. .......... 4

C. Defendants flee Georgia with Abdul Ghani and settle on remote land in New Mexico. .......... 7

D. Abdul Ghani dies during a ruqyah session. .......... 9

E. Jany prophesies Abdul Ghani's resurrection. .......... 10

F. Siraj and Lucas prepare for a potential FBI raid and the war to follow Abdul Ghani's resurrection. .......... 11

G. Law enforcement enters the compound and arrests Defendants. .......... 13

II. District court proceedings .......... 14

SUMMARY OF THE ARGUMENT .......... 15

ARGUMENT .......... 30

I. The district court properly denied Defendants' motion to suppress for lack of Fourth Amendment standing. .......... 30

A. Relevant background .......... 30

B. The district court denies Defendants' suppression motion. .......... 34

C. The Fourth Amendment does not protect a person against the search of a wrongfully occupied property .......... 36

D. Defendants were wrongfully occupying Lot 28. .......................... 37

*1. Defendants had no right to occupy Lot 28 after the Badgers revoked their consent.* .......................... 37

*2. Defendants were never the Badgers' tenants* .......................... 38

*3. Any interest Defendants may have had in Lot 28 terminated before the search* .......................... 46

E. Defendants' expectation of privacy was not reasonable simply because they had not yet been evicted .......................... 50

II. The evidence supporting the federal-victim element of Siraj's and Lucas's convictions for conspiring to kill federal officers (Count 3) was sufficient. .......................... 57

A. Standard of review .......................... 57

B. The trial evidence was sufficient for a reasonable jury to conclude that the conspiracy's object was to kill federal officers or employees. .......................... 58

III. The jury instruction on Count 3 was not plainly misleading. .......................... 62

A. Relevant background .......................... 62

B. Lucas invited any error because he proposed the instruction the district court used. .......................... 63

C. The district court correctly instructed the jury that the government must prove the federal identity of the victim. .......................... 64

D. Any error was not plain. .......................... 71

E. Any error did not affect Siraj's or Lucas's substantial rights. .......................... 73

IV. The district court properly denied the motion to dismiss the kidnapping charges. .......................... 74

A. Relevant background .......................... 75

B. Defendants waived any challenge to the district court's denial of the pretrial motion by failing to challenge the basis of the district court's decision. .......................... 76

C. The kidnapping statute's parental exception exempts only the parent from prosecution. .......................... 77

D. Siraj's immunity does not prevent Defendants from violating § 1201(a). ........ 82

*1. Defendants conspired among themselves to kidnap Abdul Ghani without regard to Siraj's actions.* ........ 82

*2. Siraj himself violated the kidnapping statute.* ........ 83

V. The jury instruction on kidnapping did not mislead the jury. ........ 86

A. Relevant background ........ 86

B. Contrary to Subhanah's arguments, kidnapping under § 1201(a)(1) is not a specific-intent crime. ........ 88

C. Hujrah fails to demonstrate any missing element in the jury instructions. ........ 99

VI. The kidnapping-conspiracy jury instruction did not mislead the jury. ........ 102

VII. Sufficient evidence supported Subhanah's, Hujrah's, and Lucas's kidnapping convictions. ........ 105

A. A reasonable jury could find that Lucas, Hujrah, and Subhanah unlawfully kidnapped Abdul Ghani. ........ 105

*1. The trial evidence showed that Abdul Ghani's kidnapping was unlawful.* ........ 105

*2. The trial evidence showed that Defendants kidnapped Abdul Ghani.* ........ 113

*3. At a minimum, the trial evidence was sufficient to show aiding and abetting.* ........ 120

*4. The trial evidence showed that Lucas knew Hakima did not consent.* ........ 121

B. A reasonable jury could find that Defendants kidnapped Abdul Ghani for some purpose or benefit. ........ 124

C. A reasonable jury could find that Defendants willfully transported Abdul Ghani. ........ 125

D. A reasonable jury could find that death resulted from the kidnapping. ........ 126

E. The parental exception does not apply to Defendants. 132

VIII. Sufficient evidence supports Subhanah's, Hujrah's, and Lucas's kidnapping-conspiracy convictions. 133

A. There was sufficient evidence of an agreement to kidnap Abdul Ghani. 133

B. The evidence of interdependence was not plainly insufficient. 134

IX. The district court did not abuse its discretion in denying Siraj's motions to sever. 135

A. Relevant background 135

*1. Siraj moves to sever his trial from his codefendants.* 135

*2. The district court denies Siraj's motion.* 136

B. Severance is required only where a defendant shows actual prejudice from a joint trial. 138

C. Siraj has not shown actual prejudice that outweighs the expense and inconvenience of separate trials. 139

*1. Siraj has not shown actual prejudice.* 139

*2. Siraj has not shown that the prejudice to him outweighed judicial-economy concerns.* 145

D. Siraj has not shown that the limiting instructions were insufficient. 146

X. Siraj and Lucas were not denied their *Faretta* rights when they were precluded from approaching the bench and were excluded from a conference regarding a nonsubstantive jury-note response. 149

A. Standby counsel may assist so long as pro-se defendants retain control over the case they wish to present. 149

B. The district court did not violate Lucas's and Siraj's *Faretta* rights by precluding them from approaching the bench. 153

*1. The question of whether pro-se Defendants' exclusion from bench conferences violates their Faretta rights is a fact-based inquiry turning on the circumstances of their cases.* 153

2. *Siraj and Lucas never objected to the district court's modified procedure for bench conferences.* ........ 155

3. *Defendants acquiesced in standby counsel's participation.* ........ 161

4. *Defendants retained actual control of the case they chose to present to the jury* ........ 164

5. *The jury would have perceived Siraj and Lucas to be representing themselves.* ........ 171

C. The jury-note conferences conducted without Siraj or Lucas did not violate their *Faretta* rights. ........ 172

1. *Relevant background* ........ 172

2. *Siraj and Lucas acquiesced to standby counsel's participation in jury-note conferences on jury instructions.* ........ 175

3. *The jury-note conferences did not involve significant tactical decisions on matters of importance.* ........ 175

XI. The district court did not err in denying Hujrah's request to represent herself. ........ 179

A. Relevant background ........ 179

1. *Hujrah files a motion to represent herself* ........ 179

2. *The district court conducts a Faretta hearing.* ........ 181

B. Hujrah's request to represent herself was not clear and unequivocal. ........ 186

C. Hujrah's attempted waiver was not knowing and intelligent... 191

XII. The prosecutor's statements in rebuttal closing argument did not plainly misstate the reasonable-doubt standard. ........ 194

A. The government argues in closing that the evidence presented at trial proves Defendants' guilt beyond a reasonable doubt.... 195

B. The prosecutor's comments were not plainly improper. ........ 198

C. The error did not affect Defendants' substantial rights. ........... 206

*1. The jury was repeatedly instructed on the correct reasonable-doubt standard.* ............................................ 207

*2. The prejudicial circumstances present in Starks and Mahorney are not present here.* ....................................... 210

*3. Any misstatement would have made little difference in the face of the overwhelming evidence of Defendants' guilt.* ......................................................................... 213

XIII. Subhanah and Hujrah's life sentences do not violate the Eighth Amendment's prohibition on cruel and unusual punishment............ 214

CONCLUSION AND STATEMENT CONCERNING ORAL ARGUMENT. 217

TYPE-VOLUME CERTIFICATION ............................................................ 218

CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION..................... 219

## ATTACHMENTS

Attachment 1: Memorandum Opinion and Order Denying Defendant's Motion to Dismiss. Doc. 739

Attachment 2: Memorandum Opinion and Order Denying Defendant's Motion to Suppress Evidence for Lack of Standing. Doc. 778

# TABLE OF CASES AND OTHER AUTHORITIES

## TABLE OF CASES

**PAGE**

Cases

*Adams v. State*,
126 S.E.2d 624 (Ga. 1962) ........ 110

*Amezquita v. Hernandez-Colon*,
518 F.2d 8 (1st Cir. 1975) ........ 51

*Arnold v. State*,
628 S.E.2d 605 (Ga. Ct. App. 2006) ........ 110

*Bell v. Wolfish*,
441 U.S. 520 (1979) ........ 201

*Bland v. Sirmons*,
459 F.3d 999 (10th Cir. 2006) ........ 210

*Brassel v. State*,
385 S.E.2d 665 (Ga. 1989) ........ 111-112

*Brewer v. Williams*,
430 U.S. 387 (1997) ........ 179, 188

*Bryan v. United States*,
524 U.S. 184 (1998) ........ 95

*Carpenter v. United States*,
264 F.2d 565 (4th Cir. 1959) ........ 119

*Chatwin v. United States*,
326 U.S. 455 (1946) ........ 21, 77, 90, 98, 100, 106-107, 112

*Chaves v. Torlina*,
99 P. 690 (N.M. 1909) ........ 45

*Cheek v. United States*,
498 U.S. 192 (1991) ........ 95

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ........................................................................... 49

*Cutter Flying Serv., Inc. v. Prop. Tax Dep't*,
572 P.2d 943 (N.M. Ct. App. 1977) .............................................. 39-40, 42-43

*Dixon v. United States*,
548 U.S. 1 (2006) ............................................................................... 83

*Faretta v. California*,
422 U.S. 806 (1975) ........................26-28, 149-155 160-161, 163-164, 167, 169, 171-172, 174, 178-179, 190-193

*Florida v. Jardines*,
569 U.S. 1 (2013) ............................................................................ 36-37

*Frantz v. Hazey*,
533 F.3d 724 (9th Cir. 2008) ............................................................ 176-178

*Gooch v. United States*,
297 U.S. 124 (1936) ........................................................................... 85

*Harmelin v. Michigan*,
501 U.S. 957 ....................................................................................... 214-216

*Hicks v. Duncan*,
173 F.3d 860 (9th Cir. 1999) (unpublished) ............................................ 167

*Lefevre v. Cain*,
586 F.3d 349 (5th Cir. 2009) .................................................................. 163

*Lockyer v. Andrade*,
538 U.S. 63 (2003) ......................................................................... 215-216

*Mahorney v. Wallman*,
917 F.2d 469 (10th Cir. 1990) ................199-202, 205-206, 208, 210-211, 213

*McKaskle v. Wiggins*,
465 U.S. 168 (1984) ...........................................150-153, 161, 163-164, 175-176

*Miller v. United States*,
123 F.2d 715 (8th Cir. 1941) ................................................................. 84

*Miller v. United States*,
317 U.S. 192 (1942) .................................................................... 79

*Moore v. Western Meat Co.*,
113 P. 827 (N.M. 1911)............................................................ 42, 44-46

*Nixon v. City & Cnty. of Denver*,
784 F.3d 1364 (10th Cir. 2015) ................................................... 77

*Old Chief v. United States*,
519 U.S. 172 (1997) .................................................................. 143

*Patton v. Mullin*,
425 F.3d 788 (10th Cir. 2005) ................................................... 209

*Rakas v. Illinois*,
439 U.S. 128 (1978) ................................................................ 49-50

*Richardson v. Marsh*,
481 U.S. 200 (1987) .................................................................. 146

*Rios v. Riedel*,
456 F. App'x 720 (10th Cir. 2012).............................................. 110

*Rummel v. Estelle,*
445 U.S. 263 (1980).................................................................... 216

*Scarlett v. Air Methods Corp.*,
922 F.3d 1053 (10th Cir. 2019) ................................................... 42

*Smith v. United States*,
568 U.S. 106 (2013) ............................................................ 85, 110

*Stallings v. Santistevan*,
No. 21-2115, 2022 WL 2824261 (10th Cir. July 20, 2022)
(unpublished)............................................................................ 188

*State v. Evans*,
442 S.E.2d 287 (Ga. Ct. App. 1994) .......................................... 110

*State v. Marquez*,
No. 30,565, 2012 WL 1252956 (N.M. Ct. App. Mar. 7, 2012)
(unpublished)............................................................................ 110

*State v. Munoz*,
129 P.3d 142 (N.M. 2006) ........ 110

*State v. Smith*,
702 S.E.2d 663 (Ga. Ct. App. 2010) ........ 110

*Taylor v. Kentucky*,
436 U.S. 478 (1978) ........ 201

*Terrence Byrd v. United States*,
584 U.S. 395 (2018) ........ 50

*Transamerica Leasing Corp. v. Bureau of Revenue*,
450 P.2d 934 (N.M. Ct. App. 1969) ........ 39

*Triple R Dev. LLC v. Stinebaugh*,
570 P.3d 230 (N.M. Ct. App. 2025) ........ 48

*United States v. Adams*,
No. 23-6121, 2025 WL 1501045 (10th Cir. May 27, 2025) ........ 204

*United States v. Alvarez*,
358 F.3d 1194 (9th Cir. 2004) ........ 137

*United States v. Angelos*,
433 F.3d 738 (10th Cir. 2006) ........ 216

*United States v. Baker*,
98 F.3d 330 (8th Cir. 1996) ........ 148

*United States v. Bennett*,
539 F.2d 45 (10th Cir. 1976) ........ 189

*United States v. Bernard*,
299 F.3d 467 (5th Cir. 2002) ........ 137

*United States v. Blair*,
54 F.3d 639 (10th Cir. 1995) ........ 104

*United States v. Blunt*,
930 F.3d 119 (3d Cir. 2019) ........ 148

*United States v. Boettcher*,
780 F.2d 435 (4th Cir. 1985) ........ 79, 84

*United States v. Bordeaux*,
84 F.3d 1544 (8th Cir. 1996) .................... 119

*United States v. Burkholder*,
816 F.3d 607 (10th Cir. 2016) .................... 127, 130

*United States v. Burtrum*,
21 F.4th 680 (10th Cir. 2021) .................... 214

*United States v. Butler*,
141 F.4th 1136 (10th Cir. 2025) .................... 213

*United States v. Caldwell*,
589 F.3d 1323 (10th Cir. 2009) .................... 134

*United States v. Cardena*,
842 F.3d 959 (7th Cir. 2016) .................... 137

*United States v. Carr*,
939 F.2d 1442 (10th Cir. 1991) .................... 51

*United States v. Carr*,
No. 23-3127, 2024 WL 1133549 (10th Cir. Mar. 15, 2024) .................... 96

*United States v. Christy*,
916 F.3d 814 (10th Cir. 2019) .................... 194-195, 203-204, 207

*United States v. Clark*,
717 F.3d 790 (10th Cir. 2013) .................... 138-140

*United States v. Cook*,
84 U.S. 168 (1872) .................... 84

*United States v. Corbett*,
750 F.3d 245 (2d Cir. 2014) .................... 216

*United States v. Corrigan*,
548 F.2d 879 (10th Cir. 1977) .................... 85

*United States v. Denny-Shaffer*,
2 F.3d 999 (10th Cir. 1993) .................... 126

*United States v. DeShazer*,
554 F.3d 1281 (10th Cir. 2009) .................... 161

*United States v. Eddings*,
158 F.4th 1133 (10th Cir. 2025) .................................................................. 43

*United States v. Egli*,
13 F.4th 1139 (10th Cir. 2021) .................................................................... 71

*United States v. Feola*,
420 U.S. 671 (1975) ....................................................58, 60, 66-69, 71-72, 104

*United States v. Flechs*,
98 F.4th 1235 (10th Cir. 2024) .................................................................... 64

*United States v. Frazier*,
129 F.4th 392 (7th Cir. 2025) ..................................................................... 142

*United States v. Freeman*,
70 F.4th 1265 (10th Cir. 2023) ........................................................ 64, 86, 89

*United States v. Gabaldon*,
389 F.3d 1090 (10th Cir. 2004) ............................................................ 92, 124

*United States v. Gartmon*,
146 F.3d 1015 (D.C. Cir. 1998) ................................................................. 142

*United States v. Gomez-Rosario*,
418 F.3d 90 (1st Cir. 2005) ........................................................................ 169

*United States v. Goodhouse*,
81 F.4th 786 (8th Cir. 2023) .............................................................. 137, 141

*United States v. Guzman*,
149 F.4th 1132 (10th Cir. 2025) ........................................... 30, 36, 50-51, 54

*United States v. Ham*,
998 F.2d 1247 (4th Cir. 1993) ..................................................... 145, 148-149

*United States v. Hamilton*,
587 F.3d 1199 (10th Cir. 2009) .................................................................. 133

*United States v. Hansen*,
929 F.3d 1238 (10th Cir. 2019) .......................................................... 191-192

*United States v. Hassan*,
742 F.3d 104 (4th Cir. 2014) ................................................................ 57, 66

*United States v. Hazelwood*,
979 F.3d 398 (6th Cir. 2020) .......... 144

*United States v. Herrera*,
51 F.4th 1226 (10th Cir. 2022) .......... 139, 145-147

*United States v. Hilliard*,
31 F.3d 1509 (10th Cir. 1994) .......... 95

*United States v. Hollis*,
971 F.2d 1441 (10th Cir. 1992) .......... 95

*United States v. Hopper*,
663 F. App'x 665 (10th Cir. 2016) .......... 119, 121, 124

*United States v. Hopson*,
150 F.4th 1290 (10th Cir. 2025) .......... 80

*United States v. Hunyady*,
409 F.3d 297 (6th Cir. 2005) .......... 54

*United States v. Isaac*,
655 F.3d 148 (3d Cir. 2011) .......... 163

*United States v. Jackson,*
248 F.3d 1028 (10th Cir. 2001) .......... 20, 89-91, 93, 95-97

*United States v. Jannotti*,
673 F.2d 578 (3d Cir. 1982) .......... 60, 69

*United States v. Jones*,
213 F.3d 1253 (10th Cir. 2000) .......... 51

*United States v. Jones*,
530 F.3d 1292 (10th Cir. 2008) .......... 137

*United States v. Kepler*,
74 F.4th 1292 (10th Cir. 2023) .......... 213

*United States v. Lanese*,
890 F.2d 1284 (2d Cir. 1989) .......... 137

*United States v. Lewis*,
787 F.2d 1318 (9th Cir.) .......... 148

*United States v. Little*,
119 F.4th 750 (10th Cir. 2024) .................................................... 144

*United States v. Lopez*,
131 F.4th 1114 (10th Cir. 2025) .................................................. 205

*United States v. Lowe*,
117 F.4th 1253 (10th Cir. 2024) ........................................ 36, 49, 51

*United States v. Lowell*,
2 F.4th 1291 (10th Cir. 2021) ...................................................... 127

*United States v. Loya-Rodriguez*,
672 F.3d 849 (10th Cir. 2012) ...................................................... 186

*United States v. Matousek*,
131 F. App'x 641 (10th Cir. 2005) ................................................ 135

*United States v. McBride*,
94 F.4th 1036 (10th Cir. 2024) ................................................ 64, 98

*United States v. McDermott*,
64 F.3d 1448 (10th Cir. 1995) .......................... 153-154, 167, 169, 171-172, 179

*United States v. McRae*,
702 F.3d 806 (5th Cir. 2012) ........................................................ 148

*United States v. Mehanna*,
735 F.3d 32 (1st Cir. 2013) .......................................................... 143

*United States v. Mills*,
895 F.2d 897 (2d Cir. 1990) ............................ 154-155, 164, 166, 179

*United States v. Morgan*,
748 F.3d 1024 (10th Cir. 2014) ........................................................ 93

*United States v. Nall*,
949 F.2d 301 (10th Cir. 1992) ...................................................... 104

*United States v. Naranjo*,
710 F.2d 1465 (10th Cir. 1983) .................................................... 143

*United States v. Olsen*,
519 F.3d 1096 (10th Cir. 2008) .................................................... 143

*United States v. Otuonye*,
995 F.3d 1191 (10th Cir. 2021) .......... 140

*United States v. Padilla*,
819 F.2d 952 (10th Cir. 1987) .......... 191, 193

*United States v. Pauler*,
857 F.3d 1073 (10th Cir. 2017) .......... 74

*United States v. Pedroza*,
750 F.2d 187 (2d Cir. 1984) .......... 120

*United States v. Pepe*,
501 F.2d 1142 (10th Cir. 1974) .......... 201

*United States v. Pickel*,
863 F.3d 1240 (10th Cir. 2017) .......... 103

*United States v. Pope*,
613 F.3d 1255 (10th Cir. 2010) .......... 76

*United States v. Pulido-Jacobo*,
377 F.3d 1124 (10th Cir. 2004) .......... 133

*United States v. Pursley*,
577 F.3d 1204 (10th Cir. 2009) .......... 138-139

*United States v. Repak*,
852 F.3d 230 (3d Cir. 2017) .......... 202

*United States v. Rodriguez*,
739 F.3d 481 (10th Cir. 2013) .......... 84

*United States v. Rosa*,
17 F.3d 1531 (2d Cir. 1994) .......... 66-69, 72

*United States v. Ruckman*,
806 F.2d 1471 (10th Cir. 1986) .......... 51

*United States v. Samora*,
954 F.3d 1286 (10th Cir. 2020) .......... 57

*United States v. Sarracino*,
131 F.3d 943 (10th Cir. 1997) .......... 124

*United States v. Sheek*,
40 F.3d 1245 & n.1 (4th Cir. 1994) (unpublished) ........................................ 79

*United States v. Sheek*,
990 F.2d 150 (4th Cir. 1993) ........................................................................ 79

*United States v. Sherrill*,
972 F.3d 752 (6th Cir. 2020) ........................................................................ 137

*United States v. Sierra-Ledesma*,
645 F.3d 1213 (10th Cir. 2011) ........................................................... 208, 210

*United States v. Simpson*,
845 F.3d 1039 (10th Cir. 2017) ........................................... 179, 185, 186, 189

*United States v. Sneezer*,
983 F.2d 920 (9th Cir. 1992) ........................................................................ 91

*United States v. Starks*,
34 F.4th 1142 (10th Cir. 2022) ......194-195, 198-200, 202, 205-206, 210-213

*United States v. Stepp*,
89 F.4th 826 (10th Cir. 2023) ...................................................................... 57

*United States v. Teerlink*,
141 F.4th 1126 (10th Cir. 2025) ................................................................... 63

*United States v. Tobin*,
676 F.3d 1264 (11th Cir. 2012) .................................................................. 148

*United States v. Toledo*,
985 F.2d 1462 (10th Cir. 1993) .................................................................... 94

*United States v. Tolliver*,
730 F.3d 1216 (10th Cir. 2013) .................................................................. 214

*United States v. Tony*,
121 F.4th 56 (10th Cir. 2024) ...................................................................... 82

*United States v. Tucker*,
451 F.3d 1176 (10th Cir. 2006) ........................................................... 152, 185

*United States v. Vann*,
776 F.3d 746 (10th Cir. 2015) ............................................................ 191-192

*United States v. Walker*,
137 F.3d 1217 (10th Cir. 1998) .......... 91-92, 108

*United States v. Wardell*,
591 F.3d 1279 (10th Cir. 2009) .......... 103, 135

*United States v. Weeks*,
653 F.3d 1188 (10th Cir. 2011) .......... 104

*United States v. Weidner*,
437 F.3d 1023 (10th Cir. 2006) .......... 134

*United States v. Williamson*,
859 F.3d 843 (10th Cir. 2017) .......... 191

*United States v. Woodmore*,
127 F.4th 193 (10th Cir. 2025) .......... 64, 70, 86

*United States v. Young*,
470 U.S. 1 (1985) .......... 195

*United States v. Youts*,
229 F.3d 1312 (10th Cir. 2000) .......... 95

*United v. Thomas*,
65 F.4th 922 (7th Cir. 2023) .......... 53

*Vistein v. Henson*,
746 F. App'x 937 (11th Cir. 2018) .......... 110

*Von Moltke v. Gillies*,
332 U.S. 708 (1948) .......... 191

*Watson v. Boone*,
131 F.3d 153 (10th Cir. 1997) (unpublished) .......... 208

*White v. Farris*,
485 P.3d 791 (N.M. Ct. App. 2021) .......... 47

*Zafiro v. United States*,
506 U.S. 534 (1993) .......... 138-140, 146, 149

*Zimmerman v. Bishop Estate*,
25 F.3d 784 (9th Cir. 1994) .......... 54

# TABLE OF AUTHORITIES

**PAGE**

Statutes

1 U.S.C. § 204(a) .......... 80

8 U.S.C. § 1101(a)(43)(N) .......... 80

8 U.S.C. § 1101(a)(43)(P) .......... 80

18 U.S.C. § 2 .......... 15, 86

18 U.S.C. § 111 .......... 66

18 U.S.C. § 371 .......... 66, 104

18 U.S.C. § 408a (1934) .......... 80

18 U.S.C. § 1114 .......... 15, 57, 62

18 U.S.C. § 1117 .......... 15, 26, 57, 62, 64, 66, 135, 140-142, 149

18 U.S.C. § 1201 .......... 19, 22, 78, 82, 94, 106, 112

18 U.S.C. § 1201(a) .......... 19, 20, 22, 76, 78, 81-83, 86, 89, 91, 96, 106, 107, 124, 126, 216

18 U.S.C. § 1201(a)(1) .......... 15, 18, 19-21,78, 88, 89, 90-94, 110, 113, 216

18 U.S.C. § 1201(a)(5) .......... 90, 96

18 U.S.C. § 1201(c) .......... 15, 82, 103, 104

18 U.S.C. § 1201(g)(1)(B)(ii) .......... 79

18 U.S.C. § 1201(h) .......... 78

18 U.S.C. § 2119(3) .......... 126

18 U.S.C. § 2315 .......... 67

18 U.S.C. § 2339A ........ 15, 62

21 U.S.C. § 841(b)(1)(E)(i) ........ 126

NMSA § 30-4-1(A) ........ 109

NMSA § 30-4-4(A)(5) ........ 109

NMSA § 30-4-4(B) ........ 109

NMSA § 30-14-1(B) ........ 53

NMSA § 35-10-1(A)(1) ........ 48

NMSA § 35-10-1(A)(2) ........ 48

NMSA § 35-10-1(A)(3) ........ 48

NMSA § 35-10-1(A)(5) ........ 48

NMSA § 35-10-2 ........ 48

NMSA § 35-10-4 ........ 49

NMSA § 47-8-8 ........ 47-48

NMSA § 47-8-9(B) ........ 47

NMSA § 47-8-36 ........ 47

NMSA § 47-8-49 ........ 48

OCGA § 16-5-40(a) ........ 109

OCGA § 16-5-45(c) ........ 111

OCGA § 16-5-45(a)(3) ........ 109, 111

OCGA § 16-5-45(c)(1) ........ 109, 110

OCGA § 16-5-45(c)(2) ........ 110

Rules

Federal Rule of Civil Procedure 12(c)(3) ........ 43

Federal Rule of Criminal Procedure 8(a) ..................................................... 136

Federal Rule of Criminal Procedure 8(b) ..................................................... 138

Federal Rule of Criminal Procedure 12(b)(1) ................................................. 76

Federal Rule of Criminal Procedure 14 ........................................................ 135

Federal Rule of Criminal Procedure 14(a) ................................................... 136

Federal Rule of Evidence 403 ................................................ 137, 140-144, 148

Federal Rule of Evidence 404(b) ........................................................ 144, 148

Other Authorities

Fifth Circuit Pattern Jury Instruction 2.54 ............................................... 85, 91

Eighth Circuit Model Jury Instruction 6.18.1201 ............................................ 85

Ninth Circuit Model Jury Instruction 17.1 ..................................................... 85

Tenth Circuit Pattern Jury Instruction 2.55 .......................... 88-89, 91, 95, 108

Eleventh Circuit Pattern Jury Instruction O49 .............................................. 88

Blacks Law Dictionary (12th ed. 2024) ..................................................... 38, 80

1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence
(10th ed. 2023) ........................................................................................ 143

Notice to Members of the Bar on Amendment to Realtime Services Policy,
U.S. District Court, District of New Mexico (Jan. 13, 2014) ...................... 156

Courtroom Technology, U.S. District Court, District of New Mexico, ............ 81

U.S. Dep't of Justice Criminal Resource Manual ........................................... 81

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## ISSUES PRESENTED

1) Did the district court properly deny the motion to suppress evidence obtained in the search of the compound for lack of standing where Defendants were wrongfully occupying another's property?

2) Was the trial evidence sufficient to prove the federal identity of the intended victims as required to sustain Siraj Wahhaj's[1] and Lucas Morton's convictions for conspiracy to kill federal officers?

3) Did the district court plainly err in instructing the jury on the federal-victim element of conspiracy to kill federal officers, and did Lucas invite any error by proposing the instruction he now challenges?

4) Did Hujrah Wahhaj, Subhanah Wahhaj, and Lucas waive their challenge to the denial of their motion to dismiss the indictment by failing to challenge its basis, and alternatively, did the superseding indictment allege a violation of the federal kidnapping statute where Defendants participated with and conspired in the kidnapping with the father of the child who was kidnapped?

5) Did the jury instruction on the kidnapping count mislead the jury on the required mens rea or any other element of the offense?

6) Did the jury instruction on kidnapping conspiracy mislead the jury on the offense's elements?

7) Was the trial evidence sufficient to support the convictions of Hujrah, Subhanah, and Lucas for kidnapping resulting in death?

8) Was the trial evidence sufficient to support the convictions of Hujrah, Subhanah, and Lucas for conspiracy to kidnap?

9) Did the district court abuse its discretion in denying Siraj's motions to sever where the kidnapping evidence was integral to his charged offenses and would have been admissible even in a separate trial?

---

[1] The United States will refer to the Defendants and many witnesses by their first names because many of them share the last name Wahhaj.

10) Were Siraj and Lucas denied their right of self-representation where they were precluded from approaching the bench and were excluded from a jury-note conference?

11) Did the district court err in denying Hujrah's motion to represent herself where her waiver of her right to counsel was not clear and unequivocal or knowing and intelligent?

12) Were the prosecutor's comments on reasonable doubt during rebuttal closing argument plainly improper, and did they affect Defendants' substantial rights?

13) Are Subhanah's and Hujrah's life sentences grossly disproportionate to their convictions for kidnapping and conspiracy to kidnap resulting in death in violation of the Eighth Amendment?

## STATEMENT OF THE CASE AND THE FACTS

### I. Defendants kidnap Abdul Ghani and conceal him in a compound in New Mexico, and Siraj and Lucas prepare for an FBI raid and the war that they believe will follow Abdul Ghani's resurrection.

#### A. Abdul Ghani lives with Hakima, who ensures that he receives appropriate medical treatment.

Abdul Ghani[2] was the only child of Siraj Ibn Wahhaj and Hakima Ramzi, who were married. 6JR.1039, 1055.[3] Due to a birth injury, Abdul Ghani developed hypoxic ischemic encephalopathy. 6JR.1056–57. This caused him to suffer serious seizures. 6JR.1061. It also delayed his development.

[2] The United States uses Abdul Ghani's name as he is deceased. Initials are used for the other children.

[3] Citations to the record take the form [vol.]JR.[page]. "JR" refers to the joint record, "SJR" refers to the supplemental joint record, and "HIR" and "SIR" refers to Hujrah's and Siraj's individual records. Videos are cited by exhibit number.

6JR.1057. But Hakima gave Abdul Ghani his seizure medication as prescribed and ensured he received regular therapy. 6JR.1061–62. With Hakima's support, Abdul Ghani was thriving. By age three, he was beginning to speak and sit and eat independently. 6JR.1064–1065; *see* Ex. 1, 2; 7SJR.1.

Before Abdul Ghani was born, Siraj entered a second, religious marriage with Jany Leveille. 6JR.1045–46. Jany already had two older sons from a prior relationship, F.L.J. and J.L.J., 6JR.1267–68, 1540–41; she and Siraj had four more children together, 6JR.1046. Hakima lived with Jany and Siraj for a time, but then Hakima and Abdul Ghani moved in with Siraj's sisters, Hujrah and Subhanah. 6JR.1053, 1058. Hujrah had one daughter. 6JR.1193. Subhanah was married to Lucas, 6JR.1053, and they had four children at the time. 6JR.2042.

Hakima was a Moroccan national with little proficiency in English. 6JR.1034, 1060. Siraj controlled every aspect of Hakima's life, from what little money she had, to where she could go, and to even where she could live. 6JR.1060. Eventually, Siraj moved Hakima and Abdul Ghani into a motel room, where they were living when the events in this case began. 6JR.1058–59. Siraj alternated his time between Hakima and Jany, visiting Hakima and Abdul Ghani in their hotel room on scheduled days. 6JR.1059. Hakima, however, lived with Abdul Ghani full-time, was his primary caretaker, and saw to his medical needs. 6JR.1059, 1061–62, 1978–79.

**B. Defendants abduct Abdul Ghani from Hakima.**

In October 2017, Siraj and Hujrah traveled to the United Kingdom to learn how to perform ruqyah. 6JR.1069. One view of ruqyah is that it serves as a protection or blessing and that it may be performed by reciting verses from the Qur'an with hands extended or rocking the body briefly. 6JR.1072–73, 1077. But another more physically intrusive, "professional" form of ruqyah is conducted to remove evil spirits (known as jinns) from the body and involves prolonged recitation and pressing the recipient's body and head. 6JR.1074, 2073. It was this form that Siraj and Hujrah traveled to the United Kingdom to study. 6JR.1074; *see* Ex. 11a–11c (videos of ruqyah).

Around this time, Jany also began receiving what she believed to be messages from God. 6JR.1546–47. Jany wrote a testament book that recorded these messages and the group's activities. 6JR.1555–57; *see* 7SJR.2–35. Defendants were all aware of this book, and Subhanah and Hujrah (both published authors) helped Jany edit it. 6JR.1155–57, 1809–10. Jany came to believe that Abdul Ghani was in fact her child, and that Hakima used black magic to take him from Jany's womb and put him in her own. 6JR.1553–54. Siraj, Hujrah, Subhanah, and Lucas shared this belief. 6JR.1553–54.

After their trip to the UK, on November 27, 2017, Siraj and Hujrah went to Hakima's motel room and accused Hakima of causing Abdul Ghani's medical conditions through black magic. 6JR.1078–79. Hakima denied doing

any such thing, but Siraj and Hujrah refused to listen. 6JR.1079. In the end, Hakima asked Siraj for a divorce, and Siraj left with Hujrah. 6JR.1079–80.

With urging from Jany, Siraj resolved to take Abdul Ghani from Hakima so they could perform ruqyah on him. 7SJR.16; *see* 6JR.1562. During Siraj's next visit to Hakima's motel room, Hakima left three-year-old Abdul Ghani sleeping on the bed in Siraj's care while she took a shower. 6JR.1083–87. As soon as she was in the shower, Siraj called out to Hakima that he was taking Abdul Ghani to the park. 6JR.1085. Siraj had never taken Abdul Ghani outside, so Hakima was shocked. 6JR.1085. She quickly dressed and came out to see what was going on. 6JR.1085. But by the time she exited the bathroom, Siraj and Abdul Ghani were gone. 6JR.1086. Siraj did not take any of Abdul Ghani's seizure medication with them. 6JR.1087.

Not knowing what to do. Hakima called Siraj. 6JR.1086. Siraj told her he would return Abdul Ghani. 6JR.1086. But he didn't. 6JR.1086. As hours and days passed, Hakima continued to try to call Siraj and Jany with increasing panic, but they blocked her calls. 6JR.1087.

Hakima turned to Siraj's brother, Muhammad Wahhaj, for help. 6JR.1090. Muhammad met with Siraj, Jany, and Hujrah in his Atlanta home. 6JR.1984. They repeated their claim that Hakima was causing Abdul Ghani to be possessed by evil spirits through black magic. 6JR.1984–85. Muhammad did not believe this and urged Siraj to return Abdul Ghani,

telling him that Hakima was best equipped to care for him. 6JR.1988–89. Siraj responded that they would have to resolve it in court. 6JR.1989.

The next morning, Muhammad took Hakima to Siraj's and Jany's house hoping to find Abdul Ghani. 6JR.1098, 1991–92. No one was home, which was unusual. 6JR.1098, 1991–92. Muhammad and Hakima next checked at Hujrah's apartment and found them there. 6JR.1099, 1991. Hakima called the police, and an officer responded. 6JR.1099, 1991. At the officer's request, Siraj brought Abdul Ghani outside. 6JR.1099–1100. Abdul Ghani cried and reached for Hakima, but Siraj refused to let her touch him. 6JR.1101. Instead, he threatened Hakima, telling her that she was "going to see what's going to happen" because she involved the police. 6JR.1101–02. The officer did not intervene, explaining to Hakima that it was a matter for the court. 6JR.1992–93. Hakima never saw her son alive again.

When Hakima later returned to Hujrah's apartment with a local police detective, they discovered that everyone had left, abandoning their belongings. 6JR.1198. Hakima called child protective services and recruited the help of Siraj's extended family to try to find Abdul Ghani and secure his safe return. 6JR.1102, 1107. The family posted on social media and made fliers. 6JR.1105–06. Family members called, emailed, and messaged Siraj, Hujrah, and Subhanah directly, desperately begging them to return Abdul Ghani and warning them of the life-threatening risks of depriving him of his

medication. 6JR.1102; 6SJR.33–39, 122–35, 466–76. Many messages went unanswered, but Subhanah responded to some, denying that there was a kidnapping and claiming that everyone was safe, even after Abdul Ghani's death. 6SJR.132–46. Eventually, on December 18, 2017, Hakima obtained a court order requiring Abdul Ghani's return. 6SJR.19.

### C. Defendants flee Georgia with Abdul Ghani and settle on remote land in New Mexico.

The family's efforts were fruitless because Siraj, Jany, Hujrah, Subhanah, and Lucas fled Georgia with Abdul Ghani and their children. After the police officer and Hakima left Hujrah's apartment, Siraj, Jany, Hujrah, Subhanah, and Lucas had a meeting. 6JR.1316–17, 1681. They then left in a rush for Alabama, where Lucas owned property. 6JR.1317–21, 1564–66. Most of the families' belongings were abandoned, although Siraj packed six or seven firearms for their journey, including a sniper rifle, a shotgun, and four pistols. 6JR.1564–66. Shortly after arriving in Alabama, Jany received a message from God directing them to travel to New Mexico, where Lucas also owned property. 6JR.1323–24, 1568–69. They left in the middle of the night with Hujrah driving her vehicle, Siraj driving his, and Lucas driving a box truck towing a camper trailer. 6JR.1325–28. Not long after they left, Siraj crashed his vehicle, resulting in minimal injuries but totaling the vehicle. 6JR.1326–27, 1570. An officer investigating the crash found the

group's circumstances suspicious, including the number of firearms in the vehicle and Siraj's attempts to isolate Abdul Ghani and the oldest child from the police, but the officer felt he had no grounds to intervene in that moment. 6JR.1859–62. They all continued to New Mexico in Lucas's box truck and trailer after Hujrah also abandoned her vehicle. 6JR.1328, 1573, 1687.

The group settled in Amalia, New Mexico, on what they mistakenly believed to be Lucas's property. (They quickly learned that it in fact belonged to Jason and Tanya Badger, *see* Argument, section I). The area was remote, and there was no electricity, water, sewer, or even structures on the property. 6JR.1575–76; 6SJR.75–77. They dug a large hole and toppled the trailer inside. 6JR.1578, 1594.




6SJR.88. Everyone lived in the trailer except for Subhanah, Lucas, and their children, who slept in the box truck nearby. 6JR.1748, 1576. At no point did the group obtain or make any effort to obtain Abdul Ghani's seizure medication from a pharmacy in New Mexico. 6SJR.510–13.

### D. Abdul Ghani dies during a ruqyah session.

After Siraj took Abdul Ghani from Hakima, he began performing intensive, physically restraining and intrusive ruqyah to rid Abdul Ghani of the evil spirits he believed possessed him. 6JR.1558–64. The daily ruqyah sessions lasted for hours, during which Abdul Ghani would scream, cry, and kick the air. 6JR.1331, 1560–62, 1578. At some point, Jany pronounced that

Abdul Ghani was in fact Isa (the Islamic name for Jesus). 6JR.1336. She believed that Abdul Ghani would walk and talk when the ruqyah sessions were completed. 6JR.1337. The outcome, however, was far more tragic.

During Abdul Ghani's last session, Siraj was performing ruqyah, holding Abdul Ghani down partly by pushing his hand on Abdul Ghani's jugular vein (the most effective technique according to Siraj). 6JR.1340, 1351, 1353. After his familiar kicking and screaming to try to make it stop, Abdul Ghani began foaming at the mouth and choking and then went silent as he stopped breathing. 6JR.1339–41, 1579–80. Abdul Ghani died December 24, 2017. 7SJR.29.

None of the adults seemed alarmed or surprised at Abdul Ghani's death besides Jany. 6JR.1345–46, 1582. No one called 911 or tried to get medical assistance. 6JR.1346. Instead, they wrapped his small body in plastic and stored it under Hujrah's bed. 6JR.1355, 1584–85. Siraj took Abdul Ghani's body out and washed it regularly, and Jany's oldest sons (who were 13 and 15) were forced to do the same. 6JR.1266, 1356, 1539, 1587. Eventually, after the body began to smell, the adults moved it to the tunnel they built on the compound. 6JR.1357–58, 1585–86.

### E. Jany prophesies Abdul Ghani's resurrection.

Jany explained to everyone that Abdul Ghani had been animated by evil spirits holding his body captive. 6JR.1351. When those spirits left, his

body became an "empty shell." 6JR.1351. But Jany prophesied that hope was not lost—Abdul Ghani would resurrect as Isa on Easter. 6JR.1352, 1588. Jany taught that when Abdul Ghani resurrected, he and the group would travel the world doing miracles and gather his believers and direct them. 6JR.1359, 1588. Abdul Ghani would go to corrupt government institutions, such as the "FBI, CIA, anything government related" and hospitals. 6JR.1360–61, 1589. The men of the group (including Jany's teen sons) would go with Abdul Ghani as an army and kill anyone who rejected his miracles or Jany's message. 6JR.1266, 1361–62, 1589–90.

Jany wrote a letter attempting to recruit Muhammad and told him to bring his money and guns so he could join the group and die as a martyr. 6SJR.148–51. Lucas returned to Georgia to deliver the letter around New Year's 2018 and told Muhammad if he didn't come with Lucas he would die the next day. 6JR.2033–37. The police responded to a call from Muhammad's wife, but Lucas refused to answer their questions about Abdul Ghani's whereabouts. 6JR.2033, 2038.

### F. Siraj and Lucas prepare for a potential FBI raid and the war to follow Abdul Ghani's resurrection.

To prepare the army and to protect the compound, Siraj led firearms and combat training, which included himself, Lucas, and Jany's teen sons. 6JR.1373, 1605–06; 7SJR.36; Ex.16a–16h; Ex. 19a–19g. They practiced

tactical assaults, offensive drills, and even firing from a motorcycle. 6JR.2511; 6SJR.325–37. They dug tunnels to serve as means of escape. 6JR.1377; 6SJR.95–100; 7SJR.41. This is also where they stored weapons and hid Abdul Ghani's body. 6JR.1613. One of the tunnels was equipped with a ladder, which led to a spider hole that would allow someone to exit surreptitiously behind the flanks of any attackers. 6JR.2494, 2648–49, 2684; 6SJR.100–06.




The compound was constructed with narrow entryways with controlled entry points that appeared designed for tactical advantages, including one false corner that ended in a "kill box," providing a defender with a firing advantage

against anyone infiltrating the compound. 6JR.2640–45; 6SJR.78–94. Jany's sons believed there would be a firefight if someone came to the compound, 6JR.1375, 1768, and heard Lucas and Siraj talk about wanting to die as martyrs. 6JR.1393.

At some point, the group began to believe the FBI was surveilling them. 6JR.1374, 1596–97. The group kept watch for anyone approaching. 6JR.1381, 1374–75. To avoid surveillance, for approximately three months before their arrest, everyone was required to stay in "the hole," meaning in the dugout area under the tarp covering the trailer. 6JR.1378–79, 1609. Lucas, Subhanah, and their children were exempt from this rule because they were not presumed to have Abdul Ghani's body or to be missing from Georgia. 6JR.1379–80. Conditions in the hole were terrible with limited sanitation. 6JR.1394. The group ran out of money and ran low on food. 6JR.1395.

### G. Law enforcement enters the compound and arrests Defendants.

On August 3, 2018, law enforcement entered the compound with a search warrant. 6JR.2127. Lucas saw them coming and warned Jany. 6JR.1396, 1620. Wearing a tactical vest, Siraj grabbed a weapon and told Jany's oldest son to grab one, too. 6JR.1397, 1620, 2195. Jany, however, told them to stand down, and they obeyed. 6JR.1397–98, 1620–21. Siraj refused to comply with the officers' order to come outside with his hands up and

maintained possession of his firearm, 6JR.2140, so Jany's 15-year-old son went out first to protect his family. 6JR.1623–25; *see* Ex. 38 at 7:00–9:00.

After securing the compound, law enforcement conducted multiple searches, uncovering 11 firearms, ammunition, the tactical vest, and other evidence. 6JR.2185–2200, 2488; 6SJR.162–323; *see* Ex. 38–44. Defendants refused to tell officers where Abdul Ghani was, 6JR.2155–56, but a child revealed the whereabouts of his body. 6JR.1627; 7SJR.42–45; Ex. 79.

## II. District court proceedings

Following their arrest, Defendants were charged federally in a seven-count superseding indictment. 1JR.175–84.

Defendants filed numerous pretrial motions, including motions to suppress and to dismiss the indictment.[4] Siraj also filed a motion to sever his case from the other Defendants, and Hujrah filed a motion to represent herself. The district court denied each of these motions. The district court granted motions by Siraj and Lucas to represent themselves.

After the government dismissed two counts, Defendants proceeded to trial on the following charges:[5]

---

[4] These motions are discussed in the relevant argument sections.

[5] Prior to trial, Jany pleaded guilty to conspiracy to provide material support to terrorists and possession of a firearm while unlawfully in the United States. 3JR.1321–36.

> Count 1—conspiracy to provide material support to kill federal officers in violation of 18 U.S.C. §§ 1114 and 2339A (all Defendants),
>
> Count 2—providing material support to kill federal officers in violation of 18 U.S.C. §§ 2, 1114, and 2339A (all Defendants),
>
> Count 3—conspiracy to kill federal officers in violation of 18 U.S.C. §§ 1114 and 1117 (only Siraj and Lucas),
>
> Count 4—conspiracy to kidnap in violation of 18 U.S.C. § 1201(c) (all Defendants except Siraj),
>
> Count 5—kidnapping in violation of 18 U.S.C. §§ 2 and 1201(a)(1) (all Defendants except Siraj).

1JR.175–84; *see* 6JR.972–73.

At the close of the evidence, the jury found Siraj and Lucas guilty on Counts 1, 2, and 3. 3JR.1898–1900, 1905–07. It found Lucas, Hujrah, and Subhanah guilty on Counts 4 and 5. 3JR.1902, 1904, 1907–08. And it found Hujrah and Subhanah not guilty on Counts 1 and 2. 3JR.1901, 1903.

Defendants were all sentenced to life imprisonment. 3JR.2435, 2441, 2447, 2453. Judgments were entered on March 11 and 12, 2024, 3JR.2433, 2439, 2445, 2451, and Defendants timely appealed, 3JR.2457, 2459, 2461, 2463.

## **SUMMARY OF THE ARGUMENT**

1. The district court properly denied Defendants' motion to suppress evidence seized in the compound search because Defendants lacked Fourth Amendment standing. Defendants failed to demonstrate any lease agreement

(either express or implied) or other property interest that entitled them to remain on Lot 28 after the true property owners unequivocally told Defendants to vacate their land through text messages and service of civil-eviction suit. Despite the absence of a formal eviction order, any expectation of privacy the Defendants had was unreasonable where they knew they were wrongfully present on the property.

2. The trial evidence was not insufficient to prove the federal identity of the victims that Siraj and Lucas conspired to kill. The government presented testimony, text messages, and other writings showing that Defendants believed the FBI was surveilling them. It presented testimony and videos showing that Siraj, Lucas, and the teen boys conducted firearms training and planned to open fire if the FBI arrived at the compound. The government also presented testimony showing that Defendants believed that when Abdul Ghani resurrected, he would lead them in a war against corrupt institutions, including the federal government, FBI, and CIA, in which Defendants would kill any nonbelievers, and that the firearms training also served to prepare them to fight in this coming war. Considered in the light most favorable to the government, the evidence was not insufficient to prove that the intended victims of Siraj's and Lucas's conspiracy were federal officers. And for the same reasons, the evidence was not insufficient on the federal-victim element of Counts 1 and 2 to prove that Siraj and Lucas

provided material support and conspired to provide material support to kill federal officers.

3. Lucas waived his challenge to the district court's jury instruction on Count 3 charging Siraj and Lucas with conspiring to kill federal officers because Lucas proposed that very instruction, and thus any error was invited.

While Siraj did not join in the proposed instruction, he did not object and has not shown that it was plainly misleading. The district court's instruction adequately instructed the jury on the federal-victim element when it required the jury to find that the "object of the conspiracy was to kill or attempt to kill officers and employees of the United States government" specifically "Federal Bureau of Investigation employees, government officials, and military personnel—on account of, or while such officers and employees were engaged in the performance of their official duties." This instruction tracked the statutory elements, required the government to prove the federal identity of the intended victims, and was not misleading in any way.

Siraj contends that the jury should have been instructed that the government must prove the federal identity of the victim either by proving that (a) the intended victim was identified with sufficient specificity such that the jury could conclude that, if the attack had been carried out, the victim would have been a federal officer, or (b) that Lucas and Siraj knew or

believed the specifically identified victims would have been federal officers. But Siraj's proposed methods of proof are not mutually exclusive—a defendant can both specifically identify the intended victim and know or believe that the victim is a federal officer. And in any event, no court has held that these two methods of proof are the exclusive means by which the government can meet its burden or that a jury must be instructed on them. Siraj's proposed additions to the jury instruction would only serve to confuse the jury. Siraj has not shown that the district court erred, much less plainly.

Nor has Siraj demonstrated a reasonable probability of a different outcome because the trial evidence was sufficient to prove the federal identity of his intended victims using *both* of his proposed methods of proof. Had the jury been instructed as Siraj proposes, the verdict would have been the same.

4. Subhanah, Hujrah, and Lucas waived their challenge to the denial of their motion to dismiss the kidnapping counts for failure to allege a violation of the federal kidnapping statute. The district court denied the motion because trial was required on disputed facts material to their legal arguments, and Defendants have not meaningfully challenged this finding on appeal. Accordingly, the Court should not consider this claim.

Even if the Court were to reach the substance of their argument, it fails on its merits. The federal kidnapping statute, 18 U.S.C. § 1201(a)(1), punishes interstate kidnappings "except in the case of a minor by the parent

thereof." Defendants argued that the participation of Siraj (Abdul Ghani's father) meant that taking Abdul Ghani from his mother was not a violation of § 1201(a)(1), and thus the superseding indictment should be dismissed. But the parental exception in § 1201(a) exempts only the parent from prosecution and does not benefit nonparents who participate, conspire, or aid in the kidnapping. The plain language of the statute does not support Defendants' proposed expansion of the parental exception. And courts that have addressed the issue have declined to extend the parental exception to the parent's coconspirators. The rule of lenity has no application here.

Nor does Siraj's parental immunity preclude Defendants' prosecution. Defendants' criminal liability is not simply derivative; they were charged and convicted for their own actions in conspiring to kidnap and kidnapping Abdul Ghani. Moreover, the parental exception does not prevent them from being held accountable for aiding and abetting Siraj because the parental exception merely provides Siraj with an affirmative defense; it does not mean that he did not violate § 1201(a)(1) when he kidnapped Abdul Ghani. The superseding indictment properly charged Defendants with violating § 1201, and thus the district court's denial of the motion to dismiss should be affirmed.

5. The kidnapping jury instruction accurately instructed the jury on the mens rea element because kidnapping is not a specific-intent crime. In *United States v. Jackson*, this Court held that § 1201(a) does not require that defendants know that their actions violate the law. 248 F.3d 1028, 1031 (10th Cir. 2001). While § 1201(a)(1) requires that the defendant willfully transport the victim, the jury was instructed on this element. Subhanah identifies no case holding that § 1201(a)(1) requires knowledge of illegality, and the statutory language imposes no such requirement.

To the extent Subhanah argues that the instructions failed to adequately instruct on general intent, she has waived this argument by failing to object below or argue for plain-error review on appeal. In any event, the jury instruction necessarily required the jury to find that Defendants acted knowingly by requiring the jury to find that Defendants unlawfully kidnapped Abdul Ghani "for some purpose or benefit." Subhanah cannot demonstrate any error affecting her substantial rights when the trial evidence overwhelmingly established that Defendants knowingly kidnapped Abdul Ghani and that Defendants knew that Hakima did not consent.

Similarly, Hujrah identifies no element of the kidnapping offense that was not accurately reflected in the jury instructions. While she contends the kidnapping was not unlawful under Georgia law, she waived this argument with respect to the jury instructions when her counsel specifically opposed

providing the jury information on Georgia law. Even if this Court were to consider it, Hujrah does not explain how her position on this legal issue should have affected the instructions given to the jury. Indeed, as discussed below, the question of whether of kidnapping is "unlawful" under § 1201(a) is not determined by reference to state law. Likewise, the district court did not err by not including the Defendants' legally incorrect instruction on the parental exception.

6. The jury instructions on the kidnapping-conspiracy count did not mislead the jury. They accurately instructed that the Defendants must agree to violate the law because they required the jury to find that the Defendants entered an agreement "to accomplish an unlawful purpose." Contrary to Subhanah's argument, a defendant need not knowingly do something to assist in the kidnapping; it is enough that he or she entered a conspiratorial agreement and that one of the coconspirators committed an overt act. And because kidnapping is not a specific-intent offense, there is likewise no requirement that a defendant know his or her conspiratorial conduct violated the law.

7. Sufficient evidence supported each element of the kidnapping offense of which the jury convicted Hujrah, Subhanah, and Lucas.

Overwhelming evidence shows that Defendants' kidnapping of Abdul Ghani was unlawful because it was against Hakima's will. In *Chatwin v.*

*United States*, 326 U.S. 455, 460 (1946), the Supreme Court held that a kidnapping in violation of § 1201 requires "an unlawful physical or mental restraint for an appreciable period against the person's will," or in the case of a child incapable of having a recognizable will, against the will of the parents. It is undisputed that Hakima did not consent to Abdul Ghani's kidnapping. Contrary to Subhanah's argument, there is no authority to support her position that Siraj's consent to Abdul Ghani's kidnapping somehow extinguished Hakima's lack of consent. Indeed, courts have found violations of § 1201(a) even where one of the parents agreed or conspired to kidnap the child.

Nor do Defendants identify any authority holding that the government must prove that the kidnapping is unlawful under some predicate state or federal statute. Even if such a requirement existed (and it does not), Abdul Ghani's kidnapping was unlawful under both Georgia and New Mexico law. The mere fact that Hakima was unable to obtain a court order before Defendants fled across state lines does not somehow make his kidnapping lawful. On the contrary, Hakima's lack of consent is what made his kidnapping unlawful, and the evidence that Abdul Ghani was taken against her will was devasting.

Likewise, the trial evidence was sufficient to show that Subhanah, Lucas, and Hujrah all personally participated in confining, kidnapping,

abducting, or carrying away and holding Abdul Ghani. The government presented extensive evidence as to each Defendant's individual actions in swiftly secreting Abdul Ghani out of Georgia, transporting him to New Mexico, and holding and concealing him there. And this same evidence supports their convictions under an aiding-and-abetting theory.

The evidence was also sufficient to show that Defendants acted knowingly. Defendants all knew that Hakima did not consent to Abdul Ghani's kidnapping. Their knowledge is reflected in Defendants' hurried flight from Georgia, the communications they received from child protective services and family members seeking Abdul Ghani's return, their efforts to conceal themselves and Abdul Ghani's whereabouts, and Jany's prophetic book documenting the group's beliefs about Abdul Ghani and the circumstances of his abduction. The jury could readily find that the government proved Defendants' knowledge.

Likewise, the evidence was sufficient to show that Defendants kidnapped Abdul Ghani for some purpose or benefit, *i.e.*, to fulfill the purposes of Jany's prophesies in which they all believed. Moreover, the evidence undisputedly showed that Abdul Ghani was willfully transported across state lines. Nothing more was required to establish these elements.

A reasonable jury could also find that the government proved beyond a reasonable doubt that Abdul Ghani's death resulted from the kidnapping.

The jury heard eyewitness testimony regarding the circumstances of Abdul Ghani's death during ruqyah. They also heard an expert witness explain how depriving Abdul Ghani of his medication and performing extended ruqyah sessions could have led to his death from an uncontrolled seizure, difficulty breathing, or a combination of the two. The expert opined that he would have expected Abdul Ghani to survive and thrive into adulthood had he continued to receive the treatment and care Hakima provided. But for the kidnapping, Abdul Ghani would not have died.

Should the Court apply a proximate-cause standard, it is equally satisfied by the trial evidence proving that Abdul Ghani's death was reasonably foreseeable. The jury heard testimony and saw messages showing that Defendants knew that Abdul Ghani had significant medical conditions and needed his medication, and that depriving him of that medication threatened his life. They also knew that the physically intensive ruqyah sessions could be dangerous and that Abdul Ghani suffered through lengthy sessions daily. Indeed, Defendants appeared unsurprised when Abdul Ghani ultimately died. The jury heard sufficient evidence from which it could conclude that Abdul Ghani's death was an entirely foreseeable consequence of his kidnapping.

Finally, the government did not have the burden to prove to the jury that the parental exception did not apply to Defendants because it is an affirmative defense, not an element of the kidnapping offense.

8. Sufficient evidence supports the convictions of Hujrah, Subhanah, and Lucas for conspiracy to kidnap Abdul Ghani.

The record evidence amply supported the inference that Defendants entered into an agreement to kidnap Abdul Ghani. They all believed in Jany's messages, knew Hakima did not consent to Abdul Ghani's kidnapping, and actively participated in transporting Abdul Ghani to New Mexico and concealing him there. That is sufficient for a reasonable jury to infer their informed and interested cooperation in the kidnapping.

Nor is the evidence of interdependence plainly insufficient. Defendants shared a mutual goal—to support Jany's prophesies and facilitate the intensive ruqyah treatment by taking Abdul Ghani from Hakima, and their individual actions supporting the kidnapping and Abdul Ghani's concealment facilitated the venture as a whole. A reasonable jury could find the interdependence required for a conspiracy.

9. The district court did not abuse its discretion in denying Siraj's motion to sever his case from his codefendants. Siraj failed to show that he was actually prejudiced by the joint trial where the evidence of Abdul Ghani's kidnapping was integral to the factual underpinnings of Siraj's material-

support and § 1117 charges. The evidence of Abdul Ghani's kidnapping and death and Jany's related prophesies regarding his impending resurrection explain why and how Siraj conspired to kill federal officers. It would have been admissible against him even in a separate trial, and the disturbing nature of Siraj's actions does not make this otherwise probative and admissible evidence unduly prejudicial. Nor has Siraj shown that any prejudice he would have suffered outweighed the district court's judicial-economy concerns. Conducting more than one three-week trial using nearly identical evidence and witnesses would have been an extraordinary waste and inflicted needless trauma on the victims.

10. Siraj's and Lucas's right of self-representation under *Faretta v. California*, 422 U.S. 806 (1975), was not violated because they were precluded from approaching the bench or excluded from a jury-note conference.

For bench conferences, after Siraj's initial objection, the district court implemented a procedure by which stand-by counsel would approach for the bench conference, the court would then pause to give stand-by counsel an opportunity to confer with Siraj and Lucas before proceeding, and the court would send the jury out if Siraj's and Lucas's direct participation was necessary. The district court used this procedure throughout trial, and neither Siraj nor Lucas raised any further objection. On the contrary, Siraj

and Lucas presumably acquiesced in stand-by counsel's go-between role in bench conferences given how they invited stand-by counsel's participation throughout trial and never expressly and unambiguously objected to the district court's modified bench-conference procedure.

Regardless of whether they acquiesced, the district court's bench-conference procedure did not violate the pro-se Defendants' *Faretta* rights because they retained control of the case they chose to present to the jury, including control of tactical decisions and the questioning of witnesses, and the district court allowed them to speak directly on any matter of importance. The district court's procedures respected Defendants' *Faretta* rights while appropriately balancing the need to ensure courtroom security by restricting their ability to roam the courtroom freely. The jury would have readily understood that Siraj and Lucas were conducting their own defense, and stand-by counsel's limited role in bench conferences would not have altered this assessment.

As for the conference regarding the jury notes, Siraj and Lucas acquiesced in stand-by counsel's participation where the jury notes related to questions on the jury instructions, and Siraj and Lucas had allowed stand-by counsel to speak on their behalf in the jury-instruction conference. Moreover, the court's response to the jury notes did not involve significant tactical decisions on matters of importance where the court merely directed the jury

to re-read its instructions. Any incursion on Siraj's and Lucas's rights was minor and did not rise to the level of a *Faretta* violation.

11. The district court did not violate Hujrah's *Faretta* right by denying her motion to represent herself. The district court did not clearly err in finding that Hujrah's request for self-representation was not clear and unequivocal. While Hujrah filed a motion to proceed pro se, she appeared to be emotionally conflicted at the hearing and told the court she did not want to represent herself but felt it was her only option, an assessment with which the court disagreed. As the district court found, Hujrah could not articulate any practical steps she would take to represent herself, and her statements reflected conflicting concerns regarding proceeding pro se. Hujrah was not similarly situated to Siraj, and the district court's grant of his motion for self-representation based on the circumstances of his case does not demonstrate that it erred in denying Hujrah's. Nor did the district court err in concluding that Hujrah's waiver was not knowing and intelligent where her decision appeared to be rooted in an emotional belief that she had no other option, and her statements did not suggest that she fully appreciated the disadvantages of self-representation. Given the strong presumption against waiver of the right to counsel, the district court did not err in denying Hujrah's motion.

12. The prosecutor's comments regarding reasonable doubt during rebuttal closing were not plainly improper. The prosecutor correctly stated

the reasonable-doubt standard and responded to defense arguments regarding various law-enforcement encounters that the defense characterized as missed opportunities to intervene and demonstrated that even law enforcement did not believe Defendants' conduct to be unlawful. The comments attacked by Defendants were preceded by a correct statement of the reasonable-doubt standard and immediately followed by the standard argument that the overwhelming trial evidence left no doubt as to Defendants' guilt. Defendants cannot demonstrate plain error where the challenged comments were ambiguous, and no precedent directly holds such comments to be improper. In any event, the prosecutor's fleeting comments did not affect Defendants' substantial rights where the jury was repeatedly instructed on the reasonable-doubt standard, the jury demonstrated its understanding of these instructions when it acquitted on certain counts, and the evidence of the Defendants' guilt was overwhelming.

13. Subhanah's and Hujrah's life sentences do not violate the Eighth Amendment's prohibition on cruel and unusual punishment. Kidnapping and conspiracy to kidnap resulting in the death of a 3-year-old child are egregious crimes. While the mandatory life sentences imposed are undeniably severe, they are not grossly disproportionate to the crimes of which the jury convicted them.

# ARGUMENT

## I. The district court properly denied Defendants' motion to suppress for lack of Fourth Amendment standing.

Lucas challenges the district court's denial of Defendants' suppression motion for lack of standing, Lucas Br. 16–27, and Siraj and Hujrah join, Siraj Br. 49–50, Hujrah Br. 29. In reviewing the denial of a suppression motion, the Court views "the evidence in the light most favorable to the determination of the district court," "accept[s] the district court's factual findings unless they are clearly erroneous," and reviews its "legal conclusions de novo," including whether a defendant's expectation of privacy is objectively reasonable. *United States v. Guzman*, 149 F.4th 1132, 1140–41 (10th Cir. 2025).

### A. Relevant background

The search took place on Lot 28 in a subdivision that was largely undeveloped, vacant, and covered in sagebrush. 3JR.471, 474. Jason and Tanya Badger were undisputedly the rightful owners of Lot 28. *See* 2JR.988–89; 3JR.473–74. In December 2017, Jason visited his property and discovered Defendants living there. 3JR.474; 7aJR.100–01.[6] Defendants presumably intended to settle on Lot 29, which Lucas had contracted to purchase, *see*

[6] Volume 7a is the unsealed version of joint record volume 7.

2JR.1098–1101, but they ended up on the Badgers' property instead. 3JR.474; 7aJR.101–02. Jason immediately told Defendants they were on the wrong lot, showed them the survey and lot map, and pointed out the boundaries of their actual lot, Lot 29. 3JR.474; 7aJR.58–59, 101, 103. Jason understood that he could require Defendants to relocate to Lot 29 immediately, 3JR.474–75, 7aJR.103, but he was concerned about throwing Defendants and their young children out of their makeshift shelter during the northern New Mexican winter. 7aJR.60. As a result, Jason and Lucas tentatively agreed to swap ownership of Lots 28 and 29, provided that Lucas paid all costs and fees related to the deal, and Jason permitted Defendants to remain on Lot 28 in the meantime. 3JR.475; 7aJR.60, 105–06. Jason did not recall if Lucas granted him use and possession of Lot 29 during the process of swapping lots. 3JR.475; 7aJR.60.

In April 2018, the Badgers and Lucas signed a written purchase agreement in which Lucas agreed to sell the warranty deed to Lot 29 to the Badgers in exchange for the specified "purchase price" of the warranty deed to Lot 28, with Lucas to pay all closing costs. 2JR.1123–25; 3JR.475. The purchase agreement set a closing date of June 3, 2018, and provided that Lucas would "give possession" of Lot 29 to the Badgers "on the date of closing." 2JR.1124 ¶ 4. The purchase agreement also provided that if any payment was not made or condition was not met, the agreement may be

terminated by the innocent party, and that the agreement would terminate if any defect in title was not corrected by June 3, 2018. 2JR.1124 ¶¶ 5, 7.

While the land-swap agreement was in flux, Jason "performed some preparatory work in anticipation of taking possession of Lot 29 when the parties closed." 3JR.476. He used a tractor tire to clear sagebrush for an entry road and installed four posts on the lot's corners. 3JR.476; 7aJR.64–65, 117. Jason elected not to build on or occupy Lot 29 until he held title. 3JR.476; 7aJR.66, 102–03.

During the pendency of the purchase agreement, the Badgers learned that Defendants were wanted for Abdul Ghani's kidnapping. 3JR.476; 7aJR.73–74. Jason reported them to the Taos County Sheriff's Office (TCSO). 3JR.476; 7aJR.74–75. At that point, Jason began to doubt the land swap would go through. 3JR.476; 7aJR.107.

Jason was correct. Shortly before closing, Lucas texted Jason to suggest that they "go around" the closing costs and instead file paperwork directly with the court based on advice from a "paralegal friend." 6SJR.4. Jason rejected this proposal and told Lucas that he had waited long enough. 6SJR.5–6. Lucas did not respond, pay closing costs, or appear for closing. 3JR.477; 7aJR.106. The purchase agreement expired under its own terms, 3JR.477; 7aJR.141, and a termination agreement executed on June 11, 2018,

confirmed that the purchase agreement was defunct. 2JR.1138; 7aJR.131, 141.

Following the termination of the agreement, the Badgers attempted to remove Defendants from Lot 28. On June 8, 2018, Jason texted Lucas and demanded that Defendants leave by June 15, 2018. 6SJR.9–10. On June 11, 2018, Jason followed up by text and asked, "Were you able to start moving your stuff off[?]" 6SJR.11. Lucas testified at the suppression hearing that he received Jason's text messages telling them to leave, but Lucas did not do so. 7aJR.216, 222.

The Badgers also filed a civil-eviction action to remove Defendants.[7] 2JR.1066–78. Lucas was served in person with a summons and notice of hearing. 3JR.478; 2JR.1074–75. Neither Lucas nor any of the Defendants appeared for the hearing. 7aJR.93–94. The action was ultimately dismissed on June 27, 2018, because it was filed in the wrong court. 2JR.1079; 7aJR.87.

Shortly thereafter, Tanya Badger called the New Mexico State Police (NMSP) to have Defendants served with a trespass notice. 3JR.202–03; *see* 3JR.478–79. NMSP sent an officer to Lot 28, but Lucas told the officer that he "inherited the land from his creator" and the civil action had been

---

[7] The Badgers filed a form entitled "Petition by Owner for Restitution," 2JR.1066, believing it was the correct way to remove trespassers from their land. 7aJR.108–09.

dismissed, and the officer left without serving the notice. 3JR.203. NMSP told Tanya to instead contact TCSO, which was leading the investigation into Siraj. 3JR.202.

The Badgers then asked TCSO to remove Defendants from the property. 3JR.479; 7aJR.174. TCSO did not do so immediately because it was still conducting its investigation and had safety concerns. 7aJR.174–76; *see* 3JR.479.

TCSO obtained a search warrant for Lot 28, which was executed on August 3, 2018. 3JR.479. During the search and resulting arrests, TCSO issued Lucas a trespass citation, 2JR.1019–20.[8] The Badgers took back possession of Lot 28 later that month. 3JR.480; 7aJR.110.

### B. The district court denies Defendants' suppression motion.

Defendants moved to suppress the evidence seized in the search of Lot 28, arguing that the search-warrant affidavit failed to establish probable cause and contained intentional or recklessly false material statements and omissions. 1JR.458–95. In response, the United States argued that Defendants lacked standing and that their suppression arguments failed on their merits. 2JR.238–80. In reply, Defendants asserted standing based on

[8] The trespass citation was ultimately dismissed for failure to prosecute after Lucas's arrest. 2JR.1160.

their failed negotiations on the potential land swap and the lack of a judicial order of eviction. 2JR.500–03.

After an evidentiary hearing, the district court denied the suppression motion. 3JR.471–89. The court found that Defendants had not shown that a lease agreement or tenancy existed between them and the Badgers. 3JR.484. Alternatively, the district court concluded that even if the parties created an implied tenancy, it at most amounted to a tenancy at will or license to remain on the land subject to unilateral revocation by the Badgers, who did so well before the search on August 3, 2018, and who provided notice to Defendants through text messages and service of the Badgers' civil lawsuit. 3JR.484–86. Thus, the court concluded that Defendants could not establish a Fourth Amendment violation under a property-rights theory. 3JR.486

Likewise, the court concluded that Defendants also lacked a reasonable expectation of privacy in Lot 28 on August 3, 2018. 3JR.488. Regardless of whether Defendants had a subjective expectation of privacy, the court concluded that any expectation was unreasonable because Defendants had no property interest or right to possess Lot 28 and had been notified that they no longer had permission to remain on Lot 28. 3JR.488.

### C. The Fourth Amendment does not protect a person against the search of a wrongfully occupied property.

To successfully raise a Fourth Amendment challenge, a defendant must first show standing by demonstrating that "'the search…violated the rights of the particular defendant who seeks to exclude the evidence.'" *Guzman*, 149 F.4th at 1139. A defendant may establish a Fourth Amendment violation under the traditional property-rights theory by showing that officers physically intruded on his property. *Florida v. Jardines*, 569 U.S. 1, 11 (2013). Alternatively, a defendant may establish standing by showing "'a legitimate expectation of privacy in the invaded place.'" *Guzman*, 149 F.4th at 1139. To meet this burden, a defendant must establish "'(1) a subjective expectation of privacy in the property searched, and (2) that society would recognize that expectation of privacy as objectively reasonable.'" *Id.*

"The Supreme Court has recognized that the 'unlicensed use of property by others is presumptively unjustified.'" *United States v. Lowe*, 117 F.4th 1253, 1261 (10th Cir. 2024). Indeed, "a person lacks an objectively reasonable expectation of privacy in a place in which his presence is 'wrongful.'" *Guzman*, 149 F.4th at 1140. For this reason, "squatters and trespassers" lack standing to challenge a search. *Id.* at 1140 & n.7 (collecting cases).

Lucas contends that Defendants had a reasonable expectation of privacy because they had an implied tenancy at will and "New Mexico law protected the defendants' right to maintain possession of the property unless lawfully evicted by court order." Lucas Br. 22.[9] Lucas's argument fails because Defendants were wrongfully occupying Lot 28, and any subjective expectation of privacy they had was unreasonable.

### D. Defendants were wrongfully occupying Lot 28.

#### 1. *Defendants had no right to occupy Lot 28 after the Badgers revoked their consent.*

The Badgers, not Lucas, were undisputedly the rightful owners of Lot 28. Lucas Br. 18; *see* 2JR.988–99. The Badgers never invited Defendants onto Lot 28. On the contrary, shortly after Defendants arrived, Jason immediately informed them that Lot 28 was his property, and that Defendants were on the wrong lot. 7aJR.54–60, 103. Out of compassion for Defendants and their children, the Badgers tentatively agreed to swap lots and did not require the Defendants to relocate while the purchase agreement for the land swap was pending. 7aJR.59–60. But Lucas failed to comply with the terms of the purchase agreement, pay closing costs, and appear for closing, and the

[9] Lucas asserts standing under the expectation-of-privacy test, not the traditional property-rights theory, and thus has waived any claim under *Jardines*. Even if this Court were to apply the property-rights test, Lucas's claim fails because as explained in section I.D., Defendants lacked any property right in Lot 28.

purchase agreement terminated, with Lucas at fault. 3JR.477. The Badgers then unequivocally revoked their consent for Defendants to occupy Lot 28 and communicated their revocation to Defendants by text message, service of civil-action notice, and having NMSP go to the property to deliver a trespass notice. 3JR.477–79. By the time of the search, Defendants knew that the purchase agreement had terminated, that the Badgers had ordered them off their property, and that Defendants had no legal claim to the Badgers' property. Defendants were wrongfully occupying the Badgers' property, and they knew it.

2. *Defendants were never the Badgers' tenants.*

Despite the Badgers' undisputed revocation of consent, Lucas claims that Defendants nonetheless continued to have a right to remain on the Badgers' property. In Lucas's view, the Badgers' act of generosity in allowing Defendants to stay on the property during the pendency of the land-swap agreement constituted a lease agreement that turned Defendants from trespassers into tenants. As a result of this purported tenant status, he argues that Defendants maintained a reasonable expectation of privacy unless or until evicted. Lucas is wrong on both fronts.

Defendants were never the Badgers' tenants. A tenancy is the "possession or occupancy under a lease." Black's Law Dictionary (12th ed. 2024). Under New Mexico law, a "'lease is an agreement under which the

owner gives up the possession and use of his property for a valuable consideration and for a definite term.'" *Cutter Flying Serv., Inc. v. Prop. Tax Dep't*, 572 P.2d 943, 947 (N.M. Ct. App. 1977). "At the end of the term the owner has the absolute right to retake, control and use the property." *Transamerica Leasing Corp. v. Bureau of Revenue*, 450 P.2d 934, 937 (N.M. Ct. App. 1969). Defendants have not met their burden to show (a) that the parties had an express or an implied-in-fact lease agreement or (b) that New Mexico law would imply a lease agreement as a matter of law.

a. Nothing in the record demonstrates that the Badgers and Defendants entered into an express or implied lease agreement. The purchase agreement signed by the Badgers and Lucas makes no mention of a tenancy. 2JR.1058–60. Nor is there any other evidence of an agreement between the parties. As the district court found, 3JR.484, Jason testified that he did not recall any oral lease, he was never the Defendants' landlord, he agreed to allow Defendants to remain on Lot 28 only while the purchase agreement was pending, and he viewed them as trespassers well before the time of the search. 7aJR.95–96, 98, 105–06. Defendants offered no testimony to dispute Jason's view that they never had a landlord/tenant relationship or to establish that Defendants subjectively understood themselves to be the Badgers' tenants. Moreover, there is no evidence that Defendants ever paid the Badgers rent or other consideration. *See* 3JR.484; 7aJR.105–06. Based on

the lack of any evidence to the contrary, the district court correctly concluded that Defendants failed to demonstrate that they were the Badgers' tenants.

Lucas contends that the district court wrongly focused on the absence of rent because New Mexico law does not require an agreement for rent. Lucas Br. 20. But New Mexico law defines a lease as an agreement by which an owner gives up possession and use of his property for "valuable consideration." *Cutter Flying Serv.,* 572 P.2d at 947. Absent rent or some form of consideration, the arrangement between the Badgers and Defendants does not qualify as a lease agreement.

Lucas also claims he paid rent by giving the Badgers occupancy of Lot 29 and argues that the district court clearly erred by finding he did not give consideration. Lucas Br. 21; 3JR.484–85. He argues that it is "undisputed" that Jason began "using and improving Lot 29" and thus Lucas must have "at least impliedly" given the Badgers permission to use Lot 29 as consideration for Defendants' possession of Lot 28. Lucas Br. 21. Lucas, however, does not identify any "use and improvement" of Lot 29 by the Badgers that clearly demonstrates that Lucas granted the Badgers permission to use Lot 29. Presumably, he is referring to the district court's findings that the Badgers placed boundary stakes at the four corners of Lot 29 and cleared a path to access Lot 29. 3JR.484; *see* 7aJR.64–65, 117. But Lucas does not explain why this evidence of limited preparatory activity on the perimeters of Lot 29

clearly required the district court to conclude that Lucas granted the Badgers permission to use Lot 29 as consideration for a lease agreement in the face of conflicting record evidence.

Indeed, the district court identified substantial evidence rebutting Defendants' claim that Lucas gave the Badgers possession of Lot 29 as consideration for a lease agreement. 3JR.484. In the purchase agreement, Lucas agreed "to give possession of the premises," Lot 29, "on the date of closing," June 3, 2018, 2JR.1124 ¶ 4, suggesting that Lucas had not already given the Badgers possession of Lot 29, and in fact never did so because the agreement terminated and the deal never closed. The district court further noted that Jason testified that he did not recall Defendants granting him use or possession before the closing date. 3JR.484; *see* 7aJR.60. And while the district court recognized that Jason placed boundary stakes on Lot 29 and created an access path to Lot 29, it also noted that Jason "declined to occupy or build on Lot 29 'until some point after it became [his].'" 3JR.484 (quoting 7aJR.66); *see also* 7aJR.103–04. Lucas does not dispute these factual findings or otherwise explain why Jason's limited activities on the Lot 29's perimeter required the district court to find that Lucas gave the Badgers permission to use Lot 29 as consideration under a lease agreement. Contrary to Lucas's claim (Br. 21), the absence of evidence that Lucas *prohibited* the Badgers from using Lot 29 does not show that Lucas paid the Badgers rent in the form

of *permission* to use and occupy Lot 29 before the land swap was finalized. The district court's factual finding that Defendants failed to show that they paid the Badgers rent is well supported by the record and not clearly erroneous.

Lucas argues that these facts merely show that the parties' lease agreement was not express. Lucas Br. 20. But an implied-in-fact agreement still requires that the parties share a "tacit understanding" or a "meeting of minds" as inferred from their conduct. *Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1064 (10th Cir. 2019). Jason's testimony that he was never Defendants' landlord, 7aJR.95, and Lucas never paid him rent, 7aJR.105–06, supports the conclusion that the parties never entered any lease agreement, whether express or implied.

b. Lacking any factual evidence of an express or implied-in-fact lease agreement, Lucas argues that one should be implied as a matter of law whenever one party uses and occupies land with the owner's permission and the occupying party acquires "some definite control and possession of the premises." Lucas Br. 17–18. To support his position, he relies on *Cutter Flying Service*, 572 P.2d at 947, and *Moore v. Western Meat Co.*, 113 P. 827, 828 (N.M. 1911). Lucas did not raise this implied-in-law argument below and

has not attempted to show good cause for his failure to do so.[10] It is thus waived under Fed. R. Civ. P. 12(c)(3), and this Court should decline to consider it. *See United States v. Eddings*, 158 F.4th 1133, 1142–43 (10th Cir. 2025) ("'Changing to a new theory on appeal that falls under the same general category as an argument presented…is not adequate to preserve issues for appeal.'"). But even if this Court were to reach it, these cases do not support the sweeping proposition that Lucas advances.

To start, *Cutter Flying Service* supports the government's position, not Lucas's. *Cutter Flying Service* considered whether certain airlines' "lease" agreements were in fact taxable lease agreements or whether they were instead nontaxable licenses. 572 P.2d at 945, 948. *Cutter Flying Service* distinguished between a lease, under which the tenant "'acquire[s] some definite control and possession of the premises,'" and a license, which "'creates no interest in the land'" and "'is simply the authority or power to use it in some specific way.'" *Id. Cutter Flying Service*, however, did not hold that "control and possession of the premises" with the owner's permission suffices to imply a lease. It instead recognized that a lease also requires "'an

[10] In district court, Defendants argued that a rental agreement could be inferred from the facts, 3JR.172–75, 192–93, but they never argued that a landlord/tenant relationship is implied in law whenever a party occupies and exercises control over land with the landowner's permission or even cited the cases that they now claim support this rule.

agreement under which the owner gives up possession and use of his property for a valuable consideration and for a definite term.'" *Id.* at 947. Defendants' possession and use of Lot 28, even with the Badgers' short-lived consent during the pendency of the land swap, does not establish a tenancy absent a lease agreement and consideration.

*Moore* likewise does not support an implied-in-law tenancy under these facts. *Moore* held that a landlord/tenant relationship may be inferred in an action filed by a landowner to recover damages for the occupation of the landowner's property by another under certain limited circumstances. 113 P. at 828–30. Specifically, this inference applies where a would-be buyer contracts to purchase property, the buyer occupies and beneficially uses the property before the purchase is completed, and ultimately the sale contract is not carried out. *Id.* at 829. Importantly, this inference *only* applies where the would-be buyer is at fault for the failure of the deal. *Id.* In that case, a rental contract will be inferred, and the buyer owes the landowner/seller rent for the would-be buyer's beneficial use of the property. *Id.* But where the failure of the contract is the fault of the seller, no implied rental contract is inferred, and the would-be buyer owes no rent. *Id.*

*Moore* is best understood as a damages rule for breach of contract. As Lucas recognizes, *Moore* only infers an implied landlord/tenant relationship where the would-be buyer is at fault for the failure of the purchase contract.

Lucas Br. 21. This rule makes sense as a matter of damages because it requires the guilty party to pay for the benefit unfairly gained through its use of the property. But it makes no sense in the context of determining whether the failed purchase agreement created an implied tenancy that provides the would-be buyer with a property interest in land. To extend the rule to this context would mean that a would-be buyer who is at fault in the failure of the purchase contract would be rewarded with a tenancy creating a property interest, but the innocent would-be buyer would be denied the same right. *Moore*'s inference is limited to its context—it infers a landlord/tenant relationship merely "for the purpose of supporting an action" filed by the would-be seller to recover damages "for the use and occupation of such premises" by the would-be buyer. 113 P. at 830. Nothing in *Moore* extends its rule beyond this context or otherwise gives a would-be buyer who is at fault the right to continue to occupy the land without the consent of the landowner. Lucas cites no case applying *Moore*'s rule in the manner he advocates. On the contrary, New Mexico law does not infer a landlord/tenant relationship where a party adversely possesses another's property, as Defendants did here. *Chaves v. Torlina*, 99 P. 690, 694 (N.M. 1909) (""The relation of landlord and tenant does not arise where the occupant of the land holds adversely to the owner, and the occupant in such case is not liable for rent. An entry on lands

of another without right and not in subordination to the title of the owner is a mere trespass, and no tenancy is created thereby.'").

Even if *Moore* could be read more broadly, *Moore* itself recognizes that a landlord/tenant relationship will be implied only "'in the absence of all evidence to the contrary.'" *Moore*, 113 P. at 828. Here, there is evidence to the contrary: the parties did not view it as a landlord/tenant relationship, no rent exchanged hands, and the Badgers did not consent to the Defendants' remaining on Lot 28 after they failed to complete the land swap.

3. *Any interest Defendants may have had in Lot 28 terminated before the search.*

Ultimately, the precise legal status Defendants held during the brief period the Badgers permitted them to occupy Lot 28 makes little difference because as even Lucas recognizes, the Badgers had the right to unilaterally terminate any tenancy, license, or permission, and in fact did so. *See* Lucas Br. 17, 22. Lucas nonetheless asserts that his alleged tenancy survived the Badgers' termination because (1) a continued tenancy at will was inferred under *Moore*, and (2) under New Mexico law, Lucas had a right to maintain possession of Lot 28 unless and until the Badgers obtained a lawful eviction order. Lucas Br. 17, 19, 22–25. First, as discussed above, nothing in *Moore* supports the inference of a tenancy in these circumstances, and *Moore* certainly does not support the conclusion that an implied tenancy continues

even after express termination by the lawful property owner. Second, the lack of a formal eviction order did not bestow Defendants with a property interest in Lot 28 that never existed.

Lucas contends that under New Mexico's Uniform Owner-Resident Relations Act ("UORRA"), his right to Lot 28 continued absent a final eviction order. Lucas Br. 23–24. UORRA prohibits self-help evictions and provides tenants (not trespassers) with certain procedural rights. *See* NMSA § 47-8-36. But UORRA only "applies to, regulates and determines rights, obligations and remedies under a *rental agreement*, wherever made, for a *dwelling unit* located within this state." NMSA § 47-8-8 (emphasis added). Here, as the district court correctly concluded, UORRA did not apply because there was no rental agreement. *See* 3JR.485 n.9. Moreover, UORRA does not apply to "occupancy under a contract of sale…if the occupant is the purchaser or a person who succeeds to his interest." NMSA § 47-8-9(B); *see White v. Farris*, 485 P.3d 791, 798 (N.M. Ct. App. 2021). This was Defendants' precise situation when the Badgers agreed to allow them to occupy the property while the purchase agreement was pending. Lucas fails to identify any error in the court's conclusion that UORRA did not apply to these circumstances.

Next, Lucas argues that even if eviction proceedings under UORRA were not required, New Mexico law still required Badger to file a civil action for unlawful detainer. Lucas Br. 24–25. But an unlawful-detainer action is

not simply an eviction proceeding by another name. Unlike an UORRA eviction action that determines the parties' rights under a rental agreement, *see* NMSA § 47-8-8, an unlawful-detainer action "'does not determine title to the property or the absolute right to possession.'" *Triple R Dev. LLC v. Stinebaugh*, 570 P.3d 230, 233 (N.M. Ct. App. 2025). It merely "permits a plaintiff who is lawfully entitled to possession of real property at the time of suit to regain possession of the property against a defendant who is in possession of the real property but who *has no right to lawful possession*" and "has only the effect of placing the parties in their original positions." *Id.* (emphasis added) While it can be used to remove holdover tenants or tenants who fail to pay rent in the unusual situation where the tenancy is not governed by UORRA,[11] it is also means by which a property owner may eject common trespassers.[12] Unlawful-detainer proceedings merely provide a legal mechanism to eject an individual who has no lawful right to remain on the property. The fact that an unlawful-detainer order has not yet been entered

---

[11] NMSA §§ 35-10-1(A)(2), (3), (5), 35-10-2. UORRA exemptions are limited. *See* NMSA § 47-8-49 (exempting for example, residence at an educational or medical institution providing room and board, transient occupancy in a hotel, employer-provided housing, or premises that are primarily used for agricultural purposes).

[12] NMSA § 35-10-1(A)(1) (allowing for unlawful-detainer action where "the defendant entered and occupied the lands and tenements of another against the will or consent of the owner and refused to vacate the premises after notice by the owner or his agent or attorney").

does not bestow a wrongful occupant with any right to the property. *See* Lucas Br. 25. It simply means that the rightful landowner had not yet secured the assistance of the sheriff in ejecting the unlawfully present occupant from the property. *See* NMSA § 35-10-4.

The mere existence of a state statutory procedure for removing an unlawful occupant does not give Defendants a constitutionally protected property interest. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("'Property' cannot be defined by the procedures provided for its deprivation…."). Indeed, Fourth Amendment standing does not turn on the intricacies of state property law. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[A]rcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."). Lucas acknowledges that any tenancy that Defendants had was terminated by the Badgers, and he identifies no lawful property interest that he could have asserted in an unlawful-detainer action that would have allowed him to retain possession of Lot 28 at the time of the search. "Mere physical possession or control of property is not sufficient to establish standing to object to a search of that property" absent "a lawful basis for asserting Fourth Amendment privacy interests." *Lowe*, 117 F.4th at 1263 (cleaned up). Defendants have none.

### E. Defendants' expectation of privacy was not reasonable simply because they had not yet been evicted.

Defendants contend that even if they had no lawful right to occupy the Badgers' property, their expectation of privacy was nonetheless reasonable and could be extinguished only by court-issued eviction order. Lucas Br. 22–27. This position finds no support in the law.

The Supreme Court has held that a person has no reasonable expectation of privacy in a place where he is wrongfully present. *See Guzman*, 149 F.4th at 1140. For example, a "burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'" *Rakas*, 439 U.S. at 143. Similarly, "[n]o matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car." *Terrence Byrd v. United States*, 584 U.S. 395, 409 (2018). The wrongfulness of the possession does not turn on the completion of a legal process to remove the cabin or car from the thief's possession. Instead, where a reasonable person would know that he is wrongfully residing on a property, any subjective expectation of privacy he may have is objectively unreasonable. *See Guzman*, 149 F.4th at 1141–42 & n.8.

For this reason, this Court has regularly concluded that individuals wrongfully occupying property have no reasonable expectation of privacy in

it. *See Guzman*, 149 F.4th at 1142 (no reasonable expectation of privacy where defendant was residing in a trailer on posted condemned property); *Lowe*, 117 F.4th at 1264 (nor in storage unit where defendant failed to show lawful possession); *United States v. Jones*, 213 F.3d 1253, 1260 (10th Cir. 2000) (nor in condo for use without owner's authorization); *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir. 1991) (nor in hotel room defendant had occupied for three weeks where he did not establish that the room was registered to him or that he was sharing it with someone to whom it was registered); *United States v. Ruckman*, 806 F.2d 1471, 1473 (10th Cir. 1986) (nor in cave on public land where defendant had been living because defendant could be ousted by authorities at any time). This Court found no reasonable expectation of privacy in these cases irrespective of whether the property owner had successfully complied with state law procedures to eject the defendant. Instead, it was sufficient that the defendants had not shown lawful possession of the property.

Indeed, *Ruckman* drew heavily from *Amezquita v. Hernandez-Colon*, 518 F.2d 8 (1st Cir. 1975), which involved facts similar to those presented here. *Amezquita* involved a group of squatters living in structures they had built on government land without any colorable claim. *Id.* at 9, 11. After officials twice asked them to depart and after an eviction action was filed but *before* any order was issued, officials began bulldozing the structures. *Id.* at 9.

The squatters then filed a class action asserting a violation of their rights, including their Fourth Amendment rights, and the district court granted injunctive relief precluding further destruction without judicial authorization. *Id.* at 9–10. The First Circuit reversed, finding it "ludicrous" that the squatters would have a reasonable expectation of privacy where they "knew they had no colorable claim to occupy the land" and had been asked twice to leave. *Id.* at 11. While the First Circuit noted the ultimate issuance of an eviction order (which a different court issued the same day as the injunction) as "further proof" that the squatters had no lawful right to the property, *id.* at 11, it concluded that mere existence of local procedures requiring prior judicial approval for eviction created no constitutionally protected property interest where the squatters failed to demonstrate that compliance with these procedures would have resulted in the squatters being allowed to remain on the land, *id.* at 13.

Like the squatters in *Amezquita*, Defendants knew they had no colorable claim to the Badgers' property and were wrongfully occupying it. 3JR.488. Lucas identifies no defense available to him in unlawful detainer proceedings that would have allowed Defendants to retain possession of the Badgers' land. Defendants' expectation of privacy was not reasonable simply because they had not yet been forcibly ejected. Indeed, Defendants' continued occupation of the Badgers' land after they withdrew their consent constituted

a criminal trespass under New Mexico law, which is strong evidence that society is not prepared to find any expectation of privacy reasonable here. *See* NMSA § 30-14-1(B) ("Criminal trespass also consists of knowingly entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof.").

Contrary to Lucas's claim, *United v. Thomas*, 65 F.4th 922 (7th Cir. 2023), does not help his position. Lucas Br. 22–23. In *Thomas*, a landlord consented to a warrantless search of a condominium leased to a tenant, even though landlords generally lack such authority. *Id.* at 923. After the search, law enforcement and the landlord learned the tenant had leased the condo using an alias. *Id.* at 925. The Seventh Circuit rejected the government's argument that the defendant lacked a reasonable expectation of privacy in the condo he leased simply because he obtained the lease by deception. *Id.* at 924. The court agreed that the landlord could have sought to terminate the tenant's lease based on his deception, but she was not entitled to remove him from the condo without a dispossessory proceeding in state court concluded in her favor. *Id.* at 924. Until that time, the tenant "was entitled to all the rights of any other leaseholder" including the right to exclude police officers. *Id.* at 924.

Unlike *Thomas*, Lucas was not a leaseholder and had no rights to which a leaseholder was entitled. Instead, Lucas was wrongfully occupying

property to which he had no legal claim, and he knew it. Even if a technical violation of a lease does not deprive an otherwise lawful tenant of a reasonable expectation of privacy, that does not mean an unlawful occupant with no claim to the property retains a reasonable expectation of privacy until forcibly evicted. Tellingly, Lucas cites no case supporting that conclusion. Indeed, courts have held otherwise. *See United States v. Hunyady*, 409 F.3d 297, 299, 301–02 (6th Cir. 2005) (finding no reasonable expectation of privacy where defendant's permission to stay in the residence was revoked and defendant refused to comply with the owner's lawful attempts to eject him, notwithstanding a formal notice to quit that left defendant a few more days to vacate); *see also Zimmerman v. Bishop Estate*, 25 F.3d 784, 786–87 (9th Cir. 1994) (holding no reasonable expectation of privacy for guest of squatters based on repeated demands by owner to squatters to leave, despite "dropped" criminal trespass proceedings and apparently uncompleted "ejectment" suit). Regardless, Lucas's position would be inconsistent with this Court's precedent, which declines to recognize as reasonable an expectation of privacy held by one wrongfully occupying property irrespective of whether the wrongful occupant has been formally ejected under local procedures. *See Guzman*, 149 F.4th at 1141–42.

Finally, Lucas argues that even if Defendants in fact had no right to remain on the property, they nonetheless maintained a reasonable

expectation of privacy because their mistake of fact as to whether they were entitled to remain on the property was reasonable. Lucas Br. 26–27. But the district court concluded that Defendants had actual notice that "they no longer had permission from the rightful owners to remain on Lot 28," based on Jason's texts telling Defendants to get off his property, the service of notice of the civil eviction suit filed by the Badgers, and the NMSP officer who the Badgers called to confront Lucas and serve him with a trespass notice. 3JR.488. After being notified in three separate ways that they no longer had permission to reside on Lot 28, Defendants cannot claim a reasonable mistake of fact as to whether they were wrongfully occupying the property.

Lucas nonetheless argues that Defendants reasonably believed they had a right to remain on the property based on the dismissal of the civil eviction suit and the failure of the NMSP to serve the trespass notice. Lucas Br. 26–27. As an initial matter, Lucas points to no record evidence establishing that Defendants in fact subjectively believed that they had a right to remain on the property. But even setting that aside, the dismissal of the civil suit on forum grounds did not make Defendants' purported belief reasonable where Lucas never appeared for the hearing and the suit was dismissed solely for being filed in the wrong court. 2JR.1079; 7aJR.94. As for the encounter with the NMSP officer, the record does not clearly show why

the NMSP officer did not complete service of the trespass notice when he first approached Lucas, beyond perhaps confusion created by Lucas's own claims that the officer subsequently cleared up with the Badgers.[13] *See* 3JR.202–03; 7aJR.89–90. Whatever the reason, Lucas was ultimately served with a trespass citation when the property was searched. 2JR.1084; 7aJR.163. Lucas has identified nothing about the encounter with the NMSP officer that would make a reasonable person believe that he had a right to remain on Lot 28 under the circumstances. Lucas knew full well that he did not own Lot 28, he had not complied with the terms of the land-swap purchase agreement, and he had been told by Jason to get off his property. Whatever subjective expectation Defendants had in the property is not one that society is prepared to recognize as reasonable, and thus the district court correctly denied their motion to suppress for lack of Fourth Amendment standing to object to the legality of the search.

[13] Lucas told the officer that he had "inherited Lot 28 from his creator and the Badgers' civil case was dismissed," 3JR.479, *see* 3JR.203. Jason testified that after the encounter, the officer requested documents from the Badgers proving that they owned the land, which they provided. 7aJR.89–90. The officer told the Badgers he would go back to talk to Lucas, but "somebody told him not to," 7aJR.89–90, presumably due to concerns regarding the ongoing investigation or Defendants' potential dangerousness, *see* 7aJR.174–76; *see* 3JR.479.

## II. The evidence supporting the federal-victim element of Siraj's and Lucas's convictions for conspiring to kill federal officers (Count 3) was sufficient.

### A. Standard of review

Siraj and Lucas challenge the sufficiency of the evidence to support his convictions on Count 3 for conspiring to kill federal officers in violation of 18 U.S.C. §§ 1114 and 1117. Siraj Br. 42–47; Lucas Br. 46–49 (joining in Siraj's arguments). The elements of this offense are: (1) defendants entered a conspiracy; (2) the conspiracy's object was to kill or attempt to kill officers or employees of the United States engaged in or on account of the performance of official duties, and (3) at least one overt act was committed in furtherance of the conspiracy. *United States v. Hassan*, 742 F.3d 104, 113 (4th Cir. 2014). Defendants challenge only the sufficiency of the evidence to prove the federal identity of the conspiracy's intended victims.

In reviewing a sufficiency challenge, the Court considers "all the evidence, both direct and circumstantial, along with reasonable inferences taken therefrom, in the light most favorable to the government." *United States v. Samora*, 954 F.3d 1286, 1290 (10th Cir. 2020). This "review is limited and deferential"; this Court "'may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Stepp*, 89 F.4th 826, 832 (10th Cir. 2023).

### B. The trial evidence was sufficient for a reasonable jury to conclude that the conspiracy's object was to kill federal officers or employees.

Considered in the light most favorable to the government, the trial evidence was sufficient for a reasonable jury to conclude that Siraj and Lucas conspired to kill federal officers. For an unfulfilled conspiracy, the government must prove "whether the agreement, standing alone, constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction." *United States v. Feola*, 420 U.S. 671, 695 (1975). The government satisfies this element when it proves that "the object of the intended attack" was "identified with sufficient specificity so as to give rise to the conclusion that had the attack been carried out the victim would have been a federal officer." *Id.* at 695–96.

Siraj's and Lucas's conspiracy had two parts. First, Siraj and Lucas believed they were being surveilled by the FBI and conspired to kill any law enforcement, including the FBI, that approached their compound. Second, Siraj and Lucas believed that when Abdul Ghani resurrected, their army would attack corrupt institutions, including the federal government, the FBI, and the CIA, and kill any nonbelievers. The government presented sufficient evidence to show that federal officers were the intended victims of both parts of the conspiracy.

Substantial evidence showed that the group believed that the FBI was investigating and surveilling them. 6JR.1374. They believed that "the Feds" sent a drone to watch them. 6JR.1596–97, 1656–57. Everyone except Lucas, Subhanah, and their children (who were exempt because they were "not presumed missing") stayed "in the hole" for months in dire conditions to avoid this surveillance. 6JR.1378–79, 1526, 1609. Jany texted her brother saying, "We are hiding cuz they called FBI." 6SJR.463; *see also* 6SJR.507 ("Ibn own brother sent the fbi after him."). Subhanah wrote in her journal, "Why hasn't the FBI arrested me yet?" 6JR.3324, 3825 (quoting Ex. 77A).[14]

Indeed, the group prepared for the FBI's arrival. Lucas and others kept watch over the compound to see if anyone was coming. 6JR.1374–75, 1381, 1451, 1770–71. They also participated in firearms training in case the FBI came to the compound. 6JR.1374, 1766; *see* Ex. 16a–16h, Ex. 19a–19g. Siraj told them that "if law enforcement came in the middle of the night," they "could engage, like shoot them and just say that we didn't see them in the dark, and we did not know that they were FBI or law enforcement."[15]

---

[14] This journal was admitted as a physical exhibit. 6JR.4236. No photocopy was admitted, but its contents were quoted at trial.

[15] F.L.J. subsequently testified that he was not "sure" that Siraj specified "FBI" in this statement. 6JR.1768.

6JR.1768; *see* 6JR.3423. The group expected that if anyone came to the trailer, the outcome would be a "firearms fight." 6JR.1375; *see* 6JR.1811.

This was not just idle talk. The group had a "secret code" to communicate if danger was coming, including the police or the FBI, 6JR.1814–15, and dug a 100-foot tunnel with a "spider hole" and weapons staged at the end as both a means of escape and gaining a tactical advantage over the interior of the compound. 6JR.1377, 1384–86, 1815–16, 2493–94. Lucas and Siraj talked about "wanting to die as a martyr so that they could get into heaven." 6JR.1393. And indeed, when the alert came that law enforcement was on the way, Siraj armed up and instructed his 15-year-old stepson to do the same. 6JR.1397, 1620–21, 1819. Absent Jany's intervention, the children believed that Siraj would have started shooting. 6JR.1398; 6JR.1820.

While ultimately it was local law enforcement that executed the search warrant, *see* Siraj Br. 43, Lucas Br. 47–48, the group *believed* that it was the FBI that was after them. *See United States v. Jannotti*, 673 F.2d 578, 593 (3d Cir. 1982) (*Feola* "did not preclude the existence of federal jurisdiction where the intended victim is believed to be a federal officer, but in fact is not."). That they ultimately turned out to be mistaken did not prevent the jury from concluding that the conspiracy's object was to kill FBI agents, thus satisfying the federal-victim element. Nor does it matter that the conspiracy's object

included others who were not federal agents. *See* Siraj Br. 43, 45–46; Lucas Br. 47–48. So long as the group believed and agreed that FBI agents were an intended target, that is sufficient to establish the federal-victim element.

Siraj and Lucas also conspired to kill federal employees in the war that would come following Abdul Ghani's resurrection. The group believed that Abdul Ghani would lead an army consisting of the group's men to rid the world of nonbelievers and corrupt institutions. 6JR.1589, 1750. They believed the entire federal government was corrupt. 6JR.1448, 1589. Specifically, Abdul Ghani would lead them to institutions like hospitals or the government, which included the federal government, FBI, and CIA, and nonbelievers who rejected Abdul Ghani's miracles would be killed. 6JR.1359–62, 1370–71, 1589–90; 3399. Siraj described this as "jihad," which his stepson understood to mean "when you die for God." 6JR.1591. The firearms training also served to prepare them for this coming war. 6JR.1371, 1528, 1765–66. Again, it does not matter that the conspiracy to kill also included nonfederal institutions. The trial evidence showed that the group specifically believed that the federal government was one of these corrupt institutions and agreed to target it and its employees in their coming war. This was enough to show that had the conspiracy been carried out, its intended targets would have included federal employees.

The same evidence was sufficient to satisfy the federal-victim element with respect to Siraj's and Lucas's convictions on Counts 1 and 2 for violating 18 U.S.C. § 2339A by providing and conspiring to provide material support knowing or intending that it was to be used to prepare for or carry out the killing of federal officers in violation of § 1114.

## III. The jury instruction on Count 3 was not plainly misleading.

Siraj contends that the district court committed plain error in instructing the jury on Count 3 because the instruction was insufficiently specific on how the government must prove the federal identity of the victim to establish a violation of 18 U.S.C. § 1117, Siraj Br. 31–41, and Lucas joins, Lucas Br. 45–46.

### A. Relevant background

Subhanah and Hujrah submitted a proposed instruction on Count 3, and Lucas joined. 3JR.1240, 1266. The district court then proposed a materially identical instruction. Through stand-by counsel, both Siraj and Lucas stated that they had no objection to this instruction. 6JR.3541. The final jury instruction read in relevant part:

> [Section 1117] makes it a crime to conspire to kill or attempt to kill any officer or employee of the United States, or of any agency in any branch of the United States government, while such officer or employee is engaged in or on account of the performance of official duties.

> To find each Defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:
>
> First: The charged Defendants entered into a conspiracy;
>
> Second: The object of the conspiracy was to kill or attempt to kill officers and employees of the United States government—here, Federal Bureau of Investigation employees, government officials, and military personnel—on account of, or while such officers and employees were engaged in the performance of their official duties; and
>
> Third: At least one overt act alleged in the Indictment was committed in furtherance of the conspiracy.

6JR.3594–95. The instruction also provided generally applicable instructions on conspiracies, including that "the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan" and that "impossibility is not a defense." 6JR.3596.

### B. Lucas invited any error because he proposed the instruction the district court used.

When a party submits a proposed jury instruction and subsequently fails to object to the instruction, this Court infers "that the party knowingly and intelligently relinquished future challenges regarding the instruction." *United States v. Teerlink*, 141 F.4th 1126, 1133 (10th Cir. 2025). In such cases, this Court "'will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively approving it at trial.'" *Id.* at 1131. This invited-error rule bars Lucas's challenge to the

jury instruction on the § 1117 count because Lucas proposed the jury instruction and then failed to object. 3JR.1240, 1266; 6JR.3541.

### C. The district court correctly instructed the jury that the government must prove the federal identity of the victim.

While Siraj did not propose the jury instruction, he raised no objection to it. Therefore, his unpreserved argument is reviewed only for plain error. *See United States v. McBride*, 94 F.4th 1036, 1044 (10th Cir. 2024). To prevail, Siraj must establish "'(1) the district court committed error; (2) the error was plain…;'" (3) it "'affected the defendant's substantial rights;'" and (4) it "'seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Flechs*, 98 F.4th 1235, 1252 (10th Cir. 2024).

In reviewing jury-instruction challenges, this Court views the instructions "'in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" *United States v. Freeman*, 70 F.4th 1265, 1278 (10th Cir. 2023). The "'trial judge is given substantial latitude and discretion in tailoring and formulating the instructions so long as they are correct statements of law and fairly and adequately cover the issues presented.'" *United States v. Woodmore*, 127 F.4th 193, 209 (10th Cir. 2025). A district court is not required "'to give

another instruction 'if it would simply give the jury a clearer understanding of the issues.'" *Id.* at 210. "'[T]he appropriate standard of review for challenges to jury instructions is whether the jury, considering the instructions as a whole, was misled.'" *Id.* at 209.

Siraj contends that the jury instruction on Count 3 was insufficient because it failed to adequately instruct on the federal-jurisdictional element, *i.e.*, the federal identity of the victim. Siraj argues that the government can prove this element in two alternative ways. First, the government can prove "the victim was identified with sufficient specificity such that the jury can conclude that, had the attack had been carried out, the victim would in fact have been a federal employee." Siraj Br. 42. Second, the government can prove "the defendant knew or believed that the victim would have been a federal employee." *Id.* Siraj asserts that the jury instruction was plainly misleading because it failed to instruct on these two means. *Id.* at 34.

Siraj is incorrect. These are not the two "alternative means" of proving the jurisdictional element. Siraj Br. 34. The two methods of proof identified by Siraj are neither exhaustive nor mutually exclusive. As a result, Siraj's proposed additions to the jury instructions are unnecessary and would only sow confusion.

The district court's jury instruction tracked the statutory elements of Count 3. Recall the elements are: (1) defendants entered a conspiracy, (2) the

conspiracy's object was to kill officers or employees of the United States while they were engaged in or on account of the performance of official duties, and (3) at least one overt act was committed in furtherance of the conspiracy. *Hassan*, 742 F.3d at 113. The jury instruction provided by the district court accurately instructed the jury on each. *See* 6JR.3594–3599.

The two alternatives Siraj identifies for proving the jurisdictional element are not found in § 1117. Instead, Siraj cobbles together these alternatives from two cases—*Feola*, 420 U.S. 671, and *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994). While both cases provide examples of how the government might prove a jurisdictional element, neither purports to identify the exclusive ways to prove a jurisdictional nexus for a conspiracy to kill federal officers.

In *Feola*, the Supreme Court concluded that a defendant need not know that the intended victim is a federal officer to fulfill the mens rea requirement for assault or conspiracy to assault a federal officer in violation of 18 U.S.C. §§ 111 and 371. *Id.* at 696. Nonetheless, the Court recognized that sometimes the defendant's knowledge of the victim's federal status may be relevant to establishing the federal identity of the victim, which serves as the "jurisdictional" element for purposes of establishing a federal crime. *Id.* at 695. As the Court explained, this element is readily satisfied anytime a federal officer is attacked. *Id.* But where a conspiracy offense involves "an

unfulfilled agreement to assault," the Court observed "it must be established whether the agreement, standing alone, constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction." *Id.* In such a case, this element would be satisfied where the conspiratorial agreement was to attack a specific individual (identified by name or other characteristic) and that individual was in fact a federal officer, regardless of whether the defendant was aware of the individual's federal-officer status. *Id.* This was the case in *Feola*, which involved a narcotics rip-off plot in which defendants assaulted and conspired to assault would-be narcotics purchasers who, unbeknownst to defendants, turned out to be undercover federal agents. *Id.* at 674. On the other hand, the Court contemplated that the federal-jurisdictional hook would not be satisfied in a case "[w]here the object of the intended attack is not identified with sufficient specificity so as to give rise to the conclusion that had the attack been carried out the victim would have been a federal officer." *Id.* at 695–96. But as *Feola* clearly presented a conspiracy to assault specific individuals who were in fact federal officers, the Court had no occasion to expound on what other factual circumstances would satisfy the requirement in other cases.

Siraj relies on *Rosa* for his second alternative means. *Rosa* involved a sufficiency challenge to a conviction for conspiracy to receive stolen goods that had traveled in interstate commerce in violation of 18 U.S.C. § 2315. 17

F.3d at 1543. Like conspiracy to assault a federal officer, conspiracy to receive stolen goods does not require that the defendant know the goods traveled in interstate commerce, but it does require a jurisdictional nexus. *Id.* at 1544. After reviewing case law (including *Feola*), *Rosa* concluded that "it is plain that any of a variety of circumstances may suffice to supply the jurisdictional nexus." *Id.* at 1545. *Rosa* found sufficient evidence of the jurisdictional nexus on two theories: (1) the stolen goods had in fact traveled in interstate commerce, regardless of whether defendants knew it; and (2) at least one coconspirator believed the stolen goods traveled in interstate commerce, regardless of whether they actually did. *Id.* at 1545–46. *Rosa* holds that the defendants' knowledge or belief is sufficient to satisfy the jurisdictional element.

*Feola* and *Rosa* do not attempt to lay out every way the government could satisfy the jurisdictional element for a conspiracy to kill federal officer. *Feola*'s discussion was necessarily shaped by the facts before it—a conspiracy to assault specific individuals identified not by their status as federal officers, but by their status as would-be drug purchasers in a planned narcotics rip-off. Against this backdrop, *Feola* identified one way in which the government could meet its burden—by proving an agreement to attack a specifically identified individual who unbeknownst to defendants turned out to be a federal officer. But as even Siraj agrees, this is plainly not the only way to

prove the jurisdictional element. *See Jannotti*, 673 F.2d at 593. *Rosa* identifies another way for the government to meet its burden—the defendant's knowledge or belief of relevant facts giving rise to federal jurisdiction—while recognizing that "any of a variety of circumstances may suffice[.]" 17 F.3d at 1545. Neither *Feola* nor *Rosa* hold that there are only two alternative means by which the government may meet its burden, or that the jury must be instructed on them.

Indeed, the two alternative means identified by Siraj are not necessarily separate theories. Defendants may enter a conspiratorial agreement to kill, for example, FBI agents. Identifying the object of the intended attack as "FBI agents" surely provides sufficient specificity to characterize the agreement as one calling for an attack on federal agents, as set forth in *Feola*'s example, even though it does not identify an individual by name or concern itself with specific FBI agents. But that same fact—an agreement to kill FBI agents—also proves that the defendants knew or believed that the would-be victims would be federal officers, as discussed in *Rosa*. That is the case here. The jury was instructed that it must find that Siraj and Lucas "came to a mutual understanding to try to accomplish a common and unlawful plan" and the "object of the conspiracy was to kill…officers and employees of the United States." 6JR.3595–96. Siraj and Lucas's agreement to kill FBI employees and federal government officials

identifies the target with sufficient specificity to prove that had the attack been carried out, the victims would have been federal officers, but it also proves that Siraj and Lucas knew or believed that their victims would be federal officers. Setting these two theories forth as "alternative means of proving the jurisdictional element of the conspiracy" would not have accurately stated the law and would likely have confused the jury. *See* Siraj Br. 34.

Contrary to Siraj's complaints, Siraj Br. 35–36, the jury instruction was sufficiently specific when it required a finding that the "object of the conspiracy was to kill or attempt to kill officers and employees of the United States government." The jury had to find that the *goal* of the conspiracy was to kill federal officers, which necessarily meant that Siraj and Lucas agreed to target specifically federal officers, that the intended victims would in fact have been federal had the conspiracy been carried out, and that Siraj and Lucas believed that their victims would be federal. The instruction was sufficient for the jury to understand "the issues to be resolved and its duty to resolve them." *Woodmore*, 127 F.4th at 210.

The impossibility-is-not-a-defense instruction does not render these instructions misleading. As Siraj concedes (Br. 36), this instruction correctly told the jury that "the United States does not need to prove that the underlying object of a conspiracy did or would have happened." 6JR.3596.

This instruction then appropriately redirected the jury to focus on the agreement "because the offense is the agreement between conspirators, not the successful carrying out of the agreement's goals." 6JR.3596. This legally correct instruction does not undermine the instruction that the jury must find that the conspiracy's object was to kill federal officers.

The breadth of the conspiracy did not require the district court to instruct the jury as Siraj now proposes. *See* Siraj Br. 34–35. While the scope of the conspiracy also included non-federal targets, that does not alter the elements that the jury must find to convict. The jury need only find that the conspiracy's object included killing or attempting to kill federal officers; it is not a defense that defendants also conspired to kill non-federal targets.

**D. Any error was not plain.**

Even if the jury instruction was insufficient, any error was not plain. "An error is plain if it is clear or obvious under current, well-settled law," meaning "there is precedent directly on point from the Supreme Court or the Tenth Circuit, or if there is a consensus in the other circuits." *United States v. Egli*, 13 F.4th 1139, 1146 (10th Cir. 2021). There is no well-settled law requiring a district court to instruct a jury on the two alternative "means" identified by Siraj.

*Feola* addresses only one of the two methods of proof identified by Siraj, and nothing in *Feola* holds that an agreement to kill federal officers lacks

sufficient specificity to satisfy the jurisdictional element. It also does not address the question of what jury instructions are required. *Feola* does not show that any error in the district court's instructions was plain.

Siraj identifies no Supreme Court or Tenth Circuit opinion holding that his two alternatives are the exclusive "means" of proving the jurisdictional element and that a district court errs when it fails to instruct the jury on these alternatives. His second alternative means relies on a Second Circuit opinion addressing the interstate-commerce element for the offense of receiving stolen goods, which itself recognizes that "any of a variety of circumstances may suffice to supply the jurisdictional nexus." *Rosa*, 17 F.3d at 1545. And while the United States agrees that it may meet its burden by proving that the defendant knew or believed that his victim would be federal, neither *Rosa* nor any other opinion cited by Siraj holds that jury instructions that require the jury to find that the conspiracy's object was to kill federal officers are insufficient or that the jury instructions must separately inform the jury it may find the jurisdictional element satisfied based on the defendant's belief or knowledge that the would-be victims are federal officers. The jury instructions were not *plainly* deficient.

### E. Any error did not affect Siraj's or Lucas's substantial rights.

Neither Siraj nor Lucas has shown that any error affected their substantial rights. As discussed more fully in section II.B., the trial evidence was sufficient to meet both proposed alternative means. The evidence was sufficient for a jury to find that Siraj and Lucas agreed to kill federal officers and employees, and that had their plans been carried out, the intended victims of their conspiracy included FBI agents and other federal officers and employees. In addition, the evidence was sufficient to show that Siraj and Lucas believed the victims of their conspiracy would be either the FBI agents who they thought were surveilling them or the employees of the federal government that they specifically identified as a corrupt institution that Abdul Ghani would lead them to eliminate. It does not matter that in the end, it was local law enforcement that executed the search, *see* Siraj Br. 40; what matters is Siraj's and Lucas's *belief* that the FBI was surveilling them and would come for them, a belief thoroughly established by the trial evidence. Likewise, because the evidence was sufficient to show that the federal government, including the FBI and CIA, would be targeted when Abdul Ghani resurrected, it is immaterial that the group's conspiracy also included nonfederal victims. *See id.*; Lucas Br. 46. Siraj and Lucas cannot show a reasonable probability that the outcome would have been different

had their proposed instructions been given because there was ample evidence to support the conviction on Count 3 no matter which way the jury instructions were phrased.

Nor have Siraj and Lucas shown a reasonable probability that the jury would not have convicted on Counts 1 and 2 if given Siraj's proposed instruction because the same evidence that was sufficient to satisfy the federal-victim element on Count 3 would have been sufficient for the government to meet its burden on the federal-victim element for Counts 1 and 2.

## IV. The district court properly denied the motion to dismiss the kidnapping charges.

Hujrah, Subhanah, and Lucas challenge the denial of their motion to dismiss Counts 6 and 7 (which became Counts 4 and 5 at trial) for failure to allege a violation of or conspiracy to violate the federal kidnapping statute. Hujrah Br. 8–12; Subhanah Br. 19–24; Hujrah Notice of Joinder at 2 (joining in Subhanah's arguments); Lucas Br. 45 (joining in Subhanah's arguments). This Court generally reviews a denial of a motion to dismiss an indictment for an abuse of discretion, but reviews questions of law de novo. *United States v. Pauler*, 857 F.3d 1073, 1075 (10th Cir. 2017).

### A. Relevant background

In their motion to dismiss, Defendants contended the kidnapping counts failed to allege a crime because the federal kidnapping statute "excludes the taking, even unlawfully, of a child by the child's parent." 1JR.452. They asserted that the participation of Siraj, Abdul Ghani's father, meant that taking Abdul Ghani from his mother was not a violation of the federal kidnapping statute. 1JR.453.

The government opposed. 1JR.846–55. In addition to contesting Defendants' legal conclusion that the parental exception barred the rest of their prosecution, the government disputed material facts set forth by Defendants by arguing that Siraj did not have lawful custody of Abdul Ghani after taking him across state lines, neither Abdul Ghani nor his mother consented to his taking, and Jany was not Siraj's wife or Abdul Ghani's surrogate mother. 1JR.851–55.

The district court denied Defendants' motion because the disputed facts meant that Defendants' claims did not fall within the "'rare exception' that permitted dismissal at the pretrial stage "'where the operative facts are undisputed.'" 3JR.205, 207. The court ruled that Defendants' claim could properly be raised at trial through a motion for a judgment of acquittal. 3JR.207–08.

### B. Defendants waived any challenge to the district court's denial of the pretrial motion by failing to challenge the basis of the district court's decision.

For motions like Defendants' that rely on facts outside the indictment, the district court may dismiss for failure to establish a violation of a charged offense only "where '[1] the operative facts are undisputed and [2] the government fails to object to the district court's consideration of those undisputed facts,' and [3] the district court can determine from them that, '*as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt.'" *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (emphasis in *Pope*). Federal Rule of Criminal Procedure 12(b)(1) only allows pretrial motions that "the court can determine without a trial on the merits." Pretrial dismissal is improper "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion." *Pope*, 613 F.3d at 1259 (emphasis in *Pope*).

In denying the motion, the district court identified several disputed facts, including whether Siraj voluntarily consented to the taking, whether Siraj and Jany were married, whether Jany was a surrogate parent to Abdul Ghani, and whether Abdul Ghani consented to going with Defendants. 3JR.207. The nature of Jany's relationship to Siraj and Abdul Ghani was relevant to the applicability of the parental exception in § 1201(a), and the dispute as to Siraj's and Abdul Ghani's consent was material because the

government had to prove that the kidnapping was against the will of the victim, or that the victim was incapable of consent and the kidnapping was "against the will of the parents or legal guardian of the victim." *Chatwin*, 326 U.S. at 460. Indeed, the factual question of Abdul Ghani's consent and capacity to consent and his mother's consent was ultimately submitted to the jury. 6JR.3601, 3603.

Defendants have not challenged the district court's basis for denying their motion. While Hujrah asserts that the facts are undisputed, none of the facts she cites address the disputes identified by the district court, 3JR.207, and she does not otherwise challenge the district court's findings. *See* Hujrah Br. 10. Subhanah and Lucas identify no error in the district court's findings as to the factual disputes. Defendants have waived their challenge to the denial of the motion to dismiss by failing to challenge its basis. *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) (appellants must "explain what was wrong with the reasoning that the district court relied on in reaching its decision").

### C. The kidnapping statute's parental exception exempts only the parent from prosecution.

Even setting aside Defendants' waiver, their challenge to the district court's denial of their motion to dismiss also fails because they are incorrect as a matter of law. Defendants contend that the parental exception precludes

their prosecution, even though none is Abdul Ghani's parent. In their view, because Siraj could not be prosecuted for kidnapping his son, Defendants' actions with respect to the kidnapping likewise fall outside the scope of the statute. Defendants' novel reading of the statute finds no support in the statutory language or precedent.

The plain language of the statute excepts only the parents of a minor from prosecution. Section 1201 provides:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, *except in the case of a minor by the parent thereof*, when—
>
> > (1) the person is willfully transported in interstate or foreign commerce…
>
> shall be punished by imprisonment for any term of years or for life and if, the death of any person results, shall be punished by death or life imprisonment.

(emphasis added). The parental exception precludes federal criminal sanctions "in the case of a minor by the parent thereof," *id.*, and even then, its protection is limited only to those whose parental rights are intact, *see* 18 U.S.C. § 1201(h). Nothing in this language suggests that the parental exception also extends to any nonparent who participates, conspires, or aids or abets in a parent's kidnapping of his or her minor child. Had Congress

intended this exception to reach further than a parent, it could have said so.[16] But the statute exempts only a parent.

Defendants identify no case adopting their expansive interpretation of the parental exception. Though no case has directly addressed this narrow question, courts have affirmed kidnapping convictions of defendants who have conspired with an exempt parent. *See United States v. Sheek*, 990 F.2d 150, 151 n.2 (4th Cir. 1993), and its companion case, *United States v. Sheek*, 40 F.3d 1245 *3 & n.1 (4th Cir. 1994) (unpublished) (stepfather who conspired with children's biological mother to kidnap them could be liable for kidnapping); *Miller v. United States*, 123 F.2d 715, 716–18 (8th Cir. 1941), *rev'd on other grounds*, 317 U.S. 192 (1942) (stepfather who conspired with child's mother to kidnap her child does not fall within parental exception); *cf. United States v. Boettcher*, 780 F.2d 435, 436–37 (4th Cir. 1985) (holding that parental exception immunized mother from aiding-and-abetting prosecution where she hired two men to kidnap her daughter, but referencing potential prosecution of her two non-parent co-conspirators). Defendants' broad interpretation finds no support in the case law.

---

[16] Indeed, Congress specifically exempted other family members from the statutory-minimum sentence applicable where the victim is a minor. *See* 18 U.S.C. § 1201(g)(1)(B)(ii) (exempting parents, grandparents, siblings, aunts, uncles, or those with legal custody). In contrast, the parental exception covers only the parent and mentions no other familial relationship.

Lacking cases to support Defendants' position, Subhanah turns to the statutory language. Subhanah argues that the statute excepts "the case," meaning the "factual scenario" of the kidnapping "of a minor by the parent thereof," such that the exception covers the parent as well as anyone else involved.[17] Subhanah Br. 20–21. But the word "case" does not go so far. True, "case" may refer to an "instance, occurrence or situation." *Case*, no. 5, Black's Law Dictionary (12th ed. 2024). But "case" may also refer simply to a "criminal proceeding." *Id.* no. 1. Indeed, in another context, Congress has used the phrase "in the case" to provide familial-status exceptions limited only to a specific individual. *See* 8 U.S.C. § 1101(a)(43)(N), (P) (providing that certain offenses are aggravated felonies "except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this

[17] Subhanah's parsing of the statutory language is contradicted by the original grammar of the statutory language, which read "except, in the case of a minor, by a parent thereof." 18 U.S.C. 408a (1934); *see* H.R. Report 73-1457, at 1 (1934). This language made clear that the "case" referred to the minor and not the situation of a minor being taken by a parent. The current edition of the Code is merely prima facie evidence of the law; the 1948 edition was enacted into positive law and is legal evidence. 1 U.S.C. § 204(a); *see United States v. Hopson*, 150 F.4th 1290, 1309 n.11 (10th Cir. 2025). The 1948 edition contains the extra comma, 62 Stat. 683, 760 (1948), which later disappeared in the 1976 edition without any apparent congressional action.

chapter"). While Subhanah contrasts the kidnapping statute with language used in other statutes to confer status-based immunity, the examples she cites only serve to demonstrate that there is no standard language used in these situations. *See* Subhanah Br. 20–21. Nothing about the use of the generic phrase "in the case of" suggests that the statutory exemption extends beyond its plain language, which covers only a kidnapping of "a minor *by the parent thereof*" and no one else.[18] 18 U.S.C. § 1201(a) (emphasis added). As noted above, no court that has considered this factual scenario has found any basis in the statute's "in the case" language to extend the parental exemption to non-parent kidnappers, coconspirators, or aiders and abettors.[19]

Finally, Subhanah argues the rule of lenity. Subhanah Br. 22–23. The plain language of the kidnapping statute, however, provides a defense only to a parent. There is no ambiguity, much a less a grievous one, that justifies

---

[18] Contrary to Subhanah's claim (Br. 22–23), nothing in the legislative history suggests that Congress intended the "in the case of" language to carry the meaning she now proposes.

[19] Hujrah finds support in an archived U.S. Department of Justice Criminal Resource Manual § 1034 that states, "The kidnapping offense generally does not apply to matters involving the taking of a minor by a parent." *See* Hujrah Br. 10 (citing https://www.justice.gov/archives/jm/criminal-resource-manual-1034-kidnapping-federal-jurisdiction). But this out-of-date manual is not binding and does not address the question of whether the parental exception extends beyond the parent.

application of the rule of lenity. *See United States v. Tony*, 121 F.4th 56, 69 (10th Cir. 2024).

### D. Siraj's immunity does not prevent Defendants from violating § 1201(a).

Hujrah takes a different approach. She argues that a parent's taking of a minor child does not violate § 1201(a), and thus Defendants' actions in aiding and accompanying Siraj and Abdul Ghani could not constitute a conspiracy to kidnap in violation of § 1201(c). Hujrah Br. 10–11. But Defendants' own conduct constituted a conspiracy, even without reference to Siraj. And in any event, the parental exception is merely an affirmative defense that immunizes Siraj from prosecution; it does not follow that Siraj's actions in unlawfully kidnapping his child with the agreement and support of the other Defendants do not violate § 1201.

#### 1. *Defendants conspired among themselves to kidnap Abdul Ghani without regard to Siraj's actions.*

Defendants' actions constituted a conspiracy to kidnap independent of Siraj's conduct. Section 1201(c) provides, "If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life." The superseding indictment charged Subhanah, Hujrah, and Lucas with conspiring with each other (and Jany) to kidnap Abdul Ghani and thus satisfied the requirement that two or more persons

conspire without regard to Siraj. 1JR.182. Likewise, to the extent Hujrah contends that they could not aid and abet Siraj, Hujrah Br. 11, their own actions in unlawfully carrying away and holding Abdul Ghani and aiding and abetting each other in these actions constituted violations of the kidnapping statute. Whether Siraj also violated the statute is immaterial (though he did); Defendants' actions standing alone constituted violations.

2. *Siraj himself violated the kidnapping statute.*

Hujrah's arguments fail for a second reason—Siraj's immunity does not mean that his actions did not violate the statute. The parental exception is an affirmative defense, not an element of kidnapping. An "'exception made by a proviso or other distinct clause'" is an affirmative defense, not an element that must be charged in the indictment. *Dixon v. United States*, 548 U.S. 1, 13 (2006). Section 1201(a) sets out a class of prohibited conduct and then, in a distinct clause set off by commas and beginning with the word "except," provides an exception to that general rule. This structure signals that the parental exception is an affirmative defense.

To the extent the statute's syntax does not resolve the point, its function does. The Supreme Court has explained that in distinguishing between elements and affirmative defenses, one asks whether an exception "is so incorporated with the language defining the offence that the ingredients of the offence cannot be accurately and clearly described" without

it or if instead "the language of the section defining the offence is so entirely separable from the exception that the ingredients constituting the offence may be accurately and clearly defined without any reference to the exception." *United States v. Cook*, 84 U.S. 168, 173 (1872). Stated another way—an "exception is not an element of the offense" "'where one can omit the exception from [a] statute without doing violence to the definition of the offense'" and where there is no "discernible legislative intent to the contrary." *United States v. Rodriguez*, 739 F.3d 481, 488 (10th Cir. 2013). In the case of the federal kidnapping statute, excising the parental exception has no effect on the definition of kidnapping. Indeed, the parental exception is entirely irrelevant to most kidnapping prosecutions.

Consistent with the statutory language, courts have treated the parental exception as an affirmative defense or an immunity granted to the parent. *See Miller*, 123 F.2d at 718 (concluding that the "burden was on the defendant to bring himself within the exception"); *cf. Boettcher*, 780 F.2d at 436 (describing the parental exception as "statutory immunity given the parent"). Because the parental exception is an affirmative defense and not an element, the government does not bear the burden of proving that the defendant is not the parent of a minor victim. Indeed, the Tenth Circuit's

Pattern Jury Instructions (like those of other circuits)[20] do not include the parental exception. *See* 10th Cir. Crim. Pattern Jury Instr. 2.55.

The parental affirmative defense does not mean that Siraj's actions did not violate the kidnapping statute. Instead, "[a]n affirmative defense admits the defendant committed the acts charged, but seeks to establish a justification or excuse." *United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977). In the case of kidnapping, parental status merely "'excuse[s] conduct that would otherwise be punishable'"; it "'does not controvert any of the elements of the offense itself.'" *Smith v. United States*, 568 U.S. 106, 110 (2013). While Siraj has a defense to prosecution, his actions still constitute a kidnapping in which Defendants participated, aided and abetted, and conspired to commit. Siraj's defense does not transfer to Defendants.

Subhanah and Hujrah argue that this conclusion leads to "absurd" results—namely that a parent cannot be punished for kidnapping his or her child, but anyone else involved in the kidnapping can. Subhanah Br. 23; Hujrah Br. 11. But it is not absurd for Congress to provide a defense to excuse only the actions of "a parent, who carried his child away because of affection." *Gooch v. United States*, 297 U.S. 124, 129 (1936). Congress could reasonably limit immunity to the parent based on his or her unique

---

[20] 5th Cir. Pattern Instruction 2.54; 8th Cir. Model Instruction 6.18.1201; 9th Cir. Model Instruction 17.1; 11th Cir. Pattern Instruction O49.

connection to the child and yet still punish anyone else who participates, conspires, and aids in the parent's criminal actions. Indeed, if everyone involved in a parental kidnapping were immunized so long as one parent participated, it would mean that even professional kidnappers hired by a parent could not be punished. *This* would be the absurdity, not the government's reading.

## V. The jury instruction on kidnapping did not mislead the jury.

Subhanah and Hujrah challenge the kidnapping jury instructions. Subhanah Br. 24–27; Hujrah Br. 12–16; Hujrah Notice of Joinder at 3. This Court reviews preserved challenges to the jury instructions' accuracy de novo. *Freeman*, 70 F.4th at 1278. A trial judge's decision to give a particular jury instruction is reviewed only for an abuse of discretion. *Woodmore*, 127 F.4th at 209.

### A. Relevant background

The district court gave the following jury instruction on kidnapping:

> In order for you to find each Defendant guilty of [§§ 1201(a) and 2], the United States must prove each of the following elements beyond a reasonable doubt:
>
> First: The charged Defendants unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held Abdul-Ghani Wahhaj;
>
> Second: The charged Defendants kidnapped Abdul-Ghani Wahhaj for some purpose or benefit;

> Third: The charged Defendants willfully transported Abdul-Ghani Wahhaj; and
>
> Fourth: The transportation was in interstate commerce;
>
> Fifth: Death resulted from the kidnapping.
>
> In the second element, to unlawfully kidnap a person means to hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense. In evaluating this element, you must first determine whether Abdul-Ghani Wahhaj was of such an age or mental state as to have been capable of giving his consent to having been seized, confined, decoyed, abducted, carried away or held. If you determine that Abdul-Ghani Wahhaj was not capable, then you must determine if his being seized, confined, decoyed, abducted, carried away, or held was against Hakima Ramzi's consent.
>
> …
>
> The phrase "for some purpose or benefit" means any purpose or reason which would benefit the charged Defendants. It does not require the United States prove that the charged Defendants kidnapped Abdul-Ghani Wahhaj specifically for reward or ransom.
>
> In the fourth element, the term "willfully" means that the charged Defendants acted voluntarily while intentionally transporting Abdul-Ghani Wahhaj. The United States must prove that the charged Defendants crossed a state line while intentionally transporting Abdul-Ghani Wahhaj, but the United States does not have to prove that the charged Defendants knew they were crossing a state line, only that they did.
>
> …

6JR.3602–03.

### B. Contrary to Subhanah's arguments, kidnapping under § 1201(a)(1) is not a specific-intent crime.

Subhanah argues that for the first element, the district court should have used 10th Cir. Pattern Jury Instruction 2.55, which requires the jury to find that the defendant, "knowingly acting contrary to law, kidnapped the person." *See* Subhanah Br. 25–26. Subhanah offers little argument as to why the "knowingly acting contrary to law" instruction was required and instead refers to her discussion on the mens rea element as part of her sufficiency-of-the-evidence argument. *Id.* at 26–27. There, she contends that kidnapping under § 1201(a)(1) is a specific-intent crime requiring the defendant to willfully transport the victim "in furtherance of the commission of the offense" of kidnapping. Subhanah Br. 28–30. She further argues that even if § 1201(a)(1) is a general-intent crime, it requires "some degree of knowledge" that Abdul Ghani's kidnapping was unlawful. Subhanah Br. 32–35.

Contrary to Subhanah's argument, the jury instructions accurately stated the mens rea for § 1201(a)(1). Subhanah's argument focuses on the requirement that the defendant "willfully transport" the victim. But the jury instructions set forth this requirement in the third element. 6JR.3602. The district court tracked both the statutory language, authoritative case law, and the pattern instruction when it instructed the jury that it must find that the "charged Defendants willfully transported Abdul-Ghani Wahhaj."

6JR.3602. Subhanah does not explain why this "willfully transported" instruction was not sufficient to accurately set forth the mens rea required in § 1201(a)(1).

To the extent Subhanah contends that the district court erred merely by not using the pattern jury instruction language for the first element, that does not establish an instructional error. Subhanah Br. 25–26. Pattern jury instructions are not binding authority. *Freeman*, 70 F.4th at 1280 n.13; 10th Cir. Pattern Criminal Jury Instructions, *Resolution of the Judicial Council of the Tenth Circuit* ("This resolution shall not be construed as an adjudicative approval of the content of such instructions, which must await case-by-case review by the Court."). In the case of the pattern kidnapping instruction, the "knowingly acted contrary to law" language found in the first element has no basis in § 1201(a) and directly conflicts with controlling Tenth Circuit law.[21]

[21] 10th Cir. Pattern Instruction 2.55 also states, "In the third element, the term 'willfully' means that the defendant acted voluntarily and with the intent to violate the law." As explained in this section, this instruction's specific-intent requirement is also incorrect. The district court did not give this instruction, and Subhanah does not challenge it. Hujrah italicizes this omitted instruction and argues that defendant must "cross state lines with the child knowing that doing so is unlawful," but she offers no argument to support this specific-intent requirement. Hujrah Br. 12, 14–15. Even assuming this is sufficiently developed for this Court's consideration, it fails because, as explained in this section, § 1201(a)(1) is not a specific-intent crime.

In *Jackson*, this Court held that federal kidnapping does not require that defendants know their actions are illegal when they kidnap, abduct, or carry away victims. 248 F.3d at 1031. Based on the statute's plain language, *Jackson* rejected the defendant's argument that § 1201(a)(5) is a specific-intent crime. 248 F.3d at 1032. It concluded that *Chatwin*'s requirement of a "'willful intent to confine the victim' means that the perpetrator intended to do the things he did, which were proscribed by law. It does not mean that he acted to confine his victim or victims *knowing such confinement was against the law*." *Id.* at 1031 (emphasis added). While the Court contrasted the language of § 1201(a)(5), which contains no statutory mens rea, with the use of the word "willfully" in § 1201(a)(1), it ultimately did not decide whether § 1201(a)(1) requires specific intent[22] and instead noted that "the word 'willfully' does not always require specific intent," *id.* at 1031 n.2. Importantly, *Jackson*'s holding that § 1201(a)(5) is a general-intent crime necessarily means that paragraph (a), which applies equally to § 1201(a)(1) and § 1201(a)(5) and contains the "unlawfully seized confined, inveigled, decoyed, kidnapped, abducted, or carried away and held" language that the

[22] *See id.* at 1032 ("[W]e hold that although § 1201(a)(1) *may* require specific intent because of inclusion of the word 'willfully,' (a)(5) clearly does not require specific intent because it does not contain such language.") (emphasis added).

district court used in element one of the instruction, requires only general intent.

The absence of a specific-intent requirement in § 1201(a)(1) is confirmed by Congress's 1972 amendment removing the word "knowingly" from the statute entirely, and in § 1201(a)(1)'s case, inserting the word "willfully" only before the jurisdictional provision requiring that the government prove that the victim was willfully transported in interstate commerce. *United States v. Sneezer*, 983 F.2d 920, 922–23 (9th Cir. 1992). While some cases across the circuits include "'knowing and willful' kidnapping as an element" of § 1201(a) (similar to the first element of the Tenth Circuit's pattern jury instructions), this formulation is based on interpretations of the statute that predate the 1972 amendment. *See id.* at 922; *see also* 5th Cir. Pattern Instruction 2.54, Note. The 1972 amendment, the plain language of the statute, and *Jackson* all support the conclusion that the willfulness requirement applies only to the interstate transportation provision, which provides the jurisdictional hook for § 1201(a)(1). Nothing in § 1201(a) requires specific intent or knowledge that the kidnapping violated the law.

The Tenth Circuit's pattern jury instruction appears to be based on *United States v. Walker*, 137 F.3d 1217, 1220 (10th Cir. 1998). *See* Pattern Criminal Jury Instruction 2.55, comment. In reviewing a sufficiency-of-the-

evidence claim, *Walker* identified the elements of § 1201(a)(1) as "(1) transportation in interstate commerce (2) of an unconsenting person who is (3) held for ransom, reward, or otherwise, (4) with such acts being done knowingly and willfully." 137 F.3d at 1220. The issue of whether § 1201(a)(1) is a specific or general-intent crime was not at issue, and *Walker* did not address it. Indeed, in *United States v. Gabaldon*, the Court clarified that *Walker*'s "requirement that the acts constituting kidnapping be done 'knowingly and willfully'" was "unique to the statutory language criminalizing interstate transportation of a kidnapped person." 389 F.3d 1090, 1094 n.1 (10th Cir. 2004). Importantly, nothing in *Walker* said that a defendant must have "knowingly act[ed] contrary to law." It merely required that "such acts" of transporting an unconsenting person in interstate commerce and holding the person for ransom, reward or otherwise must be done knowingly and willfully. 137 F.3d at 1220. *Walker* does not support the conclusion that § 1201(a)(1) requires that defendants know their actions violate the law.

Subhanah identifies no precedent requiring that § 1201(a)(1) defendants know or intend their actions to violate the law. Instead, her specific-intent argument rests on the statutory language of § 1201(a)(1), which requires that the kidnapping victim be "willfully transported in interstate or foreign commerce, … or the offender travels in interstate or

foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." *See* Subhanah Br. 28. She argues that this means that a defendant must willfully transport the victim "in furtherance of the commission of the offense," which in her view equates to a specific intent to further the offense of kidnapping. *Id.* at 30. This is a misreading of the statute.

Section 1201(a)(1) sets forth three separate means to satisfy the interstate-commerce element—1) the victim is willfully transported in interstate commerce, 2) the offender travels in interstate commerce, or 3) the offender uses "any means, facility, or instrumentality of interstate…commerce in committing or in furtherance of the commission of the offense." The "in furtherance" language applies only to the third option, which was added to the statute in 2006 to cover intrastate conduct. *See United States v. Morgan*, 748 F.3d 1024, 1031 (10th Cir. 2014). Prior to the amendment, the statute simply required that "the person is willfully transported in interstate or foreign commerce." *See Jackson*, 248 F.3d at 1030. Here, Defendants were charged only with the first means of violating the statute—by willfully transporting Abdul Ghani in interstate commerce. 1JR.182–83. The "in committing or in furtherance of the commission of the offense" language has no application to Defendants' case.

Subhanah argues that the term "willfully" should apply to "in furtherance of the commission of the offense" as a matter of grammar and the general presumption that the mens rea applies to each element of a crime. Subhanah Br. 29. But even if it were true that "willfully" applies to each means of establishing the interstate-commerce element, it does not resolve the question of whether "in furtherance of the commission of the offense" applies to a transportation case. In any event, the general presumption that the mens rea applies to each element of an offense has limited application in § 1201(a)(1)'s context where this Court has already agreed that "the interstate aspect of § 1201 is merely jurisdictional and not an element of the crime" for which the defendant must possess some *mens rea*. *United States v. Toledo*, 985 F.2d 1462, 1468 (10th Cir. 1993).

Even accepting Subhanah's reading that the statute requires that the victim be "willfully transported in interstate or foreign commerce…in committing or in furtherance of the commission of the offense," the language does not require that defendants know their actions violated the law. Under Subhanah's reading, the statute would simply require a nexus between the transportation and the offense.[23] It does not require that defendants know their conduct is illegal.

---

[23] The nexus requirement makes sense in a case relying on the use of an instrumentality of interstate commerce, as there is no inherent nexus

The appearance of the word "willfully" in the statute does not impose a specific-intent requirement. To be sure, "willfully" is "'a word of many meanings' whose construction often depends on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998). While willfully has at times been interpreted to require specific intent or that the defendant know his or her conduct was unlawful,[24] this Court has also said that "a requirement that an act be done 'willfully' normally does not necessitate proof that the defendant was specifically aware of the law penalizing his conduct." *United States v. Hollis*, 971 F.2d 1441, 1451 (10th Cir. 1992) (cleaned up); *see Jackson*, 248 F.3d at 1031 n.2. Its use may simply require that the government prove that "the defendant had knowledge of his conduct." 10th Cir. Pattern Instruction 1.38 comment; *see, e.g., United States v. Hilliard*, 31 F.3d 1509, 1517–18 & n.5 (10th Cir. 1994) ("willfully" was proved where the defendant "knowingly performed an act, deliberately and intentionally 'on purpose' as contrasted with accidently, carelessly or unintentionally"); *United States v. Youts*, 229 F.3d 1312, 1316 (10th Cir. 2000) (quoting Model Penal

---

between some use of an instrumentality and the kidnapping. In contrast, in a transportation case, the transportation of the victim across state lines necessarily demonstrates a nexus between the offense and the interstate-commerce element and an additional nexus requirement would be mere surplusage.

[24] *See Bryan*, 524 U.S. at 194–98; *Cheek v. United States*, 498 U.S. 192, 201 (1991).

Code § 2.02(8)) ("'A requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense ….'"). Absent any other indication of specific intent, the use of the word "willfully" does not create an additional element of specific intent to violate the law. *See United States v. Carr*, No. 23-3127, 2024 WL 1133549, at *5 (10th Cir. Mar. 15, 2024) (unpublished) ("This court has not held that the kidnapping statute…requires specific intent to use an instrumentality in interstate commerce.").

Subhanah also argues that the enhanced punishment of a life sentence for kidnapping resulting in death supports requiring specific intent. Subhanah Br. 34–35. But the enhancement for kidnappings resulting in death applies equally to every form of kidnapping under § 1201(a), and yet this Court has held that only general intent is required for kidnappings in violation of § 1201(a)(5). *Jackson*, 248 F.3d at 1032. The resulting-in-death enhancement has no bearing on the mens rea.[25]

---

[25] Even if Subhanah is correct that kidnapping is a specific-intent crime, any error in the jury instructions was harmless because the evidence readily established that Defendants knew they were violating the law (even apart from the Georgia court order, which they evaded service on until the very end). Their knowledge can be inferred from 1) the group leaving all possessions and fleeing hurriedly to Alabama after Hakima and the officer came to see Abdul Ghani, 6JR.1317–21, 1564–66; 2) Siraj trying to distance Abdul Ghani from any authorities during the car crash in Alabama, 6JR.1839–40, 1844–45, 1859–60, 3) messages the group received from the family saying they were wanted by the police, 6SJR.419, 468, 486; 4) Siraj's

Alternatively, Subhanah argues that even if kidnapping is a general-intent statute, it still requires knowledge that the kidnapping was unlawful. Subhanah Br. 32. But general intent means simply "'an act done voluntarily and intentionally, and not because of mistake or accident.'" *Jackson*, 248 F.3d at 1030. It requires "that a defendant know the facts that makes his conduct illegal," not that "a defendant know that the conduct in which he engaged was illegal." *Id.* at 1030–31.

Subhanah suggests that the jury instructions effectively set forth a strict-liability offense because the only intent required was the intent to transport the child in interstate commerce, which she describes as "'otherwise innocent conduct.'" Subhanah Br. 35. Before the district court, Defendants only advanced the position that kidnapping was a specific-intent crime and that the jury must be so instructed. 3JR.1712–13. The district court held that the kidnapping was a general-intent crime, meaning that Defendants must have intended to take, hold, or conceal Abdul Ghani. 3JR.1634–35.

---

phone having viewed and screenshotted missing posters related to Abdul Ghani, 6SJR.384–87; 6JR.2732–36; 5) Lucas lying to law enforcement when he went back to Atlanta to try to recruit Muhammad to join the group, 6JR.1922; 6) messages indicating that the FBI was looking for them, 6SJR.463, 507; 7) testimony that they had to all stay down in "the hole" for months to hide from the FBI, 6JR.1374–81, 1596–97, 1609; and 8) their lying about Abdul Ghani when law enforcement came in August, 6JR.2155–56. Had the jury been instructed on specific intent, the outcome would have been the same.

Defendants never argued that the instructions were inadequate to instruct the jury on general intent. Thus, to the extent Subhanah now argues that the instructions failed to set forth the general intent required for kidnapping, this issue is not preserved, and Subhanah's failure to argue for plain-error review on appeal means that it is waived. *McBride*, 94 F.4th at 1044.

Even if this Court were to review for plain error, the instructions necessarily advised the jury that Defendants must have kidnapped Abdul Ghani knowingly when they stated that Defendants must have kidnapped him "for some purpose or benefit." A kidnapping done "for some purpose or benefit" cannot be committed by accident or mistake. The instructions further defined "unlawfully kidnap" to require Defendants "to hold, keep, detain, and confine the person against that person's will." 6JR.3602. These instructions necessarily required the jury to find that Defendants knowingly and intentionally kidnapped Abdul Ghani against his consent (or the consent of his mother). *See Chatwin*, 326 U.S. at 460 ("The act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim."). There was no error in the district court's instruction, much less a plain one.

Even if Subhanah could meet her burden to show that the instruction plainly failed to instruct the jury that the Defendants must have acted

knowingly, she cannot demonstrate that this error affected her substantial rights.[26] As discussed in section VII., the evidence overwhelmingly established that the Defendants knowingly confined, kidnapped, abducted, or carried away and held Abdul Ghani and that they did so knowing that Hakima did not consent. Moreover, to convict on the kidnapping-conspiracy count, the jury had to find that Defendants entered into agreement or reached a mutual understanding to take, conceal, or kidnap Abdul Ghani, which necessarily required the jury to conclude that Defendants acted knowingly. *See* 6JR.3599–3600. Had the district court provided additional instruction on the mens rea, the jury's verdict would undoubtedly have been the same.

### C. Hujrah fails to demonstrate any missing element in the jury instructions.

Hujrah argues that the jury instructions failed to include three elements of kidnapping: 1) "defendant unlawfully seized or confined and held a victim," 2) "*with* a willful intent to confine the victim, *and* 3) then willfully transported him. Hujrah Br. 14 (emphasis in brief). She argues that these elements were included in the proposed pattern instruction, and the district court's instruction eliminated these elements. *Id.* at 14–16. In quoting the

[26] To the extent the Court finds this argument preserved, it is harmless beyond a reasonable doubt for the same reasons it fails under prong three of plain-error review.

proposed pattern instruction, Hujrah underlines certain portions, but she offers no explanation as to what part of the district court's instruction was insufficient. *Id.* at 15.

The first and third statutory elements identified by Hujrah are readily found in the district court's instructions. The instruction covered the first element when it charged the jury that it must find that "[t]he charged Defendants *unlawfully* seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held Abdul-Ghani." 6JR.3602 (emphasis added). It covered the third element when it instructed the jury that it must find that "[t]he charged Defendants *willfully transported* Abdul-Ghani Wahhaj." *Id.* (emphasis added). Hujrah offers no explanation as to why the instructions did not adequately cover these elements.

As to the willful intent to confine the victim, the district court instructed that the Defendants must have kidnapped Abdul Ghani "for some purpose or benefit" and defined the term "to unlawfully kidnap a person" as "to hold, keep, detain, and confine the person against that person's will." 6JR.3602. As discussed above at V.B., *Chatwin* concluded that this purpose element "necessarily implies … a willful intent to so confine the victim." 326 U.S. at 460. Hujrah does not address the purpose-or-benefit instruction or explain why it was not sufficient. She has demonstrated no error in the district court's instructions on the three elements she underscores.

Hujrah also asserts that the kidnapping was not unlawful under Georgia law. Hujrah Br. 14. Defendants, however, never argued in district court that the jury should be instructed on Georgia law or proposed instructions to that effect. Indeed, Hujrah's counsel waived this argument by specifically asking that the jury *not* receive information on Georgia law. 2SJR.375–76. Even now, Hujrah does not explain how her arguments regarding Georgia law impact the jury instructions. Even if it were relevant (and it is not as explained in section VII.A.1), the question of whether Abdul Ghani's kidnapping violated Georgia law was a legal question reserved for the judge, not a factual issue on which the jury must be instructed. Hujrah's Georgia-law argument is irrelevant for purposes of the jury instructions.

Finally, Hujrah perfunctorily argues that the district court should have included the instruction, "Kidnapping cannot occur when a parent takes their minor child, even without consent of the other parent." Hujrah Br. 15–16. Hujrah offers no explanation as to why this proposed instruction was required. And as explained in sections IV.C and IV.D, Defendants' proposed instruction is an incorrect statement of law. The district court did not err by declining to give this instruction.

## VI. The kidnapping-conspiracy jury instruction did not mislead the jury.

Subhanah also challenges the kidnapping-conspiracy jury instruction. Subhanah Br. 24–25, and Hujrah joins, Hujrah Br. 28. Subhanah contends that the district court erred by refusing to give the proposed pattern instruction requiring the jury to find that "the defendant agreed with at least one other person *to violate the law*," which she argues is the "essence of the crime of conspiracy." *Id.* at 24–25. Subhanah further contends that the jury instructions failed to convey that Defendants must have knowingly assisted in the kidnapping. *Id.* at 30. She also appears to challenge the instruction on grounds that it did not require the jury to find that the Defendants knew their actions violated the law. *Id.* at 30–31. She is wrong on all counts.

The jury instructions accurately instructed the jury that it must find that the "Defendants entered into a conspiracy," which it defined as "an agreement between two or more persons to accomplish an unlawful purpose.' 6JR.3599. The instruction continued, "the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan." 6JR.3600. It further explained, "the evidence must show a Defendant knowingly joined the conspiracy with the intent to advance its purposes." 6JR.3600. These instructions accurately conveyed the same legal standard in the proposed pattern instruction that

"the defendant agreed with at least one other person to violate the law." 10th Cir. Pattern Criminal Jury Instruction § 2.19. Subhanah does not explain how the district court's instruction materially differs from the pattern instruction or what was misleading about it.

Contrary to Subhanah's argument, a jury need not find that a defendant "knowingly" *do* something "that assisted in the kidnapping of a child" to be guilty of conspiracy. Subhanah Br. 30. "The foundation of a conspiracy is the *agreement* to commit an unlawful act." *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009) (emphasis added). One of the conspirators must commit an "overt act to effect the object of the conspiracy," 18 U.S.C. § 1201(c), but there is no requirement that each coconspirator knowingly assist. The jury instructions required that the evidence "show a defendant knowingly joined the conspiracy with the intent to advance its purposes." 6JR.3600. This accurately stated the law. *United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (defendant must have "'knowingly and voluntarily participated in the conspiracy'"). Subhanah has shown no error in this instruction.

Subhanah also appears to argue that the jury was insufficiently instructed on the mens rea, which in her view requires knowledge that the conspiracy's object violates the law. Subhanah Br. 30–31. While conspiracy is a specific-intent crime, the specific intent required is "'the intent to advance

or further the unlawful object of the conspiracy.'" *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995). Absent a specific-intent requirement in the underlying substantive offense (and as discussed in section V.B., kidnapping has none), conspiracy does not require proof that Defendants acted with knowledge that their conduct violated the law. *Id.* at 643 (holding "the prosecution need not prove a defendant intentionally violates a known legal duty in order to sustain a conviction under § 371 in cases where the underlying substantive offense does not impose such a requirement"); *see also Feola*, 420 U.S. at 687 ("The general conspiracy statute, 18 U.S.C. § 371,[27] offers no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law.").[28] Subhanah has not shown how the district court's instruction was

[27] While kidnapping conspiracies are charged under § 1201(c) as opposed to the general conspiracy statute, their substantive elements are the same.

[28] Subhanah cites *United States v. Weeks*, 653 F.3d 1188, 1202 (10th Cir. 2011), which set forth the rule that "'a conspiracy conviction requires at least the degree of criminal intent necessary for the substantive offense itself'" and then concluded that "[a]n agreement with others that certain activities be done, without knowing at the time of the agreement that the activities violate the law, is therefore insufficient to establish conspiracy." Perhaps this conclusion was based on the elements of the underlying securities fraud offense. *See id.* ("Knowledge of an agreement to violate the law is a critical element of the offense to which Mr. Weeks pled guilty."). If not, then it is inconsistent with *Blair* and *Feola*, which it did not address. Subhanah also cites *United States v. Nall*, 949 F.2d 301, 305 (10th Cir. 1992), which says "the purpose of [the] agreement must be to break the law," but does not

inaccurate or that the court abused its discretion in declining to use Defendants' proposed instructions.

## VII. Sufficient evidence supported Subhanah's, Hujrah's, and Lucas's kidnapping convictions.

Subhanah, Hujrah, and Lucas challenge the sufficiency of the evidence to support their kidnapping convictions. Subhanah Br. 27–37; Hujrah Br. 16–20; Hujrah Notice of Joinder at 3 (joining in Subhanah's arguments); Lucas Br. 49–52 (joining in Subhanah's and Hujrah's arguments). Contrary to Defendants' argument, the trial evidence was sufficient for the jury to find each of the kidnapping elements beyond a reasonable doubt.[29]

### A. A reasonable jury could find that Lucas, Hujrah, and Subhanah unlawfully kidnapped Abdul Ghani.

#### 1. *The trial evidence showed that Abdul Ghani's kidnapping was unlawful.*

Subhanah and Hujrah challenge the sufficiency of the evidence to establish that Abdul Ghani's taking was unlawful. Hujrah Br. 18–19, Subhanah Br. 35–37.[30] Lucas joins in their arguments, Lucas Br. 49, and Hujrah joins in Subhanah's, Notice of Joinder 3.

---

address whether the defendant must *know* his or her conduct violated the law.

[29] Defendants do not challenge the interstate-commerce element.

[30] Subhanah also challenges the sufficiency of the evidence to show that she acted with the specific intent "'to further the offense of kidnapping.'" Subhanah Br. 30; *see also* Hujrah Notice of Joinder at 3 (joining argument that kidnapping statute requires "willful intent (meaning voluntarily and

A defendant kidnaps a victim within the meaning of § 1201 when he or she "*unlawfully* seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds" the victim. 18 U.S.C. § 1201(a) (emphasis added). The statute does not define the term "unlawfully." The Supreme Court, however, explained in *Chatwin* that "involuntariness of seizure and detention … is the very essence of the crime of kidnaping." 326 U.S. at 464. Kidnapping "implies an *unlawful* physical or mental restraint for an appreciable period *against the person's will* and with a willful intent so to confine the victim." *Id.* at 460 (emphasis added). In the context of a victim lacking capacity to consent due to age or mental state, such as Abdul Ghani,[31] "the confinement then must be against the will of the parents or legal guardian of the victim." *Id.*

In this case, Hakima plainly did not consent to Abdul Ghani's taking, and Defendants do not argue otherwise. Instead, Defendants argue that Hakima's adamant lack of consent does not make Abdul Ghani's taking

with the intent to violate the law)". But as discussed in section V.B., the kidnapping statute requires only general intent, and Subhanah and Hujrah do not attempt to argue that their actions were the result of accident or mistake.

[31] Subhanah asserts that Abdul Ghani was "too young to consent," Subhanah Br. 36, and the United States agrees. To the extent he was not, the evidence shows that he communicated his lack of consent by asking to go "home," in the days following his taking, 6JR.1314, 6SJR.56; and crying and reaching for Hakima, 6JR.1101.

"unlawful" within the meaning of § 1201. Subhanah takes the position that so long as the child's father consented, he could override Hakima's clear and unequivocal refusal. Subhanah Br. 36. Subhanah claims Siraj had the "all the traditional parental rights to consent on behalf of his own child," *see id.*, but she ignores that Hakima enjoyed these same rights (to say nothing of the factual evidence of Hakima's full-time custodianship of Abdul Ghani before his kidnapping). Subhanah cites no authority holding that one parent can singlehandedly extinguish the will of another. On the contrary, a number of cases have acknowledged that kidnapping is unlawful under § 1201 even when one parent consents to the kidnapping and conspires to bring it about. *See* section IV.C. If one parent's consent were enough, none of these cases would have constituted a federal kidnapping. Instead, they demonstrate that a kidnapping is unlawful when it is against the consent of *a* parent.[32]

[32] *Chatwin* recognizes that a kidnapping can be against the will of the legal guardian. 326 U.S. at 460. This acknowledges that state custody or guardianship proceedings may shape the consent required in a particular case. Where the state has granted custody or decisionmaking authority to a legal guardian, the guardian's consent may govern depending on terms of the legal custody. But absent a custody order depriving a parent of decisionmaking authority, both parents retain the authority to withhold consent. This makes sense in light of the clear policy purpose behind *Chatwin*'s explication of the parental consent rule: that snatching a small or helpless child away from their caregiving custodian against the will of that custodian is a crime.

Section 1201's unlawfulness element does not require that the kidnapping be separately unlawful under some other statute. *See* Hujrah Br. 14; Lucas Br. 50. Indeed, this Court has never held that kidnapping requires proof of an underlying predicate crime.[33] Instead, its inquiry focuses on whether the kidnapping was against the consent or will or the victim. *See Walker*, 137 F.3d at 1220 (identifying the elements of kidnapping as "(1) transportation in interstate commerce (2) of an unconsenting person who is (3) held for ransom, reward, or otherwise, (4) with such acts being done knowingly and willfully."); *see also* 10th Cir. Pattern Instruction 2.55 ("To 'kidnap' a person means to unlawfully hold, keep detain and confine the person against that person's will."). Defendants cite no case requiring that the government prove an underlying predicate crime to sustain a federal kidnapping conviction.

Even if it were appropriate for the Court to look to underlying state law to determine whether Abdul Ghani's kidnapping was unlawful, both Georgia and New Mexico law readily show that it was. As his mother, Hakima had a

[33] The unlawfulness requirement applies to all kidnappings, not just child kidnappings. In other contexts, a requirement that the government prove some additional statutory violation becomes even more convoluted. What would be the underlying state or federal crime that would make the kidnapping of a competent adult unlawful?

right to lawful custody of Abdul Ghani, even absent a custody order.[34] Under both Georgia and New Mexico law, it was a crime for any of the Defendants, including Siraj, to interfere with Hakima's custody by taking Abdul Ghani from Hakima and leaving Georgia for New Mexico for the purposes of concealing him and depriving Hakima of custody.[35] And this conduct was also punishable as kidnapping in both Georgia and New Mexico.[36] Even if some separate state law violation were necessary to establish a federal kidnapping's "unlawfulness," Siraj's status as Abdul Ghani's father does not immunize him under either state's law and does not otherwise make it lawful

---

[34] *See* OCGA § 16-5-45(a)(3) ("'Lawful custody' means that custody inherent in the natural parents…."); NMSA § 30-4-4(A)(5) ("'[R]ight to custody means the right to physical custody or visitation of a child arising from: (a) a parent-child relationship between the child and a natural…parent absent a custody determination.").

[35] *See* OCGA § 16-5-45(c)(1) ("A person commits the offense of interstate interference with custody when without lawful authority to do so the person knowingly or recklessly takes or entices any minor…away from the individual who has lawful custody of such minor…and in so doing…removes such minor…from this state."); NMSA § 30-4-4(B) ("Custodial interference consists of any person, having a right to custody of a child, maliciously taking, detaining, concealing or enticing away or failing to return that child without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child of his right to custody.").

[36] OCGA § 16-5-40(a) ("A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will."); NMSA § 30-4-1(A) ("Kidnapping is the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent:…(2) that the victim be held as a hostage or shield and confined against his will.").

for him to transport Abdul Ghani across state lines to secret him away from Hakima.[37]

The time it took for Hakima to obtain a court order for law enforcement to pick up Abdul Ghani did not create a twilight period during which it was lawful for Defendants to transport Abdul Ghani out of Georgia without Hakima's consent. *See* Hujrah Br. 13, 18; Lucas Br. 50. For purposes of § 1201(a)(1), Abdul Ghani's kidnapping was unlawful from its inception

---

[37] Georgia law allows parents to be prosecuted for custodial interference and kidnapping their own children. *See Vistein v. Henson*, 746 F. App'x 937, 939 (11th Cir. 2018) (finding probable cause to arrest mother for retaining child out of state in violation of § 16-5-45(c)(1) and (2) where mother and father had joint custody of child); *State v. Smith*, 702 S.E.2d 663, 665–66 (Ga. Ct. App. 2010) (sufficient evidence supported kidnapping conviction because father lacked lawful authority to move his daughter and hold her against her will); *Arnold v. State*, 628 S.E.2d 605, 607–08 (Ga. Ct. App. 2006) (finding factual basis for guilty plea to custodial interference where father "hit the mother, grabbed the child, and tried to leave"); *State v. Evans*, 442 S.E.2d 287, 288 (Ga. Ct. App. 1994) (custodial-interference statute applies when parent lawfully removes child from state, but unlawfully retains custody out of state); *cf. Adams v. State*, 126 S.E.2d 624, 626 (Ga. 1962) (holding father could not be prosecuted for kidnapping under prior Georgia statute that has since been amended).

New Mexico law is the same. *See Rios v. Riedel*, 456 F. App'x 720, 724 (10th Cir. 2012) (finding probable cause to arrest mother for custodial interference with father's custody rights under New Mexico law even though biological father had no custody determination in place); *State v. Marquez*, No. 30,565, 2012 WL 1252956, at *6 (N.M. Ct. App. Mar. 7, 2012) (unpublished), *rev'd on other grounds*, No. 33,548, 2015 WL 1291651 (N.M. Mar. 23, 2015) (finding no parental exception to kidnapping); *State v. Munoz*, 129 P.3d 142, 143 (N.M. 2006) (prosecution of biological father with joint legal custody for custodial interference).

because it was against Hakima's will. Even under Georgia law, the pickup order does not mark the moment Abdul Ghani's taking became unlawful. *See* Lucas Br. 50; Hujrah Br. 12–13. As his natural parent, Hakima had lawful custody of Abdul Ghani. *See* OCGA § 16-5-45(a)(3). As the Georgia court found, Siraj "absconded" with Abdul Ghani on November 30, 2017. *See* 6SJR.31. Taking Abdul Ghani from Hakima's custody and fleeing the state of Georgia was a crime under Georgia law.[38] *See* OCGA § 16-5-45(c). The pickup order simply attempted to remedy the already unlawful taking by ordering that Abdul Ghani be returned to his mother's custody.

Hujrah further argues that Siraj's taking of Abdul Ghani could not be unlawful under Georgia law because there was no custody order providing "'exact notice of the line which may not be transgressed,'" as required by *Brassel v. State*, 385 S.E.2d 665, 666 (Ga. 1989). Hujrah Br. 14, 18. *Brassel* involved the misdemeanor prosecution of a father who had been granted "'the right of reasonable visitation, which shall include, but not be limited to, every

[38] One local police officer's belief that he lacked authority to immediately take Abdul Ghani from Siraj the morning after Abdul Ghani was taken from Hakima does not make Siraj's actions lawful. *See* Hujrah Br. 10, 13; *see also* 6JR.1992–93. At that point, Defendants had not yet fled the state, and the situation was still developing. Indeed, Captain William Stubbs believed Siraj was appropriately included in the National Crime Information Center database after he absconded with Abdul Ghani. 6JR.3343. And regardless, the Court reviews de novo whether the unlawfulness element is satisfied; the legal opinion of a single Georgia patrol officer before the Defendants carried Abdul Ghani out of the state does not control.

weekend'" for retaining his child without the child's mother's permission (at home, within the state) for two extra days. *Brassel*, 385 S.Ed.2d at 665. Pointing to the language of the custody agreement that did "not limit the definition of 'reasonable,'" the court found the custody agreement insufficiently specific to provide "notice of the exact conduct giving rise to the prosecution." *Id.* at 666. *Brassel* was a case on the margins; this case is not. Defendants stole Abdul Ghani away from his mother and crossed multiple state lines to conceal him with the intent to deprive her permanently of his lawful custody. This was plainly illegal under Georgia law, as well as New Mexico law and federal law.

Defendants' attempt to take refuge in *Chatwin*'s admonitions that courts should avoid expanding § 1201 beyond "'true kidnappings'" ignore the vast differences between *Chatwin* and this case. Subhanah Br. 36–37. *Chatwin* involved a 15-year-old who *voluntarily* traveled to Mexico and married against her parents' wishes. 326 U.S. at 457–60. *Chatwin* cautioned against the application of the federal kidnapping statute to similar situations which may be "unattractive or immoral" but lack "the involuntariness of seizure and detention which is the very essence of the crime of kidnapping." *Id.* at 464. There is no danger of that here. Abdul Ghani was seized without Hakima's knowledge, held without her consent in the face of her pleas for his return, rushed over state lines to avoid detection, and then held and

concealed in a buried camper in a remote patch of New Mexico sagebrush. Whatever the description of a "true kidnapping" might be, Defendants' actions here fall squarely within it, and their conduct is an exemplar of the "very essence of the crime of kidnapping" within parameters of § 1201(a)(1).

2. *The trial evidence showed that Defendants kidnapped Abdul Ghani.*

Subhanah, Lucas, and Hujrah challenge the sufficiency of the evidence to show that each of them personally kidnapped Abdul Ghani because they contend it was Siraj who took Abdul Ghani and they were merely "along for a ride." Lucas Br. 50–52; *see also* Subhanah Br. 40–41; Hujrah Notice of Joinder at 3 (joining in Subhanah's sufficiency arguments). Contrary to their claims, there was ample evidence from which the jury could find that they agreed to and personally participated in Abdul Ghani's kidnapping.

Hujrah was instrumental in the kidnapping from the beginning. Hujrah traveled to the United Kingdom with Siraj to learn the intense exorcism-style ruqyah that eventually killed Abdul Ghani. 6JR.1069, 1074–77, 1147. She and Siraj personally met with Hakima to accuse her of using black magic on Abdul Ghani. 6JR.1070–72, 1079–80, 1148. Hujrah (like everyone else) agreed that Jany was Abdul Ghani's real mother and that Hakima had stolen him from Jany's womb through black magic. 6JR.1305–10, 1783–84. Hujrah also helped Jany write her book. 6JR.1809–10. After

Siraj took Abdul Ghani from Hakima, Hujrah attended the meeting at Muhammad's house to attempt to convince Muhammad that Hakima was doing black magic. 6JR.1092, 1984–85. She also sheltered Siraj, Jany, Abdul Ghani, and their six other children in her small apartment once Jany and Siraj came to believe they were no longer safe from scrutiny in their home. 6JR.1315, 1784–85, 1991–92; 7SJR.18. After a police officer came to Hujrah's apartment looking for Abdul Ghani, Hujrah participated in a meeting with the other adults, after which they left Georgia in a rush. 6JR.1316–17; 7SJR.21–22. Hujrah withdrew $11,600, draining almost the entire balance of her bank account, 6JR.2869, 6SJR.509; hastily disenrolled her daughter from school, 6JR.440, 1194, and drove herself and her daughter to Alabama to accompany the group. 6JR.1327. At some point, she abandoned her car and traveled with Abdul Ghani and the rest of the group in Lucas's box truck and trailer across state lines to New Mexico. 6JR.1327–28, 1792–93. Hujrah even helped drive the truck. 6SJR.396.

In New Mexico, Hujrah lived in a small trailer with Abdul Ghani, 6JR.1524, bore witness to his suffering during the hours-long ruqyah sessions, and even complained of the noise his crying made, 6JR.1331–33, 1523–24. Hujrah took no action during Abdul Ghani's ruqyah sessions, even when he was showing signs of an acute medical emergency, and made no effort to report his death. 6JR.1333, 1345–46. Instead, she slept with his body

stored under her bed. 6JR.1355. And when law enforcement eventually arrived, Hujrah refused to tell them where Abdul Ghani was. 6JR.2155–56. Hujrah actively participated in confining, carrying away, holding, and concealing Abdul Ghani in the New Mexico compound.

Subhanah and Lucas also played central roles in Abdul Ghani's kidnapping. They too subscribed to Jany's claim that Abdul Ghani was Jany's son stolen from Jany's womb through black magic, 6JR.1305, 1518, 1547–55, 1783–84, as well as that Abdul Ghani was Isa, 6JR.1583–84. 1806–07. The teen boys testified that Subhanah and Lucas attended the meeting of the adults that occurred shortly after the police officer came to Hujrah's apartment about Abdul Ghani and just before the group hurriedly left for Alabama. 6JR.1317, 1479–80, 1509, 1514–15, 1526, 1681–82. While Hujrah's daughter testified and Jany's book suggested that Subhanah and Lucas may have already been in Alabama by the time the others arrived, 6JR.1786, 7SJR.23,[39] the jury reasonably could have credited the testimony of the older boys who provided details regarding Lucas's emotional reaction to Jany's prophesies at the family meeting at Hujrah's house, 6JR.1681–83.

Regardless of when Subhanah and Lucas joined the group, they undoubtedly were instrumental in the group's activities in Alabama where

[39] *Cf.* 6JR.1429 (J.L.J.'s testimony that it was possible that Subhanah and Lucas were already camping on the land as stated in Jany's book).

Lucas provided his land and trailer to harbor Abdul Ghani and the group. 6JR.1321–23, 1487–88, 1566. And Jany's book says that they "recapped the stories [Lucas] missed," 7SJR.23, so Lucas was well aware of what was happening. After Siraj crashed his vehicle during the flight to New Mexico, Lucas helped transport Abdul Ghani and the group across state lines in his truck and trailer. 6JR.1487–88, 1509. Subhanah and Lucas made this journey with Abdul Ghani first to Alabama and then to New Mexico based on their belief in Jany's messages. 6JR.1323–24, 1770.

In New Mexico, Lucas and Subhanah held Abdul Ghani on what Lucas initially believed to be his land and in Lucas's trailer. 6JR.1323–24, 1435, 2357–61. Lucas contributed to the group's efforts to build the compound, 6JR.1770, and rented equipment to clear the land. 6JR.1751–52. During his return trip to Atlanta around New Year's 2018 to recruit Muhammad to join the group, Lucas concealed Abdul Ghani's whereabouts when questioned by law enforcement and Muhammad. 6JR.1922–23, 2033, 2036, 2038. Lucas told the children not to talk about Abdul Ghani's death. 6JR.1806.

Back in New Mexico, Subhanah supported the daily activities and care of the group, including Abdul Ghani. Subhanah cooked and cleaned, including cleaning the trailer where Abdul Ghani was held. 6JR.1508. She was often in the trailer, and like everyone else, she knew of the tortuous

ruqyah sessions Abdul Ghani endured, 6JR.1515–16, 1577, and of Abdul Ghani's fragile medical state, *see* section VII.D.

Other than physical assistance and participation, Subhanah's biggest contributions to the group's efforts to take and conceal Abdul Ghani were by serving as the messenger of the group. She communicated more than anyone else to family members and friends to dissuade them in their efforts to find Abdul Ghani and to brush aside concerns about his medical needs.[40] Subhanah referred to the messages and postings made by family members as "lies." 6SJR.473. She claimed, "There was no kidnapping," 6SJR.140, and reassured everyone that she and her family were "[a]live and well," 6SJR.137, despite knowing full well that Abdul Ghani died several weeks

[40] *See, e.g.,* 6SJR.135 ("Trust me when I say, things are NOT what they appear to be ...."); 6SJR.134 ("Please advise Maisha to stop making these comments on [Facebook]. It's not helping."); 6SJR.139 ("I sincerely appreciate your genuine concern. I could imagine What you all believe is taking place. I make du'a that Allah defends me and all the parties slandered. There's no need for me to say anymore and it's easy to make people believe anything nowadays. Alhumdulillah me and my family are safe…."); 6SJR.140 ("You have no idea what is going on. You need to learn the facts before making accusations."); 6SJR.141 ("I didn't know I was missing y'all. This is hilarious."); 6SJR.142 ("Think about it, why would my dad Imam Siraj Wahhaj message people and tell them to contact the Clayton County Police if they find me and my siblings, rather than asking them to contact him?") (cleaned up); 6SJR.39 ("Someone wrote something disturbing about [Jany] and [Siraj] and the family that is circulating…. Apparently they are making people think negatively about [Siraj] and they have write[n] the names and ages of all the children and they are circulating it on [Facebook], etc."); 6SJR.473–74 (Subhanah's text discussing the missing-child flyers).

earlier. In addition to managing the group's communications with concerned family members, Subhanah (who had previously written and published a book) helped edit Jany's book, which told the story of the group's abduction of Abdul Ghani and flight to New Mexico. 6JR.1555–56, 1810. Subhanah's credit card was also used to buy supplies for the group. 6JR.2875–78; 6SJR.508.

During the time that most of the group were hiding in the trailer and surrounding tunnels and holes to avoid detection by law enforcement, Lucas and Subhanah supported their continued concealment of Abdul Ghani's body by leaving the land to obtain supplies. 6JR.1767, 1814; 6SJR.146, 508. When the group's resources ran dry, Subhanah solicited money and food to allow the group to remain in hiding while swearing those she contacted to secrecy. 6SJR.143–45, 443–46, 500–05. Lucas reached out to his mother and sister to ask for money for food. 6JR.3496–97; 6SJR.146. After law enforcement arrived at the compound looking for Abdul Ghani, Subhanah lied and claimed she knew nothing. Ex. 43; 6JR.1591–92.

Contrary to Subhanah and Lucas's arguments, Lucas Br. 50–51, Subhanah Br. 40, the evidence discussed above shows that Defendants did not merely fail to intervene or report Abdul Ghani's whereabouts. Far from it, all three Defendants actively participated in confining, carrying away, concealing, and holding Abdul Ghani until and after his death. Lucas also

argues that there was no evidence that he had sole possession of Abdul Ghani, participated in his care, or performed ruqyah on him, Lucas Br. 50, and Hujrah also emphasizes that she never performed ruqyah on him, Hujrah Notice of Joinder at 3. But none of these actions are elements that the government must prove to sustain a kidnapping conviction. Subhanah protests that she did not kidnap Abdul Ghani because "she was no more than another passenger," Subhanah Br. 40, and Hujrah argues that she did not participate in the actual taking or transportation of Abdul Ghani, Hujrah Notice of Joinder at 3. Kidnapping liability, however, is not limited to the one who initially snatches the child or drives the vehicle (although the texts show Hujrah did drive, 6SJR.396).[41] Subhanah and Hujrah actively participated in the kidnapping in the many other ways detailed above.

---

[41] *See United States v. Hopper*, 663 F. App'x 665, 667–68, 672 (10th Cir. 2016) (affirming conviction of defendant who joined kidnapping after the victim was seized and was not the driver); *see also United States v. Bordeaux*, 84 F.3d 1544, 1548 (8th Cir. 1996) (sufficient evidence for kidnapping conviction where defendant was in the car when the victim was offered a ride by someone else, took part in beating the victim, and sat next to the victim in the car and occasionally hit the victim in the back of the head and told him not to "mess with the boys," and never got assistance for the victim after he left the group); *Carpenter v. United States*, 264 F.2d 565, 572 (4th Cir. 1959) (concluding that for purposes of a kidnapping conviction it did not matter which of the defendants "was the first to seize control of the kidnap victims or their automobiles, or that one was driving at a particular time and the other was not. If they were acting in concert, each acting voluntarily in the pursuit of their joint purpose, each was responsible….").

Considering the evidence in the light most favorable to the government, the evidence showed that Hujrah, Subhanah, and Lucas helped shelter and transport Siraj and Abdul Ghani, traveled with them across state lines, remained with them through dire conditions in New Mexico, did nothing to obtain assistance for Abdul Ghani or report his whereabouts or ultimately his death, and instead went to great efforts to conceal him and themselves from friends, family, and the authorities. All three believed in Jany's prophesies regarding Abdul Ghani and voluntarily contributed their resources and labor to further the kidnapping scheme. They were no mere bystanders but active participants. This is more than sufficient for the jury to conclude that they kidnapped Abdul Ghani. *See, e.g., United States v. Pedroza*, 750 F.2d 187, 198 (2d Cir. 1984) (sufficient evidence of kidnapping where defendant was not present for abduction but stayed at the house where the victim was held and drove around with co-defendants as they made final arrangements to exchange the victim for cocaine).

3. *At a minimum, the trial evidence was sufficient to show aiding and abetting.*

Regardless of whether the evidence was sufficient to show that Hujrah, Subhanah, and Lucas *personally* kidnapped Abdul Ghani, the evidence was more than sufficient to sustain their conviction on an aiding-and-abetting theory. *See* 1JR.182–83; 6JR.3605–06. To convict on an aiding-and-abetting

theory, the jury would have to conclude that they "willfully associated" themselves with the kidnapping and "sought to make it succeed through some action of [their] own." *Hopper*, 663 F. App'x at 671–72. For purposes of aiding and abetting, "[m]ere knowledge of the crime or presence at the crime scene is insufficient—there must be some 'showing of intent to further the criminal venture.'" *Id.* All the evidence discussed above demonstrates the myriad ways in which Hujrah, Subhanah, and Lucas willfully associated themselves with the kidnapping, intended to further its objectives, and actively worked to help it succeed.

Subhanah challenges the sufficiency of the evidence on aiding and abetting by attempting to minimize her contributions to the kidnapping. Subhanah Br. 42–43. But even the evidence she herself cites is sufficient to show that she contributed to the efforts to confine and hold Abdul Ghani and to conceal him. Subhanah, as well as Lucas and Hujrah, were not convicted for "'mere omissions'" or "'inactions,'" *id.* at 41, but for all the things they did to kidnap and aid and abet the kidnapping of Abdul Ghani.

4. *The trial evidence showed that Lucas knew Hakima did not consent.*

Lucas argues that the evidence was insufficient to show that he *knew* Hakima did not consent. Lucas Br. 50. But the evidence of Defendants' knowledge was overwhelming.

The evidence discussed in section VII.A.2 of Lucas's belief in Jany's claims regarding Abdul Ghani and Lucas's role in the group's hurried flight from Georgia and its elaborate efforts to conceal Abdul Ghani in New Mexico all supports the inference that Lucas knew Hakima did not consent to Abdul Ghani's kidnapping.

In addition, Hakima's extended family and friends posted on social media seeking Abdul Ghani's return and reached out directly to Siraj, Jany, Hujrah, and Subhanah. 6JR.1102, 1105–07, 1195–97, 1211; 6SJR.17–18, 33–39, 121–46, 466–76. The group knew that family members were posting on Facebook and had made flyers seeking Abdul Ghani's return.[42] Siraj received a text message from the Department of Family and Children's Services, 6SJR.465, and knew law enforcement was looking for him, 6SJR.468 (text from Imam Tariq informing Siraj that there was an All Points Bulletin (APB) out on him and the family). The group knew full well that Hakima was doing everything in her power to secure Abdul Ghani's return. While these text messages included Jany, Siraj, Hujrah, and Subhanah, but not Lucas, the jury could readily infer that this information was shared among the group.

[42] 6SJR.384–87 (flyers and posts screenshotted on Siraj's phone); 6SJR.471 (text message between Jany and Siraj discussing Facebook page); 6SJR.473–75 (text message between Subhanah and Isha Holder referencing social media postings and flyers); 6SJR.476 (text to "Sis" asking "Where the baby[?]" and "Why don't u turn urself in[?]").

Indeed, it was common knowledge among the group that Abdul Ghani was taken against the will of Hakima. Jany's book reported that she received a message from God ordering Siraj to take Abdul Ghani so that they could perform ruqyah on him, and Siraj did so by whisking him away while Hakima was showering. 7JSR.16. The contents of the book were shared with the group, and Subhanah and Hujrah helped edit and write the book. 6JR.1277–80, 1555–56, 1770, 1809. The group, including Lucas, believed Jany's messages regarding Hakima stealing Abdul Ghani from Jany's womb and the need to perform ruqyah on Abdul Ghani to drive out evil spirits. *See* section VII.B; 6JR.1770. Even the children knew that Siraj had taken Abdul Ghani without Hakima's consent, and the group was hiding because Hakima had reported him missing. 6JR.1308, 1405, 1562–63, 1784. Jany's oldest son testified that Lucas knew that Hakima would never voluntarily abandon her child to Siraj. 6JR.1769.

Lucas's concealment of Abdul Ghani's whereabouts when questioned by law enforcement in Atlanta in December 2017 further supports the inference that he knew that Hakima had not consented to Abdul Ghani's taking. 6JR.1922. This inference is also supported by Lucas's hurried, if not downright suspicious, aid to Siraj and transfer of all the belongings from the wrecked car through the porthole in Lucas's box truck in Alabama in the middle of the night. 6JR.1853–54. Considered in the light most favorable to

the government, the trial evidence supported the inference that Lucas, like the other members of the group, knew that Abdul Ghani had been taken against Hakima's will.

### B. A reasonable jury could find that Defendants kidnapped Abdul Ghani for some purpose or benefit.

Defendants challenge the sufficiency of the evidence to show that they kidnapped Abdul Ghani for some purpose or benefit. Lucas Br. 51; Subhanah Br. 40; Hujrah Notice of Joinder at 3.

The kidnapping statute requires that the kidnapping be done "for ransom or reward or otherwise." 18 U.S.C. § 1201(a). To satisfy this element, the government need only prove that "the holding of the kidnap victim fulfill some 'purpose desired by the captor.'" *Gabaldon*, 389 F.3d at 1095. The purpose or benefit requirement is "very lax." *Id.* at 1096. Concealment of the victim satisfies this requirement. *Id.* (sufficient benefit shown where the transportation of the kidnapping victim gave defendant greater secrecy in disposing of the victim's body and the opportunity to destroy evidence); *United States v. Sarracino*, 131 F.3d 943, 947 (10th Cir. 1997) ("Moving a victim … to prevent detection satisfies the statute."). Intangible benefits do too. *See Hopper*, 663 F. App'x at 672 (finding that defendant's desire to "make her brother happy" satisfied the purpose requirement).

The evidence showed that Defendants believed they were prophets, 6JR.1808, 7SJR.32–33, and that Jany was receiving messages from God. 6JR.1547–49. They all believed that Hakima stole Abdul Ghani from Jany's womb, that Hakima caused Abdul Ghani to be possessed by evil spirits that caused his medical conditions, and that Siraj should perform ruqyah on Abdul Ghani to rid him of these evil spirits. 6JR.1518, 1523, 1525–26, 1547–1554, 1683, 1769–70, 1783–84. And after Abdul Ghani died, they believed he would resurrect as Isa, 6JR.1583–84, 1806, potentially through the baby that Subhanah was pregnant with at the time, 6JR.1507–08. Defendants' agreement with these beliefs can also be inferred by their actions in traveling with the group to New Mexico; using their resources to create a compound where they could shelter and avoid detection; and remaining there together for months despite the harsh conditions. Kidnapping Abdul Ghani, transporting him to New Mexico, and concealing him there served to fulfill the purposes of Jany's prophesies. That is sufficient to satisfy the purpose-or-benefit requirement.

### C. A reasonable jury could find that Defendants willfully transported Abdul Ghani.

Subhanah challenges this element by arguing that there was no evidence that she "personally transported" Abdul Ghani because she was "no more than another passenger," Subhanah Br. 40, and Hujrah joins, Hujrah

Notice of Joinder at 3. "While transportation in interstate or foreign commerce of the kidnapped victim is an essential jurisdictional element of a § 1201(a) offense, it need not be established that the defendant in question participated in such transportation, but merely that the victim was at some point during the offense transported in interstate or foreign commerce." *United States v. Denny-Shaffer*, 2 F.3d 999, 1020 n.26 (10th Cir. 1993). There is no dispute that Abdul Ghani was intentionally transported from Georgia to Alabama to New Mexico, and that is sufficient.[43]

### D. A reasonable jury could find that death resulted from the kidnapping.

Hujrah and Lucas challenge the sufficiency of the evidence to show that Abdul Ghani's death resulted from the kidnapping. Hujrah Br. 19–20; Lucas Br. 51.

Section 1201(a) provides for punishment by death or life imprisonment "if the death of any person results." While this Court has not addressed the standard applicable to this element in the federal kidnapping statute, it has addressed similar "death results" language in the federal carjacking statute, 18 U.S.C. § 2119(3), and a drug trafficking statute, 21 U.S.C. § 841(b)(1)(E)(i).

[43] Lucas argues that there was no evidence that any defendant planned to cross state lines with Abdul Ghani after they arrived in New Mexico. Lucas Br. 51. But this is irrelevant because Abdul Ghani was unlawfully kidnapped when he was transported out of Georgia to Alabama and then to New Mexico. *See* section VII.A.1.

*United States v. Lowell*, 2 F.4th 1291, 1297 (10th Cir. 2021); *United States v. Burkholder*, 816 F.3d 607, 621 (10th Cir. 2016). In both cases, this Court held that Congress's use of this type of language reveals a clear choice to forgo a proximate-cause requirement and require only proof of but-for causation. *Burkholder*, 816 F.3d at 621; *see also Lowell*, 2 F.4th at 1297. The "death results" language in the kidnapping statute is indistinguishable and thus similarly requires but-for causation. But-for causation simply means that "'[t]he cause without which the event could not have occurred.'" *Burkholder*, 816 F.3d at 613 (quoting Black's Law Dictionary (10th ed. 2014)).[44]

A reasonable jury could find that the kidnapping was the but-for cause of Abdul Ghani's death. The trial evidence showed that Abdul Ghani's birth injuries resulted in hypoxic ischemic encephalopathy, spastic quadriplegic cerebral palsy, and seizures. 6JR.2945–50. Abdul Ghani's seizures were difficult to stop once they began but were responsive to medication. 6JR.2958. As a result, he took medication twice daily to prevent seizures and had a fast-acting gel used to help stop a seizure in progress. 6JR.2959. The trial evidence showed that Siraj did not take Abdul Ghani's medications with him, 6JR.1087, there was no record of any prescription being filled for Abdul

[44] The district court instructed the jury using the proximate cause standard at Defendants' request over the United States' objection. 6JR.3601, 3604, 4199–4203. On appeal, Hujrah agrees that but-for causation applies. Hujrah Br. 19.

Ghani anywhere in New Mexico, 6SJR.510–13, and numerous family members implored Defendants in texts and social media messages that Abdul Ghani was in danger without his medication, 6SJR.17, 33–34, 39, 133–34. Hujrah's daughter confirmed in her testimony that Abdul Ghani was not receiving his medication, 6JR.1796.

As to the circumstances of Abdul Ghani's death, Jany's oldest sons and Hujrah's daughter all testified that Abdul Ghani died during a ruqyah session with Siraj. 6JR.1338–39, 1578–80, 1803. The teen boys heard Abdul Ghani crying and screaming. 6JR.1339, 1579. Abdul Ghani was lying on his back, and J.L.J. saw Siraj put his hand on Abdul Ghani's neck, specifically his jugular vein. 6JR.1339–41, 1351, 1353. The teen boys heard Abdul Ghani choking, and they saw Abdul Ghani foam from his mouth. 6JR.1339–40, 1580. After Abdul Ghani fell silent, Siraj said Abdul Ghani wasn't breathing. 6JR.1341, 1580. Jany's book confirms that during Abdul Ghani's final ruqyah session, he was "going in and out of sleep" and his "heartbeat was going in and out" before it stopped for good. 7SJR.29–30.

Dr. John Phillips provided expert testimony on the potentially fatal impact of stopping Abdul Ghani's seizure medication and performing extended ruqyah sessions on him. Dr. Phillips explained that stopping seizure medication suddenly puts patients at a much higher risk for seizures and that Abdul Ghani specifically had a seizure disorder that put him at high

risk for dangerous seizures that would last a long time if his medication was stopped. 6JR.2980–81. Dr. Phillips also testified that performing ruqyah while holding Abdul Ghani on his back would put him "in a terrible position for protecting [his] airway," noting that his cerebral palsy made him weak, particularly in the muscles around his airway. 6JR.2984. He explained that the testimony about Abdul Ghani foaming at the mouth suggested he was not swallowing secretions and was at risk of aspirating them into his lungs. 6JR.2984. There was testimony that the ruqyah was so physically grueling that it left another of Siraj's children, an otherwise healthy two-year-old child, so exhausted he could barely move. 6JR.1300–02; 7SJR.2,4. Dr. Phillips said that Abdul Ghani's exhaustion would be the same or worse due to the weakness associated with cerebral palsy. 6JR.2984. Dr. Phillips testified that subjecting a small child like Abdul Ghani to ruqyah could result in death if he were to have a seizure during the ruqyah or if he were to become hypoxic and experience difficulty breathing due to exhaustion or the obstruction of his airway from unswallowed secretions. 6JR.2986–87. He also explained that stress and hypoxia can make a seizure more likely and Abdul Ghani had a history of seizures that did not stop. 6JR.2988. With or without a seizure, the hypoxia and difficulty breathing could cause decreased pulse, which without treatment could lead to cardiac arrhythmias and ultimately the heart stopping. 6JR.2988. Finally, Dr. Phillips opined that had Abdul Ghani

continued the treatment and care he had been receiving with Hakima, he would expect that Abdul Ghani would have survived into adulthood, been able to communicate and be independently mobile, and continued to be a happy, socially interactive person. 6JR.2989–90. This evidence was more than sufficient for the jury to conclude that but for the kidnapping that deprived him of his seizure medication and subjected him to endless exhausting ruqyah sessions, Abdul Ghani would not have died.

Hujrah argues that because the autopsy was unable to determine the cause of death, the evidence was insufficient to find that the kidnapping caused the death. Hujrah Br. 20; *see* 6SJR.514 (death certificate). But the inability of the autopsy to identify the cause of death from Abdul Ghani's decomposed body after Defendants concealed it for eight months was unsurprising, 6JR.3000, 3207–13, 3220, and did not preclude the jury from finding based on the evidence above that his death resulted from the kidnapping.

Although Lucas does not identify the applicable legal standard, he argues that there was insufficient evidence that the death was foreseeable. Lucas Br. 51. This is the proximate-cause standard on which the jury was instructed. *See Burkholder*, 816 F.3d at 613 (""To be proximately caused, the harm must be reasonably foreseeable.""). Should the Court apply this

standard, the trial evidence was more than sufficient to show that Abdul Ghani's death was the reasonably foreseeable result of the kidnapping.

The trial record was replete with evidence that all the Defendants knew Abdul Ghani had medical conditions that required medication and that his life and health would be endangered without it. 6JR.1061–62, 1106, 1164–65. Even the children knew that Abdul Ghani had a medical condition and needed medicine. 6JR.1287–89, 1544–45, 1782. After the group absconded with Abdul Ghani, family members repeatedly contacted them and emphasized Abdul Ghani's special needs, the importance of giving him his medication, and the potentially dangerous consequences of their actions in both their messages and on the flyers they distributed. 6JR.17, 34, 39, 128, 133–34, 384–86. Given this information, it was reasonably foreseeable that it would threaten Abdul Ghani's life to deprive him of his medications and transport him to a remote area of New Mexico that lacked readily accessible medical care in the event of an emergency.

Defendants also all knew Abdul Ghani was subject to lengthy ruqyah sessions at least daily during which he screamed and cried, and no one intervened. 6JR.1333, 1580–81, 1802–03; 7SJR.29. They also knew the ruqyah sessions were intense and could be dangerous—Jany had reported in her book a prior incident where Siraj performed ruqyah on their healthy two-year-old son until the child was so exhausted he could barely move and Siraj

was worried enough to check if the child's heart had stopped beating. 7SJR.2, 4. Indeed, all Defendants appeared unsurprised at Abdul Ghani's death. 6JR.1345–47, 1582; 7SJR.30. Even Siraj's and Jany's young daughter could see that Defendants were responsible and responded to the news of Abdul Ghani's death by saying, "You are all going to jail …." *See* 6JR.1354; 7SJR.30. Given Abdul Ghani's health conditions, his lack of medication, and the impact of the ruqyah sessions, his death was the entirely foreseeable result of taking him from his mother's care, depriving him of his medications, and subjecting him to lengthy ruqyah sessions.

**E. The parental exception does not apply to Defendants.**

Hujrah contends that the government presented insufficient evidence to prove the "essential element" that the parental exception does not apply. Hujrah Br. 18. As discussed above at section IV.D.2, the parental exception is not an element of the crime of a kidnapping, but an affirmative defense available only to the parent of the minor child. The burden of proof is on the defendant, not the government. As Hujrah was not Abdul Ghani's parent and presented no evidence to that effect, the jury had no evidence from which it could conclude that the parental exception barred conviction.

## VIII. Sufficient evidence supports Subhanah's, Hujrah's, and Lucas's kidnapping-conspiracy convictions.

### A. There was sufficient evidence of an agreement to kidnap Abdul Ghani.

Defendants challenge the sufficiency of the evidence to prove the existence of an agreement to violate the law or to help Siraj. Lucas Br. 50; Subhanah Br. 26, 32; Hujrah Notice of Joinder at 3. Subhanah contends that there was insufficient evidence that she entered the agreement with "informed and interested cooperation, stimulation, or instigation." Subhanah Br. 32.

"'To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence.'" *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004). "'Even a single overt act by the defendant can be sufficient to connect him to the conspiracy if that act leads to a reasonable inference of intent to participate in an unlawful agreement or criminal enterprise.'" *United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009).

The record evidence fully supports the inference of the existence of an agreement by the Defendants to kidnap Abdul Ghani. Defendants all believed in Jany's messages, including that Hakima stole Abdul Ghani from Jany, caused Abdul Ghani to be possessed by evil spirits, and Abdul Ghani required

ruqyah to get rid of these spirits. *See* section VII.B. They all knew that Hakima did not consent to Abdul Ghani's taking. *See* section VII.A.4. And they actively participated in transporting Abdul Ghani to New Mexico and concealing him there. *See* section VII.A.2. Their actions are sufficient to support the inference of "'informed and interested cooperation, stimulation, [or] instigation.'" *United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006). To the extent Subhanah argues that the evidence was insufficient to prove that she knew that the kidnapping violated the law, this is not an element of a conspiracy offense. *See* section VI.

### B. The evidence of interdependence was not plainly insufficient.

Subhanah argues that there was insufficient evidence of interdependence between her and the other Defendants because she did nothing for her own benefit with respect to conspiring to kidnap Abdul Ghani, and thus she likewise did nothing for the shared mutual benefit of the coconspirators. Subhanah Br. 37–39. She concedes this argument was unpreserved but requests that the Court review it for plain error. Subhanah Br. 38. Hujrah and Lucas join. Hujrah Notice of Joinder at 3; Lucas Br. 49.

"Interdependence exists where coconspirators intend to act together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (cleaned up).

"To establish interdependence, the government does not need to show that a defendant personally profited from involvement in the criminal conspiracy, but only that a defendant played an essential role in the furtherance of a common, illicit goal." *United States v. Matousek*, 131 F. App'x 641, 645 (10th Cir. 2005); *see also Wardell*, 591 F.3d at 1291 ("Interdependence is present if 'the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole.'").

The same evidence that fulfills the purpose-or-benefit requirement for kidnapping demonstrates that Defendants shared a mutual goal. *See* section VII.B. Their individual actions detailed in section VII.A.2 clearly facilitated actions of the other Defendants and the kidnapping venture as a whole. The evidence of interdependence was not plainly insufficient.

## IX. The district court did not abuse its discretion in denying Siraj's motions to sever.

### A. Relevant background

#### 1. *Siraj moves to sever his trial from his codefendants.*

Siraj, through counsel, moved to sever his trial from his codefendants under Federal Rule of Criminal Procedure 14. 2JR.688. Siraj argued that his material-support and § 1117 charges (Counts 1 to 3) were "separate and discrete" from the kidnapping counts, that evidence relating to the kidnapping counts would be inadmissible in a separate trial, 2JR.692, and

that the "explosively prejudicial" kidnapping evidence risked "immeasurable" prejudice, 2JR.693, 696.

Subhanah, Hujrah, and Lucas also filed a motion for severance of the kidnapping counts, in which Siraj joined. 2JR.748. The United States opposed these motions. 2JR.820–40, 883–907.

2. *The district court denies Siraj's motion.*

The district court denied the severance motions. 3JR.1132–45. It concluded that the kidnapping counts were properly joined with the others under Federal Rule of Criminal Procedure 8(a) because they were "'based on the same act or transaction or two or more acts or transactions connected together' or constitute 'parts of a common scheme or plan.'" 3JR.1137. The court found that "evidence of [Abdul Ghani]'s kidnapping is thoroughly intertwined with evidence of Defendants' conspiracy to provide material support to terrorism, [and] conspiracy to murder." 3JR.1137.

The court then concluded that severance of Siraj's case or the kidnapping counts was unwarranted under Rule 14(a). 3JR.1138–40. Siraj's argument that the jury might improperly attribute kidnapping evidence to the other charges was "unsupported speculation" that fell "well short" of his burden to clearly show prejudice. 3JR.1138. The court anticipated that much of the kidnapping evidence would be relevant to the other charges because

the kidnapping was central to the material-support conspiracy and limiting instructions could cure any theoretical prejudice. 3JR.1138–39.

Finally, the court concluded that concerns of judicial economy outweighed any risk of prejudice: "Severing this complex conspiracy case into separate trials for one or more Defendants on the eve of trial would involve unimaginable logistics and would place an insuperable burden on the Court and the United States." 3JR.1144. The court pointed out that there were (at the time) five Defendants charged with five or more counts, which would require proof of nearly identical facts at trial. 3JR.1144. Holding additional trials on the same evidence would "extraordinarily wasteful." 3JR.1144.

At trial, Siraj did not object to the admission of kidnapping evidence under Rule 403 or argue that it was otherwise inadmissible against him. And he did not renew his motion for severance at the close of the government's evidence[45] or explain to the district court how he was prejudiced by the

---

[45] Some courts require a defendant to renew his severance motion at the close of evidence to preserve it for appellate review. *See United States v. Sherrill*, 972 F.3d 752, 762 (6th Cir. 2020); *United States v. Cardena*, 842 F.3d 959, 980 (7th Cir. 2016); *United States v. Alvarez*, 358 F.3d 1194, 1206 (9th Cir. 2004); *United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002). *Cf. United States v. Lanese,* 890 F.2d 1284, 1289 (2d Cir. 1989) (renewal not required for preservation but "'failure to pursue vigorously the severance issue below increases our reluctance to second-guess the trial court's decision'"); *United States v. Goodhouse*, 81 F.4th 786, 791 n.3 (8th Cir. 2023) (acknowledging a split in intracircuit authority).

This Court has not addressed the issue on the merits. *See United States v. Jones*, 530 F.3d 1292, 1300 & n.2 (10th Cir. 2008) (noting that this Court has

evidence at the joint trial. Nonetheless, he now argues that the district court abused its discretion in denying his motion for severance.

### B. Severance is required only where a defendant shows actual prejudice from a joint trial.

Rule 8(b) allows multiple defendants to be charged in the same indictment if they "participated in the same act or transaction, or in the same series of acts or transactions constituting an offense or offenses." In cases where multiple defendants are indicted together, joint trials are preferred because they "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993). In conspiracy trials, such as this one, this Court presumes that coconspirators should be tried together. *United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009).

Rule 14(a) nonetheless gives the district court the discretion to sever a defendant's trial or "provide any other relief that justice requires" where a joint trial "appears to prejudice a defendant." For purposes of Rule 14(a), a defendant must demonstrate "'actual prejudice.'" *United States v. Clark*, 717 F.3d 790, 818 (10th Cir. 2013). Even if prejudice is shown, "Rule 14 does not

---

not embraced this rule and reviewing the unrenewed motion for severance for an abuse of discretion). This Court should require renewal because a failure to renew prevents the district court from assessing in the first instance whether joinder was actually prejudicial based on the evidence presented at trial, a fact-bound inquiry that the district court is best positioned to conduct.

require severance." *Zafiro*, 506 U.S. at 538–39. Instead, "it leaves the tailoring of the relief to be granted, *if any*, to the district court's sound discretion." *Id.* at 539 (emphasis added). "Limiting instructions[] often will suffice to cure any risk of prejudice." *Id.*

Given this deferential standard, a "defendant seeking to vacate a conviction based upon the denial of a motion to sever faces a steep challenge." *Pursley*, 577 F.3d at 1215. "The district court is the primary referee on severance claims," and this Court has "only a distant view of the ring." *Clark*, 717 F.3d at 818. Accordingly, this Court reviews preserved claims only for an abuse of discretion. *Id.*

"To obtain reversal of an order denying severance of defendants, a party must show

> • actual prejudice outweighing the expense and inconvenience of separate trials and
>
> • inadequacy of less drastic means to cure potential prejudice (like limiting instructions)."

*United States v. Herrera*, 51 F.4th 1226, 1271 (10th Cir. 2022).

**C. Siraj has not shown actual prejudice that outweighs the expense and inconvenience of separate trials.**

1. *Siraj has not shown actual prejudice.*

Actual prejudice exists "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*,

506 U.S. at 539. The mere fact that a defendant has "a better chance of acquittal" in a separate trial is not sufficient. *Id.* at 540. A risk of prejudice may be "present when the jury considers evidence against a defendant that is admissible only against a co-defendant," but the argument that this otherwise inadmissible evidence would have a "spillover effect" is insufficient to carry a defendant's burden to demonstrate actual prejudice. *Clark*, 717 F.3d at 818.

Siraj contends he was prejudiced by the emotionally impactful evidence of the kidnapping and death of Abdul Ghani, which he claims would have been inadmissible in a separate trial under Rule 403. Siraj Br. 18–22. Rule 403 allows the court to exclude "relevant evidence if its probative value is substantially outweighed by a danger of…unfair prejudice." Evidence is unfairly prejudicial under Rule 403 only "'if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged." *United States v. Otuonye*, 995 F.3d 1191, 1207 (10th Cir. 2021) (emphasis in original).

In Siraj's case, Rule 403 would not have barred the admission of the kidnapping evidence because it was inseparable from his material-support and § 1117 offenses. The district court concluded that the kidnapping evidence was "thoroughly intertwined with evidence of Defendants'

conspiracy to provide material support to terrorism [and] conspiracy to murder" and that these charges and the kidnapping were "'part of a common scheme or plan.'" 3JR.1137. Nowhere in his brief does Siraj challenge this finding or otherwise address the probative value of the evidence of the kidnapping and death of Abdul Ghani on his other charges. Nor did he object to the admission of this evidence under Rule 403 at trial. Without addressing the evidence's probative value, Siraj cannot show that Rule 403 would have barred its admission if he were tried separately. And no matter how emotionally impactful the kidnapping evidence was, Siraj cannot demonstrate that he was actually prejudiced by its admission in a joint trial if it would also been admitted in a separate trial. *See Goodhouse*, 81 F.4th at 791.

Indeed, the probative value of Abdul Ghani's kidnapping and death to Siraj's material-support and § 1117 charges was high. It was central to explaining why and how Siraj conspired to kill federal officers and provided and conspired to provide material support to do so. Jany's prophesies were the reason Siraj and the others kidnapped Abdul Ghani, took him to New Mexico, and built a militarized compound to conceal the group and protect it from any potential invaders, including FBI agents and other federal officers. Jany's prophesies were also the reason Siraj deprived Abdul Ghani of his medication and performed ruqyah on him, resulting in his death. After Abdul

Ghani's death, Siraj cared for Abdul Ghani's corpse in anticipation of his resurrection after which he believed Abdul Ghani would lead them in the coming war for which they had been preparing and during which they would attack corrupt government institutions and kill federal officers. The kidnapping and death of Abdul Ghani were so intertwined with the material-support and § 1117 charges that there was no way to prove the conspiracy alleged in Counts 1 to 3 without also presenting evidence of Abdul Ghani's kidnapping and death.[46]

Siraj suggests that this evidence was unfairly prejudicial because it would encourage the jury to convict based on emotion. Siraj Br. 19. But unfair prejudice does "not provide a shield for defendants who engage in outrageous acts." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998). The government is not required "to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *Id.* at 1021. On the contrary, the government is entitled to present evidence "creating a coherent narrative of [the defendant's] thoughts and actions in perpetrating the

[46] The only evidence discussed by Siraj that arguably may not have been admitted in a separate trial was Dr. Phillips's expert testimony. But given the evidence about Abdul Ghani's death that unquestionably would have come in anyway, this particular testimony would not have cause actual prejudice. *See United States v. Frazier*, 129 F.4th 392, 406 (7th Cir. 2025) (where kidnapping evidence was already "tragic and shocking," evidence challenged under Rule 403 "cannot be said to have incrementally added to the prejudice of evidence").

offense for which he is being tried." *Old Chief v. United States*, 519 U.S. 172, 192 (1997). At times, evidence of a crime is "emotionally charged," "'alarming,'" "'disturbing'" or "even 'blood curdling.'" *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013). But when "much of this emotional overlay is directly related to the nature of the crimes that the defendant has set out to commit," it "should not surprise a defendant that proof of his participation in [violent] conspiracies…will engender the presentation of evidence offensive to the sensibilities of civilized people."[47] *Id.*; *see United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983) ("'Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.'"). Indeed, this Court has "been reluctant to find prejudice where 'the relationship of the charges [grows] out of the defendant's own conduct.'" *United States v. Olsen*, 519 F.3d 1096, 1103 (10th Cir. 2008). The evidence presented regarding Abdul Ghani's kidnapping and death was necessary to provide a coherent

---

[47] *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:13 (4th ed. 2023) ("Especially in criminal cases…, the behavior charged to a party may be offensive, and its impact on society, victims, or another party may be unpleasant and even shocking and horrendous, and often it is painful to contemplate. Evidence that tends fairly and directly to depict such behavior and its result does not raise the risk of 'unfair prejudice' under Rule 403 merely because believing the evidence paints a dismal picture of the character of the person, [or] makes the jury dislike the person and what he did.")

narrative explaining how and why Siraj provided material support and conspired to kill federal officers. Undoubtably, the testimony of Abdul Ghani's mother about the loss of her only child and of the children regarding Abdul Ghani's death was heartbreaking. But the United States was not required to provide an antiseptic, edited version of Siraj's actions. The emotional impact does not establish a danger of unfair prejudice that would substantially outweigh the probative value of this evidence under Rule 403.

Siraj analogizes his situation to cases addressing unfair prejudice in the context of the admission of a defendant's prior bad acts under Rule 404(b). Siraj Br. 20. But 404(b) only applies when the evidence is extrinsic to the crime, meaning the evidence is "'extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" *United States v. Little*, 119 F.4th 750, 777 (10th Cir. 2024). Thus, from the start, 404(b) evidence generally has less probative value than intrinsic evidence like Abdul Ghani's kidnapping and death, which was "'directly connected to the factual circumstances'" of Siraj's charged crimes and provided necessary "'contextual or background information to the jury.'" *Little*, 119 F.4th at 777. In addition to this distinction, in the cases Siraj cites, the probative value of the extrinsic evidence was almost non-existent. *Cf. United States v. Hazelwood*, 979 F.3d 398, 412 (6th Cir. 2020) (concluding that district court should have excluded recordings of irrelevant racist and

misogynist statements); *United States v. Ham*, 998 F.2d 1247, 1253 (4th Cir. 1993). The exclusion in these cases of extrinsic evidence of appalling acts with little to no probative value provides no support for the exclusion of the intrinsic evidence of Abdul Ghani's kidnapping and death where it was an integral part of the factual narrative. The offensive nature of Siraj's conduct is not a stand-alone basis for exclusion.

2. *Siraj has not shown that the prejudice to him outweighed judicial-economy concerns.*

Siraj must demonstrate not only actual prejudice, but also that this prejudice outweighed the "'obviously important considerations of economy and expedition in judicial administration.'" *Herrera*, 51 F.4th at 1272. He has made no attempt to do so.

The district court found that severing the cases "on the eve of trial would involve unimaginable logistics and would place an insuperable burden on the Court and the United States," especially where the trials would require "proof of nearly identical facts at trial." 3JR.1144. The trial lasted three weeks. Doing it twice would have been "extraordinarily wasteful." 3JR.1144. On top of that, two trials would have impeded efficiency and fairness by "randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand" and would have run

the risk of "the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

A second trial would also have placed a heavy burden on the witnesses. It would have forced Siraj's child victims and Abdul Ghani's bereaved mother to take the stand not once, but twice, and relive their traumas for a second time. 2JR.900–01; *see Richardson*, 481 U.S. at 210 (finding that "requiring victims and witness to repeat the inconvenience (and sometimes trauma) of testifying" impaired the efficiency and fairness of the criminal justice system). Siraj has identified no good reason to put them through that twice.

**D. Siraj has not shown that the limiting instructions were insufficient.**

Limiting instructions generally suffice "to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. This Court "often consider[s] limiting instructions because" it "presume[s] that juries follow them." *Herrera*, 51 F.4th at 1273. Here, the jury was repeatedly reminded that it must consider the evidence individually against each Defendant and each charged count separately. It was instructed to base its verdict "solely upon the evidence presented as to that Defendant, without prejudice or sympathy," 6JR.3581; not to consider whether Defendants were guilty of "any act, conduct, or crime not charged in the Indictment," 6JR.3607; not to let its verdict on any one Defendant or count influence its verdict on any other, 6JR.3607–08; not to consider

evidence admitted only against one Defendant against any other, 6JR.3611; and to convict a Defendant on a charge only if it was convinced that the United States proved beyond a reasonable doubt each element of that specific offense, 6JR.3588–90, 3593, 3595, 3599, 3602.[48]

The jury demonstrated its ability to follow these instructions. For example, the jury convicted Hujrah and Subhanah of kidnapping but acquitted them of material support. 3JR.1901–04; *see Herrera*, 51 F.4th at 1272 ("[A] mixed verdict might dispel worries about prejudice."). And while Siraj speculates that the jury only convicted him on Counts 1 to 3 because he was not charged of the kidnapping offenses, its conviction of Lucas on *both* the kidnapping offenses *and* Counts 1 to 3 suggests otherwise. 3JR.1905–08. Indeed, as to Siraj, the verdict form on Count 3 identified the specific overt acts that the jury unanimously found beyond a reasonable doubt that Siraj committed in support of the conspiracy to kill federal officers. 3JR.1899–90. This further demonstrates that the jury's verdict on Counts 1 to 3 was based on the conspiracy evidence and was not simply a ploy to punish him for the kidnapping.[49] *See* Siraj Br. 22.

---

[48] Siraj never requested any other limiting instruction with respect to any specific evidence regarding the kidnapping, beyond Ex. 103, Morton's post-offense letter. 6JR.1726–27, 3615.

[49] The burden is on the defendant as part of the merits analysis to demonstrate actual prejudice from the denial of severance. *See Herrera*, 51 F.4th at 1271. Absent such a showing, the Court must affirm. Siraj has not

Siraj contends that limiting instructions can never cure the prejudice from evidence admitted in violation of Rule 403. Siraj Br. 22. But even if that were true, the kidnapping evidence here did not violate Rule 403, for the reasons identified in section IX.C.1. For the same reasons, the cases he cites are no help. All involved evidence that was highly prejudicial and *would not have been admitted against the defendant in a separate trial.*[50] *See* Siraj Br. 23–26. There is no prejudice when the evidence would have been admitted regardless of whether Siraj was tried separately or jointly.

Finally, Siraj relies on *Ham* to show that limiting instructions cannot cure the prejudice of 404(b) evidence of child molestation, especially where the defendants were "members of an unpopular religion." Siraj Br. 26–27. But the child-molestation evidence in *Ham* was extrinsic to the offense conduct and was not particularly probative, serving only to make the defendants' "motive slightly more likely." *Ham*, 998 F.2d at 1253. Here, however, the evidence of Abdul Ghani's kidnapping and death underpinned the material-

---

met his burden, and so there is no error requiring a harmlessness analysis. *See* Siraj Br. 28–31.

[50] *See United States v. Blunt*, 930 F.3d 119, 125 (3d Cir. 2019); *United States v. Tobin*, 676 F.3d 1264, 1292 (11th Cir. 2012); *United States v. McRae*, 702 F.3d 806, 825 (5th Cir. 2012); *United States v. Baker*, 98 F.3d 330, 335 (8th Cir. 1996); *United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir.), *opinion amended on denial of reh'g*, 798 F.2d 1250 (9th Cir. 1986).

support and § 1117 counts with which Siraj was charged. While Siraj argues that like *Ham*, he too was a member of an "unpopular religion," Siraj Br. 27, the evidence regarding his unusual beliefs was essential to explain his material support and conspiracy to kill federal officers, which the group planned to effectuate after Abdul Ghani resurrected as Isa. While a limiting instruction may have been insufficient in *Ham*, the case offers little insight as to the effectiveness of the instructions in this case.

Given that the kidnapping evidence would have been admissible at a separate trial, that the jury instructions directed the jury to consider each defendant's guilt individually and each charged count separately, and that the jury's verdict demonstrated its ability to do so, Siraj has not shown a "serious risk" that his joint trial "compromise[d] a specific trial right" or "prevent[ed] the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. The district court did not abuse its discretion in trying Siraj jointly with his codefendants.

## X. Siraj and Lucas were not denied their *Faretta* rights when they were precluded from approaching the bench and were excluded from a conference regarding a nonsubstantive jury-note response.

### A. Standby counsel may assist so long as pro-se defendants retain control over the case they wish to present.

In *Faretta*, the Supreme Court recognized defendants have a Sixth Amendment right to represent themselves when that choice is voluntary and

intelligent. 422 U.S. at 807. *Faretta*, however, also recognized that the court may appoint standby counsel, even over a defendant's objection, "to aid the accused if and when the accused requests help." *Id.* at 834 n.46.

*McKaskle v. Wiggins* addressed standby counsel's role. 465 U.S. 168 (1984). It explained that the defendant's *Faretta* right:

> encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.

*Id.* at 174.

*Wiggins* identified two general limitations on standby counsel's role. First, it observed that the "core of the *Faretta* right" is the defendant's preservation of "actual control over the case he chooses to present to the jury." *Id.* at 178. "If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." *Id.* "Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id. Wiggins*, however, found that this second limitation is not a concern where standby counsel participates

outside the presence of the jury because the trial judge "must be considered capable of differentiating the claims presented by a pro se defendant from those presented by standby counsel." *Id.* at 179.

*Wiggins* further emphasized that a defendant may waive his *Faretta* rights, even after invoking them. 465 U.S. at 182. Standby counsel's participation with the defendant's express approval is "constitutionally unobjectionable." *Id.* But "[e]ven when [the defendant] insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably." *Id.* Indeed, "[o]nce a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Id.* at 183.

*Wiggins* carved out certain types of tasks that can be completed by standby counsel without running afoul of the defendant's *Faretta* rights. For example, *Faretta* rights are "not infringed when standby counsel assists the *pro se* defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to

complete." *Id.* at 183. Standby counsel may also assist the defendant in complying with "basic rules of courtroom protocol and procedure." *Id.*

This Court reviews a preserved argument that a defendant's *Faretta* rights were violated de novo. *United States v. Tucker*, 451 F.3d 1176, 1180 (10th Cir. 2006). In doing so, *Wiggins* reminds us that navigating the need to honor a defendant's *Faretta* rights while allowing standby counsel to assist is hardly a straightforward task. The "trial judge may be required to make numerous rulings reconciling the participation of standby counsel with a *pro se* defendant's objection to that participation." *Wiggins*, 465 U.S. at 177 n.8. As *Wiggins* observed, these "'judgment calls'" are entitled to the "usual deference" afforded to the trial judge. *Id.*

Lucas and Siraj assert that the district court violated their *Faretta* rights in two ways—by excluding them from bench conferences and by excluding them a jury-note conference. Lucas Br. 27–35; Siraj Br. 49 (adopting Lucas's argument). But the record shows that the district court scrupulously honored their *Faretta* rights to present their cases in their own ways.

### B. The district court did not violate Lucas's and Siraj's *Faretta* rights by precluding them from approaching the bench.

#### 1. *The question of whether pro-se Defendants' exclusion from bench conferences violates their* Faretta *rights is a fact-based inquiry turning on the circumstances of their cases.*

In *United States v. McDermott*, the Tenth Circuit specifically addressed a claim that a defendant's exclusion from bench conferences denied him his *Faretta* rights. 64 F.3d 1448 (10th Cir. 1995). There, the trial judge categorically prohibited the pro-se defendant from addressing "purely legal matters," while allowing the defendant to represent himself on all other matters. *Id.* at 1452. As a result of this bifurcated presentation, the defendant was excluded from bench conferences and the jury-instruction conference. *Id.* The trial judge's reason for this restriction was the defendant's lack of knowledge on legal issues. *Id.* Notably, the trial judge gave no other reason for the defendant's exclusion from bench conferences, such as "security considerations or any suggestion that [the defendant] would not abide by the necessary procedures or protocol of the court." *Id.*

*McDermott* applied *Wiggins*'s rule that "standby counsel may not, over the defendant's objection, 'make or substantially interfere with any significant tactical decisions...or...speak instead of the defendant on any matter of importance....'" 64 F.3d at 1454. *McDermott*, however, pointed out that *Wiggins* found only that such events *erode* a defendant's rights; it

"stop[ped] short of a per se rule" that such events *violate* a defendant's *Faretta* right. *Id. McDermott* recognized that the analysis is "fact-specific" and "some minor incursions" may not amount to a violation of a defendant's Sixth Amendment rights. *Id. McDermott*, however, found that in that case, the defendant's categorical exclusion from 30 bench conferences during a 6-day trial was a significant incursion on his *Faretta* rights and remanded for a new trial. *Id.*

In conducting the fact-specific analysis for whether the defendant's rights were merely eroded or violated, *McDermott* looked to *United States v. Mills*, 895 F.2d 897 (2d Cir. 1990), as an example of when incursions on a defendant's *Faretta* right by standby counsel fall short of a Sixth Amendment violation. *McDermott*, 64 F.3d at 1452–53. *Mills* found no Sixth Amendment violation when the defendant was excluded from sidebar conferences in which standby counsel participated. 895 F.2d at 905. *Mills* concluded that from everything the jury heard, the defendant was "conducting every aspect of his defense that he chose to conduct" and that the jury had no way of knowing that the defendant wished to be present for sidebar conferences. *Id.* Specifically, the Court noted that the defendant made the opening statement, examined and cross-examined witnesses, made objections, and made his own closing argument. *Id.* Moreover, the defendant was present when standby counsel made legal arguments outside the jury's presence. *Id.* The Court

emphasized that standby counsel was pursuing the "line of defense fashioned by" the defendant himself. *Id. Mills* concluded that the defendant had "a fair chance to present his case in his own way" "both in fact and in the perception of the jury," and that his *Faretta* right was not violated. *Id.*

2. *Siraj and Lucas never objected to the district court's modified procedure for bench conferences.*

Throughout the trial, the district court honored the pro-se Defendants right to present their own case in their own way while also maintaining courtroom order and security. The court first addressed the parameters of standby counsel's role at a pretrial conference. Standby counsel asked whether they should raise any legal issues that might come up. 6JR.4156. The Court alerted them that they should instead confer with Siraj and Lucas and alert them to the issues. *Id.* When standby counsel asked how they should handle bench conferences, the Court told standby counsel to come to the bench, "relay any information" to Siraj and Lucas, and "serve as a go-between on bench conferences." *Id.* Both Siraj and Lucas were present, 6JR.4125–26, and neither objected to this arrangement.

During voir dire and the first day of trial, the parties followed this plan. Standby counsel participated in bench conferences without Siraj or Lucas at the bench, and Siraj and Lucas raised no objection to the practice. *See, e.g.,* 6JR.1004, 1094, 1108, 1120, 4459, 4483. Beyond bench conferences, Siraj and

Lucas acquiesced or expressly consented to standby counsel's participation in various aspects of the trial. While Siraj asked his own voir dire questions, 6JR.4476–78, Lucas deferred to his codefendants' counsel, with the understanding that he could provide them with questions to ask on his behalf. 6JR.4168. After voir dire, Siraj's and Lucas's standby counsel raised discovery issues with the court in their presence, 6JR.4500–03, and engaged with the court on juror issues on Siraj's and Lucas's behalf. 6JR.4504.

The first indication that Siraj and Lucas were dissatisfied with this arrangement came on the second day of trial. Siraj indicated he was "having a hard time understanding what's happening at the bench conferences" due to problems with the "live feed," which he said was delayed or not working properly.[51] 6JR.1132. Siraj explained that by the time standby counsel relayed to him what happened, the issue was already decided without Siraj having the opportunity to make objections or provide input to preserve his

---

[51] This appears to refer to the "realtime" feed, which "is the electronic data flow from the court reporter to the computer of each person or party ordering and receiving the realtime transcription in the courtroom." *Notice to Members of the Bar on Amendment to Realtime Services Policy*, U.S. District Court, District of New Mexico (Jan. 13, 2014), https://www.nmd.uscourts.gov/sites/nmd/files/Realtime%20policy%20revision%20notice1-13-14.pdf (last visited Dec. 2, 2025); *see also Courtroom Technology*, U.S. District Court, District of New Mexico, https://www.nmd.uscourts.gov/courtroom-technology (last visited Dec. 22, 2025). This realtime feed would have provided the pro-se Defendants with a draft, unedited transcript of the bench conferences as they unfolded.

positions for appellate review. 6JR.1132. As an example, Siraj identified the government's request for additional time during voir dire, to which Siraj said he would have objected had he had the opportunity. 6JR.1132–33. Siraj stated, "I understand that for security issues, you may not want me to approach," but he suggested that these concerns could be addressed by the Marshals approaching the bench with the pro-se Defendants.[52] 6JR.1133.

The district court responded:

> THE COURT: All right. Well, fair enough. I think probably—and again, you know, we're all creatures of habit, and there are not very many trials where individuals are pro se. But I think what I need to do is give you an opportunity—give stand-by counsel an opportunity to talk to you before we proceed. And so I'll start doing that.…I'll try to slow things down so that you and Mr. Morton have an opportunity to weigh in.
>
> MR. WAHHAJ: Thank you, Judge.
>
> THE COURT: All right. And I'll do this for appellate review. I'll note your objections for the record. And then we'll try to make sure that we proceed in a more orderly—or slow it down so that stand-by counsel can confer with you. And then if we need to, we'll send the jury out, if we have to.
>
> MR. WAHHAJ: Thank you, Judge.
>
> THE COURT: All right.

---

[52] While the district court never expressly identified security concerns as the reason for its bench-conference procedure, security was a concern throughout this case, as discussed in more detail at section X.B.4. Both Siraj and his standby counsel acknowledged the security concerns presented by the pro-se Defendants approaching the bench. 6JR.1133; 2SJR.132.

> MR. MORTON: Judge, I would just like to add, I join in on that argument.
>
> THE COURT: All right, I'll note you joined in on it. And also, I'll slow things down so that [standby counsel] have time to confer with you, and if they need to come back up. We'll try it like that.

6JR.1133–34.

The trial transcript shows that the district court did what it promised. The court took care to confirm that standby counsel had sufficient time to consult with Siraj and Lucas after bench conferences and that the necessary communication was occurring.[53] In addition, Siraj and Lucas also had access to the realtime transcription feed for bench conferences, which helped convey what was discussed at the bench. When an important issue arose at the bench, such as the motion for a mistrial made by Lucas's standby counsel, the court deferred the issue until it could be discussed outside the presence of the

---

[53] *See, e.g.,* 6JR.1222 ("Tell [Siraj] his objection is being sustained at this point. But if he wants to keep going down this road, then in rebuttal, I'm going to allow this kind of questioning."); 6JR.1234–35 (in response to counsel's question as to whether both standby counsel should approach, the court responded, "However you want to do it, to communicate it, it doesn't matter to me. I just want the communication to go back."); 6JR.1236 (after bench conference the district court instructed, "And then, before we move on, give [standby counsel] a minute to explain."); 6JR.1350 (district court sustained objection at the bench, directed the government to rephrase, and "give [Siraj's standby counsel] a minute"); 6JR.1514 ("Give [standby counsel] a moment to explain to Mr. Morton."); 6JR.1693 (Lucas's standby counsel states at the end of a bench conference, "I'll tell [Lucas.] I renew our objection to that issue, and I'll explain to him your ruling."); 6JR.2668 ("And then just apprise Mr. Wahhaj and Mr. Morton.").

jury, which allowed Siraj and Lucas to participate directly without approaching the bench. *See* 6JR.2143, 2156–63. This procedure ensured that Siraj and Lucas remained in control of significant tactical decisions and could speak directly to the court on any matter of importance while still accounting for the need for security and the orderly functioning of a four-defendant trial.

Throughout the remainder of the trial, Siraj and Lucas never again objected that they were being excluded from bench conferences, that standby counsel was not adequately communicating to them the content of the bench conferences, or that they could not raise additional objections or provide additional input after conferring with standby counsel. *See* 6JR.1134 ("I'll slow things down so that [standby counsel] have time to confer with you, and if [standby counsel] need to come back up."). Nor did Siraj or Lucas ever ask for the jury to be sent out so they could address the court directly, an option the court had explained would be available. *See* 6JR.1134 ("[I]f we need to, we'll send the jury out, if we have to.").

Indeed, Siraj and Lucas would have been well aware that alternative arrangements were possible when they wished to speak directly to the court because the district court sometimes elected to use them. The court addressed matters of importance directly with Siraj and Lucas outside the presence of the jury, as it did with the motion for a mistrial made by Lucas's standby counsel, 6JR.2143, 2156–63, or Lucas's request to call certain witnesses,

6JR.3058–59, 3179. The court even granted a request by Siraj's standby counsel for Siraj to approach the bench for a particularly sensitive discussion regarding his decision to continue to represent himself, after standby counsel first made arrangements with the Marshals and the courtroom deputy.[54] Siraj and Lucas knew the procedure for speaking directly to the court outside the presence of the jury and never expressed dissatisfaction with it.

But after their initial objection, neither Siraj nor Lucas raised any objection to the court's modified bench-conference procedure during the remaining two and a half weeks of trial. Siraj's and Lucas's initial objection to the bench-conference procedure was not sufficient to alert the district court that they believed the court's modified procedures were inadequate. By not objecting to the district court's modified procedures or raising any additional concerns throughout the rest of the three-week trial, they forfeited their challenge to the district court's bench-conference procedures. This Court

[54] Based on developments at trial, standby counsel wished to advise Siraj, in front of the district judge, that his best interests would be served by allowing standby counsel to assist him in cross-examination and that he was putting himself in grave danger of further charges. 2SJR.132–33. Siraj stated, "I understand that. We are working together. He still is giving me tips, and I will use the tips. But I still would like to use my [*Faretta*] rights." 2SJR.133. The court then conducted another *Faretta* colloquy on the record, confirmed that Siraj still wished to voluntarily and knowingly waive his right to counsel, and encouraged Siraj to consult with standby counsel during trial. 2SJR.133–36.

should review their *Faretta* claim only for plain error. *See United States v. DeShazer*, 554 F.3d 1281, 1288 (10th Cir. 2009).

3. *Defendants acquiesced in standby counsel's participation.*

In addition to failing to preserve the issue for appellate review, Siraj and Lucas acquiesced in standby counsel's participation by failing to object. As noted above, "[o]nce a pro se defendant invites or agrees to any substantial participation by counsel," a defendant is presumed to acquiesce in subsequent participation by standby counsel "at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Wiggins*, 465 U.S. at 183. Throughout trial, Siraj and Lucas regularly invited standby counsel to participate on their behalf. "A defendant does not have a constitutional right to choreograph special appearances by counsel." *Id.* Absent a clear objection to standby counsel's participation in bench conferences under the district court's modified procedures, Siraj's and Lucas's acquiescence in standby counsel's participation in bench conferences as well as other aspects of the trial "substantially undermines [their] later protestations that counsel interfered unacceptably." *Id.* at 182.

Both Siraj and Lucas at times welcomed assistance from standby counsel in performing certain functions at trial. Even outside the presence of the jury, standby counsel at times spoke on Siraj's and Lucas's behalf in their presence. Although Lucas and Siraj were free to make their own objections

(and did in fact do so, as discussed below), standby counsel also made objections on their behalf and in their presence.[55] At times, the record is clear that at least some of these objections were made directly at the express request of Siraj or Lucas.[56] Standby counsel stated Lucas's and Siraj's positions in their presence.[57] Standby counsel argued motions on their behalf.[58] The district court reminded Siraj and Lucas that they could speak

---

[55] *See, e.g.*, 6JR.1668, 1727, 1773, 2149, 2212, 2342–43, 2644, 2649, 2854, 2881, 2918, 2982, 3170, 3500 (objections by Lucas's standby counsel); 6JR.1372, 1392, 1727, 2202, 2400, 2662, 3432, 3444, 3445 (objections by Siraj's standby counsel).

[56] *See* 6JR.2342–43 ("Mr. Morton, would like me to object to any testimony from Tonya Badger as being cumulative."); 6JR.2156–57 (The court: "[D]oes Mr. Morton consent to you stating the objection?" Mr. Morton: "I do consent, Judge.").

[57] *See* 6JR.1199–1201 (standby counsel stating Siraj's position on his request to have a witness remain under subpoena). 6JR.1259–60 ("And [Siraj's] indicated that he's dropping the issue of Hakima remaining. He's withdrawing that motion via his messenger."); 6JR.1658 ("Mr. Morton asked me to tell the Court that he believes his cross-examination will take more than ten minutes. He would ask that…he be able to begin in the morning."); 6JR.1891 (standby counsel stating both Siraj's and Lucas's position on format of exhibit); 6JR.3025 (standby counsel arguing Lucas's position on admission of an exhibit outside the presence of the jury); 6JR.1726–27, 1730 (standby counsel for Siraj arguing against the admission of evidence and asking for Siraj's name to be included in limiting instruction).

[58] 6JR.2156–58 (Lucas's standby counsel arguing Lucas's motion for a mistrial and Siraj's standby counsel adding an argument on behalf of Siraj)., 6JR.3024, 3046–49 (Siraj's standby counsel arguing Rule 29 motion); 6JR.3049 (Lucas's standby counsel stating that he adopted codefendant's Rule 29 motion); 6JR.3049 (Siraj and Lucas indicating they had nothing to add to standby counsel's Rule 29 arguments); 6JR.3376 (Siraj's standby counsel clarifying Siraj's request for admission of an exhibit); 6JR.3384 (standby counsel requesting closing argument time on behalf of Siraj and

directly to the court.[59] But Siraj and Lucas nonetheless chose at times to rely on standby counsel to speak for them. Indeed, by the time of the jury-instruction conference, Siraj and Lucas relied entirely on standby counsel to speak on their behalf on matters concerning the jury instructions.[60] 6JR.3509–69. By relying on standby counsel to speak on their behalf throughout trial, they are presumed to have acquiesced in standby counsel's participation as a "go-between" for bench conferences.

To overcome this presumed acquiescence, Siraj and Lucas needed to "expressly and unambiguously" object to the district court's modified bench-conference procedure. *Wiggins*, 465 U.S. at 183. In similar circumstances, courts have found no *Faretta* violations where standby counsel participates in bench conferences instead of the pro-se defendant. *See United States v. Isaac*, 655 F.3d 148, 154 (3d Cir. 2011) (pro-se defendant waived participation in sidebar conferences by failing to object); *Lefevre v. Cain*, 586 F.3d 349, 355 (5th Cir. 2009) (pro-se defendant who was shackled acquiesced in standby

---

Lucas); 6JR.3513–14, 3543, 3555–56 (Siraj's standby counsel stating his position on jury instructions).

[59] 6JR.2343 (Lucas's standby counsel: I will raise [the objection] as it goes." The court: "Or he can say objection." Siraj's standby counsel: "The same kind of thing for Mr. Wahhaj."); 6JR.2156–57 (asking for Lucas's express consent for his standby counsel to state his objection).

[60] Standby counsel took a moment to consult with Lucas during the jury-instruction conference. 6JR.3520–21, but neither Siraj nor Lucas stated anything on the record during the conference.

counsel's participation in bench conferences by not objecting); *Mills*, 895 F.2d at 904 (no *Faretta* violation in excluding pro-se defendant from bench conferences prior to his objection). Absent a clear objection to the district court's modified directions for standby counsel to serve as a "go-between" for bench conferences, there is no *Faretta* violation where Siraj and Lucas otherwise invited substantial participation by standby counsel in their defense.

4. *Defendants retained actual control of the case they chose to present to the jury.*

Regardless of whether Siraj and Lucas acquiesced in standby counsel's participation in bench conferences, the district court's bench-conference procedure did not violate their *Faretta* rights because they retained control of the presentation of their case. The *Faretta* right is eroded where standby counsel's participation "effectively allows counsel to make or substantially interfere with any significant tactical decision, or to control the questioning of witnesses, or speak *instead* of the defendant on any matter of importance." *Wiggins*, 465 U.S. at 178. Standby counsel's participation in bench conferences did not run afoul of this rule because Siraj and Lucas retained control of tactical decisions and the questioning of witnesses, and the district court allowed defendants to speak to the court directly on any matter of importance.

The record shows that Siraj and Lucas retained actual control over their defense. Siraj conducted his own voir dire, while Lucas chose to defer to codefendants' counsel.[61] Siraj and Lucas made their own opening statements and closing arguments.[62] They determined what witnesses they wished to call[63] and conducted their own direct and cross-examinations.[64] They made their own objections.[65] They filed and presented motions.[66] They admitted exhibits.[67] Outside the presence of the jury, the district court conducted proceedings in open court to allow Siraj and Lucas to participate fully. Standby counsel regularly made clear that when they participated, they were "pursuing a line of defense fashioned by" the pro-se defendants themselves.[68]

---

[61] 6JR.4168, 4476–78.

[62] 6JR.1022, 3060, 3718, 3733.

[63] 6JR.3058–59, 3179.

[64] *See, e.g.*, 6JR.1152, 1464, 1493, 1669, 1696, 1948, 2065, 2071, 2263, 2276, 2329, 2330, 2446, 2450, 2557, 2567, 2690, 2697, 2769, 2894, 2896, 3128, 3239, 3241, 3266, 3366.

[65] *See, e.g.*, 6JR.1050, 1173, 1203, 1348, 1366, 1392, 1398, 1606, 1607, 1620, 1622, 1764, 1771, 1971 (objections by Siraj); *see also* 6JR.1166, 1313, 1516, 1520, 1521, 1603, 1608, 1615, 1773, 1800, 1805, 1899, 1969, 1970, 1989, 2103, 2217, 2296, 2600, 2989, 3021, 3291, 3292, 3460 (objections by Lucas);

[66] *See, e.g.*, 1JR.74 (Doc. 940, 941); 2JR.666, 3JR.2024; 6JR.1199–1200; 6JR.3058–59.

[67] *See, e.g.*, 6JR.2398, 3376.

[68] 6JR.1201 (standby counsel informing court "I'm just the mouthpiece for Mr. Wahhaj"); 6JR.1259–60 (standby counsel informing court that Siraj was withdrawing his motion to present Hakima from remaining in the courtroom "via his messenger"; *see also* 6JR.1223 (district court tells Siraj's standby

*Mills*, 895 F.2d at 905. Siraj and Lucas identify nothing in the record that suggests otherwise. The record makes clear that Siraj and Lucas made their own tactical decisions, and standby counsel merely assisted with their implementation.

The restriction on Defendants approaching the bench did not allow standby counsel to speak instead of Defendants on any matter of importance. To start, many of the bench conferences did not qualify as matters of importance. A number were administrative, mostly involving scheduling.[69] Many involved basic trial objections made by Hujrah's or Subhanah's counsel to the government's examination of witnesses, or vice versa.[70] Not every

---

counsel in reporting back to Siraj on the bench conference, "All you can do is be the messenger. I can't ask you to do anything more.").

[69] The United States counts eight bench conferences that were administrative in nature. *See* 6JR.1658, 2559, 2662, 2919, 3051, 3379, 3472, 3745. Lucas also double counts one non-administrative bench conference. *See* Lucas Br. 28 (citing single bench conference at 6JR.2611 and 6JR.2613). Regardless, the ultimate inquiry does not turn on the exact count.

[70] 6JR.1234–36 (government raises relevance objection to questioning by Subhanah's counsel, and the court sustains objection and provides direction on permissible questioning); 6JR.1372 (Subhanah's counsel objects to government questioning based on facts not in evidence, and the court instructs the government to lay the foundation); 6JR.1402–04 (Hujrah's counsel objects to government questioning on relevance grounds, and the court orders government to rephrase); 6JR.2057–59 (government objects to questioning by Subhanah's counsel as addressing matters relevant to a prohibited mistake-of-law defense, and the court rules the questioning is within the scope of direct); 6JR.2200–02 (Subhanah's counsel objects based on the best evidence rule, and the court instructs the government to admit the exhibit first); 6JR.2238–43 (government objects to the improper use by

routine evidentiary objection qualifies as important. *See Hicks v. Duncan*, 173 F.3d 860 (9th Cir. 1999) (unpublished) (no *Faretta* violation where standby counsel attended sidebar conference on pro-se defendant's objection because "standby counsel was simply helping Hicks in the presentation of his objection"). Nor was every objection by co-defendants' counsel or to questioning by co-defendants' counsel relevant to Siraj's and Lucas's case. *See McDermott*, 64 F.3d at 1452 (distinguishing bench conferences discussing matters of importance from "bench conferences [that] addressed only minor procedural issues or matters concerning codefendants"). The court was presiding over a four-defendant trial with six defense attorneys, two pro-se defendants, and four prosecutors. The court was well within its discretion to

---

Subhanah's counsel of a document to refresh the witness's recollection, and the court instructs Subhanah's counsel on the permissible scope of questioning); 6JR.2292–93 (Hujrah's counsel requests the court's guidance on how to refresh the witness's recollection with an audio recording, and there is some discussion of relevance at the bench); 6JR.2688–89 (government objects to questioning by Hujrah's counsel based on facts not in evidence, and the court directs the government to address it on redirect); 6JR.2708–12 (government objects to Subhanah's counsel reading a recorded recollection into the record and on relevance grounds, and the court sustains relevance objection); 6JR.2808–09 (government objects to questioning by Subhanah's counsel on relevance, and the court overrules the objection); 6JR.3414–16 (Subhanah's counsel objects on hearsay grounds to questioning by Hujrah's counsel, and the court directed counsel to rephrase); 6JR.3479–80 (government objects on relevance to question by Subhanah's counsel, and the court overruled it); 6JR.3486–91 (government objects on relevance to questioning by Subhanah's counsel regarding Subhanah's statements, and the court sustained it).

maintain orderly procedures in the courtroom by limiting who presented argument at each bench conference, and it exercised this discretion as necessary.[71] Siraj and Lucas were not entitled to chime in on every routine objection made on behalf of a different defendant or by the government to questioning by one of the other defendant's counsel.

To be sure, some bench conference did involve matters of importance to Lucas and Siraj's case.[72] The district court recognized up front that this would likely occur. In such cases, the district court offered an alternative—Siraj and Lucas could present their arguments directly outside the presence of the jury. Indeed, the district court used this option itself when Siraj and Lucas's direct participation was necessary, such as when Lucas's standby counsel moved for a mistrial. *See* 6JR.2143, 2156–63. Yet despite the district court repeatedly ensuring that standby counsel conveyed the content of bench

---

[71] 6JR.1221 ("No offense, but I've got too many lawyers up here. The lawyer taking the witness is the one that's going to make the argument."); 6JR.2849 (Court speaking to Hurjah's counsel: "Well, it's not your witness. It is whoever is handling the witness is going to make the argument, otherwise we will never get through this.").

[72] Although Lucas claims 41 conferences involved substantive legal discussions, he mentions the substance of only 9. *See* Lucas Br. 28. Of those 9, one is the motion for a mistrial that the court deferred until it could be addressed in open court outside the presence of the jury. 6JR.2143. Another involved the first juror note, which occurred only after pro-se Defendants had the opportunity to review the note over the course of a break. 6JR.3051, 3056–57.

conferences to the pro-se defendants before proceeding (in addition to viewing the realtime transcript), the defendants never availed themselves of the alternative procedure offered by the district court by requesting to address the court outside the presence of the jury.

A "*pro se* defendant's right to 'address the court freely' is not absolute." *United States v. Gomez-Rosario*, 418 F.3d 90, 102 (1st Cir. 2005). "Rather, the court may use standby counsel to facilitate the orderly functioning of the proceedings so long as the defendant retains control over 'significant tactical decisions' and 'on any matter of importance.'" *Id.* This is what the court did by relying on standby counsel to approach the bench and offering the defendants the opportunity to speak to the court directly outside the presence of the jury whenever necessary. Siraj and Lucas have not shown that this procedure deprived them of the opportunity to speak on their own behalf.

The district court's choice of bench-conference procedures respected defendants' *Faretta* rights and fell solidly within the exercise of its discretion to manage its courtroom and provide for courtroom security. This Court has previously suggested that security concerns may be valid reason to exclude a defendant from bench conferences. *See McDermott*, 64 F.3d at 1452 (emphasizing that "[i]t is important to note that the court gave no other reasons for excluding" defendant from bench conference such as "security considerations"). While the district court never expressly identified security

concerns as the reason for its bench-conference procedure, security concerns played a role throughout the case. As the district court noted, Siraj and Lucas were charged with serious, violent criminal offenses. 4JR.236. On top of that, they had a history of noncompliance with security policies.[73] Plainly, both pro-se Defendants as well as their counsel were aware of the court's security concerns, and Siraj and his counsel referenced them in court, 6JR.1133; 2SJR.132. These security concerns justified the district court's decision not to allow Siraj and Lucas to roam the courtroom freely.[74] And while Siraj proposed that the court address its security concerns by having the Marshals approach with them for every bench conference, regular parades of Marshals to the bench in addition to two pro-se defendants and up to ten attorneys would have been disruptive. The district court's approach of prohibiting Siraj and Lucas from approaching the bench, but allowing them the option of discussing issues outside the presence of the jury when necessary reasonably

[73] The district court had allowed a pretrial joint defense meeting with all Defendants present to take place in the courtroom. 4JR.129. It disallowed this practice after it learned that Defendants had not complied with policies and protocol regarding prisoner conduct during this meeting and during transport. 4JR.130; *see also* 4JR.227–28. The court found that Defendants' conduct "poses a concern not only for the safety of Defendants but also to counsel and overall security in the federal courthouse." 4JR.130

[74] In addition to prohibiting the pro-se Defendants from approaching the bench during bench conferences, the court also restricted them to the podium when examining witnesses. 6JR.1694, 4163.

balanced the need to maintain a secure and orderly courtroom with the pro-se defendant's right to present their own cases.

Contrary to Lucas's argument at Br. 30, the circumstances of Siraj's and Lucas's case bear no resemblance to *McDermott*. There, the court categorically prohibited the pro-se defendant from participating in any purely legal matter—including both bench conferences and the jury-instruction conference—for no reason other than his lack of legal knowledge. *McDermott*, 64 F.3d at 1451–52. Here, however, the district court permitted Siraj and Lucas to make any legal argument they wished. Its sole restriction was to prevent them from approaching the bench, and it provided an alternative means for Siraj and Lucas to present any issues to the court outside the presence of the jury. *McDermott* did not adopt a per-se rule that barring a defendant from participating in bench conferences violates a defendant's *Faretta* rights and emphasized the fact-dependent nature of the inquiry. *Id.* at 1452, 1454. The facts here show that unlike *McDermott*, Siraj and Lucas were allowed to speak directly on any matter of importance.

5. *The jury would have perceived Siraj and Lucas to be representing themselves.*

From what the jury saw, they would have understood that Siraj and Lucas were conducting their own defense. The court explained to the jury that Siraj and Lucas were representing themselves. 6JR.4266. What the jury

observed would have only confirmed this. As previously mentioned, Siraj and Lucas made their own opening statements and closing arguments, examined witnesses, and made objections. The jury had no way of knowing that they may have wanted to attend the bench conferences; the court certainly never announced their exclusion to the jury. Indeed, Siraj and Lucas were "so visibly in charge of [their] defense" that standby counsel's participation in bench conferences and other technical matters "would not have destroyed" the pro-se Defendants' '"dignity and autonomy"' protected by their *Faretta* right. *McDermott*, 64 F.3d at 1454.

### C. The jury-note conferences conducted without Siraj or Lucas did not violate their *Faretta* rights.

#### 1. *Relevant background*

The first juror note came during trial. It asked why Siraj was not facing charges regarding Abdul Ghani's welfare, wellbeing, or death. 3JR.1888. The court provided it to the parties, including the pro-se Defendants, so they could review it during a break. 6JR.3051. After the break, the court held a bench conference because there was a reporter in the courtroom. 6JR.3056. The parties agreed to the court responding by simply telling the juror that the jury will receive instructions at the end of the case regarding the law and not to discuss the case with anyone until the case was submitted. *See* 6JR.3056–57; *see* 3JR.1889. Standby counsel for Lucas and Siraj were

present, and neither indicated that Lucas or Siraj wished to address the court regarding the note. *See* 6JR.3056.[75]

Before jury deliberations began, the court discussed the procedure for jury notes. The court indicated that if there was a note, the court would email it to counsel, and then they would discuss it by phone or at the courthouse. 6JR.3771. The court stated that standby counsel could confer with Siraj and Lucas in the courtroom. 6JR.3771. Neither Siraj nor Lucas objected to this arrangement. 6JR.3771.

During jury deliberations, the first note the jury sent asked for the definition of "armed" in Count 3[76] and the second asked about the role of the overt acts listed in Count 3.[77] *See* 3JR.1891–92.[78] The district court emailed

---

[75] Lucas addresses this jury-note conference as a bench conference. Lucas Br. 29. The United States agrees with this approach because this conference was indistinguishable from all the other bench conferences and the preservation and acquiescence arguments for bench conferences discussed above apply equally to the first jury-note conference. The United States addresses it here simply to provide relevant background facts regarding how the district court handled jury notes.

[76] The note read: "What is the definition of 'armed'? Count 3 says 'armed with firearms and ammunition[.]' But does that mean in his vicinity, on his person, loaded and chambered, etc.?"

[77] The note read: "On Count 3, if any of the acts are 'true,' does that mean we must select 'guilty' or are the acts in support of if a 'guilty' decision is made?"

[78] Lucas refers to these as the third and fourth notes, Lucas Br. 33, which is technically accurate if one counts the jury note designating a foreperson, 3JR.1890.

the first note to defense counsel, including standby counsel, and held a telephonic conference to discuss it.[79] 6JR.3775. While they were discussing the response to the first note, the second note was delivered to the court. 6JR.3778. The court then emailed the second note to counsel, including standby counsel. 6JR.3778. The court and counsel agreed that the jury should be given "a standard response," 6JR.3778, and instructed to re-read and rely on the instructions it had already been given. 6JR.3776–81; *see* 3JR.1893. During this conference, standby counsel for Siraj stated that Siraj and Lucas did not need to be present because the court was merely instructing the jury to re-read the instructions and thus it was not a substantive hearing. 6JR.3781. The court agreed, and the response was sent to the jury. 6JR.3781.[80]

---

[79] The record does not reveal whether standby counsel consulted with Siraj and Lucas regarding the first note, but presumably they had no opportunity to do so for the second note as it came in during the telephonic conference.

[80] Another jury note came in during deliberations and asked if the jury could find out where Hujrah's gun was found in the compound. 6JR.3787. The court again held a telephonic conference, and the parties agreed with the court's proposed response that no new evidence could be provided. 6JR.3787–88; 3JR.1895. Lucas and Siraj do not argue that their exclusion from this jury-note conference (which concerned evidence of Hujrah's guilt) violated their *Faretta* rights.

2. *Siraj and Lucas acquiesced to standby counsel's participation in jury-note conferences on jury instructions.*

Recall that Siraj and Lucas permitted standby counsel to appear on their behalf for the jury-instruction conference and speak on their behalf on all matters related to the jury instructions. *See* 6JR.3509–69. As Siraj and Lucas were "given the opportunity and elect[ed] to have counsel appear before the court" on jury instructions, their complaints about their exclusion from jury-note conferences addressing questions regarding the jury instructions "lose much of their force." *Wiggins*, 465 U.S. at 183. By agreeing to "substantial participation by counsel" on jury instructions, standby counsel's subsequent appearances on jury notes asking questions about those instructions "must be presumed to be with [Siraj's and Lucas's] acquiescence." *Id.*

3. *The jury-note conferences did not involve significant tactical decisions on matters of importance.*

As the jury-note conferences took place outside the presence of the jury, they concern only the first *Wiggins* limitation—that the pro-se Defendants preserve actual control over their cases. *See Wiggins*, 465 U.S. at 179. Assuming Siraj and Lucas did not acquiesce in standby counsel's participation, the question is whether standby counsel's participation "effectively allow[ed] counsel to make or substantially interfere with any

significant tactical decisions" or "speak *instead* of the defendant on any matter of importance." *Id.* at 178.

The response to the jury notes did not involve significant tactical decisions on matters of great importance. Both the challenged jury notes involved the jury's interpretation of the jury instructions. The jury asked for a definition of the term "armed" and about the role of the overt acts in Count 3. The parties agreed that there was no legal definition for the term "armed" to give the jury, and that the answer to their question about the overt acts was already provided in the instructions. In the end, the parties agreed that there was nothing to be done other than to tell the jury to re-read its instructions. The court responded to the jury in a note that said, "You have been provided all the instructions on the law applicable to this case. You must rely on these instructions. Please re-read your instructions." 3JR.1893. Both standby counsel and the court characterized this response as not "substantive." 6JR.3781. Particularly given the pro-se Defendants' deferral to standby counsel on jury instructions, this response did not rise to the level of a significant tactical decision or a matter of importance.

Contrary to Lucas's contention at page 32 of his brief, *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc), is not on point. In *Frantz*, the pro-se defendant had repeatedly asked the court during the jury-instruction conference and at other points during trial to admit either the tape or the

transcript of a 911 call, which he believed contained impeachment material. 533 F.3d at 729. During deliberations, the jury sent a note asking to hear the tape of the 911 call. *Id.* at 740. The judge held a conference in chambers attended by standby counsel, but not the pro-se defendant. *Id.* at 731. At the conference, the state agreed to release the disputed 911 tape to the jury "'if that's what the defendant wants to do.'" *Id.* Standby counsel rejected the state's offer, stating that the pro-se defendant did not want the tape to go to the jury. *Id.* The judge denied the jury's request and instructed that the jurors should rely on their recollection of the evidence. *Id.*

Under these circumstances, the Ninth Circuit held that the jury-note conference involved "significant tactical decisions" on a "matter of importance"—the pro-se defendant had the right to speak for himself on the tactical choice of whether to admit evidence that the pro-se defendant himself had previously sought to be admitted. *Frantz*, 533 F.3d at 741–42. While the court also found that the pro-se defendant was entitled to be present because the conference resolved the content of the judge's response to the jurors' request, *Frantz* did not state a categorical rule that a jury-note conference always qualifies as matter of importance under every circumstance no matter how generic the court's response. *Id.* at 742–43. In the end, *Frantz* remanded for an evidentiary hearing regarding whether the pro-se defendant consented to standby counsel's participation in the jury-note conference, noting that

implicit consent was unlikely given that "Frantz asserted that his right to self-representation extended to all matters involving jury instructions" and "fully participated in the primary discussion regarding final jury instructions." *Frantz*, 533 F.3d at 745.

Siraj and Lucas are not similarly situated to the pro-se defendant in *Frantz*. Siraj and Lucas allowed standby counsel to manage all jury-instruction issues and had not participated at all in the jury-instruction conference. *See* 6JR.3509–69. The jury notes involved only questions regarding the language of the jury instructions, not a disputed issue regarding the admission of evidence. Indeed, nothing in the record suggests that Siraj or Lucas had any interest in shaping the language of the jury instructions, in contrast to Frantz to whom the admission of the 911 tape had been critical and who was heavily involved in the jury instructions. *Frantz* offers little guidance to the facts presented in this case, and in any event, would not be binding on this Court. Considering the jury-note conferences in the context of this trial, allowing counsel to speak on Siraj's and Lucas's behalf at the jury-instruction conference on these two notes did not violate their *Faretta* rights.

Reviewing the trial as a whole, the district court respected Siraj's and Lucas's right to represent themselves and went to great lengths to ensure that "both in fact and in the perception of the jury," they had "a fair chance to

present" their own cases in their own ways. *Mills*, 895 F.2d at 905. To the extent that the court's procedure for bench conferences and jury notes limited Siraj and Lucas, any incursion on their rights was minor and did not rise to the level of a *Faretta* violation. *See McDermott*, 64 F.3d at 1454 ("[M]inor incursions, as in *Mills*, will fall short of a Sixth Amendment violation.").

## XI. The district court did not err in denying Hujrah's request to represent herself.

Hujrah challenges the district court's denial of her motion to represent herself. Hujrah Br. 21–28. This Court reviews "de novo whether a constitutional violation occurred and for clear error the factual findings underlying the district court's decision to deny the motion. *United States v. Simpson*, 845 F.3d 1039, 1046 (10th Cir. 2017). In reviewing whether a defendant waived her right to counsel, this Court must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1997).

### A. Relevant background

#### 1. *Hujrah files a motion to represent herself.*

Initially, Hujrah was represented by two court-appointed attorneys, who the court eventually permitted to withdraw after Hujrah filed an ethics complaint.[81] 2JR.1247. In a hearing regarding the withdrawal of her first

[81] In its order, the district court praised Hujrah's first set of attorneys and noted that "the ethics complaint filed against them was totally devoid of any

attorneys, Hujrah unequivocally told the district court, "I do not want to represent myself." 5SJR.169. After permitting her former counsel to withdraw, the district court appointed two new attorneys to represent Hujrah. 2JR.1247.

Approximately eight months later, on March 15, 2023, Hujrah filed a motion to proceed pro se. 2JR.921. Hujrah alleged that there had been "a complete breakdown of communication and a conflict of interest" between herself and her *former* counsel. 2JR.921. As to her current counsel, she raised the following complaints:

1) She alleged that her codefendant's counsel recorded meetings without her consent.

2) She alleged that her current counsel stated "I don't think it's futile to go to trial," asked her a question about the proposed plea offer that made her uncomfortable because she believed a plea deal was no longer an option, and asked her questions to "bait" her after she declined the plea offer.

3) She alleged that her counsel had not yet discussed trial strategies and were not sufficiently considering her ideas. Specifically, when she proposed hiring an expert (of unspecified expertise), counsel proposed an alternative route, which Hujrah agreed was good.

4) She believed that because counsel's pretrial motions were unsuccessful, counsel would not be able to defend her adequately at trial.

---

merit" and found no evidence that her former counsel failed to effectively represent her. 2JR.1247.

2JR.922–24. She summarized her complaints as follows:

> Ms. Wahhaj will have been in custody for five years as of August 2023, and if counsel are not discussing trial strategies, have not looked at her case in awhile, are inadvertently sending messages that it is futile to go to trial, are putting more emphasis on plea deals than trial preparation, appears to be baiting Ms. Wahhaj post February 9, 2023, is recording Ms. Wahhaj without her consent on devices which leaves her suspicious of counsel's motives and render her unable to participate in her own defense, and if requests by Ms. Wahhaj for trial prep are not considered such as expert testimony, Ms. Wahhaj is further at risk of an unfair trial, inter alia.

2JR.924.

Hujrah feared that if she was not given "free reign to proceed pro se, she [would] be severely prejudiced even more so than by her former counsel who rendered her uninformed about her case and in limbo for years." 2JR.924. She explained that if she "wasn't so severely harmed by her former counsel[,] it would have been a different story." 2JR.925. She believed that she needed "to deploy any and all approaches for trial and at this time can no longer risk leaving her life in the hands of counsel nor can she make the same assumption as she did with former counsel that counsel are doing their due diligence to further her cause." 2JR.925.

2. *The district court conducts a* Faretta *hearing.*

The district court started the hearing by inquiring into Hujrah's background and experience. 5HIR.206–07. Hujrah confirmed that she had obtained her GED and taken some college courses in psychology but had

never studied law or represented herself. 5HIR.207 The district court proceeded to inform Hujrah that: 1) she had a constitutional right to counsel, 2) if she represented herself, she would lose access to court-funded investigators or experts, 3) the court could not assist or give her legal advice, apart from the advice not to represent herself, 4) she would have to comply with court rules and her lack of training in these rules would be a disadvantage, and 5) the court would not further delay the case to give her extra time. 5HIR.206–08, 212–13. Hujrah indicated that she understood. 5HIR.206–08, 212–13. The court also had the government explain the maximum penalties Hujrah faced if she were convicted on the charges against her, which included a mandatory life sentence on the kidnapping charges. 5HIR.208–11.

The district court confirmed that Hujrah understood that she may have defenses to these charges that she would not be able to effectively present at trial due to her lack of familiarity with the court rules. 5HIR.211–12. The court asked Hujrah if that concerned her at all, and she said, "No, Your Honor." 5HIR.212.

In an ex parte session, the court asked Hujrah to explain why she wanted to represent herself. Hujrah said she would like to proceed pro se so she could "expend all [her] energies and efforts on preparing my defense." 5HIR.214. But she also said, "I don't want to go pro se. Neither do I prefer to

go pro se. But at this critical juncture, I feel like it is my only best option at this point." 5HIR.214–15. She explained that if she was pro se, she wouldn't have to worry about "red flags" or whether the direction she wanted to pursue was in opposition to her counsel. 5HIR.215. She then discussed how she was prejudiced by her *former* counsel and conceded that she would not be able to do a better job than her *current* counsel. 5HIR.215. But she maintained that she wanted "free rein to really give this thing everything I've got." 5HIR.215. She explained that she was not concerned about her lack of knowledge because "I am very resourceful and I will find a way," although she articulated no plan. 5HIR.216. Hujrah praised her current counsel but said, "I have to give it everything I've got and I have to defend myself." 5HIR.216. She felt that there "may be opposition" by her current counsel on how she wants to handle the case, and she didn't "want to expend a lot of energy and time convincing" her counsel. 5HIR.218.

The district court explained to Hujrah that defense counsel had a duty to talk to her about the plea offer and the strengths and weaknesses of the case. 5HIR.219–20. The court pushed Hujrah on how she planned to present a defense without the resources available to lawyers, such as a court-appointed investigator. 5HIR.220. Hujrah again offered no plan and only stated that she was "resourceful" and would "make a way." 5HIR.220. When the court again explained that she would be at a "real disadvantage," Hujrah

said she understood but she felt “like it’s my only option left now at this point.” 5HIR.221.

Both of Hujrah’s counsel addressed the concerns she raised in her motion. Counsel assured Hujrah that all their pretrial motions put forth their best arguments and were focused on prevailing. 5HIR.221. Counsel explained that counsel has a duty to advise her on various possibilities and outcomes and that she is best served by counsel who may push back on her proposed strategies so that she can make voluntary and knowing decisions regarding the core decisions that are hers to make. 5HIR.222–23. Her counsel further indicated that the questions asked of her were sincerely intended to gather information necessary for her defense, not to “bait” her. 5HIR.226–27. Counsel asked Hujrah to be open with them about any concerns she may have. 5HIR.227–28. Counsel also assured her that no one has ever made secret recordings of their meetings. 5HIR.229. Counsel told her that there may be disagreements about strategy that would need to be discussed to make the best decisions for her case but reminded her that she not only has “a voice,” but she has “the ultimate decision.” 5HIR.229–30.

After allowing Hujrah time to speak with her counsel, Hujrah maintained that she still wanted to represent herself. 5HIR.230. The court asked one final time what Hujrah could do representing herself while incarcerated that her lawyers could not do. Hujrah responded:

> It's not a matter of [what] my lawyers can't do for me, it's just at this time, I am ready to progress the case the way I want to progress it. I'm just ready to, basically, put my life back in my hands, because I don't feel like right now it's in my hands.

5JR.231.

The district court denied Hujrah's motion to proceed pro se. 2JR.1246–56. In considering her motion, the court analyzed the four conditions necessary for self-representation. 2JR.1252. Those conditions are:

> 1) "[T]he defendant must 'clearly and unequivocally' inform the district court of [her] intention to represent [herself]."
>
> 2) "[T]he request must be timely and not for the purpose of delay."
>
> 3) "[T]he court must conduct a comprehensive formal inquiry to ensure that the defendant's waiver of the right to counsel is 'knowingly and intelligently' made."
>
> 4) "Finally, the defendant 'must be able and willing to abide by rules of procedure and courtroom protocol.'"

*Simpson*, 845 F.3d at 1046. The district court found that Hujrah did not meet any of these four requirements and denied her motion. 2JR.1252–56. Because the record amply supports the district court's findings that Hujrah's request to represent herself was not clear and unequivocal or knowing and intelligent, this Court should affirm.[82]

[82] The United States acknowledges that a motion for self-representation made before jury selection and not for the purpose of delay, as Hujrah's motion was, is timely. *See* 2JR.1254; *Tucker*, 451 F.3d at 1183. Likewise, to the extent the district court concluded that Hujrah was unable to comply with court rules, procedures, and protocols because of her lack of knowledge

### B. Hujrah's request to represent herself was not clear and unequivocal.

The district court's finding that Hujrah's request for self-representation was not clear and unequivocal is factual finding reviewed for clear error. *United States v. Loya-Rodriguez*, 672 F.3d 849, 856 (10th Cir. 2012). "[E]ven when defendants appear to request self-representation, their other statements or actions may render the requests unclear or ambiguous." *Simpson*, 845 F.3d at 1048. Accordingly, this Court must consider Hujrah's "statements in context and consider the inferences reasonably drawn by the district court." *Id.*

The district court did not clearly err in finding that Hujrah's request for self-representation was not clear and equivocal based on her conflicting statements. In prior proceedings regarding her former counsel, Hujrah unequivocally told the district court, "I do not want to represent myself." 5SJR.169. And in the context of her new request to represent herself, Hujrah continued to express reluctance to represent herself, stating that she did not

---

or preparedness, 2JR.1256, that is not a basis to deny self-representation. *Simpson*, 845 F.3d at 1051. Regardless, the district court's decision was justified by two valid reasons—Hujrah's waiver was not clear and unequivocal, and it was not knowing and intelligent. This Court can affirm on either or both grounds. *See id.*

want to proceed pro se but felt it was her only option. 2JR.1253. The court noted that Hujrah appeared to be "emotionally conflicted" and was "in tears" at times. 2JR.1253.

The district court also found that Hujrah's assessment that proceeding pro se was her only option was not factually accurate, pointing out that there was no significant breakdown in her relationship with counsel and citing Hujrah's own acknowledgement that "her current counsel had sincerely and compassionately been acting in her interests." 2JR.1253. The court also noted that the reasons she cited for her dissatisfaction with counsel had been dispelled at the hearing after counsel explained that they had not been recording their meetings, that they had only discussed the plea offer to fully inform and advise her and not to "bait" her, and that they would give full consideration to her ideas about trial strategy. 2JR.1249–50. Indeed, many of Hujrah's complaints that drove her request for self-representation appeared to involve her former counsel. 2JR.921–22, 925; 5HIR.215.

Nor did it appear that Hujrah had truly grappled with the practical realities of what self-representation entailed. The district court found that while Hujrah understood her lack of resources and her limited ability to defend herself, she could not "articulate what steps she would take or how she would proceed to obtain the necessary knowledge, skills, information, and resources to adequately defend the case." 2JR.1253. Yet despite this, her

acknowledgment that she could not do better than her current counsel, 5HIR.215, and her continuing statements that "I don't want to go pro se," she maintained that representing herself was her "only best option at this point." 5HIR.214–15.

Considered in context, the district court could reasonably interpret Hujrah's request to represent herself as equivocal—she wished to represent herself only if she had no viable alternative. But the district court found that she *did* have alternatives based on her own description of her positive relationship with her current counsel. The district court, which was required to engage in *every reasonable presumption* against the waiver of the right to counsel, *Brewer*, 430 U.S. at 404, reasonably found that under these circumstances, her request was not clear and unequivocal.

Hujrah identifies no clear error in these findings. While she cites portions of the trial transcript in which she stated her desire to represent herself, Hujrah Br. 26, she does not address her conflicting statements that she did not wish to represent herself and was requesting to do so only because she believed she had no other option. *See Stallings v. Santistevan*, No. 21-2115, 2022 WL 2824261, at *2 (10th Cir. July 20, 2022) (unpublished) (concluding that the waiver of the right to counsel was not clear and unequivocal where defendant "said he did not want to proceed pro se and did not feel comfortable doing so, but preferred that to representation by his

appointed counsel" and repeatedly changed his mind). The district court had no duty to clarify her equivocal request, *Simpson*, 845 F.3d at 1051, and Hujrah has not shown that the court's interpretation was implausible or impermissible based on the record.

Instead of addressing her conflicting statements, Hujrah argues that the district court erroneously considered her lack of legal knowledge. While it is true that a lack of technical legal knowledge is not a basis to deny a defendant's motion for self-representation, *see United States v. Bennett*, 539 F.2d 45, 51 (10th Cir. 1976), the district court's point in referencing this concern was for purposes of determining whether her waiver was clear and unequivocal. The fact that Hujrah was "unable to articulate" a plan for how she could go about defending herself, 2JR.1253, showed that she had not meaningfully engaged with what self-representation would mean for her path forward. This was particularly concerning when combined with her "emotionally conflicted" and tearful demeanor, her statements that she did not want to represent herself but felt she had no other option, her acknowledgment that her current counsel was "had sincerely and compassionately been acting in her interests," 2JR.1253, and her admission that she could not "do a better job than my current counsel," 5HIR.215.

Hujrah compares her case to Siraj's, suggesting that the district court clearly erred because the district court granted Siraj's case, but not hers.

Hujrah Br. 22–24. Hujrah cites nothing in the record that suggests that Siraj similarly equivocated by both requesting to proceed pro se and telling the court that he did not wish to do so, as Hujrah did.[83] And as even she concedes, Hujrah Br. 24, Hujrah's relationship with counsel was not similarly situated to Siraj's. Siraj had "a challenging attorney-client relationship" with defense counsel, "strongly disagree[d] with the defense strategy" proposed by defense counsel, and "curtail[ed] or cut off communications with counsel when counsel refused to blindly do his bidding." 1HIR.545–46. Hujrah, on the other hand, praised her defense attorneys, and the court found no significant breakdown of their relationship. Siraj had a clear path that he wished his defense to take (however misguided it was), 1HIR.545, while Hujrah could not articulate her plan to proceed with her defense pro se, 2JR.1253. Under these circumstances, the court did not clearly err in finding Hujrah's waiver unclear and equivocal, while reaching a different conclusion in Siraj's case.

[83] The record does not contain a transcript of the ex parte portion of Siraj's *Faretta* hearing, and the United States was of course not present and does not know what transpired. *See* 3SIR.110–11. Nor is the United States aware of any other materials contained in the ex parte volume 5 of Hujrah's individual record on appeal beyond the transcript of her *Faretta* hearing, which was the only portion released by the Court in response to the United States' unopposed June 24 motion for a ruling on whether relevant volumes of the record should remain ex parte.

### C. Hujrah's attempted waiver was not knowing and intelligent.

A waiver of the right to counsel must be made knowingly and intelligently. *United States v. Vann*, 776 F.3d 746, 763 (10th Cir. 2015). "'[B]efore a court may grant a waiver, it must ensure the defendant is 'aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" *United States v. Williamson*, 859 F.3d 843, 862 (10th Cir. 2017). Specifically, the defendant must understand "the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter," otherwise known as the *Von Moltke* factors. *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948). As this Court has explained, "*Faretta* requires a showing on the record that the defendant who elects to conduct his own defense had some sense of the magnitude of the undertaking and the hazards inherent in self-representation when he made the election." *United States v. Padilla*, 819 F.2d 952, 956 (10th Cir. 1987).

"The 'tried-and-true method' for a district court to assess" these factors "is to 'conduct a thorough and comprehensive formal inquiry of the defendant on the record'" in the context of a *Faretta* hearing *United States v. Hansen*,

929 F.3d 1238, 1249 (10th Cir. 2019). But ultimately, the Court's approach "eschews formalism in favor of pragmatism" and emphasizes that whether a waiver is knowing and intelligent turns on the "'totality of the circumstances, including the background, experience, and conduct of the defendant.'" *Id.* at 1252. The validity of the waiver is reviewed de novo. *Vann*, 776 F.3d at 762.

The district court acknowledged that during the formal inquiry in her *Faretta* hearing, Hujrah indicated that she understood "the charges against her, the existence of possible defenses, and the range of allowable punishments," as well as "the serious risks and disadvantages of representing herself in a criminal case." 2JR.1255. The court nonetheless concluded that her waiver was not knowing and intelligent for two reasons. First, it appeared to the court "that her request to proceed pro se resulted from her emotional belief that she has no other option." 2JR.1255. And second, Hujrah "was unable to articulate how she would obtain the necessary resources and develop an adequate defense to the very serious and complex charges against her in the short time available to her." 2JR.1255. Indeed, Hujrah indicated that she was not concerned about the dangers of self-representation because she is "very resourceful" and "will find a way," 5HIR.215–16, but could not indicate what she would be able to do for herself beyond what her lawyers were doing, 5HIR.231. Based on these two factual findings, the court concluded that the record did not establish that Hujrah "fully appreciates the

dangers and disadvantages of self-representation" or that "her choice being made with eyes open." 2JR.1255. The district court could reasonably conclude that Hujrah had not shown that the required "sense of the magnitude of the understanding and the hazards inherent in self-representation," *Padilla*, 819 F.2d at 956, where she could not articulate any plan at all for how she planned to represent herself while incarcerated and facing a life sentence in a complex case. 2JR.1255.

Hujrah demonstrates no error in these findings. She does not address the court's concerns that her waiver was driven by emotion, as opposed to being an informed decision based on the reality of her situation. Nor does she address the court's concern that her inability to articulate a plan for her defense suggested that she did not fully appreciate the dangers of representing herself. She focuses instead on that fact that both she and Siraj responded to the formal *Faretta* inquiry in the same way—by stating that they understood the charges against them, the range of possible punishments, the availability of possible defenses, the role of standby counsel, and the disadvantages of proceedings pro se and that both stated that they understood. Hujrah Br. 22–23. But this Court must consider the whole picture. Even if Hujrah gave the "correct" answers to the court's standard questions, the district court could not ignore her conflicted statements, her emotional demeanor, and her inability to engage at a

practical level with what proceeding pro se would mean for her defense. Hujrah has not shown that the district court clearly erred by finding that Hujrah's decision was made without full appreciation for the dangers of self-representation. In light of the strong presumption against waiver, she cannot show that her waiver was indeed knowing and intelligent on this record.

### XII. The prosecutor's statements in rebuttal closing argument did not plainly misstate the reasonable-doubt standard.

Lucas, joined by the other Defendants, argues that the prosecutor misstated the law in referencing the reasonable-doubt standard in his rebuttal closing argument. Lucas Br. 35–45; Siraj Br. 49–50; Subhanah Br. 44; Hujrah Notice of Joinder 4. Defendants did not object to the prosecutor's statement in district court, Lucas Br. 36, and thus this Court reviews only for plain error.

This Court will reverse based on an unpreserved challenge to allegedly inappropriate remarks by counsel "only when (1) the prosecutor's statement is *plainly improper* and (2) the *defendant* demonstrates that the improper statement affected his or her substantial rights." *United States v. Christy*, 916 F.3d 814, 827 (10th Cir. 2019) (cleaned up) (emphasis in original). In considering whether the remarks were plainly improper, this Court views "the remarks in the context of the entire trial." *United States v. Starks*, 34 F.4th 1142, 1158 (10th Cir. 2022). As the Supreme Court has observed, "[t]he

line separating acceptable from improper advocacy is not easily drawn." *United States v. Young*, 470 U.S. 1, 7 (1985). Misstating the law, however, crosses into improper advocacy. *Starks*, 34 F.4th at 1158. To prevail on plain-error review, a misstatement must be "'clear'" or "'obvious.'" *Christy*, 916 F.3d at 827. If the Court finds that the prosecutor made an improper comment, it must then determine whether the defendant has met his or her burden to show "'a reasonable probability that, but for the error claimed, the result of the proceedings would have been different.'" *Starks*, 34 F.4th at 1157.

### A. The government argues in closing that the evidence presented at trial proves Defendants' guilt beyond a reasonable doubt.

After both parties rested their cases, the district court instructed the jury. The instructions repeatedly informed the jury that the government had the burden of proving each Defendant guilty beyond a reasonable doubt. *See* 6JR.3588–89. It told the jury that if "you think there is a real possibility that a charged Defendant is not guilty, you must give that charged Defendant the benefit of the doubt and find him or her not guilty." 6JR.3589.

The government then presented its closing argument. It focused its closing on the "avalanche of evidence" presented during the three-week trial, 6JR.3664, and how it proved the elements of each crime charged beyond a reasonable doubt, 6JR.3626–64.

After the government's closing, Defendants presented their own. 6JR.3665–3744. Hujrah's counsel closed by reminding the jury of the reasonable-doubt instruction, Instruction No. 4. 6JR.3717–18. Defense counsel asked, rhetorically, "Who has the burden of proof? The United States. And that burden of proof is beyond a reasonable doubt." 6JR.3717. Defense counsel continued to read from the jury instruction, "'Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the charged Defendants' guilt.'" 6JR.3717. Counsel explained, "That's the burden of proof. And that also means that when there are inferences to be drawn and the Government hasn't proved those inferences, that the presumption of innocence is what applies, not a presumption of guilt." 6JR.3717. Returning to Instruction No. 4, defense counsel read, "'If, based on your consideration of the evidence, you are firmly convinced that a charged Defendant is guilty of the crime charged, you must find that charged Defendant guilty. If on the other hand, you think there is a real possibility that a charged Defendant is not guilty, you must give that charged Defendant the benefit of the doubt'—the benefit of the doubt," defense counsel emphasized,—'and find him or her not guilty.'" 6JR.3717–18. On that theme, "the benefit of the doubt," the defense counsel concluded.

After the two pro-se Defendants finished their closing arguments, the prosecutor presented his rebuttal argument. The rebuttal responded to

various arguments made by the four defendants in closing, including that there was no evidence to support the charges, 6JR.3747–49; that law enforcement's failure to respond more quickly was actually the cause of Abdul Ghani's death because various officers did not act fast enough to find and save him, 6JR.3749–50; that Subhanah and Hujrah were helpless victims of Islamic culture and religion with no choice in their actions, 6JR.3750–52; that the kidnapping was a mere custody dispute, 6JR.3752–55; that Abdul Ghani's death was not foreseeable, 6JR.3755–56; that the Defendants were merely building an earthship, 6JR.3762–63; and that Jany's prophesies were just fantasies, 6JR.3756–62. The prosecutor's rebuttal refocused the jury not on Defendants' beliefs, but on the evidence of Defendants' actions and how it proved that the Defendants committed the crimes charged. 6JR.3758–62. The prosecutor then made the following remarks:

> Now is the time for you to consider the evidence and the law. If you find that the United States has proved its case beyond a reasonable doubt, you are required to find the Defendants guilty. There was some discussion of reasonable doubt, and I have to say, from the beginning of this long, tragic ordeal, the law repeatedly gave the Defendants the benefit of the doubt. Local law enforcement and Child Protective Services in Georgia gave Siraj the chance to pursue lawful custody proceedings, but instead, Siraj and the Defendants, acting together, abducted and fled with Abdul Ghani across state lines.
>
> Then in Alabama, you'[ll] recall the testimony of the state trooper who investigated the car accident there. He was very suspicious by what he saw. He wanted to do something. He

> knew something was wrong. But he allowed Siraj and the others to continue on to New Mexico, nonetheless, to his everlasting regret, and this was because the law afforded the Defendants the benefit of the doubt, and because the trooper at that time had no cause, no legal cause to hold them.
>
> Then we heard testimony from the Taos County Sheriff's Office, which investigated the missing child report that was communicated to them in late December and early January. The Sheriff's Office did all they could to develop probable cause, and it took a long time to do that, because they just didn't have sufficient evidence. And the Sheriff respected the Defendants' right to privacy and gave the Defendants the benefit of the doubt before finally being able to get a search warrant to search the property.
>
> They've had their reasonable doubts. They've had their benefit of the doubt. The Constitution, as we know, provides all of us the benefit of the doubt, but the Defendants have now used up all the doubt they are due. The evidence proving the Defendants' guilt is overwhelming. There is no doubt whatsoever. The Defendants are guilty as charged.

6JR.3764–66. Finally, the prosecutor concluded by turning the jury's attention back to "the heart of the case," Abdul Ghani and his tragic death. 6JR.3766.

### B. The prosecutor's comments were not plainly improper.

Lucas argues that the prosecutor misstated the reasonable-doubt standard. Lucas Br. 36–37. Referencing without context the last paragraph of the block-quoted language, Lucas contends that the government misstated the law by claiming that "the defendants had *previously* been afforded reasonable doubt and had now used it all up." Lucas Br. 36. He claims this alleged misstatement was plainly improper based on *Starks*, 34 F.4th at

1158, despite the prosecutor's statement in this case making no mention of the presumption of innocence as was at issue in *Starks*.

In *Starks,* this Court concluded that a prosecutor plainly misstated the law regarding the presumption of innocence when the prosecutor said in closing:

> Now, on Monday, if you'll recall, you were instructed that this defendant was presumed innocent. That he was clothed in the presumption of innocence. And *that was absolutely true Monday*. But here we are[, on] Wednesday. Ladies and gentlemen, I submit to you that based upon the evidence and based upon your common sense, that *that is no longer true*. That as the defendant sits before you today, that that presumption *has been changed* based upon [the] substantial weight of credible evidence. And as you see him, the naked truth about him, this man, based on this evidence, is a drug dealer.

*Starks*, 34 F.4th at 1154. The government conceded that this statement was plain error, and this Court agreed. *Id.* at 1159. *Starks* found that the prosecutor's remarks advised the jury that "after the presentation of the evidence, Mr. Starks was 'no longer' 'clothed in the presumption of innocence,'" *id.* at 1159, an assertion that was inconsistent with this Court's precedent in *Mahorney*, holding that the presumption of innocence "'(1) remains with the accused throughout every stage of the trial, including, most importantly, the jury's deliberations, and (2) is extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable

doubt,'" *Starks*, 34 F.4th at 1159 (quoting *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990)).

*Mahorney* likewise involved a prosecutor's misstatement regarding the presumption of innocence. In rebuttal closing, the prosecutor said:

> I submit to you, under the law and the evidence, that we are in a little different position today than we were when we first started this trial and it was your duty at that time, under the law of this land, as you were being selected as jurors, to actively in your minds presume that man over there not to be guilty of the offense of rape in the first degree, but, you know, things have changed since that time. I submit to you at this time, under the law and under the evidence, that that presumption has been removed, that that presumption no longer exists, that that presumption has been removed by evidence and he is standing before you now guilty. That presumption is not there any more.

*Mahorney*, 917 F.2d at 471. Both *Mahorney* and *Starks* explained that "the essence of the error in the prosecution's comments here was that they conveyed to the jury the idea that the presumption had been eliminated from the case prior to deliberations." *Id.* at 473; *Starks*, 34 F.4th at 1159.

*Starks* and *Mahorney* are examples at the far end of the spectrum and concern comments about the presumption of innocence. The prosecutor did not commit the same error here when referencing reasonable doubt. Indeed, as Lucas concedes at Br. 38, the prosecutor in this case never referenced the presumption of innocence at all. This distinction matters.

While reasonable doubt and the presumption of innocence are "corollar[ies]," *United States v. Pepe*, 501 F.2d 1142, 1143 (10th Cir. 1974), they are neither identical nor interchangeable. Both reasonable doubt and the presumption of innocence relate to the burden of proof in criminal trials, but the presumption-of-innocence doctrine also serves "as an admonishment to the jury to judge an accused's guilt or innocence solely on the evidence adduced at trial and not on the basis of suspicions that may arise from the fact of his arrest, indictment, or custody, or from other matters not introduced as proof at trial." *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). The presumption-of-innocence doctrine is "an inaccurate, shorthand description of the right of the accused to 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion; … an 'assumption' that is indulged in the absence of contrary evidence." *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978).

The presumption of innocence, which reminds the jury to draw no inference of guilt from the defendant's status as one accused of criminal conduct, follows the defendant through deliberations until the jury reaches its verdict. *Mahorney*, 917 F.2d at 471 n.2. The reasonable-doubt standard, by contrast, concerns the duty of the *government* to prove a defendant's guilt beyond a reasonable doubt. So, while it would be improper for the prosecutor to argue to the jury at the conclusion of the evidence that the jury was now

free to hold the defendant's status as an arrestee against the defendant, it is not error for a prosecutor to argue in closing that based on the evidence presented, the government has met its burden to prove its case beyond a reasonable doubt. Indeed, prosecutors can and routinely do make this argument in closing. *See, e.g., United States v. Repak*, 852 F.3d 230, 261 (3d Cir. 2017). The presumption-of-innocence rule from *Starks* and *Mahorney* that restricts statements to the jury that the presumption of innocence no longer exists does not preclude a prosecutor from arguing that the government has satisfied the reasonable-doubt standard, which is what the prosecutor did here.

Contrary to Lucas's argument at Br. 39, the prosecutor never mispresented the reasonable-doubt standard. Context matters, and the prosecutor's statement came in the midst of a longer reference to reasonable doubt, after an initial closing argument heavily focused on the evidence proving the charges beyond a reasonable doubt, and after a three-week trial where the evidence and story of the Defendants' conduct was laid out for the jury in detail. Recall that the prosecutor began the challenged argument by correctly reminding the jury of the reasonable-doubt standard: "If you find that the United States has proved its case beyond a reasonable doubt, you are required to find the Defendants guilty." 6JR.3764. After this indisputably correct description of the reasonable-doubt standard, the prosecutor

proceeded to discuss various instances in which law enforcement gave Defendants the colloquial "benefit of the doubt" in the factual narrative of how the Defendants' were able to get as far as they did in their commission of the charged offenses. 6JR.3764–65. While Lucas contends that these various encounters were irrelevant, the Defendants had argued in closing (and had made similar statements to the jury during trial) that the failure of law enforcement to act suggested that even law enforcement did not believe that Defendants' actions were unlawful, that Defendants' criminal conduct would have been prevented had law enforcement simply intervened earlier, and that at least some of the Defendants were powerless to make different choices if even law enforcement would not intervene. 6JR.3667, 3677–78, 3688–90, 3703, 3726, 3739. The prosecutor's discussion regarding prior encounters with law enforcement was responsive to the defense arguments regarding the inferences to be drawn from law enforcement's lack of intervention earlier. A prosecutor has "more leeway" in responding to defense arguments, *Christy*, 916 F.3d at 825, and the prosecutor's discussion of these encounters was appropriate in that context. Moreover, the last defense counsel ended his closing on the theme of "the benefit of the doubt," so it is unsurprising that the prosecutor's closing rebuttal comments echoed this theme and argued that government's presentation of evidence at trial had proven their guilt beyond a reasonable doubt.

To the extent that the prosecutor's discussion of "reasonable doubt" and "benefit of the doubt" in proximity and reference to the Constitution may have been inartful, these three sentences must be read in context with the inextricable comments that immediately followed: "The evidence proving the Defendants' guilt is overwhelming. There is no doubt whatsoever. The Defendants are guilty as charged." 6JR.3765–66. The prosecutor's subsequent remarks demonstrate that the three preceding sentences were intended to argue that the government had presented sufficient evidence to meet its burden of proof, which the prosecutor had reminded the jury required proof beyond a reasonable doubt just three paragraphs earlier. 6JR.3764. "[Courts] 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning.'" *Christy*, 916 F.3d at 825. This Court should not so infer here where the prosecutor's isolated comments were not misleading in the context of his correct statements of the reasonable-doubt standard before and after. *United States v. Adams*, No. 23-6121, 2025 WL 1501045, at *3 (10th Cir. May 27, 2025) (rejecting argument that prosecutor's statement that the defendant "'cannot get to beyond a reasonable doubt'" misstated the law in context given that the prosecutor had acknowledged the reasonable-doubt standard "just a few sentences earlier"). Contrary to Lucas's claims, nothing in the rebuttal argument suggested that "the reasonable-doubt standard no longer applied," Lucas Br. 41, only that it had

been satisfied—a basic argument that can and should be made by a prosecutor at any closing argument.

And even if this Court were to read the prosecutor's comments as conflating "reasonable doubt" with the "benefit of the doubt," the ambiguity in these comments (which Lucas himself describes as "muddled," Lucas Br. 39) precludes Lucas from showing that these comments were *plainly* improper. *See United States v. Lopez*, 131 F.4th 1114, 1133 (10th Cir. 2025) (holding that an ambiguous statement is not plainly improper). Indeed, had the comments been as obviously improper as Lucas now alleges, one of the six defense attorneys present would presumably have noticed. But the prosecutor's comments were rooted in the evidence, responsive to defense arguments, and bookended by undisputedly correct statements of the reasonable-doubt standard. In context, there was no obvious misstatement of the legal standard.

In addition to the ambiguity in the comments, Lucas's failure to cite any case from this Court or the Supreme Court holding that similar comments regarding "reasonable doubt" or the "benefit of the doubt" are improper dooms his plain error argument. *See Starks*, 34 F.4th at 1157 ("'[T]o be clear or obvious, the error must be contrary to well-settled law.'"). His citations to *Starks* and *Mahorney* do not carry his burden because their discussion of improper comments regarding the presumption of innocence do

not plainly apply to the reasonable-doubt argument that Lucas advances here. Indeed, *Starks* and *Mahorney* dealt with statements about the presumption of innocence on the far end of the spectrum. Here, however, the comments were part of a factual context where Defendants relied on their previous encounters with law enforcement to argue that they should not be found guilty of the crimes charged. The prosecutor's rebuttal that the government proved its case by providing evidence of the full picture of Defendants' conduct—something officers in the previous law-enforcement encounters never had—was well within the realm of common statements about the government's evidence having satisfied its burden of proof. Given the ambiguity in the comments and the absence of any on-point authority holding similar comments to be improper, Lucas cannot show that any error in the prosecutor's discussion of reasonable doubt in rebuttal was plain.

**C. The error did not affect Defendants' substantial rights.**

This Court need not decide whether the prosecutor's fleeting comment was improper as Lucas's prosecutorial-misconduct argument also fails because he has not met his burden to demonstrate that any error affected the Defendants' substantial rights. To meet his burden, Lucas "must demonstrate that an error was 'prejudicial, meaning that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *Starks*, 34 F.4th at 1157. In considering prejudice, this Court

considers "'the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case.'" *Christy*, 916 F.3d at 826. The Court "presume[s] that juries follow the district court's curative instructions unless there is reason to believe otherwise." *Id.* It also considers the "prevalence and degree of improper statements in a trial." *Id.* Ultimately, the "'question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct.'" *Id.* Here, the jury was repeatedly reminded of the reasonable-doubt standard, and there is no reasonable probability that the prosecutor's brief ambiguous comment rendered it unable to fairly judge the overwhelming evidence of Defendants' guilt.

1. *The jury was repeatedly instructed on the correct reasonable-doubt standard.*

The jury instructions cured any prejudice resulting from the prosecutor's statements regarding reasonable doubt. The jury instructions correctly informed the jury of the reasonable-doubt standard. Instruction No. 4 told the jury:

> The United States has the burden of proving each charged Defendant, individually, guilty beyond a reasonable doubt. The law does not require any individual Defendant prove his or her innocence or produce any evidence at all. The United States has the burden of proving the charged Defendants guilty, individually, beyond a reasonable doubt, and if it fails to do so, you must find the charged Defendants not guilty.

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the charged Defendants' guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the United States' proof exclude any reasonable doubt concerning each charged Defendants' guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case.
>
> If, based on your consideration of the evidence, you are firmly convinced that a charged Defendant is guilty of the crime or crimes charged, you must find that charged Defendant guilty. If on the other hand, you think there is a real possibility that a charged Defendant is not guilty, you must give that charged Defendant the benefit of the doubt and find him or her not guilty.

6JR.3588–89.

In addition to this instruction, the reasonable-doubt standard was woven throughout the jury instructions, regularly reminding the jury of the government's burden. 6JR.3590, 3593, 3595, 3599, 3601, 3602, 3604, 3605, 3606, 3608, 3609, 3611, 3619; *see United States v. Sierra-Ledesma*, 645 F.3d 1213, 1227 (10th Cir. 2011) (finding alleged misstatement in rebuttal closing harmless where "the district court instructed the jury multiple times throughout the trial" on the reasonable-doubt standard); *Watson v. Boone*, 131 F.3d 153 *3–4 (10th Cir. 1997) (unpublished) (finding prosecutor's statement during rebuttal closing that it was time to lift the presumption of innocence was not prejudicial where the jury was properly instructed and the prosecutors comments were less "egregious and pervasive than *Mahorney*").

The verdict forms again echoed the reasonable-doubt standard. 3JR.1899, 1902, 1904, 1906–08. The defense closing argument correctly identified and discussed the reasonable-doubt standard. 6JR.3679–80, 3717–18. And perhaps most significantly, the prosecutor correctly stated the reasonable-doubt standard in the course of making the very remarks that Lucas now challenges. 6JR.3764. These regular reminders of the correct standard neutralized any confusion stemming from the prosecutor's ambiguous statements. *See Patton v. Mullin*, 425 F.3d 788, 812 (10th Cir. 2005) (prosecutor's corrected comment during voir dire regarding the presumption of innocence and uncorrected comments during closing that defendant is presumed innocent until the state meets its burden of proof did not deprive the defendant of a fair trial where "the prosecutor also reminded the jury that the state had the burden of proving its case beyond a reasonable doubt").

In the context of this reasonable-doubt chorus, the prosecutor's alleged misstatements in rebuttal were isolated and ambiguous. The vast majority of the government's closing argument and rebuttal argument focused on the extensive evidence proving the Defendants' guilt. The challenged comments made up a small fraction of the government's closing. Moreover, the jury was instructed that "the lawyers'…statements and arguments are not evidence," 6JR.3610, diminishing the potential for prejudice. Whatever ambiguity was present in the prosecutor's limited rebuttal remarks was unlikely to confuse

the jury on the correct standard. *Sierra-Ledesma*, 645 F.3d at 1227 (any prosecutorial misconduct in closing was harmless where “the controverted comments constituted only a small portion of the Government’s entire closing argument”). Indeed, the jury’s acquittal of Hujrah and Subhanah on the material-support charges proves that the jury did not get misled by the prosecutor’s argument as Lucas claims. Instead, the jury’s acquittals affirm that it understood the reasonable-doubt standard and complied with its duty to find a defendant not guilty where it found there to be reasonable doubt. “The jury is presumed to follow its instructions,…even when there has been misleading argument.” *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006). The record offers no reason to believe that the jury did anything but apply the reasonable-doubt standard on which they were correctly and repeatedly instructed.

2. *The prejudicial circumstances present in* Starks *and* Mahorney *are not present here.*

In attempting to meet his burden to demonstrate to show that his substantial rights were affected, Lucas relies heavily on *Starks* and *Mahorney*. Both cases, however, found prejudice for reasons not applicable here.

In *Mahorney*, defense counsel “vigorously objected” to the prosecutor’s misstatements regarding the presumption of innocence, and the court

"immediately and categorically overruled [the objection] in the presence of the jury." 917 F.2d at 473. *Mahorney* found that this placed the court's "official imprimatur" on the prosecutor's misstatements, which "obviously amplified their potential prejudicial effect on the jury." *Id.* Here, defense counsel did not object, and the court did nothing to suggest to the jury it condoned any misstatements by the prosecutor.

Likewise, *Starks* is readily distinguishable. In *Starks*, the prosecutor's misstatement of the presumption of innocence was undisputably a "clear or obvious" error that the district court should have addressed *sua sponte*, and the court's failure to do so "could have left the jury with the impression that the court condoned the prosecution's impermissible statements." 34 F.4th at 1161. Here, the prosecutor's statements were ambiguous and coupled with a correct statement of the reasonable-doubt standard. Despite having four defense counsel and two standby defense counsel at the ready, none of them noticed any error and objected. Under these circumstances, nothing suggested to the jury that the district court condoned the government's statements.

*Starks* further concluded that the "unconventional timing" of the jury instructions in that case "may have significantly undermined" their capacity to mitigate the prejudicial effects of the prosecutor's misstatement. 34 F.4th at 1162–63. In *Starks*, the district court gave the full set of jury instructions

*before* the presentation of evidence, and as a result, the jury heard the instructions on the presumption of innocence a full two days before they deliberated. *Id.* 1163. But no such unique circumstances existed here. The district court instructed the jury immediately before closing arguments, and the reasonable-doubt standard was correctly referenced at various points throughout closing arguments. The jury was also encouraged to review the jury instructions before beginning deliberations. 6JR.3618. The instructions effectively served to mitigate any prejudice caused by the prosecutor's statement in rebuttal.

Notably, *Starks* declined to decide whether the prejudicial effects stemming from the government's misstatement were "standing alone" of sufficient magnitude to affect the defendant's substantial rights. 34 F.4th at 1169. Instead, it cumulated the effects of this error with two other errors (one preserved and one not) and concluded that *combined* they were sufficient for the defendant to meet his burden to show that his substantial rights were affected. *Id.* Here, there are no other errors to cumulate, and thus *Starks* says nothing about whether a single alleged misstatement by a prosecutor during a three-week trial affected Defendant's substantial rights sufficiently to warrant reversal.[84]

---

[84] Lucas and Siraj ask this Court to reverse based on the cumulative prejudice of the errors alleged. Lucas Br. 52; Siraj Br. 48–49. Cumulative

3. *Any misstatement would have made little difference in the face of the overwhelming evidence of Defendants' guilt.*

Finally, and most significantly, the trial evidence in this case was so strong that Defendants cannot show a reasonable probability that any isolated misstatement affected the outcome of their trial. In *Starks*, the government's proof was "essentially circumstantial and dependent on the testimony of an admitted drug addict and alleged coconspirator with a plea deal." 34 F.4th at 1160. In *Mahorney*, "the jury was basically presented with two relatively credible, competing stories related by the complaining witness and the accused, neither of which was conclusively confirmed or disproportionately discredited by extrinsic evidence." 917 F.2d at 474. In contrast, in Defendants' cases, the sheer volume of evidence was overwhelming. The government presented powerful evidence, both direct and circumstantial, including testimony from many eyewitnesses to various aspects of the crimes, videos of Siraj's and Lucas's firearms training, Jany's testament book explaining the Defendants' beliefs and actions, Defendants' own words in the form of text and social media messages and other writings,

error requires Defendants to prove more than one error. *United States v. Butler*, 141 F.4th 1136, 1148 (10th Cir. 2025), And unpreserved errors factor into the analysis only where the error was plain. *United States v. Kepler*, 74 F.4th 1292, 1320 (10th Cir. 2023). Because Defendants have not shown any actual error (much less plain error for their unpreserved claims), they cannot benefit from the cumulative-error doctrine. *Id.*

financial records, and expert testimony. *See* sections II, VII, VIII. In the face of this overwhelming evidence, there is no reasonable probability that a handful of sentences in the prosecutor's rebuttal argument altered the outcome of this case.

### XIII. Subhanah's and Hujrah's life sentences do not violate the Eighth Amendment's prohibition on cruel and unusual punishment.

Subhanah argues that her life sentence was grossly disproportionate in violation of the Eighth Amendment because she either committed no crime or committed only a "crime of omission" by failing to respond to inquiries regarding Abdul Ghani's whereabouts or otherwise reveal his location. Subhanah Br. 45. She disclaims any responsibility for Abdul Ghani and points out that she did not conduct ruqyah. *Id.* She contends a life sentence is grossly disproportionate to her conduct. Subhanah Br. 45. Hujrah joins. Hujrah Br. 29; Notice of Joinder at 3–4. Subhanah and Hujrah objected on this basis in district court, 3JR.2154–63, and the district court overruled their objection. 3JR.2418–24. Their claim is thus reviewed de novo. *See United States v. Tolliver*, 730 F.3d 1216, 1230 (10th Cir. 2013).

The Eighth Amendment prohibits "cruel and unusual punishments." In noncapital cases, the Eighth Amendment "does not require individualized sentencing" or "'strict proportionality between crime and sentence.'" *United States v. Burtrum*, 21 F.4th 680, 688 (10th Cir. 2021) (quoting *Harmelin v.*

*Michigan*, 501 U.S. 957, 1001 (Kennedy, J., concurring)). It prohibits "'only extreme sentences that are 'grossly disproportionate' to the crime.'" *Id.* "To determine whether a sentence is grossly disproportionate, courts compare the gravity of the offense to the severity of the sentence." *Id.* Only "the extraordinary case" violates this gross-disproportionality principle. *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003).

Subhanah and Hujrah were convicted of kidnapping and conspiracy to kidnap resulting in the death. Kidnapping and conspiracy to kidnap are undeniably serious crimes warranting harsh punishment, even more so when the crime results in the torturous death of a three-year-old child with special needs. *Harmelin*, 501 U.S. at 987 ("Of course some offenses, involving violent harm to human beings, will always and everywhere be regarded as serious…."). Subhanah attempts to minimize her role are foreclosed by the jury verdict. The jury concluded that Subhanah and Hujrah, through their individual actions, conspired to kidnap Abdul Ghani and kidnapped or aided and abetted in Abdul Ghani's kidnapping and that the kidnapping resulted in Abdul Ghani's death. *See* sections VII, VIII (describing Hujrah and Subhanah's actions participating in and supporting the kidnapping). Regardless of whether Subhanah or Hujrah personally conducted ruqyah on Abdul Ghani or whether Siraj bore greater responsibility for Abdul Ghani's death, the crimes Subhanah and Hujrah committed are grave. Indeed,

Congress deemed these crimes so serious that it mandated a life sentence. *See* 18 U.S.C. § 1201(a); *United States v. Corbett*, 750 F.3d 245, 252 n.5 (2d Cir. 2014) ("[I]t is well established that Congress may require mandatory minimum criminal sentences, including § 1201(a)(1)'s sentence of life imprisonment where the kidnapper causes any person's death.").

While a mandatory life sentence is a undoubtably a severe penalty, it is not disproportionate to the grave nature of Defendants' crimes. Indeed, the Supreme Court has rejected Eighth Amendment challenges to similar sentences for less serious conduct. *See United States v. Angelos*, 433 F.3d 738, 750–51 (10th Cir. 2006) (collecting cases). For example, in *Rummel v. Estelle*, the Supreme Court rejected an Eighth Amendment challenge to a life sentence with the possibility of parole under a Texas recidivist statute for successive convictions for fraudulent use of a credit card to obtain $80 worth of goods or services, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses. 445 U.S. 263, 265–66, 285 (1980). And in *Harmelin*, the Supreme Court affirmed a life sentence without the possibility of parole for possession of more than 650 grams of cocaine. 501 U.S. at 961, 1005. If these sentences were not grossly disproportionate to the crimes of conviction, a life sentence for a kidnapping resulting in the death of a child is likewise not grossly disproportionate. This is not the "extraordinary case" that violates the Eighth Amendment. *Andrade*, 538 U.S. at 77.

## CONCLUSION AND STATEMENT CONCERNING ORAL ARGUMENT

For the foregoing reasons, this Court should affirm Defendants' convictions and sentences.

The United States requests oral argument to address any remaining issues or questions not fully resolved in the briefs.

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

RYAN ELLISON
Acting United States Attorney

*s/ Tiffany L. Walters*

TIFFANY L. WALTERS
Assistant U.S. Attorney
201 Third Street NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274
tiffany.walters2@usdoj.gov

**TYPE-VOLUME CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 51,862 words. I relied on my word processor to obtain the count. My word processing software is Word 2016.

*s/ Tiffany L. Walters*
TIFFANY L. WALTERS
Assistant United States Attorney

## CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION

I HEREBY CERTIFY that the foregoing brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on December 23, 2025.

I ALSO CERTIFY that Greg Acton, Andrew Casey, Katayoun Donnelly, and Jacob Rasch-Chabot, attorneys for Defendants-Appellants, are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*s/ Tiffany L. Walters*
TIFFANY L. WALTERS
Assistant United States Attorney