FILED
United States Court of Appeals
Tenth Circuit

October 6, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SIRAJ IBN WAHHAJ,

Defendant - Appellant.

No. 23-2168

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HUJRAH WAHHAJ,

Defendant - Appellant.

No. 23-2170

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SUBHANAH WAHHAJ,

Defendant - Appellant.

No. 23-2171

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>LUCAS MORTON,<br><br>Defendant - Appellant. | No. 24-2039 |

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. Nos. 1:18-CR-02945-WJ-2, 1:18-CR-02945-WJ-3, 1:18-CR-02945-WJ-4, 1:18-CR-02945-WJ-5)**

---

Jacob Rasch-Chabot, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant Siraj Wahhaj.

Katayoun A. Donnelly of Azizpour Donnelly LLC, Denver, Colorado, for Defendant-Appellant Hujrah Wahhaj.

Gregory M. Acton of Acton Law Office, PC, Albuquerque, New Mexico, for Defendant-Appellant Subhanah Wahhaj.

Andrew M. Casey of Hendrick, Casey, Hutter, PLLC, Oklahoma City, Oklahoma, for Defendant-Appellant Lucas Morton.

Tiffany L. Walters, Assistant United States Attorney (Todd Blanche, Attorney General, and Ryan Ellison, First Assistant United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

Federal law prohibits "unlawfully seiz[ing], confin[ing], inveigl[ing], decoy[ing], kidnap[ping], abduct[ing], or carr[ying] away" another person. 18 U.S.C. § 1201(a). But what must the government prove to establish that a defendant "unlawfully" did one of those things? Many issues swirl in these related appeals, but this question takes center stage.[1]

Based on messages that Jany Leveille allegedly received from God, Defendant Siraj Ibn Wahhaj believed that his wife Hakima Ramzi was using black magic on their disabled, three-year-old son, Abdul Ghani. Siraj also believed that the only way to help Abdul Ghani was to perform ruqyah—a Muslim version of an exorcism—to rid him of evil spirits.

So Siraj snatched Abdul Ghani away from Hakima, his primary caregiver from birth. Days later, Siraj and Abdul Ghani—along with Jany; Defendants Hujrah Wahhaj, Subhanah Wahhaj, and Lucas Morton; and the group's children—fled from Georgia to Alabama. About ten days after that, they left for New Mexico. There, the group built a compound on a remote, empty lot in the desert.

Each day, Siraj and Jany performed ruqyah on Abdul Ghani. These sessions were grueling. During the last ruqyah session, Siraj held Abdul Ghani

[1] The clerk's office consolidated appeal Nos. 23-2168, 23-2170, 23-2171, and 24-2039, which involve various issues raised by four codefendants after a joint trial. This opinion addresses all four appeals.

down and put his hand on Abdul Ghani's neck. Abdul Ghani started struggling, foaming at the mouth, and choking, until he stopped breathing.

Jany then prophesized that Abdul Ghani would be resurrected as Jesus Christ. He would lead them around the world to confront corrupt institutions, including federal agencies like the CIA and FBI. The group would follow with an army and kill anyone who didn't "believe in" Abdul Ghani. To prepare, Siraj led firearms training for Lucas and Jany's sons. Siraj and Lucas also fortified the compound, preparing to defend it against any approaching law-enforcement officers.

Eventually, state officers in New Mexico secured a search warrant for the compound. As the officers approached, Siraj armed himself and told one of Jany's sons to grab a weapon from the compound's stash. But on Jany's orders, Siraj stood down. Officers arrested Siraj and Lucas and removed the others from the compound. A few days later, officers located Abdul Ghani's body in a tunnel Siraj and Lucas had dug under the compound.

The government indicted Hujrah, Subhanah, and Lucas under 18 U.S.C. § 1201(a)(1) and (c) with conspiracy to commit kidnapping and with kidnapping resulting in death. It didn't indict Siraj for those offenses because § 1201(a) exempts from prosecution parents who kidnap their own child. *See id.* § 1201(a), (h).

A jury later convicted Hujrah, Subhanah, and Lucas. On appeal, they argue that their role in seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away Abdul Ghani wasn't unlawful under § 1201(a).

Exercising jurisdiction under 28 U.S.C. § 1291, we agree. The jury instructions misstated the meaning of § 1201(a)'s "unlawfully" element. And the government didn't introduce enough evidence to establish that Hujrah's, Subhanah's, or Lucas's conduct was unlawful. So we reverse their convictions for conspiracy to commit kidnapping and kidnapping resulting in death.

The government also indicted Hujrah, Subhanah, Lucas, and Siraj with conspiracy to provide material support to kill federal officers and with providing material support to do the same. And it indicted Siraj and Lucas with conspiracy to kill federal officers.

The jury acquitted Hujrah and Subhannah, but it convicted Siraj and Lucas—who proceeded pro se—on all three counts. Siraj and Lucas now appeal, arguing among other things that the district court violated their Sixth Amendment rights when it excluded them from a jury-note conference.

Here, too, we agree. The district court committed structural error when it excluded the pro se defendants from a jury-note conference of tactical importance. As a result, we vacate Siraj's and Lucas's convictions on the material-support and conspiracy-to-kill counts and remand for further proceedings.

## BACKGROUND

### I. Factual Background[2]

In August 2014, Hakima Ramzi and Defendant Siraj Ibn Wahhaj had a child, Abdul Ghani. At birth, Abdul Ghani suffered hypoxic ischemic encephalopathy, a brain injury resulting from a lack of oxygen or blood flow, which delayed his development. He also had a form of cerebral palsy and experienced seizures. Still, with medication, therapy, and Hakima's care, he had started speaking and moving independently by the age of three. Hakima was Abdul Ghani's primary caretaker, and no one else gave him his medication.

While Siraj was legally married to Hakima, he entered a religious marriage with Jany Leveille. Siraj and Jany had several children together, and Jany also had two sons from a prior relationship. Siraj split his time between Hakima and Jany's households. Eventually, he moved Hakima and Abdul Ghani into a motel room.

Among other siblings, Siraj had two sisters: Defendants Hujrah Wahhaj and Subhanah Wahhaj. Hujrah had one daughter. Subhanah was married to Defendant Lucas Morton, with whom she had four children.

In October 2017, Siraj and Hujrah traveled to England to learn how to perform ruqyah. One form of ruqyah involves reciting Qur'an verses while extending hands over or rocking a person. This form provides protection or a

---

[2] We take these facts from the testimony and evidence presented at trial.

blessing. Another form is "[a] Muslim version of an exorcism." JR. vol. VI at 1290. It involves reciting Qur'an verses while holding the person's body and head. That form is more physically intrusive, is used to extract evil spirits, and requires training to perform. Siraj and Hujrah went to England to learn this more physically intrusive type of ruqyah.

Around this time, Jany allegedly began receiving messages from God. She told the others that God had told her that Abdul Ghani was her son and that Hakima had used black magic to steal him from Jany's womb. When Jany shared these messages with Siraj, Hujrah, Subhanah, and Lucas, they believed her.

In late November 2017, Siraj and Hujrah confronted Hakima. She denied any involvement in black magic and asked Siraj for a divorce.

Then Jany said that God told her Siraj needed to get Abdul Ghani so they could perform ruqyah on him. So on either November 30 or December 1, Siraj went to Hakima's motel room and, while she was in the shower, announced that he was taking Abdul Ghani to the park. Because Siraj hadn't previously taken Abdul Ghani outside, Hakima rushed from the shower, but by then Siraj and Abdul Ghani were gone. She waited, but they didn't come back, and Siraj had left Abdul Ghani's medication behind.

When Hakima called Siraj, he said he would bring Abdul Ghani back. But he never did. He eventually blocked Hakima's calls.

After Hakima told Siraj's brother Muhammad Wahhaj what had happened, Muhammad spoke to Siraj, Jany, and Hujrah. They told Muhammad about Hakima's using black magic, but Muhammad didn't believe them and told them to return Abdul Ghani.

The next day, Muhammad and Hakima found Siraj at Hujrah's house. Hakima called the police and, on officers' orders, Siraj brought Abdul Ghani outside. Despite Abdul Ghani's protests, Siraj wouldn't let Hakima touch Abdul Ghani and threatened her for involving the police. The officers didn't intervene, advising Hakima that she would need to "go through the court processes" to get Abdul Ghani back. *Id.* at 1992–93.

Soon after, Hakima called child-protective services. She also returned to Hujrah's house with a police detective. But no one was there. Hakima contacted Siraj's family members, who reached out to Siraj, Jany, Hujrah, and Subhanah. Some of the messages from Siraj's family stressed that Abdul Ghani needed both his medication and Hakima's care. Yet for the most part, the group didn't respond.

On December 18, a Georgia juvenile court issued a "pick up order" authorizing law enforcement to retrieve Abdul Ghani and place him with Hakima.[3] Around that time, Hakima filed for divorce and emergency custody.

[3] About a month later, the same court issued an "adult warrant" for Siraj and a second pick-up order for Abdul Ghani.

But her actions were futile. By then, Siraj and Abdul Ghani were in New Mexico, living with Jany, Hujrah, Subhanah, Lucas, and their children. Earlier, after Muhammad and Hakima had first brought the police to Hujrah's house, Siraj, Jany, Hujrah, Subhanah, and Lucas held a meeting. They decided that the group "had to leave Georgia." *Id.* at 1316. So they abandoned most of their belongings and fled to Alabama, where either Lucas or Siraj owned property.

After spending about ten days in Alabama, Jany said that God was directing them to New Mexico, where Lucas owned property. So early in the morning on December 13, the group left Alabama in three vehicles. But Siraj soon crashed, totaling his car.

One of the officers who investigated the accident testified that he had noticed things that "concern[ed]" him and "felt off." *Id.* at 1859, 1861. Siraj had many firearms in the car and tried to keep the children "isolated" from the officers. *Id.* at 1859–60. But lacking grounds to detain anyone, the officers let the group go, this time all inside Lucas's box truck and an attached camper.

By December 17, the group arrived in Amalia, New Mexico, and settled on an empty lot in a remote area with no water or electricity.[4] They dug a hole and pushed the trailer inside it. Subhanah, Lucas, and their children slept in the box truck; everyone else slept in the trailer.

---

[4] Defendants thought they had settled on Lucas's land, but they had mistakenly settled on adjacent land belonging to Jason and Tanya Badger.

Since taking Abdul Ghani from Hakima, Siraj had been performing physically intrusive ruqyahs on him. The ruqyahs occurred daily, lasted hours, and made Abdul Ghani scream, cry, and kick. At some point, Jany declared that Abdul Ghani was Isa (the Arabic word for Jesus) and that the ruqyah sessions would heal him.

During a session on December 24, Siraj held Abdul Ghani down and put his hand on Abdul Ghani's jugular vein, causing Abdul Ghani to scream and cry. Abdul Ghani began choking and foaming at the mouth until he stopped breathing.

The group wrapped Abdul Ghani's body in plastic and put it under Hujrah's bed. Jany told the others that the evil spirits had left Abdul Ghani's body, leaving him an "empty shell." *Id.* at 1351. She prophesized that he would return as Isa on Easter. Then he would lead them around the world to "corrupt institutions," including the federal government, while performing miracles and collecting followers. *Id.* at 1447. The men at the compound would form an army and kill anyone who didn't "believe in" Abdul Ghani. *Id.* at 1359.

All the adults at the compound believed this prophecy. And in early 2018, Lucas traveled to Georgia to try to recruit Muhammad. The police came, but Lucas refused to answer any questions about Abdul Ghani.

Back in New Mexico, Siraj, Lucas, and the older boys began combat training with firearms to prepare to launch Abdul Ghani's army, and also because they thought the FBI was surveilling them. They built a firing range,

hid weapons, and dug a tunnel "in case . . . of escape," eventually hiding Abdul Ghani's body there. *Id.* at 1377. They kept watch, hid in the trailer, and prepared for "[a] firearms fight" if anyone came to the compound. *Id.* at 1375, 1596. Living conditions were rough, and the group resorted to messaging people for help when they ran low on food and money.

On August 3, the Taos County Sheriff's Office secured a warrant to search the compound for Siraj and Abdul Ghani. Lucas learned that officers were approaching and warned the others. Siraj armed himself and told one of Jany's sons to grab a weapon. But when Jany told them to stand down, they did.

Officers arrested Siraj and Lucas and removed the others from the compound. They searched for Abdul Ghani but couldn't find him, and the adults wouldn't reveal his location. Eventually, one of the children told officers that Abdul Ghani's body was in a tunnel.

## II. Procedural History

A federal grand jury indicted Jany, Siraj, Hujrah, Subhanah, and Lucas on these charges:

- Count 1: conspiracy to provide material support to kill federal officers in violation of 18 U.S.C. §§ 1114 and 2339A (all Defendants);
- Count 2: providing material support to kill federal officers in violation of 18 U.S.C. §§ 2, 1114, and 2339A (all Defendants);
- Count 3: conspiracy to kill federal officers in violation of 18 U.S.C. §§ 1114 and 1117 (Siraj, Lucas, and Jany);
- Count 4: conspiracy to kidnap in violation of 18 U.S.C. § 1201(c) (all Defendants except Siraj); and
- Count 5: kidnapping resulting in death in violation of 18 U.S.C. §§ 2 and 1201(a)(1) (all Defendants except Siraj).

The grand jury also indicted them under 18 U.S.C. § 371 with conspiracy to commit an offense against the United States—providing a firearm to Jany, who was in the country unlawfully. And it indicted Jany and the others under 18 U.S.C. §§ 2 and 922(g)(5) for Jany's possessing firearms and ammunition and for aiding and abetting her possession.

Jany pleaded guilty to conspiring to provide material support to kill federal officers and to possessing a firearm while unlawfully in the United States. The government then dismissed the §§ 371 and 922(g)(5) counts against Siraj, Lucas, Hujrah, and Subhanah, and the court renumbered the remaining counts to those listed above. They then went to trial.

A jury found Siraj guilty on Counts 1, 2, and 3; Lucas guilty on Counts 1, 2, 3, 4, and 5; and Subhanah and Hujrah guilty on Counts 4 and 5 only. The district court sentenced all four to life imprisonment.

Siraj, Lucas, Subhanah, and Hujrah timely appealed, challenging some of the district court's pretrial orders and trial rulings, as well as their convictions. Together, they raise multiple issues:

- Issue 1: Did the district court err by denying Defendants' motion to dismiss the indictment?
- Issue 2: Did the district court err by denying Defendants' motion to suppress evidence?
- Issue 3: Did the district court err by denying Siraj's motion to sever?
- Issue 4: Did the district court err in its jury instructions for the conspiracy-to-kill-federal-officers offense?
- Issue 5: Was there sufficient evidence to convict on the conspiracy-to-kill-federal-officers count?

- Issue 6: Did the district court err in its jury instructions on the kidnapping offenses?
- Issue 7: Was there sufficient evidence to convict on the kidnapping counts?
- Issue 8: Did the district court violate Siraj's and Lucas's Sixth Amendment rights by excluding them from bench and jury-note conferences?
- Issue 9: Did the district court violate Hujrah's Sixth Amendment rights by denying her motion to proceed pro se?
- Issue 10: Did the government commit prosecutorial misconduct during closing arguments?
- Issue 11: Were Hujrah's and Subhanah's sentences disproportionate under the Eighth Amendment?
- Issue 12: Did Siraj or Lucas show cumulative error?

On Issues 1 through 5, we affirm. But on Issues 6 through 8, we reverse. As a result, we need not reach Issues 9 through 12.

## DISCUSSION

### I. Issue 1: Motion to Dismiss the Indictment

Subhanah and Hujrah each argue that the district court erred by denying their joint motion to dismiss the indictment. Lucas joins Subhanah's appeal.

#### A. Procedural Background

##### 1. The Indictment

The indictment charged two kidnapping-related counts:

> <u>Count 6</u>
>
> . . .
>
> 35. From at least in or about October 2017, up to and including in or about August 2018, in the District of New Mexico and elsewhere, **JANY LEVEILLE, HUJRAH WAHHAJ, SUBHANAH WAHHAJ**, and **LUCAS MORTON**, and others known and unknown to the Grand Jury, knowingly did conspire, combine, confederate,

agree, and act interdependently with each other to unlawfully seize, confine, inveigle, decoy, kidnap, abduct, carry away, and hold [Abdul Ghani], a child who had not attained the age of eighteen (18) years, to conceal and hold him, and, in committing or in furtherance of the commission of the offense, did willfully transport [Abdul Ghani] in interstate commerce from the State of Georgia to the State of New Mexico, and did conceal and hold [Abdul Ghani], resulting in his death.

In violation of 18 U.S.C. § 1201(c).

Count 7

. . .

37. From at least in or about October 2017, up to and including in or about August 2018, in the District of New Mexico and elsewhere, **JANY LEVEILLE, HUJRAH WAHHAJ, SUBHANAH WAHHAJ**, and **LUCAS MORTON** knowingly did and did attempt to unlawfully seize, confine, inveigle, decoy, kidnap, abduct, carry away, and hold [Abdul Ghani], a child who had not attained the age of eighteen (18) years, to conceal and hold him, and, in committing or in furtherance of the commission of the offense, did willfully transport [Abdul Ghani] in interstate commerce from the State of Georgia to the State of New Mexico, and did conceal and hold [Abdul Ghani], resulting in his death.

In violation of 18 U.S.C. §§ 1201(a)(1) and 2.

JR. vol. I at 182–83.

### 2. Motion to Dismiss

Defendants[5] jointly moved to dismiss the indictment's kidnapping and conspiracy-to-kidnap counts. Relying heavily on 18 U.S.C. § 1201's parental

---

[5] Throughout the Discussion section, we use "Defendants" to refer to the group of defendants appealing the relevant issue. As noted at the beginning of section I, Subhanah, Hujrah, and Lucas appeal the denial of the motion to dismiss. So "Defendants" in section I refers to only these three defendants.

exception, they argued that because Siraj—Abdul Ghani's father—took and transported Abdul Ghani in interstate commerce, "there was no violation of the federal kidnapping statute." *Id.* at 449; *see* 18 U.S.C. § 1201(a) (prohibiting unlawfully taking someone and "hold[ing that person] for ransom or reward or otherwise," "except in the case of a minor by the parent thereof").

The government opposed the motion. It argued that the indictment charged Hujrah, Subhanah, Lucas, and Jany with conspiring with *each other*, not with Siraj, to kidnap Abdul Ghani. And because none of them was Abdul Ghani's parent, the government argued that none of them was excepted from liability under the kidnapping statute.

The district court denied the motion. *United States v. Leveille*, 671 F. Supp. 3d 1266, 1267 (D.N.M. 2023). Though the government "appear[ed] to agree" that Siraj was Abdul Ghani's father and had "accompanied Defendants and [Abdul Ghani] from Georgia to New Mexico," the court concluded that several material factual disputes remained unresolved. *Id.* at 1268–69. Those disputes included whether Siraj had voluntarily consented to kidnapping Abdul Ghani or whether Jany's revelations had "tainted" his consent, whether Abdul Ghani had "consented to going with Defendants, whether [Jany] was married to [Siraj], and whether [Jany] could be considered a surrogate parent to [Abdul Ghani]." *Id.* at 1269 (citation omitted). Because "the facts Defendants rel[ied] on" to challenge the indictment "[we]re in dispute," the court ruled that it

couldn't "conclude as a matter of law that the Superseding Indictment fail[ed] to state" an offense. *Id.* at 1267.

**B. Standard of Review**

"We review the denial of a motion to dismiss an indictment for an abuse of discretion." *United States v. Stevens*, 881 F.3d 1249, 1252 (10th Cir. 2018) (citation modified). And we "review any statutory interpretation issues involved in the ruling de novo." *United States v. Berres*, 777 F.3d 1083, 1089 (10th Cir. 2015).

**C. Legal Framework**

Under Federal Rule of Criminal Procedure 12(b), a defendant can move to dismiss an indictment for failing to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). We test an indictment "solely on the basis of the allegations made on its face," and we accept those allegations as true. *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (citation omitted).

Yet sometimes, courts may consider Rule 12(b)(3)(B)(v) motions based on "facts outside the indictment and bearing on the general issue of guilt." *United States v. Chavez*, 29 F.4th 1223, 1226 (10th Cir. 2022) (citation modified). To win dismissal on such grounds, (1) "the operative facts" must be "undisputed," (2) the government must fail to object to the district court's considering those facts, and (3) the district court must be able to "determine from [those facts] that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt." *Id.* (citation modified). "If

contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, the prosecution must continue." *Id.* at 1226–27 (citation modified).

**D. Analysis**

Defendants assert that their challenges to the indictment turn on statutory interpretation, that is, "[w]hether the federal kidnapping statute exempts a particular kind of kidnapping or only exempts" parents. Subhanah Op. Br. at 19; *see also* Hujrah Op. Br. at 8. But because Defendants waived this challenge, we decline to reach it.

The district court denied Defendants' motion because of material factual disputes. *Leveille*, 671 F. Supp. 3d at 1267–69. Yet no defendant challenges that reasoning on appeal. Instead, they assert that "the facts are undisputed" and that the court should have granted their motion because the kidnapping statute's parental exception precluded liability. Hujrah Op. Br. at 11.

"Our law is clear: The first task of an appellant is to explain to us why the district court's decision was wrong." *United States v. Martinez*, 92 F.4th 1213, 1265 (10th Cir. 2024) (citation modified). But Defendants don't do that. In fact, their opening briefs don't address the district court's reason for denying their motion—the existence of material factual disputes—at all. Because Defendants never explained what was wrong with the court's reasoning, they waived their challenge to the court's decision. *See id.*; *Nixon v. City & Cnty. of Denv.*, 784 F.3d 1364, 1366 (10th Cir. 2015) (holding that counsel must

"explain what was wrong with the reasoning that the district court relied on in reaching its decision").

## II. Issue 2: Motion to Suppress

Lucas, Siraj, and Hujrah argue that the district court erred by denying their motion to suppress evidence seized during the search of the compound.

### A. Procedural Background

#### 1. Factual Background

When the group got near Amalia, New Mexico, it settled on an undeveloped plot of land: Lot 28. But Lucas didn't own Lot 28—Jason and Tanya Badger did. Though Lucas had purchased Lot 29, the group mistakenly settled on Lot 28 instead.

Jason visited Lot 28, found Defendants there, and told them they were on the wrong lot. Though Jason knew he could make them leave, the presence of the group's small children left him hesitant to "throw them out in the cold." JR. vol. VII at 179. So Jason and Lucas made a deal: if Lucas paid all closing fees and costs, they would swap lots. In the meantime, Jason would let Defendants stay on Lot 28.

A few months later, in April 2018, Lucas and the Badgers entered into a written purchase agreement for Lucas to sell Lot 29's warranty deed to the Badgers for the "purchase price" of Lot 28's warranty deed. JR. vol. II at 1123. As discussed, the agreement called for Lucas to pay all closing costs. It set a

closing date for June 3, and said that if one party failed to meet its conditions, the other could terminate the agreement.

Likely after entering the purchase agreement, Jason cleared sagebrush off Lot 29 and put posts at the lot's corners. But beyond this preparatory work, he did nothing else to the lot.

While the deal was still pending, Jason looked up Defendants online. He learned that Siraj and Lucas "were wanted." *See* JR. vol. VII at 193. So he reported Defendants to the local sheriff's office. Around that time, Jason also gave the sheriff's office permission to search Lot 28 "for th[e] specific investigation on Siraj Wahhaj and Lucas Morton." JR. vol. II at 296. But the officers waited instead, hoping to collect more evidence for a search warrant.

A few days before the purchase agreement's closing date, Lucas asked to "go around" the closing costs by filing directly with the court. Supp. JR. vol. VI at 4. Jason declined. And come June 3, Lucas neither attended the closing nor paid the costs. As a result, the purchase agreement expired, and a lawyer executed a termination agreement on June 11.

After the deal expired, the Badgers tried to remove Defendants from their property. On June 8, Jason texted Lucas demanding that they leave by June 15. Jason texted again three days later, "Were you able to start moving your stuff off"? *Id.* at 11. Despite receiving those messages, Lucas didn't respond, nor did Defendants leave the property.

So the Badgers sued to evict Lucas. Lucas received a summons and notice of a hearing. But the Badgers had filed in the wrong court, and the case was soon dismissed.

Next, the Badgers contacted the New Mexico State Police and asked them to serve Defendants with a trespass notice. An officer visited the compound, but Lucas told him that the court had dismissed the eviction lawsuit and that Lucas had "inherited the land from his creator." JR. vol. III at 203. So the officer left without serving the notice and told the Badgers to contact the sheriff's office, which was "the lead investigating agency in the apprehension of" Siraj. *Id.* at 202. The Badgers did just that, asking the sheriff's office to remove Defendants from Lot 28. But because officers were still investigating Siraj, they held off.

On August 3, the sheriff's office secured a warrant to search Lot 28 for Siraj and Abdul Ghani and to check on the other children's welfare. During the search, officers arrested Siraj and Lucas and removed the others from the Badgers' property.[6] From the compound, the officers seized ten firearms, large amounts of ammunition, twelve high-capacity magazines, and a bulletproof vest. The Badgers then regained possession of Lot 28. A few days later, armed with another search warrant, officers found Abdul Ghani's body hidden in a tunnel under the compound.

---

[6] Officers arrested Siraj based on an arrest warrant issued by the Georgia juvenile court, and they arrested Lucas for harboring a fugitive (Siraj).

### 2. Motion & Ruling

Defendants moved to suppress evidence seized during the search. They argued that the search-warrant affidavit lacked probable cause because it didn't establish a nexus between Lot 28 and the persons to be seized (Siraj and Abdul Ghani). Relatedly, they argued that the affidavit contained material misstatements and omissions, warranting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). They also argued that the good-faith exception didn't apply, that the seizure exceeded the warrant's scope, and that the warrant was overly broad.

The government opposed the motion. It argued that Defendants lacked Fourth Amendment standing to challenge the search and that their motion failed on the merits. Defendants replied that they had standing because officers had searched their home. They also emphasized that the Badgers had let them stay on the property and never obtained a court order directing them to leave.

After an evidentiary hearing and additional briefing, the district court denied the motion, concluding that Defendants lacked Fourth Amendment standing. *United States v. Leveille*, No. 18-cr-2945, 2023 WL 3737334, at *1 (D.N.M. May 31, 2023). First, the court held that when officers searched the compound, Defendants had no property interest in Lot 28. *Id.* at *6. It explained that Defendants hadn't shown that they had a lease agreement with the Badgers or that any implied tenancy survived the Badgers' revoking Defendants' permission to stay on the lot. *Id.* at *7–8.

Second, the court ruled that any expectation of privacy in the lot wasn't objectively reasonable. *Id.* at *8. It emphasized that Defendants lacked a property interest in the land, that the Badgers had revoked Defendants' permission to stay there, and that Defendants "were notified in several ways" that they were no longer welcome. *Id.* at *9.

**B. Standard of Review**

When reviewing the denial of a motion to suppress, "we view the evidence in the light most favorable to the government and accept the district court's factual findings unless clearly erroneous." *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (citation modified). A factual finding "is clearly erroneous only if it is without factual support in the record or if," after reviewing the evidence, we are "left with a definite and firm conviction that a mistake has been made." *United States v. Craine*, 995 F.3d 1139, 1157 (10th Cir. 2021) (citation omitted).

We review de novo a district court's "[u]ltimate determinations of reasonableness concerning Fourth Amendment issues and other questions of law." *Cates*, 73 F.4th at 805 (citation omitted). That includes whether Defendants had an objectively reasonable expectation of privacy in Lot 28. *See United States v. Guzman*, 149 F.4th 1132, 1141 (10th Cir. 2025).

### C. Legal Framework

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Under the exclusionary rule, the government can't introduce evidence obtained in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 231–32 (2011). But "to challenge the lawfulness of a search and seizure . . . a defendant must first establish his or her standing to do so." *Guzman*, 149 F.4th at 1139 (citation omitted). Fourth Amendment standing asks whether "the search at issue violated the rights of the particular defendant" invoking the exclusionary rule. *Id.* (citation omitted).

A defendant can establish Fourth Amendment standing in two ways. First, a defendant has standing under a "traditional property-based" theory if officers "gain[ed] evidence by physically intruding on constitutionally protected areas." *Id.* at 1139 n.6 (citation omitted). Second, a defendant has standing under a legitimate-expectation-of-privacy theory if he establishes "(1) a subjective expectation of privacy in the property searched, and (2) that society would recognize that expectation of privacy as objectively reasonable." *Id.* at 1139 (citation omitted).

"[A] person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it." *Byrd v. United States*, 584 U.S. 395, 404 (2018). Still, "property

concepts" can "aid[]" a court in assessing whether a defendant has a reasonable expectation of privacy. *Id.* Along those lines, occupying property without permission "is presumptively unjustified," *United States v. Lowe*, 117 F.4th 1253, 1261 (10th Cir. 2024) (citation omitted), and "a person lacks an objectively reasonable expectation of privacy in a place in which his presence is wrongful," *Guzman*, 149 F.4th at 1140 (citation modified).

**D. Analysis**

Defendants had the burden of establishing their standing to challenge the search of Lot 28. *Id.* at 1139. They didn't carry that burden.

Defendants argue that they had a reasonable expectation of privacy in Lot 28 for two related reasons: they were Lot 28's tenants and the Badgers never evicted them.[7] Starting with tenancy, they assert that because the Badgers let them live on Lot 28 pending the land transfer, they had an implied tenancy agreement with the Badgers. Though the deal fell through, they say that they

[7] Defendants don't argue a "traditional property-based" theory for standing. *Guzman*, 149 F.4th at 1139 n.6. Instead, they rely on "property concepts" to argue that their expectation of privacy was reasonable. Lucas Op. Br. at 16 (citation omitted).

stayed on the property under an implied tenancy at will.[8] And in their view, their at-will tenancy gave them a reasonable expectation of privacy in Lot 28.[9]

But Defendants were more like trespassers than tenants. It's undisputed that the Badgers owned Lot 28 and that the parties never executed the purchase agreement to swap lots. *Leveille*, 2023 WL 3737334, at *6. The district court also found not only that the Badgers had revoked Defendants' permission to stay on the lot, but that Defendants "were notified in several ways that they no longer had permission" to be there. *Id.* at *9. Those findings weren't clearly erroneous. Indeed, Jason texted Lucas that Defendants needed to leave the property. Then Lucas was served with an eviction action. And police approached him with a trespass notice, too.

Defendants who wrongfully occupy property do not have objectively reasonable expectations of privacy in that property. *Lowe*, 117 F.4th at 1261. For example, in *Guzman*, a property owner allegedly allowed the defendant to

---

[8] No one defines "tenancy at will" under New Mexico law. But the Second Restatement of Property defines it as "[a] lease that is terminable at the will of either party" and explains that "[w]here the parties enter into a lease of no stated duration and no periodic rent is reserved or paid, a tenancy at will is presumed." Restatement (Second) of Property, Land. & Ten. § 1.6 (1977).

[9] The government argues that Defendants waived this implied-tenancy argument by failing to raise it before the district court. Though the government admits that Defendants "argued that a rental agreement could be inferred from the facts," Resp. Br. at 43 n.10 (citing JR. vol. III at 172–75, 192–93), it argues that Defendants "never argued that a landlord/tenant relationship is *implied in law* whenever a party occupies and exercises control over land with the landowner's permission," *id.* (emphasis added). We assume without deciding that Defendants did not waive this argument.

park his trailer on the owner's land. 149 F.4th at 1136–37. But the city had declared the land "substandard" and posted notices forbidding people from residing there. *Id.* at 1136. Officers later visited the property and searched the defendant's trailer. *Id.* at 1137–38.

We held that the defendant lacked Fourth Amendment standing to challenge the search. *Id.* at 1141. Even if the property owner's permission gave the defendant a subjective expectation of privacy, we reasoned that the "posted notices' express prohibition on anyone residing on the property" made the defendant's expectation objectively unreasonable. *Id.* After all, the notices had "sufficiently notified him that residing on the property was wrongful." *Id.* at 1142; *see also United States v. Hunyady*, 409 F.3d 297, 299, 301–02 (6th Cir. 2005) (holding that the defendant lacked a reasonable expectation of privacy after he was asked to leave a house he was wrongfully occupying); *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11 (1st Cir. 1975) (holding that squatters had no reasonable expectation of privacy in homes they had built on government-owned land).

As in *Guzman*, Defendants knew they no longer had permission to stay on Lot 28. Despite knowing "that residing on the property was wrongful," they refused to leave. *See* 149 F.4th 1142. As a result, their remaining on Lot 28 resembled a criminal trespass under New Mexico law. *See* N.M. Stat. Ann. § 30-14-1(B) ("Criminal trespass . . . consists of knowingly entering or remaining upon the unposted lands of another knowing that such consent to

enter or remain is denied or withdrawn by the owner or occupant thereof.”). *Guzman* thus supports the unreasonableness of Defendants’ privacy expectations.

As support for their view that a tenancy existed, Defendants rely on *Moore v. Western Meat Co.*, 113 P. 827 (N.M. 1911), and *Cutter Flying Service, Inc. v. Property Tax Department*, 572 P.2d 943 (N.M. Ct. App. 1977). But neither case supports finding an implied tenancy here.

*Moore* cited with approval the principle that absent contrary evidence, “the law . . . will imply the existence of the relation of landlord and tenant between two parties where one owns land, and by his permission it is used and occupied by the other.” 113 P. at 828 (citation omitted). But *Moore*’s facts are different from ours. There, the defendant contracted to purchase property from the plaintiff. *Id.* at 829. Though the parties never performed the contract, the defendant occupied the property anyway. *Id.* Eventually, the plaintiff sued the defendant for “use and occupation,” seeking rent for the defendant’s occupation period. *Id.* at 828–29.

The Court ruled that “an action for use and occupation will lie against the vendee of land entering by reason of his contract before the conveyance to him has been executed, and who, after so entering into possession, refuses or fails to comply with his contract.” *Id.* at 829. In that situation, “the contract or promise to pay rent is inferred from the circumstances,” and “the best that can

be said of" the defendant's use of the property was that it created "a mere tenancy at will." *Id.*

Defendants argue that the facts here mirror *Moore*'s, supporting an implied tenancy agreement between Defendants and the Badgers. The government responds that "*Moore* is best understood as a damages rule for breach of contract," Resp. Br. at 44, and is limited to supporting a landlord-tenant relationship only "for the purpose of supporting an action" by a seller to recover damages from the would-be buyer's use of the property, *id.* at 45 (quoting *Moore*, 113 P. at 830).

We agree that *Moore* isn't persuasive here. Specifically, we think *Moore*'s holding is limited to "use and occupation" actions. *Moore* doesn't focus on the occupant's interest in the property. Instead, it discusses an implied landlord-tenant relationship so that the property's *owner* can recover damages for the occupant's unlawful use and occupation—something like an unjust enrichment claim. *See* 113 P. at 830. As *Moore* explained, "[i]n *these cases* the contract or promise to pay rent is inferred from the circumstances." *Id.* at 829 (emphasis added).

New Mexico's caselaw—or lack thereof—supports this reading. To our knowledge, no New Mexico court has ever cited or relied on *Moore*. And that's for *any* proposition, let alone that a buyer gains a Fourth Amendment property interest whenever the buyer occupies a property in anticipation of a purchase that falls through.

As for *Cutter*, there the New Mexico Court of Appeals explained that a landlord-tenant relationship "cannot be inferred as a matter of law from the mere fact of lawful occupancy. The tenant must acquire some definite control and possession of the premises." 572 P.2d at 947 (citation omitted). Relying on that language, Defendants argue that because they controlled and possessed Lot 28 for six months, they had an implied tenancy agreement.

But the *Cutter* plaintiffs had formal agreements with the defendant that gave them "leasehold interest[s]" in certain areas and licenses to use others. *See id.* at 945, 947. Here, Defendants can point to no such agreement with the Badgers. Still, Defendants say that like the *Cutter* plaintiffs, they had exclusive control over Lot 28, and that this exclusive control created a lease. Even if the Defendants were more than trespassers on Lot 28, their interest would be more like a license than a lease. As *Cutter* explains, "the difference between a license and a lease is that a lease gives to the tenant the right of possession against the world, while a license creates no interest in the land, but . . . is simply the authority or power to use it in some specific way." *Id.* at 947 (citation omitted). Defendants never showed that, before the Badgers revoked their permission to stay on the lot, they had an exclusive right of possession in Lot 28, rather than permission "to use it in some specific way." *Id.* (citation omitted). Besides, "mere physical possession or control of property is not sufficient to establish standing to object to a search of that property." *Lowe*, 117 F.4th at 1263 (citation modified).

So all in all, *Moore* and *Cutter* don't establish that Defendants had an implied tenancy agreement with the Badgers.

What's more, even if we assume that Defendants had an implied tenancy at will, any such tenancy would have ended when Jason revoked their permission to stay on Lot 28. A "tenancy at will is terminated on the day the notice of termination is received by the other party to the lease." Restatement (Second) of Property, Land. & Ten. § 1.6.[10] Defendants even admit that the Badgers "could unilaterally terminate the tenancy." Lucas Op. Br. at 17.

Still, Defendants argue that because the Badgers never evicted them, they never lost their property interest in Lot 28. In support, they rely not on New Mexico caselaw, but on *United States v. Thomas*, 65 F.4th 922 (7th Cir. 2023). There, the defendant used a false name to lease a condo. *Id.* at 923. His landlord later consented to officers' searching the property without a warrant. *Id.* The Seventh Circuit considered whether the defendant had a reasonable expectation of privacy in the condo, and held that the defendant's deception hadn't erased his privacy expectations. *Id.* at 924–25. The court explained that until the landlord evicted him, the defendant "was entitled to all the rights of any other leaseholder." *Id.* at 924.

*Thomas* is distinguishable for a couple reasons. Most obviously, it dealt with Georgia's law, not New Mexico's. *See id.* More importantly, the defendant

---

[10] Neither party cites a New Mexico case explaining implied tenancies at will or their requirements.

in *Thomas* had an express lease agreement with the landlord. *Id.* at 923. Not so here. Again, even assuming Defendants had an implied tenancy agreement, the Badgers had revoked it by the time of the search.

This second difference is key. The Seventh Circuit held that "deceiving one's landlord to obtain a lease" didn't "alter[] society's understanding that a landlord may not consent to a search on the tenant's behalf." *Id.* at 924, 926. But society has no such understanding about Defendants' privacy interests in Lot 28. The crux of our legitimate-expectation-of-privacy analysis is whether "society is prepared to recognize" a defendant's privacy expectations "as reasonable." *Guzman*, 149 F.4th at 1140 (citation modified). And we see no societal recognition that Defendants—who settled on the Badgers' land, knew they lacked permission to stay there, and declined to leave—had a reasonable expectation of privacy in the Badgers' property.

Perhaps recognizing these differences from *Thomas*, Defendants turn to New Mexico statutory law to support their argument that, until formally evicted, they had property rights in Lot 28. Defendants first point to New Mexico's Uniform Owner-Resident Relations Act. *See* N.M. Stat. Ann. §§ 47-8-1 to -52. Under UORRA, property owners usually must go through eviction procedures to regain possession of their property. *See, e.g.*, *id.* § 47-8-36.

To start, though "property concepts" can "aid[]" our Fourth Amendment analysis, *see Byrd*, 584 U.S. at 404, "[t]he Fourth Amendment does not turn on

the intricacies of state law," *Thomas*, 65 F.4th at 924. At any rate, Defendants' reliance on UORRA here falls short. UORRA "applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located within" New Mexico. N.M. Stat. Ann. § 47-8-8 (emphasis added). Even if the Defendants had an implied rental agreement—which, again, we doubt—it wasn't for a "dwelling unit." *See id.* Under New Mexico law, a dwelling unit is

> a structure, mobile home or the part of a structure . . . that is used as a home, residence or sleeping place by one person who maintains a household or by two or more persons who maintain a common household and includes a parcel of land leased by its owner for use as a site for the parking of a mobile home.

*Id.* § 47-8-3(G). And Defendants fail to show that their alleged agreement with the Badgers for Lot 28 was to be used in that manner.

Defendants also point to New Mexico's unlawful-detainer and forcible-entry statutes. *Id.* §§ 35-10-1, 47-8-49. They say that New Mexico "does not permit self-help evictions" and instead requires property owners to bring civil actions for forcible entry or unlawful detainer. Lucas Op. Br. at 24. In Defendants' view, because "the Badgers did not complete any legal process to . . . remove the defendants," Defendants "were entitled to maintain possession of Lot 28" even after Jason terminated their tenancy. *Id.* at 25.

But the question is whether Defendants had a reasonable expectation of privacy in Lot 28, not whether the Badgers followed the proper procedures to remove them. And as the government explains, forcible-entry and unlawful-

detainer actions "do[] not determine title to the property or the absolute right to possession." *Triple R Dev. v. Stinebaugh*, 570 P.3d 230, 233 (N.M. Ct. App. 2025) (citation omitted). Rather, they let property owners "regain possession of the property against a defendant who is in possession of the real property but who has no right to lawful possession." *Id.* Put differently, the fact that the Badgers didn't obtain an unlawful-detainer judgment says little about Defendants' underlying interests in Lot 28, much less their reasonable expectation of privacy there.

Finally, Defendants argue that even if they lacked a property interest, they still had an objectively reasonable expectation of privacy because the state court dismissed the eviction proceedings, and the police left without serving the trespass notice.

Though these facts might support Defendants' *subjective* expectation of privacy, they don't convince us that Defendants' expectation was *objectively* reasonable. *See Lowe*, 117 F.4th at 1260 ("A subjective expectation of privacy does not warrant Fourth Amendment protection unless society is prepared to accept that expectation as objectively reasonable." (citation modified)). As explained, we see no societal recognition of Defendants' alleged privacy expectations in the Badgers' property.

In sum, Defendants didn't show that they had a reasonable expectation of privacy in Lot 28. So they lacked Fourth Amendment standing, and the district court correctly denied their suppression motion.

## III. Issue 3: Siraj's Motion to Sever

Siraj challenges the district court's denial of his motion to sever his trial from his co-defendants'.

### A. Procedural Background

Siraj moved under Federal Rule of Criminal Procedure 14 to sever his trial from the others'. Because he wasn't indicted on the kidnapping offenses, he argued that evidence of Abdul Ghani's kidnapping wouldn't be admissible against him in a separate trial. He also claimed that the kidnapping evidence and evidence of Abdul Ghani's health conditions would prejudice him, emphasizing that the emotional nature of the evidence would color the jury's decision making.

The government opposed the motion. It argued that judicial economy outweighed any prejudice. And in its view, facts related to the kidnapping were essential to the material-support and conspiracy-to-kill counts. It also argued that limiting instructions would cure any risk of prejudice.

The district court denied Siraj's motion.[11] *United States v. Leveille,* No. 18-cr-2945, 2023 WL 4753874, at *1 (D.N.M. July 24, 2023). The court held that "unsupported speculation that the jury may improperly attribute evidence falls well short of [Siraj's] burden of clearly showing prejudice." *Id.*

---

[11] In the same order, the district court also denied other Defendants' severance motions. *United States v. Leveille,* No. 18-cr-2945, 2023 WL 4753874, at *1 (D.N.M. July 24, 2023). Only Siraj's motion is at issue on appeal.

at *4 (citation modified). Plus, limiting instructions could cure any prejudice from evidence that wouldn't be "cross-admissible." *Id.*

The court added that the kidnapping evidence was likely "relevant to the other charges given the centrality of [the] alleged kidnapping to the United States' anticipated trial theory." *Id.* And because the trial would involve "a set of operative facts common to all Defendants," the court held that severing the cases "would place an insuperable burden" on both the court and the government. *Id.* at *6. So the court ruled that severance was "entirely unjustified." *Id.*

**B. Standard of Review**

We review for abuse of discretion the denial of a motion to sever. *United States v. Clark*, 717 F.3d 790, 818 (10th Cir. 2013). A court abuses its discretion by making "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *United States v. Durham*, 902 F.3d 1180, 1230 (10th Cir. 2018) (citation omitted). And a court "by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

**C. Legal Framework**

"If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Under Rule 14, "prejudice" means "actual prejudice." *Clark*, 717 F.3d at 818 (citation

omitted). And “Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court’s sound discretion.” *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993).

What’s more, “[t]here is a preference in the federal system for joint trials of defendants who are indicted together.” *Id.* at 537. That’s especially true for coconspirators. *See United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009). And “a single trial is ideal when the government plans to recite a single factual history, put on a single array of evidence, and call a single group of witnesses.” *United States v. Margheim*, 770 F.3d 1312, 1320 (10th Cir. 2014) (citation modified).

Thus, courts “should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.” *Zafiro*, 506 U.S. at 539. Such a risk exists “when the jury considers evidence against a defendant that is admissible only against a co-defendant, and is increased when multiple defendants are tried together in a complex case.” *Clark*, 717 F.3d at 818 (citation modified). But “a mere allegation that [the] defendant would have a better chance of acquittal in a separate trial” isn’t enough, nor is “an argument that evidence against one defendant would have a spillover effect on another defendant.” *Id.* (citation modified).

Defendants "seeking to vacate a conviction based upon the denial of a motion to sever face[] a steep challenge." *Pursley*, 577 F.3d at 1215. That's because we leave to the district court's discretion "the determination of risk of prejudice and any remedy." *United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997). Simply put, "the district court is the primary referee on severance claims, for we, as an appellate court, have only a distant view of the ring." *United States v. Rudolph*, 152 F.4th 1197, 1218 (10th Cir. 2025) (citation modified). So to establish that a court abused its discretion by denying a severance motion, a defendant must show (1) "actual prejudice outweighing the expense and inconvenience of separate trials" and (2) the "inadequacy of less drastic means to cure potential prejudice (like limiting instructions)." *United States v. Herrera*, 51 F.4th 1226, 1271 (10th Cir. 2022).

**D. Analysis**

The district court didn't abuse its discretion by holding that Siraj didn't show actual prejudice outweighing the expense and inconvenience of multiple trials.[12] *See Leveille*, 2023 WL 4753874, at *4–6. As the court explained, based on the government's trial theories, evidence of Abdul Ghani's kidnapping was

[12] Siraj didn't renew his severance motion before trial. There's some debate about whether defendants must renew their severance motions to preserve the issue for appeal. *See United States v. Goodhouse*, 81 F.4th 786, 791 n.3 (8th Cir. 2023). We haven't adopted a renewal rule. *See United States v. Jones*, 530 F.3d 1292, 1300 n.2 (10th Cir. 2008). And despite the government's urging, we need not do so now, because Siraj's challenge fails even under abuse-of-discretion review.

relevant to all charged offenses. *See id.* at *4. The government intended to rely on the same witnesses and elicit similar testimony for the kidnapping, material-support, and conspiracy-to-kill offenses. *See id.* at *2–3. So a severed trial would have severely "burdened judicial administration and economy." *Rudolph*, 152 F.4th at 1223. And judicial economy often triumphs where severance would require two factually similar trials. *See, e.g.*, *United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007); *United States v. Dirden*, 38 F.3d 1131, 1141 n.13 (10th Cir. 1994).

Siraj counters that evidence of Abdul Ghani's kidnapping and death wouldn't have been admissible in a separate trial. Consolidated trials can create a serious risk of prejudice "when the jury considers evidence against a defendant that is admissible only against a co-defendant." *Clark*, 717 F.3d at 818. And Siraj argues that if he'd had a separate trial, evidence of Abdul Ghani's kidnapping would have been inadmissible under Federal Rule of Evidence 403, which allows the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of" unfair prejudice.

Yet Siraj forfeited this argument by failing to raise Rule 403 at trial. True, he raised Rule 403 in his severance motion. But in its order, the district court explained that "it ha[d] not yet ruled on the admissibility of any evidence," and that under Rule 403, "[a]ll admitted evidence is subject to exclusion if its probative value is substantially outweighed by the risk of unfair prejudice." *Leveille*, 2023 WL 4753874, at *4.

Because Siraj never raised Rule 403 at trial, the district court never got to weigh the kidnapping evidence's probative value against its potential prejudice. And Siraj never made a plain-error argument on appeal, either. So he forfeited his argument that the kidnapping evidence would have been inadmissible under Rule 403. *See United States v. Tew*, 171 F.4th 1210, 1235 (10th Cir. 2026) (holding that defendant forfeited severance argument because she "never sought a ruling from the district court on the specific argument").

Siraj also argues that consolidating the trial "created the perfect storm of prejudice," overriding any judicial-economy concerns. Siraj Op. Br. at 15. True enough, consolidated trials can create a serious risk of prejudice if they "prevent the jury from making a reliable judgment about guilt or innocence." *Clark*, 717 F.3d at 818 (citation omitted). Siraj stresses the nature and volume of the kidnapping evidence, arguing that the government planned to show that he took Abdul Ghani from his mother, deprived him of essential care, abused him, and then killed him. In his view, this "heinous, disturbing, and emotionally devastating" evidence would create "the greatest danger of unfair prejudice." Siraj Op. Br. at 20 (citation modified); *see United States v. Tobin*, 676 F.3d 1264, 1292 (11th Cir. 2012) ("Only gruesome, emotional, or highly inflammatory evidence will provide a basis for severance." (citation modified)), *overruled on other grounds by*, *United States v. Duldulao*, 87 F.4th 1239 (11th Cir. 2023). Along those lines, Siraj emphasizes that the government's anticipated witnesses included children from the compound and Abdul Ghani's

mother, whose testimony "would overcome any juror's emotions." *Id.* at 21. Finally, relying on *Old Chief v. United States*, 519 U.S. 172 (1997), he argues that absent a separate trial, the jury would think that he "kidnapped and killed his own child, [so] he is a bad person who is more likely to conspire to kill federal employees." Siraj Op. Br. at 19. Or that the jury—unable to convict him for killing Abdul Ghani—would convict him on the material-support and conspiracy-to-kill counts, even if he wasn't guilty of those offenses.

These arguments fall short. The government can present evidence "creating a coherent narrative of [the defendant's] thoughts and actions in perpetrating the offense for which he is being tried." *See Old Chief*, 519 U.S. at 192. Here, that included many of the tragic facts surrounding Abdul Ghani's death. Indeed, sometimes "even graphic depictions" of misconduct are "relevant to support other evidence about how the crime occurred." *United States v. McVeigh*, 153 F.3d 1166, 1203 (10th Cir. 1998) (citation modified).

Besides, the district court held that limiting instructions would counter any risk of prejudice from the kidnapping evidence. *Leveille*, 2023 WL 4753874, at *4. After all, "limiting instructions[] often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539; *see also United States v. Hutchinson*, 573 F.3d 1011, 1026 (10th Cir. 2009). And here, the instructions did just that. *See Hutchinson*, 573 F.3d at 1026 (considering, on review of pretrial severance denial, the instructions ultimately given to the jury).

In the preliminary instructions, the court explained that "the United States chose not to prosecute Siraj" for kidnapping because "federal law creates an affirmative defense for a biological parent who kidnaps his own child." JR. vol. VI at 973. After both sides rested, the court instructed the jury to decide guilt "solely upon the evidence presented as to that Defendant, without prejudice or sympathy." *Id.* at 3581. The court also instructed the jury to consider guilt only for each defendant's charged crimes, not to let one defendant's verdict impact another's, and to convict only if the government proved each offense element beyond a reasonable doubt. Both we and the Supreme Court have held that substantially similar limiting instructions were sufficient to cure any prejudice. *See Hutchinson*, 573 F.3d at 1026; *Zafiro*, 506 U.S. at 541.

In arguing that the limiting instructions were insufficient, Siraj points us to *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996), *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012), and *United States v. Blunt*, 930 F.3d 119 (3d Cir. 2019). None of those cases are persuasive. All three concerned evidence that wouldn't have been admissible against the defendant in a separate trial. *See Baker*, 98 F.3d at 335; *McRae*, 702 F.3d at 825, 828; *Blunt*, 930 F.3d at 126. For example, the *McRae* defendant had "no connection" to the highly prejudicial evidence admitted against his co-defendants, because that evidence related to "separate events." 702 F.3d at 825. And had the defendant been tried alone, his trial would have lasted three days; instead, the joint trial lasted a

month, featuring "sordid evidence" about his codefendants' conduct. *Id.* at 825–26.

Again, because Siraj never raised Rule 403 at trial, we can't say whether evidence about Abdul Ghani's kidnapping would have been inadmissible against him. That said, unlike the evidence in the cases that Siraj cites, Abdul Ghani's kidnapping was "central[]" to the government's theories on the material-support and conspiracy-to-kill counts. *See Leveille*, 2023 WL 4753874, at *4. Plus, in *McRae*, the Fifth Circuit concluded that severance was required only as the trial progressed and became increasingly prejudicial to the defendant. *See* 702 F.3d at 816, 828. That reasoning further supports the district court's decision to deny Siraj's *pretrial* motion.

Nor was the district court wrong to presume that the jury could "compartmentalize the evidence against each defendant." *Herrera*, 51 F.4th at 1274. Hearing facts about separate counts didn't "render null the jury's ability to segregate the evidence associated with each defendant's individual actions." *Clark*, 717 F.3d at 820 (citation modified). In fact, the jury confirmed that it could follow these instructions when it found Siraj and Lucas, but not Subhanah and Hujrah, guilty on the material-support counts. By finding half the defendants guilty and the others not, the jury indicated that it could separately consider the offenses and defendants. *See, e.g.*, *Herrera*, 51 F.4th at 1274–75 (finding no abuse of discretion in part because the verdict showed that the jury separately considered each defendant); *Tew*, 171 F.4th at 1236 (similar).

In sum, because Siraj didn't show an uncurable risk of prejudice, the district court didn't abuse its discretion by denying Siraj's pretrial motion to sever.

## IV. Issue 4: Conspiracy-to-Kill Instructions

Siraj and Lucas challenge the jury instructions for the conspiracy-to-kill-federal-officers count. They argue that the court erred by failing to instruct the jury on the offense's federal jurisdictional element.[13]

Defendants also argue that the district court's alleged jury-instruction error affected their conspiracy-to-provide-material-support and providing-material-support convictions, too. They say that if there's "a reasonable probability" that, without the error, "the jury would not have found a conspiracy to kill federal officers," the jury wouldn't have found Defendants guilty on the other counts, either. Siraj Op. Br. at 41.

### A. Procedural Background

The district court gave the following jury instructions for the conspiracy-to-kill offense:

> Defendants Siraj Ibn Wahhaj and Lucas Morton are charged in Count 3 with conspiring to murder an officer or employee of the United States, in violation of 18 United States Code Section 1117.
>
> This law makes it a crime to conspire to kill or attempt to kill any officer or employee of the United States, or of any agency in any branch of the United States government, while such officer or

[13] "[J]urisdictional element" refers not to our subject-matter jurisdiction but to the offense's element that "ties the substantive offense . . . to one of Congress's constitutional powers." *Torres v. Lynch*, 578 U.S. 452, 457 (2016).

> employee is engaged in or on account of the performance of official duties.
>
> To find each Defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:
>
> First: The charged Defendants entered into a conspiracy;
>
> Second: The object of the conspiracy was to kill or attempt to kill officers and employees of the United States government—here, Federal Bureau of Investigation employees, government officials, and military personnel—on account of, or while such officers and employees were engaged in the performance of their official duties; and
>
> Third: At least one overt act alleged in the Indictment was committed in furtherance of the conspiracy.

JR. vol. VI at 3594–96. The court then instructed the jury about conspiracies.

No defendant objected to these instructions. In fact, Subhanah, Hujrah, and Lucas proposed substantially similar ones.[14]

**B. Standard of Review**

Because neither Siraj nor Lucas objected, we review the instructions for plain error. "A party seeking relief under the plain-error rubric bears the burden of showing (1) an error, (2) that is plain, which means clear or obvious under

[14] For this reason, the government argues that the invited-error rule precludes Lucas's appeal. And true enough, "when a party proposes a jury instruction, this act constitutes an intentional and knowing relinquishment, and we will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively approving it at trial." *United States v. Teerlink*, 141 F.4th 1126, 1131 (10th Cir. 2025) (citation modified). Lucas replies that he never joined Subhanah and Hujrah's proposed instructions. Though skeptical of Lucas's disavowal, we need not address invited error because his challenge fails on the merits.

current law, and (3) that affects substantial rights." *United States v. Maryboy*, 138 F.4th 1274, 1281 (10th Cir. 2025) (citation omitted). If a defendant meets all three conditions, "we may exercise our discretion to correct the error if [it] seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation modified). "We apply plain error less rigidly when reviewing a potential constitutional error, which is the case here because an improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee." *United States v. Benford*, 875 F.3d 1007, 1016–17 (10th Cir. 2017) (citation modified).

### C. Legal Framework

District courts have "substantial latitude and discretion in tailoring and formulating [jury] instructions so long as they are correct statements of law and fairly and adequately cover the issues presented." *United States v. Woodmore*, 127 F.4th 193, 210 (10th Cir. 2025) (citation omitted). Jury instructions should "give jurors the correct principles of law applicable to the facts so that they can reach a correct conclusion as to each element of an offense according to the law and the evidence." *United States v. Freeman*, 70 F.4th 1265, 1280 (10th Cir. 2023) (citation omitted). Though "[t]he instructions as a whole need not be flawless, . . . we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." *Woodmore*, 127 F.4th at 210 (citation omitted).

**D. Analysis**

A defendant violates 18 U.S.C. § 1117 if he conspires with another "to violate [certain identified sections] of this title, and one or more of such persons do any overt act to effect the object of the conspiracy." One identified section is § 1114, which prohibits "kill[ing] or attempt[ing] to kill any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties." *Id.* § 1114(a).

Our circuit doesn't have a pattern instruction for conspiracy to kill federal officers. In fact, we've cited § 1117 only a handful of times. *See United States v. Prentiss*, 206 F.3d 960 (10th Cir. 2000), *reh'g en banc*, 256 F.3d 971 (10th Cir. 2001); *United States v. Ortiz*, 182 F.3d 934 (10th Cir. 1999) (unpublished table decision). And in those cases, we never identified the offense's elements.

To fill this gap, the parties and district court relied on *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014), for the jury instructions. According to *Hassan*, conspiracy to kill a federal officer requires:

> (1) that [the defendant] entered into a conspiracy; (2) the object thereof was to kill or attempt to kill officers and employees of the executive branch of the federal government . . . on account of—or while such officers and employees were engaged in—the performance of their official duties; and (3) that at least one overt act was committed in furtherance of the conspiracy.

*Id.* at 113.

We disagree with *Hassan*'s second element. That's because it doesn't align with controlling Supreme Court precedent, *United States v. Feola*, 420 U.S. 671 (1975). *Feola* clarifies what the government must prove to establish jurisdiction over fulfilled and unfulfilled conspiracies to assault (or in this case, to kill) federal officers.

"[I]n addition to substantive elements," most federal offenses have "a jurisdictional one," too. *Torres*, 578 U.S. at 457. The substantive elements identify the harmful conduct, while the jurisdictional element "ties the substantive offense . . . to one of Congress's constitutional powers." *Id.* "Both kinds of elements must be proved to a jury beyond a reasonable doubt." *Id.* at 467.

Conspiracy to kill federal officers is no exception. To establish federal jurisdiction over such a charge, the government must show that the defendant conspired to kill *federal* officers or employees while they were performing their official duties. *See* 18 U.S.C. §§ 1114, 1117. What the government must prove to satisfy that jurisdictional element—"the federal-officer requirement"—depends on whether the conspiracy was fulfilled or unfulfilled. *Feola*, 420 U.S. at 676 (citation modified).

*Feola* explains this distinction. There, the defendants planned to assault and rob drug buyers during a sale. *Id.* at 674. Unknown to the defendants, the buyers were undercover federal agents, who were able to thwart the assault. *Id.*

The government charged the defendants under 18 U.S.C. §§ 371 and 111 with conspiring to assault and with assaulting federal officers. *Id.* at 673, 675.

The Court considered whether "knowledge that the intended victim is a federal officer is a requisite" for both crimes. *Id.* at 672–73. It held that the substantive offense—assaulting federal officers—didn't require that the defendant "be aware that his victim is a federal officer." *Id.* at 684. Instead, it required only "an intent to assault, not an intent to assault a federal officer." *Id.* In support, the Court noted 18 U.S.C. § 111's twin policy aims: "to protect both federal officers and federal functions." *Id.* at 679. The Court concluded that "[t]he rejection of a strict scienter requirement is consistent with both purposes." *Id.*

The Court then held that the same reasoning applied to the conspiracy charge. To prove a fulfilled conspiracy to assault, as in *Feola*, the government didn't need to prove that the defendants knew the victim's federal identity, if the defendants did, in fact, attack a federal officer. *See id.* at 695. Put differently, the defendants in *Feola* who conspired to attack their drug buyers at a prearranged sale didn't have to know that the buyers were federal officers. *Id.* For attacks on sufficiently identified persons who turn out to be federal officers, the defendants are liable for the substantive crime as well as the conspiracy to commit it. *Id.*

But in reviewing convictions for *unfulfilled* conspiracies to attack federal officers, the focus changes to *what would have happened* had the conspiracy been fulfilled. *Id.* at 695–96. Here's the Court's language:

> If the agreement calls for an attack on an individual specifically identified . . . and that specifically identified individual is in fact a federal officer, the agreement may be fairly characterized as one calling for an assault upon a federal officer, even though the parties were unaware of the victim's actual identity . . . . Where the object of the intended attack is not identified with sufficient specificity so as to give rise to the conclusion that had the attack been carried out the victim *would have been* a federal officer, it is impossible to assert that the mere act of agreement to assault poses a sufficient threat to federal personnel and functions so as to give rise to federal jurisdiction.

*Id.* (emphasis added).

So under *Feola*, the jurisdictional inquiry for an unfulfilled conspiracy depends on whether "federal personnel and functions" were sufficiently threatened by the agreement to assault (or in this case, to kill). And that depends on whether the defendants sufficiently specified the identity of the intended victims and whether that group contained at least one federal officer. If so, the defendants are guilty of a conspiracy to kill a federal officer under 18 U.S.C. §§ 1114, 1117. If not, the government can't show federal jurisdiction over the crime.

Thus, we hold that to prove a *fulfilled* conspiracy to kill a federal officer, the government must show that (1) the defendants "entered into a conspiracy," *Hassan*, 742 F.3d at 113; (2) "at least one overt act was committed in furtherance of the conspiracy," *id.*; and (3) the defendant killed or attempted to

kill a person who in fact was a federal officer, whether the defendant knew that or not, on account of or while the officer was performing official duties, *Feola*, 420 U.S. at 695; 18 U.S.C. §§ 1114, 1117.

Separately, to prove an *unfulfilled* conspiracy to kill a federal officer, the government must show that (1) the defendants "entered into a conspiracy," *Hassan*, 742 F.3d at 113; (2) "at least one overt act was committed in furtherance of the conspiracy," *id.*; (3) "the agreement call[ed] for an attack on" an individual or group identified with "sufficient specificity so as to give rise to the conclusion that had the attack been carried out the victim would have been a federal officer," *Feola*, 420 U.S. at 695–96; and (4) the defendants agreed to kill or attempted to kill the victim (who would have been a federal officer) on account of or while he or she was performing official duties, 18 U.S.C. §§ 1114, 1117.

With this legal standard in mind, we turn to Defendants' challenge, which centers on the conspiracy-to-kill count's jurisdictional element—the federal-officer requirement.

**1. Error**

Tracking the above-quoted language from *Feola*, Defendants argue that the district court had to instruct the jury about the government's need to prove that Defendants had identified the intended victims with "sufficient specificity" so that the jury could find that at least one victim would have been a federal

officer if the Defendants had carried out their intended attack. *Feola*, 420 U.S. at 695–96.

We agree that *Feola* holds the government to this proof. As explained, *Feola* effectively refines the jurisdictional element for conspiracy-to-kill-federal-officers offenses. For fulfilled conspiracies, the government must prove that the person the defendants killed was, *in fact*, a federal officer. *Id.* at 695. For unfulfilled conspiracies, the government must show that, had the defendants completed their intended attack, "the victim *would have been* a federal officer." *Id.* at 696 (emphasis added). Without such proof, the government hasn't shown the federal nexus, which is necessary to convict a defendant of the charges in federal court. *See id.*

Simply put, meeting the federal jurisdictional nexus as defined in *Feola* is a prerequisite to a conviction for the charge of conspiracy to kill federal officers. So absent correct instructions articulating the applicable *Feola* standard—here, the standard for unfulfilled conspiracies—the jury lacked what it needed to "reach a correct conclusion as to each element of [the] offense according to the law and the evidence." *Freeman*, 70 F.4th at 1280 (citation omitted). In other words, we don't think the court adequately instructed the jury about "its duty to resolve" the conspiracy-to-kill count's jurisdictional element. *Woodmore*, 127 F.4th at 210 (citation omitted). Thus, the court erred in its conspiracy-to-kill instructions.

The parties also say the government could establish federal jurisdiction by proving that the Defendants *believed* their attack would be on federal officers, and Defendants argue that the court should have instructed on this method of proving the jurisdictional element. Though we conclude that *Feola* rejects that the defendants' beliefs can establish the federal jurisdictional nexus, we still address the parties' arguments.

For their position that the defendants' "beliefs" are relevant to the nexus determination, the parties rely primarily on *United States v. Rosa*, 17 F.3d 1531 (2d Cir. 1994). In that case, the defendants bought supposedly stolen goods from an undercover federal agent. *Id.* at 1537–39. The government charged the defendants with conspiracy to receive stolen goods under 18 U.S.C. §§ 371 and 2315. *Id.* at 1539. The Second Circuit noted that the interstate-travel-of-stolen-goods requirement of these charges was "an element that must be proven" as "the premise for federal jurisdiction." *Id.* at 1544. It also stated that "[t]he government need not prove that the defendant had knowledge of that travel." *Id.*

Because "the goods that defendants purchased from [the federal agent] had in fact traveled" across state lines, the conspiracy was fulfilled, and the circuit ruled that the offense's jurisdictional element had been "satisfied whether or not the defendants knew of the interstate travel." *Id.* at 1546. Though that satisfied the element, the court remarked that "even if the goods have not traveled interstate, the jurisdictional nexus may be satisfied by *the*

*belief* of at least one conspirator that the goods had traveled interstate." *Id.* (emphasis added). But that didn't matter, because of "clear evidence that at least [one defendant] knew the goods the coconspirators bought and planned to buy were traveling interstate." *Id.* On this point, the court specified how defendant Rosa learned from the undercover federal agent that different stolen goods had in fact traveled to the buyer across a state line. *Id.*

We have doubts about *Rosa*'s "belief" ruling. Under *Feola*, all that matters is whether the defendants sufficiently identified a target so that, had the defendants fulfilled the conspiracy, the victim *would have been* a federal agent. *See* 420 U.S. at 695–96. As we see it, "belief" has no place in *Feola*'s framework. Holding otherwise would undo *Feola*'s requirement that the sufficiently identified victim in fact be a federal officer. A mistaken belief that an intended victim was a federal officer doesn't suffice.

Indeed, *Rosa* doesn't reference or discuss *Feola*'s key language, as we quoted above, pertaining to unfulfilled conspiracies. Nor do all but one of the other cases that the parties cite. *See United States v. Soy*, 454 F.3d 766 (7th Cir. 2006); *United States v. Medeiros*, 897 F.2d 13 (1st Cir. 1990); *United States v. Shively*, 715 F.2d 260 (7th Cir. 1983).[15]

[15] The parties cite *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982), which involved the federal-jurisdiction-nexus issue of "the movement of articles in interstate commerce" under the Hobbs Act, 18 U.S.C. § 1951. *Id.* at 590. The court opined on *Feola*'s nexus determination for assaults against federal officers and employees. *Id.* at 593–94. Though not quoting or parsing

(*footnote continued*)

Besides, those cases are distinguishable for other reasons. None considered offenses with the federal-officer jurisdictional element. Indeed, "belief" might be more appropriate in cases like *Rosa* and *Medeiros*, which involved sting operations in which federal officers told the defendants that contraband had traveled in interstate commerce. *See Rosa*, 17 F.3d at 1537–39; *Medeiros*, 897 F.2d at 14–15. Though *Soy* didn't involve a sting operation, it relied on *United States v. Pinckney*, 85 F.3d 4 (2d Cir. 1996), and *Rosa* to conclude that a defendant's belief could satisfy the interstate-nexus requirement. *Soy*, 454 F.3d at 769.

And in *Shively*, the Seventh Circuit assessed the need to prove the jurisdictional element of a bank's FDIC-insured status in a bank-fraud case. 715 F.2d at 264–65. Though the bank was in fact FDIC-insured, the government neglected to establish this at trial. *Id.* The court rejected using § 371 "to punish all conspiracies to defraud banks, just because most banks are federally

---

the operative paragraph of *Feola* setting forth the rule for unfulfilled conspiracies, 420 U.S. at 695–96, the court concluded that the requirement of a "sufficient threat" to federal officers "did not preclude the existence of federal jurisdiction where the intended victim is believed to be a federal officer, but in fact is not." *Id.* at 593. In other words, federal officers could be "sufficiently threatened" under *Feola* despite no federal officers actually being threatened. We read this as extending the nexus boundaries beyond where *Feola* set them. After all, the Court deemed it "*impossible to assert* that the mere act of agreement to assault poses a sufficient threat to federal personnel and functions so as to give rise to federal jurisdiction" unless "the object of the intended attack is [] identified with sufficient specificity so as to give rise to the conclusion that had the attack been carried out the victim would have been a federal officer[.]" *Feola*, 420 U.S. at 695–96 (emphasis added).

insured," but affirmed the convictions based on strong evidence "that the defendants in this case intended to defraud a federally insured bank." *Id.* at 265–67. We have nothing like that here.

So the district court didn't err by not instructing on *Rosa*'s "belief" ruling. That said, as discussed above, the district court's conspiracy-to-kill instructions were still legally incorrect. The instructions allowed the jury to convict based on solely an intent to kill federal officers, even if the victims weren't sufficiently identified for the jury to find that federal officers would have been victims of the intended attack. *See Feola*, 420 U.S. at 695–96. Based on the court's failure to instruct under *Feola*, Defendants have satisfied this step of the plain-error test.

**2. Plain**

"An error is plain if it is clear or obvious under current, well-settled law." *United States v. Egli*, 13 F.4th 1139, 1146 (10th Cir. 2021). Law is well-settled if "there is precedent directly on point from the Supreme Court or the Tenth Circuit" or "a consensus in the other circuits." *Id.*

Here, the instruction does not abide *Feola*, which is a controlling "precedent directly on point." *Id.* So the court's error was plain.

**3. Substantial Rights**

An error affects substantial rights when there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 507–08 (2021) (citation

omitted). Put differently, Defendants must show that—had the district court instructed on *Feola*'s requirement for proving the jurisdictional element of an unfulfilled conspiracy to kill a federal officer—"there is a reasonable probability" that the jury wouldn't have convicted them. *See id.* (citation modified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Samora*, 954 F.3d 1286, 1293 (10th Cir. 2020) (citation omitted). "In the case of an erroneous jury instruction on the principal elements of the offense, we often conclude that the error affected the outcome of the proceedings." *Id.* (citation modified).

As the next section explains, under one of the government's theories, strong evidence supported the conspiracy counts' jurisdictional element. And based on that evidence, we have no doubt that the jury concluded that, had Defendants carried out their intended attack, some victims would have been federal officers. So Defendants haven't shown a reasonable probability of a different outcome under a correct instruction. Thus, they haven't met the third condition of plain-error review, and we reject their instruction-based challenges to their conspiracy-to-kill and material-support convictions.

## V. Issue 5: Sufficiency of the Evidence – Conspiracy-to-Kill Convictions

Siraj and Lucas challenge the sufficiency of the evidence on their conspiracy-to-kill-federal-officers convictions. Defendants again argue that if we find insufficient evidence on the conspiracy-to-kill convictions, we must also reverse their related material-support and conspiracy-to-provide-material-

support convictions. As they put it, without "any plan to kill federal employees, it necessarily follows that there was insufficient evidence that [Siraj and Lucas] provided, or conspired to provide, material support to prepare for and carry out a non-existent plan to kill employees." Siraj Op. Br. at 48.

### A. Procedural Background

After the government rested, Defendants moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the government hadn't proved that they conspired to kill one or more federal agents. Lucas renewed his Rule 29 motion after trial. Siraj did not.

### B. Standard of Review

In deciding a sufficiency-of-the-evidence challenge, we review the record de novo. *United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012).

When a defendant fails to renew a Rule 29 motion after presenting evidence, we usually review for plain error only. *United States v. Rufai*, 732 F.3d 1175, 1189 (10th Cir. 2013). Though Siraj didn't renew, he says he had good reason: his standby counsel never gave him key documents that he needed for his motion. He asks us to excuse his nonrenewal for good cause. The government doesn't oppose this request, so we review de novo both Siraj's and Lucas's challenges.

### C. Legal Framework

"[E]vidence is sufficient to support a conviction so long as after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (citation modified).

### D. Analysis

Defendants argue only that the government failed to establish the jurisdictional element for the conspiracy-to-kill offense. To prove this element, the government needed to show that had the defendants completed their intended attack, one victim "would have been a federal officer." *Feola*, 420 U.S. at 696.

The government presented two theories to support the conspiracy-to-kill count. First, it argued that Defendants believed that the FBI was watching them, and that Defendants planned to kill any law-enforcement officers—including FBI agents—who approached the compound. Second, it argued that once resurrected, Abdul Ghani would lead Defendants to corrupt institutions, including federal agencies, and they would kill any nonbelievers. We consider each theory in turn.

#### 1. Conspiracy to Kill Federal Officers During the Execution of Warrants at the Compound

The government proved that Defendants believed the federal government, including the FBI, was watching them. For example, one of the children testified that "we believed . . . we were under surveillance . . . [by the] FBI." JR. vol. VI at 1374. Jany texted that Defendants were "hiding" because

someone had "called [the] FBI," Supp. JR. vol. VI at 463, and Subhanah wrote in a journal, "why didn't the FBI arrest me," JR. vol. VI at 3324.

The government then showed that Siraj and Lucas prepared to defend themselves if the FBI approached the property. They trained with firearms, developed secret-warning codes, dug a tunnel, and hid weapons around the compound. One child testified that, if "anyone" came to the compound, Defendants would start a "firearms fight." JR vol. VI at 1375. Another testified that Siraj told them to shoot any approaching law enforcement "and just say we didn't see them in the dark, and we did not know that they were FBI or law enforcement."[16] *Id.* at 1768. Finally, when officers approached to execute the search warrant, Siraj armed himself. And one child testified that they believed that Siraj would have started shooting.

But as Defendants point out, the conspiracy wasn't specific to killing FBI agents. Instead, Defendants planned to kill *any* law-enforcement officers who approached the compound. Defendants also emphasize that the officers who arrived to search the compound were local, not federal, officers. So in their view, the government's evidence didn't prove that the intended attack's victims would have been federal officers.

We agree that the government didn't prove the jurisdictional element for this theory. The identified victims—any law enforcement who approached the

[16] The child then testified that he was "not sure" whether Siraj said FBI specifically. JR. vol. VI at 1768.

compound—were too generic to meet *Feola*'s "sufficient specificity" standard. *See* 420 U.S. at 695. Defendants agreed to attack whoever came, whether they happened to be FBI agents or county sheriff's deputies. That proves only that the Defendants anticipated that some victims *could* be federal officers or employees. It doesn't prove that "had the attack been carried out[,] the victim *would have been* a federal officer[.]" *Id.* at 696 (emphasis added). So the government failed to meet its burden on this theory.

**2. Conspiracy to Kill Federal Officers After Abdul Ghani's Resurrection**

The government elicited testimony that Defendants believed that Abdul Ghani would rise from the dead and lead an "army" to "get rid of all the corruption in the world," including corruption in the federal government. JR. vol. VI at 1589, 1765–66. One of the children testified that a resurrected Abdul Ghani would lead Defendants to "government, hospitals, anything major," including the "FBI, CIA, anything government related."[17] *Id.* at 1360. Any people at these places who rejected Abdul Ghani "would be killed." *Id.* at 1362. The children also testified that Siraj and Lucas held firearms training to prepare for this "war." *Id.* at 1765.

The government argues that this evidence "showed that the group specifically believed that the federal government was one of these corrupt

[17] The sole location identified by name was "Grady," a hospital in Georgia.

institutions and agreed to target it and its employees in their coming war." Resp. Br. at 61.

We agree that the government's evidence was sufficient to support the conspiracy-to-kill offense's jurisdictional element. The government introduced evidence of Defendants' plan to participate in Abdul Ghani's army and attack federal entities and personnel, including at the CIA and FBI. The idea was that if federal officers didn't "believe in" Abdul Ghani, Defendants would kill them. JR. vol. VI at 1359. And to prepare for that, they participated in firearms training. Based on that evidence, a reasonable jury could conclude that the victims of Defendants' intended attack would have been federal officers. In other words, Defendants identified their victims—federal institutions—with "sufficient specificity" to "pose[] a sufficient threat to federal personnel and functions." *Feola*, 420 U.S. at 695–96; *see also Hassan*, 742 F.3d at 143 (finding sufficient evidence for § 1117 offense when defendant agreed to attack a federal institution). This intended plan posed a sufficient threat to federal officers.

Defendants argue that the conspiracy was much broader than killing federal employees—it was to kill nonbelievers all over the world. But Defendants envisioned a campaign of attacks, some of which would be on federal buildings and employees. It is no defense that Defendants planned additional attacks on other locations and victims.

Defendants also argue that the conspiracy was too conditional to support conviction. Specifically, they say that Abdul Ghani "was going to decide where to go and what to do—the group was waiting to find out." Siraj Op. Br. at 44.

But viewing the evidence in the light most favorable to the government, sufficient evidence supports the convictions. We acknowledge that one witness, when asked if the plan to attack the federal government had any specifics, said "[t]here w[ere] no specifics" until the resurrected child "decide[d] the specifics," and that's "what the group was waiting to find out." JR. vol. VI at 1371. But the jury wasn't required to credit this testimony over the other evidence of Defendants' plan. The same witness testified that the plan was to attack "[t]he Federal Government," including the "FBI, CIA, anything government related." *Id.* at 1360, 1370–71. Another witness denied that the intended victims of Abdul Ghani's army were "unknown at the time," explaining that because the group "believed that the entire government was corrupt," it would be a target. *Id.* at 1448.

A reasonable jury could infer from this evidence that the Defendants had already identified the target of their conspiracy to kill—the federal government—and were simply waiting for Abdul Ghani to join them before they began the war. That was specific enough to conclude that the victims of Defendants' planned attack would have included federal officers and employees. *See, e.g.*, *United States v. Duka*, 671 F.3d 329, 352 (3d Cir. 2011) (holding that "the place where the defendant intends to kill the federal employee, i.e., whether at a particular base in New Jersey or somewhere in Afghanistan," isn't an element of §§ 1117 or

1114); *United States v. Cox*, 705 F. App'x 573, 576 (9th Cir. 2017) (affirming § 1117 conviction when "Defendant and his co-conspirators agreed to attack government officials—including federal officers—in the event of certain conditions that they subjectively thought were likely to occur").

In the end, under the government's second theory, a factfinder could reasonably have found the conspiracy-to-kill offense's jurisdictional element was satisfied beyond a reasonable doubt. *See Cavazos*, 565 U.S. at 7. So we reject Defendants' sufficiency-of-the-evidence challenge.

## VI. Issue 6: Jury Instructions – Kidnapping Counts

Hujrah and Subhanah challenge the jury instructions for the kidnapping counts. We focus on only one of the issues they raise: whether the instructions' definition of "unlawfully kidnaps" correctly stated the law.[18] Because both the conspiracy and kidnapping instructions included this definition, we consider them together.

### A. Procedural Background

#### 1. Instructions on Unlawfulness

As mentioned, a defendant violates 18 U.S.C. § 1201(a)(1) by "unlawfully seiz[ing], confin[ing], inveigl[ing], decoy[ing], kidnap[ping], adbuct[ing], or carr[ying] away and hold[ing] for ransom or reward or

[18] Because we reverse Defendants' kidnapping-related convictions, we need not resolve the other issues raised by Hujrah and Subhanah. *See United States v. Montelongo*, 420 F.3d 1169, 1171 n.1 (10th Cir. 2005).

otherwise any person, except in the case of a minor by the parent thereof, when . . . the person is willfully transported in interstate or foreign commerce." Section 1201 also criminalizes conspiring to kidnap. *Id.* § 1201(c).

Here, the final jury instruction for conspiracy to kidnap said the government must prove that "[t]he object of the conspiracy was to unlawfully seize, confine, inveigle, decoy, kidnap, abduct, or carry away and hold Abdul-Ghani Wahhaj for some purpose or benefit and transport him in interstate commerce." JR. vol. VI at 3599. Similarly, the instruction for kidnapping said that the government must prove that "[t]he charged Defendants unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held Abdul-Ghani Wahhaj." *Id.* at 3602. And the instructions for both offenses added the following:

> to unlawfully kidnap a person means to hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense. In evaluating this element, you must first determine whether Abdul-Ghani Wahhaj was of such an age or mental state as to have been capable of giving his consent to having been seized, confined, decoyed, abducted, carried away or held. If you determine that Abdul-Ghani Wahhaj was not capable, then you must determine if his being seized, confined, decoyed, abducted, carried away, or held was against Hakima Ramzi's consent.

*Id.* at 3600–03.

### 2. Background on Instructions

Subhanah, joined by Hujrah and Lucas, proposed jury instructions for the kidnapping counts. Part of their proposal said that

> [k]idnapping cannot occur when a parent takes their minor child, even without the consent of the other parent. If you find that Siraj Ibn Wahhaj voluntarily took his child, [Abdul Ghani], from Georgia to New Mexico, then you must find Defendant not guilty. It is the government's burden to prove beyond a reasonable doubt the child was not taken voluntarily by his father, Siraj Ibn Wahhaj.

JR. vol. III at 1270–72. Defendants also asked that, for both the conspiracy to kidnap and kidnapping counts, the instructions state that Defendants had to "knowingly act[] contrary to law." *Id.* at 1269, 1271.

At a pretrial conference, the district court discussed the kidnapping instructions with the parties. Defendants argued that it wasn't "a violation of federal law for a parent . . . to transport his son across state lines," so the court needed to instruct the jury that Defendants had to *know* that it was otherwise unlawful for them to join Siraj in taking Abdul Ghani from Georgia to New Mexico. JR. vol. VI at 4189. The government disagreed, responding that it's "unlawful for a parent to kidnap his own kid" if "it's done according to the [kidnapping statute's] elements, it's done against the will of the person who was taken, and it's done for a reason, and it's done to transport across state lines." *Id.* at 4190–91.

The parties also discussed instructing on consent. Relying on *Chatwin v. United States,* 326 U.S. 455 (1946), the government argued that lack of consent satisfied the unlawfulness element. It then argued that because Abdul Ghani was too young to consent, the jury must "look to the parents for consent[,] [a]nd then it's the question of the mother's consent and whether the Defendants

knew that the mother had consented or not." JR. vol. VI at 4195. Defendants challenged this approach, arguing that "[t]he Government can certainly argue to the jury that it believes this was unlawful because the mother didn't consent, but we should be able to argue to the jury that it was not unlawful in part because the father was with the child." *Id.* at 4197. So because they believed that "[c]onsent [wa]sn't the whole story," Defendants asked the court not to instruct on consent at all. *Id.*

After taking the parties' arguments under advisement, the district court proposed this instruction:

> [Y]ou [must] determine if ABDUL GHANI WAHHAJ was of such an age or mental state as to have been incapable of giving his consent to having been seized, confined, decoyed, abducted, carried away or held. If not, then you must determine if ABDUL GHANI WAHHAJ having been seized, confined, decoyed, abducted, carried away or held was against his parent's consent.

JR. vol. III at 1847 (citation modified).

The government objected to the "his parent's consent" wording and asked the court to change it to "his mother's consent" instead. The government explained that, as written, the instruction "could . . . suggest that a single parent's consent, such as Siraj Wahhaj's consent in this case, is enough to completely extinguish the other parent's lack of consent." *Id.* at 1703. It argued that "there is no authority" suggesting "that one parent can singlehandedly extinguish the will or consent of another parent by participating in a kidnapping and a conspiracy to kidnap a child away from the other parent." *Id.* at 1704.

And "[t]o the extent that there is any question as to whether Hakima Ramzi had legal rights to the custody of Abdul Ghani that [Defendants] violated," the government asked the court to take judicial notice of several state laws. *Id.* at 1704 n.1.

In their written objections, Defendants again argued that the court should instruct that Defendants had to know that joining Siraj in taking Abdul Ghani was unlawful. They also asked the court to include their original proposed instruction addressing § 1201's parental exception.

The court's proposed final instructions didn't change any of the consent language as the government had requested, nor did it add Defendants' language about the parental exception.

After the defense rested, but before the court instructed the jury, Defendants renewed their objections to the kidnapping instructions. They argued that the court should strike the sentence saying that Defendants had to take Abdul Ghani against his "parent's" consent. The government countered that "unlawful means without the consent of the victim" and "if the victim can't consent, then it is unlawful when it is against the consent of a parent." JR. vol. VI at 3552.

The final instructions included the government's requested language: "If you determine if ABDUL GHANI WAHHAJ was not capable [of consenting], then you must determine if his being seized, confined, decoyed, abducted,

carried away or held was against HAKIMA RAMZI's consent." JR. vol. III at 1802, 1821–25.

In a written ruling, the district court explained this change. The court noted Defendants' position that "unlawfully" meant "knowingly acting contrary to the law, suggesting that [Siraj's] consent . . . and the absence of a court order terminating his parental rights could serve as a defense to the kidnapping." *Id.* at 1848. On the other hand, the court noted the government's position that "unlawfully" meant "taking a child across state lines without the consent of the custodial parent—in this case Hakima Ramzi."[19] *Id.* Looking to Georgia law, the court held that it was "illegal for both parents and non-parents to take a child away from a non-consenting custodial parent and transport them across state lines." *Id.* at 1850. Because "no federal law" conflicted with Georgia's, the court concluded that Defendants' joining Siraj in taking Abdul Ghani without Hakima's consent "constitute[s] unlawful kidnapping under 18 U.S.C. § 1201(a)." *Id.*

**B. Standard of Review**

We review for abuse of discretion the district court's "shaping or phrasing a particular jury instruction and deciding to give or refuse a particular

[19] The district court didn't define "custodial parent." Nor did it explain its legal import or why identifying a custodial parent was relevant under either federal or state law. Similarly, the court observed that Hakima was Abdul Ghani's "primary custodian and caregiver." JR. vol. III at 1380. Though we understand how the district court reached this conclusion, it has no legal import here.

instruction." *Woodmore*, 127 F.4th at 209 (citation modified). But "[w]e review the jury instructions" themselves "de novo and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *Id.* (citation omitted).

**C. Legal Framework**

Again, jury instructions should "give jurors the correct principles of law applicable to the facts so that they can reach a correct conclusion as to each element of an offense according to the law and the evidence." *Freeman*, 70 F.4th at 1280 (citation omitted). But even when instructions misstate the law or omit an element of the offense, "we still apply the harmless error rule." *Id.* (citation omitted). To establish that an error was harmless, the government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 1281 (citation modified).

**D. Analysis**

Both Hujrah and Subhanah attack the district court's instructions for 18 U.S.C. § 1201(a)'s "unlawfully kidnaps"[20] element. Hujrah argues that she couldn't unlawfully kidnap Abdul Ghani because it was Siraj—who had "unrestricted parental rights"—who took Abdul Ghani from Hakima and

[20] The parties and the district court used "unlawfully kidnaps" as shorthand for all the means listed in § 1201(a)—seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away. We do the same.

transported him across state lines. *See* Hujrah Op. Br. at 13. And until the Georgia juvenile court issued the first pick-up order, days after the group arrived in New Mexico, "there were no legal lines drawn in this case" that would have made Defendants' conduct unlawful. *Id.* at 14 (citation modified). So Hujrah asserts that the district court should have instructed that if Siraj consented to the group's taking Abdul Ghani, then their doing so wasn't "unlawful" under § 1201.[21]

Though she mostly focuses her argument on the mens rea requirements for kidnapping and conspiracy, Subhanah also argues that "[b]ecause it was not unlawful for Siraj Wahhaj to 'seize' his own child under the Federal Kidnapping Act, it was impossible under the law for others to conspire with him to 'unlawfully seize' the child."[22] Subhanah Op. Br. at 25. We view these arguments as challenging the following instruction:

---

[21] The government argues that Hujrah waived this challenge by objecting during a pretrial conference to the government's introducing as trial exhibits copies of Georgia and New Mexico statutes. We disagree. To start, Hujrah objected to the government's introducing copies of these statutes in a different context. What's more, the district court relied on Georgia law to craft the final kidnapping jury instructions. And we must consider whether the instructions "accurately state[d] the governing law and provide[d] the jury with an accurate understanding of the relevant legal standards." *Woodmore*, 127 F.4th at 209 (citation omitted). So raising Georgia law is fair game.

[22] Despite Subhanah's phrasing, the government didn't charge Defendants with conspiring with *Siraj* to kidnap Abdul Ghani. But we read her argument as saying that, because of Siraj's involvement, it was also impossible for Subhanah, Hujrah, Lucas, and Jany to conspire with *each other* to kidnap Abdul Ghani.

> [T]o unlawfully kidnap a person means to hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense. In evaluating this element, you must first determine whether Abdul-Ghani Wahhaj was of such an age or mental state as to have been capable of giving his consent to having been seized, confined, decoyed, abducted, carried away or held. If you determine that Abdul-Ghani Wahhaj was not capable, then you must determine if his being seized, confined, decoyed, abducted, carried away, or held was against Hakima Ramzi's consent.

JR. vol. VI at 3600–03; JR. vol. III at 1821, 1824.

This instruction misstated the law. To support this instruction, both the government and the district court relied on *Chatwin,* 326 U.S. at 464. Both misread its holding.

In *Chatwin*, three defendants were charged and convicted under § 1201 for inveigling, decoying, holding, and transporting across state lines a fifteen-year-old girl. *Id.* at 457. Without the permission of her parents or the juvenile authorities, the defendants convinced and then helped the girl leave Utah and travel to Mexico to legally marry a 68-year-old adherent of "the original Mormon church." *Id.* at 457–59.

The Supreme Court overturned the defendants' kidnapping convictions. *Id.* at 465. In doing so, it made two important rulings. First, it explained that "unlawfully kidnaps" and "holds" in § 1201 are separate elements. *Id.* at 459. The statute requires "that the kidnapped victim shall have been (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by

any means whatsoever and (2) held for ransom or reward or otherwise." *Id.* (citation modified).

The Court then considered these elements separately. The government argued that it had proved "both elements." *Id.* The Court expressed "serious doubts" that the defendants had inveigled the girl, questioning the premise that "the girl [had been] incapable of understanding the full significance of petitioner's importunities because of her tender years and extremely low mentality." *Id.* (citation modified). But the Court didn't ultimately decide whether the government had proved that element, instead pointing to "a complete lack of competent proof" that the defendants had held her. *Id.* at 459–60.

That brings us to the Court's second important ruling: that the holding element requires "an unlawful physical or mental restraint for an appreciable period against the [victim's] will." *Id.* at 460. The Court added that "[i]f the victim is of such an age or mental state as to be incapable of having a recognizable will, the confinement then must be against the will of the parents or legal guardian of the victim." *Id.*

On *Chatwin*'s facts, the Court saw no involuntary holding. It determined from the evidence that the girl could have left her relocated premises at any time, so the government hadn't proved that the defendants held her against her will. *Id.* Nor had the government proved that she couldn't "exercis[e] her own free will," which made her parents' will immaterial. *Id.* at 461.

The government reads *Chatwin* as saying that "unlawfully" in § 1201(a) means seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away the victim without his or her consent. The district court agreed. And on appeal, the government maintains that a kidnapping is unlawful if it "was against the consent or will of the victim." Resp. Br. at 108.

But *Chatwin* doesn't support the government's or district court's reading. *Chatwin* never defines "unlawfully kidnaps," let alone defines it as holding someone against their will. Instead, *Chatwin* makes clear that unlawfully kidnapping and holding are separate elements, and that the *holding* is what must be against the victim's will. *See* 326 U.S. at 459–60.

Nor does *Chatwin* instruct us to look to the victim's or parents' consent to determine whether a kidnapping was unlawful. Again, the language the government and district court relied on concerned § 1201's *holding* element, not its *unlawfully kidnaps* element. *See id.* at 460; *see also United States v. Murphy*, 100 F.4th 1184, 1196–97 (10th Cir. 2024) (explaining that *Chatwin* interpreted § 1201(a)'s holding element).

Thus, under a correct reading of *Chatwin*, we see no basis for the district court's defining "unlawfully" as meaning against the victim's will. True, both elements of the kidnapping statute—"seizure and detention"—require involuntariness. *See Chatwin*, 326 U.S. at 464. But by their nature, § 1201(a)'s listed means—"seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away"—already cover involuntariness. For example, to prove an inveigling, the

government must show a "luring, or enticing, or leading the person astray by false representations or promises, or other deceitful means." *United States v. Ford*, 157 F.4th 1229, 1234 (10th Cir. 2025). Or to prove kidnapping, the government must show that the defendant took someone "by force and against his will." *Id.* at 1234 n.7 (citation omitted). Because the means already require involuntariness, we see no textual basis for "unlawfully" requiring the same. *See Thompson v. United States*, 604 U.S. 408, 415 (2025) (explaining that courts should "avoid a [statutory] reading which renders some words altogether redundant." (citation omitted)).

The government cites caselaw that it says shows a kidnapping can be unlawful as long as one parent doesn't consent. It points us to *United States v. Sheek*, 990 F.2d 150 (4th Cir. 1993); *United States v. Sheek*, 40 F.3d 1245 (4th Cir. 1994) (unpublished table decision); *Miller v. United States*, 123 F.2d 715 (8th Cir. 1941), *rev'd on other grounds*, 317 U.S. 192 (1942); and *United States v. Boettcher*, 780 F.2d 435 (4th Cir. 1985). But those cases don't resolve our problem with the jury instructions. They focus on § 1201's parental exception, not the unlawfulness element.

Nor do the district court's reasons for giving the instruction convince us. It concluded that Georgia's custodial-interference statute, Ga. Code Ann. § 16-5-45, made it unlawful under 18 U.S.C. § 1201(a) to "take a child away from a non-consenting custodial parent and transport them across state lines."

JR. vol. III at 1848. So the court instructed the jury that Hakima's lack of consent could satisfy the unlawfulness element.

This approach was wrong for two reasons. First, the district court never instructed the jury on Georgia law. So we don't know how the jury could have found Defendants' actions unlawful under a state law it never knew about. *See United States v. Lozier*, 122 F.4th 717, 722–24 (8th Cir. 2024) (discussing importance of jury instructions where § 1201's "unlawfully" element depended on violating state law). The government states that whether Defendants violated state law was a legal question for the district court to answer, not a factual question for the jury. But it does not support that assertion. In fact, at oral argument, the government agreed that unlawfulness is an element of the offense. And "the Fifth and Sixth Amendments require conviction by a jury of *all* elements of the crime." *United States v. Gaudin*, 515 U.S. 506, 519 (1995). Second, as we explain in the sufficiency-of-the-evidence section, the court misread Georgia law.

We therefore conclude that the district court misstated the law when it told the jury (1) that "unlawfully kidnaps" means to hold someone against his will, and (2) that Defendants unlawfully kidnapped Abdul Ghani if the seizing, confining, decoying, abducting, or carrying away was done without Hakima's consent.

All that said, we're left with an important yet unresolved question: What does "unlawfully" mean? Though § 1201 doesn't define it, we've held in

another context that "the ordinary meaning of 'unlawful' is 'contrary to law or unauthorized by law.'" *United States v. Davey*, 151 F.4th 1249, 1256 (10th Cir. 2025) (quoting *Unlawful*, Black's Law Dictionary 1705 (rev. 4th ed. 1968)). So defined, the term "unlawful" captures more than just "criminal" conduct; it also "includes non-criminal laws and violations." *Id.* (citation omitted). Thus, under that definition, deciding whether conduct is unlawful "requires looking to whether the conduct is contrary to law or unauthorized by law." *Id.* at 1259 (citation modified) (emphasis omitted).

We think that definition and test apply here. We see no reason not to give "unlawfully" as used in § 1201(a) its ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). This reading also complements *Chatwin*'s overarching theme: courts shouldn't read § 1201 to apply to all "unattractive or immoral situations." 326 U.S. at 464. Indeed, "there [is no] indication that Congress desired or contemplated that the punishment of death or long imprisonment, as authorized by the [kidnapping statute], might be applied to those guilty of immoralities lacking the characteristics of true kidnap[p]ings." *Id.* Thus, we hold that to determine whether someone has unlawfully kidnapped another person under § 1201(a), a jury must determine whether the defendant's conduct—seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away another person—

was “contrary to law or unauthorized by law.” *Davey*, 151 F.4th at 1256 (citation omitted).

With all this in mind, we hold that the district court’s jury instruction defining “unlawfully kidnaps” misstated the law by improperly defining one of the kidnapping offenses’ elements. And as we explain below, this instructional error was not harmless. Had the court correctly instructed on the law, the jury couldn’t have found unlawfulness based on the government’s evidence. We vacate Hujrah’s and Subhanah’s convictions.[23]

## VII. Issue 7: Sufficiency of the Evidence – Kidnapping Convictions

Hujrah, Subhanah, and Lucas challenge the sufficiency of the evidence on the kidnapping convictions. Though we’ve vacated Hujrah’s and Subhanah’s convictions, we still must consider their sufficiency-of-the-evidence challenge. That’s because under double-jeopardy principles, “[i]f the evidence [was] insufficient to convict, the government could not retry” them. *See United States v. Spradley*, 146 F.4th 949, 962–63 (10th Cir. 2025).

Subhanah, Hujrah, and Lucas raise many arguments, but here, too, we address only one: whether, under a correct interpretation of § 1201(a), the government proved that Hujrah, Subhanah, and Lucas “unlawfully” kidnapped Abdul Ghani. Because unlawfulness is an element of both the conspiracy-to-kidnap and kidnapping counts, they rise and fall together. Indeed, convicting on

---

[23] Lucas did not challenge these instructions.

the conspiracy count would require finding that Defendants agreed "to accomplish an unlawful purpose"—"unlawfully . . . kidnap[ping]" Abdul Ghani. *See* JR. vol. VI at 3599.

**A. Procedural Background**

After trial, Hujrah, Subhanah, and Lucas renewed their Rule 29 motions for judgment of acquittal. The district court denied the motions.

**B. Standard of Review**

Again, we review de novo sufficiency-of-the-evidence challenges. *Cornelius*, 696 F.3d at 1316.

**C. Legal Framework**

As mentioned, when reviewing for sufficient evidence, we view the evidence in the government's favor and affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cavazos*, 565 U.S. at 7 (citation omitted). Recall that a defendant violates 18 U.S.C. § 1201(a)(1) by "unlawfully seiz[ing], confin[ing], inveigl[ing], decoy[ing], kidnap[ping], adbuct[ing], or carr[ying] away and hold[ing] for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when . . . the person is willfully transported in interstate or foreign commerce." Section 1201 also criminalizes conspiring to kidnap. *Id.* § 1201(c).

**D. Analysis**

Defendants argue that the government didn't prove that they unlawfully kidnapped Abdul Ghani. At trial—and in the jury instructions—the government advanced only one theory of unlawfulness: that Defendants' kidnapping Abdul Ghani was unlawful because neither Abdul Ghani nor Hakima consented.

The government failed to show how Abdul Ghani's or Hakima's failure to consent to the taking would make Defendants' actions unlawful. To start, the parties agree that Abdul Ghani was too young to consent.[24] As for Hakima, the government identified no court order or state law making it unlawful for Siraj and Defendants to take Abdul Ghani without her consent.[25] Indeed, as Abdul Ghani's parent, Siraj had parental and custody rights under Georgia law. *See* Ga. Code. Ann. § 16-5-45(a)(3). So given evidence that Siraj agreed with his

[24] Despite this, the government argues that the evidence shows that Abdul Ghani didn't consent, because on separate occasions he (1) uttered "home" and (2) cried and reached for Hakima when she visited Siraj at Hujrah's house. But aside from its misreading of *Chatwin*, the government never explained how Abdul Ghani's lack of consent would make his father's or the Defendants' actions *unlawful*. Plus, none of this evidence speaks to Abdul Ghani's ability to consent or withhold consent for himself. Nor did the government establish what Abdul Ghani meant when he said "home." And crying and reaching for Hakima alone aren't enough for a reasonable juror to conclude that Abdul Ghani didn't consent.

[25] We doubt the government proved that *Defendants* seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away Abdul Ghani. Instead, all evidence supports that *Siraj* took those actions. But even assuming Defendants did seize, confine, inveigle, decoy, kidnap, abduct, or carry away Abdul Ghani, as explained below, the government didn't show how their doing so would be unlawful.

own and the other Defendants' actions, the government's proof that Hakima alone didn't consent can't sustain the kidnapping convictions.[26] In other words, no reasonable juror could have found § 1201(a)(1)'s essential elements beyond a reasonable doubt. *See Cavazos*, 565 U.S. at 7.

Though we need not consider theories neither presented nor instructed to the jury, *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991); *Ciminelli v. United States*, 598 U.S. 306, 316–17 (2023), we note that the evidence didn't support the alternative theories of unlawfulness that the government raised either before trial or on appeal.

First, before trial, the government alleged that Siraj's consent "was tainted by Jany" and her prophecies, suggesting that *neither* parent consented to Defendants' taking Abdul Ghani. JR. vol. I at 855. But the government didn't pursue this theory at trial, so there's no evidence to support it.

Second, the government contends that the December 18, 2017, pick-up order made Defendants' conduct unlawful. But the Georgia juvenile court didn't issue that order until *after* Defendants arrived with Abdul Ghani in New Mexico. Besides, the December 18 order said only that officers could return Abdul Ghani to Hakima. It made no findings about any unlawful conduct by Siraj (or Defendants). So the government can't use the order to prove that

---

[26] The government doesn't say how Defendants could be guilty if Siraj acted lawfully, or if we rejected the argument that lacking one parent's consent made Defendants' actions unlawful.

Defendants acted unlawfully when they joined Siraj in taking Abdul Ghani from Hakima and crossing state lines.

Third, the government points to the January 9, 2018, arrest warrant for Siraj, and the January 31, 2018, order granting Hakima's ex parte motion for emergency custody. The government highlights that both documents said Siraj "absconded with" Abdul Ghani on either November 30 or December 1, 2017. Supp. JR. vol. VI at 31–32, 157. So in the government's view, Defendants' unlawful conduct must have started on one of those days.

We disagree. "Abscond[ing]" doesn't mean that Siraj violated state law or a court order. *See, e.g.*, *Abscond*, Black's Law Dictionary (12th ed. 2024) (defining "abscond" as "[t]o depart secretly or suddenly, esp. to avoid arrest, prosecution, or service of process" or "[t]o leave a place, usu. hurriedly, with another's money or property"); *Vazquez v. State*, 830 S.E.2d 143, 153 (Ga. 2019) (reiterating that "abscond" can mean "to go in a clandestine manner out of the jurisdiction of the courts, or to lie concealed, in order to avoid their process" (citation modified)). So without more, neither the arrest warrant nor the emergency custody order prove that Siraj acted unlawfully by transporting Abdul Ghani from Georgia. And if Siraj didn't act unlawfully, neither did the other Defendants.

Fourth and finally, the government contends that Defendants' actions were unlawful under both Georgia and New Mexico custodial-interference and kidnapping laws.

Again, we disagree. Under Georgia law, "[a] person commits the offense of interference with custody when without lawful authority to do so, the person . . . [k]nowingly or recklessly takes or entices any child . . . away from the individual who has lawful custody of such child." Ga. Code Ann. § 16-5-45(b)(1)(A); *see also id.* § 16-5-45(c)(1) (similar statute prohibiting interstate interference with custody). Lawful custody means "custody inherent in the natural parents" or custody awarded by court order. *Id.* § 16-5-45(a)(3).

Nothing supports that Siraj lacked lawful authority to take Abdul Ghani. As Abdul Ghani's natural parent, Siraj had "inherent" custody over him. No court orders disrupted that authority or made it unlawful for Siraj to take Abdul Ghani from Hakima when he did.

*Brassell v. State*, 385 S.E.2d 665 (Ga. 1989), is instructive. In divorce proceedings, a county court issued an order giving the defendant's ex-wife custody of their minor child. *Id.* at 590. The order gave the defendant "the right of reasonable visitation," including weekends. *Id.* (citation omitted). After one such weekend, the defendant kept the child for a few extra days. *See id.* The state then charged him for custodial interference under section 16-5-45(b)(1)(C), which prohibits intentionally retaining possession of a child after a lawful visitation period. *See id.*

The Georgia Supreme Court held that the father couldn't be "in violation of the statute unless the terms of the custody order are so clear that the parties have exact notice of the line which may not be transgressed." *Id.* at 591. It

reasoned that "[a] defendant in a criminal case must have notice of the exact conduct giving rise to the prosecution." *Id.* So it reversed the defendant's conviction and dismissed the charges. *Id.*

True, *Brassell* dealt with section 16-5-45(b)(1)(C), not subsection (A). But we think *Brassell*'s reasoning applies just as well to Siraj's situation. Without a court order saying otherwise, a parent with "lawful custody"—like Siraj—would have "lawful authority" to take his or her own child. *See, e.g.*, *Carlson v. Carlson*, 748 S.E.2d 304, 308 (Ga. Ct. App. 2013) (holding that section 16-5-45(b) "contemplates that incarceration can be an appropriate punishment for wil[l]ful violation of *a custody order*" (emphasis added)); *Gwinnett Health Sys., Inc. v. Delu*, 592 S.E.2d 497, 499–501 (Ga. Ct. App. 2003) (noting that state agency had lawful authority over children under section 16-5-45 where court order awarded the agency temporary custody over them); *Ware v. City of Atlanta*, 861 F. App'x 791, 796–97 (11th Cir. 2021) (concluding that officer had arguable probable cause that the defendant-grandmother violated section 16-5-45(b)(1) where "a custody transfer order" gave custody to state agency). Indeed, section 16-5-45's "purpose . . . is to protect the custody interests of the child's lawful custodian from interference by another person." *Thompson v. State*, 537 S.E.2d 807, 809 (Ga. Ct. App. 2000).

In sum, under Georgia law, Siraj was one of Abdul Ghani's lawful custodians. So absent a court order, both Siraj and Hakima had equal custody

rights and lawful authority over Abdul Ghani.[27] *See Brassell*, 385 S.E.2d at 591. Thus, the government didn't prove that Siraj violated Georgia's custodial-interference statute when he took Abdul Ghani.

This also means that the government didn't prove that Defendants aided and abetted any unlawful conduct on Siraj's part. *See United States v. Cornelio-Pena*, 435 F.3d 1279, 1287 (10th Cir. 2006) ("Aiding and abetting requires . . . proof that the underlying crime was in fact committed."). Nor did the government prove that Defendants themselves violated the custodial-interference statute. That's because all evidence shows that Siraj, not the other Defendants, initially took Abdul Ghani from Hakima. *See* Ga. Code Ann. § 16-5-45(b)(1)(A).

New Mexico law falls short, too. New Mexico's custodial-interference statute prohibits

> any person, having a right to custody of a child, maliciously taking, detaining, concealing or enticing away or failing to return that child without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child of his [or her] right to custody.

[27] None of the Georgia cases that the district court relied on for its jury instructions say differently. Most involved alleged violations of custody orders. *See State v. Evans*, 442 S.E.2d 287, 288 (Ga. Ct. App. 1994); *Scott v. State*, 400 S.E.2d 677, 678 (Ga. Ct. App. 1990); *Vistein v. Henson*, 746 F. App'x 937, 938–39 (11th Cir. 2018) (per curiam). And the other case included few facts, never mentioning custody rights or lawful authority. *See Arnold v. State*, 628 S.E.2d 605, 607–08 (Ga. Ct. App. 2006).

N.M. Stat. Ann. § 30-4-4(B). It also prohibits someone without custody rights from doing the same. *Id.* § 30-4-4(C). A defendant violates these statutes only "if the child was present in New Mexico" when the defendant took, detained, concealed, enticed, or failed to return the child. *See id.* § 30-4-4(J); *State v. Sung*, 999 P.2d 430, 434 (N.M. Ct. App. 2000).

New Mexico's "custodial interference statute is intended to prevent persons with custodial rights from disrupting another person's right to custody." *State v. Munoz*, 129 P.3d 142, 146 (N.M. 2006). So unlike under Georgia's custodial-interference law, Siraj—who had full custodial rights under New Mexico law, *see* N.M. Stat. Ann. § 30-4-4(A)(5)(A)—could still violate the New Mexico statute by keeping Abdul Ghani from Hakima.[28]

But neither Siraj nor Defendants could have violated New Mexico's custodial-interference statutes until *after* they crossed the New Mexico state line, where they concealed Abdul Ghani on the compound near Amalia. *See* N.M. Stat. Ann. § 30-4-4(B), (C), (J). Put differently, when they crossed state

---

[28] At oral argument, Defendants contended that *State v. Lefthand*, 362 P.3d 174 (N.M. Ct. App. 2015), held that an individual violates New Mexico's custodial-interference statute only if he violates a court order. But they misread *Lefthand*. There, the custodial parent had a "right to custody" *based on* a court order. *Id.* at 179 (citation omitted); *see* N.M. Stat. Ann. § 30-4-4(A)(5) (stating that a right to custody means a right to physical custody arising from either a parent-child relationship absent a custody determination or a custody determination). Because the right to custody in *Lefthand* arose from a custody determination, the injured parent had to establish her right to custody "by proving the existence of a court order." 362 P.3d at 179. But nothing suggests this rule applies when a parent's right to custody arises only from a parent-child relationship.

lines and entered New Mexico, their conduct wasn't yet unlawful under New Mexico law. And that's a problem if trying to prove a violation of 18 U.S.C. § 1201(a)(1), which requires holding and transporting the victim "*after* unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying [the victim] away." *United States v. Abdullahi*, 144 F.4th 1034, 1039 (8th Cir. 2025) (citation modified) (emphasis added).

Consider *United States v. Toledo*, where we held that the kidnapping had to "be in progress" when the victim "crossed state lines." 985 F.2d 1462, 1468 (10th Cir. 1993). "If the victim is no longer being held against her will, the kidnapping has ended, and the interstate travel cannot serve to further the commission of the crime." *Id*. at 1467.

This reasoning applies equally here, where no *unlawful* kidnapping had occurred before the interstate transport. Indeed, "the criminal activity [must] precede the interstate movement." *United States v. Hughes*, 716 F.2d 234, 238 (4th Cir. 1983); *see also United States v. Denny-Shaffer*, 2 F.3d 999, 1020 n.26 (10th Cir. 1993) (holding that the kidnapping victim must be "at some point *during the offense* transported in interstate or foreign commerce" (emphasis added)); *United States v. Boone*, 959 F.2d 1550, 1555–56 (11th Cir. 1992) (holding that kidnapping by inveiglement occurs "prior to transportation"). Because there's no evidence that Siraj and Defendants crossed state lines *after* they allegedly violated the New Mexico custodial-interference statutes, there's insufficient evidence to support this theory of guilt.

The government also asserts that Defendants' actions were unlawful because they were kidnappings under Georgia and New Mexico law. But under that law, too, Georgia requires the defendant to act without lawful authority. *See* Ga. Code Ann. § 16-5-40(a). And as discussed, the government didn't prove that Siraj lacked lawful authority or that Defendants otherwise "abduct[ed] or st[o]l[e] away" Abdul Ghani. *See id*. And even if Defendants violated New Mexico's kidnapping statute, *see* N.M. Stat. Ann. § 30-4-1, again, the government didn't prove that they crossed state lines after their conduct became unlawful under that statute.

* * *

"[C]ourts must cabin § 1201 so as not to unfairly expand its breadth to reach offenses that do not inherently possess the characteristics of kidnapping." *Murphy*, 100 F.4th at 1197. *Chatwin* warns against "[a] loose construction" of the statute; otherwise, "the boundaries of potential liability would be lost in infinity." 326 U.S. at 464. Indeed, "the broadness of [§ 1201] does not permit us to tear the words out of their context" to apply them to all "unattractive or immoral situations." *Id.*

Defendants' taking Abdul Ghani was an "unattractive [and] immoral situation." *See id.* It was wrong for Siraj and Defendants to take Abdul Ghani from Hakima, and tragedy ensued. But that doesn't make it a federal

kidnapping.[29] At least for a situation like that involving Abdul Ghani, the government needed to prove that a law or court order forbade Defendants' conduct. It did not do so.

In sum, because the government introduced insufficient evidence to support § 1201's "unlawfully kidnaps" element, we reverse Subhanah's, Hujrah's, and Lucas's convictions for conspiracy to kidnap and kidnapping resulting in death. They may not be retried for these charges. *See Bravo-Fernandez v. United States*, 580 U.S. 5, 20 (2016).

## VIII. Issue 8: Sixth Amendment – Bench and Jury-Note Conferences

Lucas and Siraj argue that the district court violated their Sixth Amendment rights by excluding them from bench and jury-note conferences.

### A. Procedural Background

Lucas and Siraj proceeded pro se, and the district court appointed them separate standby counsel. During a pretrial conference, their standby counsel asked about bench conferences. The court told counsel to "come up, and then

[29] We emphasize that, when a parent with undiminished custody rights carries away his own child across state lines, the other parent has a civil remedy in the state court from the state in which the child was taken. Under the Uniform Child Custody Jurisdiction and Enforcement Act, the home state has jurisdiction over custody matters if an action is filed within six months of the child's taking. *See, e.g.*, Ga. Code Ann. § 19-9-61.

you can relay any information to [Siraj] and [Lucas]," or in other words, "serve as a go-between." JR. vol. VI at 4156. Neither Lucas nor Siraj objected.

During voir dire and the first day of trial, the court held six bench conferences. As decided, the court let only standby counsel approach the bench. The record suggests that Lucas and Siraj could view a "live feed," JR. vol. VI at 1132, or "a draft, unedited transcript of the bench conferences as they unfolded," Resp. Br. at 156 n.51.

The next morning, Siraj and Lucas objected to these procedures. Siraj explained that the live feed was delayed or not working. And by the time standby counsel returned from the conference and "relay[ed] to [him] what happened, it's already decided without [him] having any objections or any input." JR. vol. VI at 1132. Siraj asked to approach the bench for future conferences and suggested that, to curb any security concerns, the court let the marshals approach with him.[30]

The court decided that it would "give stand-by counsel an opportunity to talk to [Siraj and Lucas] before we proceed" and would "try to slow things down so that [Siraj] and [Lucas] have an opportunity to weigh in." *Id.* at 1133. It also permitted standby counsel, after talking to Siraj and Lucas, to "come back up" and "if we need to, we'll send the jury out." *Id.* at 1134.

[30] Earlier, the district court observed that some of Defendants' prior courtroom conduct created a safety and security risk. But the district court didn't cite any security concerns when it adopted these bench-conference procedures.

The court adopted these bench-conference procedures, and neither Siraj nor Lucas objected again. According to Lucas, they were then excluded from at least forty-eight bench conferences, many of which addressed substantive matters.

The district court also excluded Lucas and Siraj from a jury-note conference. Before deliberations, the court advised that if it received a jury note, it would share the note with standby counsel before having counsel confer with Lucas and Siraj in the courtroom. Neither defendant objected to these procedures.

Then, during deliberations, the jury sent two notes about Count 3 (conspiracy to kill federal officers in violation of 18 U.S.C. §§ 1114 and 1117). The first note asked for the definition of "armed." The second asked, "if any of the acts [in furtherance of the conspiracy] are 'true,' does that mean we must select 'guilty' or are the acts in support of if a 'guilty' decision is made?" JR. vol. III at 1892.

The court emailed the first note to counsel and held a telephone conference. The record doesn't reflect whether standby counsel consulted Lucas or Siraj beforehand. As for the second note, the court received it during the telephone conference about the first note, so we know that standby counsel didn't consult either defendant about it.

For both notes, counsel and the district court agreed to tell the jury to reread the instructions. They also agreed that Lucas and Siraj didn't "need to be

present" because the court was "just answering the jury's questions by saying, re-read the instructions." JR. vol. VI at 3781.

### B. Standard of Review

We review de novo whether a district court denied a defendant's Sixth Amendment right to self-representation. *United States v. Akers*, 215 F.3d 1089, 1096 (10th Cir. 2000). We review any underlying factual findings for clear error. *Id.* Because denying the right to self-representation is a structural error, we don't apply harmless-error review. *See id.*

The government argues that we should review Lucas and Siraj's challenge to the bench-conference procedures for plain error. In the government's view, "Siraj's and Lucas's initial objection to the bench-conference procedure was not sufficient to alert the district court that they believed the court's modified procedures were inadequate." Resp. Br. at 160. So the government argues that they forfeited their challenge by not renewing their objection after the court modified its procedures.

Defendants counter that their initial objection was sufficient, and that Federal Rule of Criminal Procedure 51 didn't require them to raise "[e]xceptions" to the court's ruling. *See* Fed. R. Crim. P. 51(a). They also point to *United States v. McDermott*, in which we held that a pro se defendant didn't need to renew his objection to the court's excluding him from bench conferences. 64 F.3d 1448, 1451 (10th Cir. 1995).

We agree with the government. Defendants "never sought a ruling from the district court on the specific argument" presented on appeal—that the district court's modified bench-conference procedures violated their Sixth Amendment rights.[31] *See Tew*, 171 F.4th at 1235. Rule 51 and *McDermott* don't convince us otherwise.

Certainly, "[e]xceptions to rulings or orders of the court are unnecessary." Fed. R. Crim. P. 51(a). But objections to modified procedures aren't mere exceptions to a prior ruling. Unlike raising an exception, telling the court that its modified procedures weren't working wouldn't have been redundant. Without an objection, the court had no way of knowing that slowing down the proceedings and allowing standby counsel to consult with Lucas and Siraj hadn't solved the problem.

As for *McDermott*, it's distinguishable. There, the district court excluded a pro se defendant from bench conferences, ruling that the defendant "will not address the purely legal matters, but [he] will be able to represent [him]self" on everything else. 64 F.3d at 1451 (citation omitted). The court then granted "an exception redundantly under the Federal Rules to my ruling, because I take it that you object to the limitations I have placed on you, but those will be the limitations." *Id.* (citation omitted).

---

[31] Lucas and Siraj frame their appeal as generally attacking their exclusion from all bench conferences. But their argument focuses on their alleged exclusion after Siraj objected and the court modified its procedures in response.

Unlike *McDermott*, the district court's ruling here didn't "by its terms, preclude[] the need for any renewal of the objection." 64 F.3d at 1451. When initially objecting, Siraj repeated that his "issue" with the bench-conference procedures was "hav[ing] no input." JR. vol. VI at 1132. In response, the court ruled, "what I need to do is give you an opportunity—give standby counsel an opportunity to talk to you before we proceed. And so I'll start doing that." *Id.* at 1133. Nothing about the court's ruling precluded a renewed objection if the court's solution didn't fix the problem. As a result, we review Lucas and Siraj's exclusion from bench conferences for plain error only.

Separately, as for the jury-note conference, Lucas and Siraj argue that because they were excluded from the conference, they never had a chance to object. And "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." Fed. R. Crim. P. 51(b). The government doesn't challenge this point. So we review de novo the exclusion of Lucas and Siraj from the jury-note conference.

**C. Legal Framework**

Defendants have a Sixth Amendment right to self-representation. *See Faretta v. California*, 422 U.S. 806, 818 (1975). Though a defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored." *Id.* at 834.

Still, courts can appoint standby counsel to help pro se defendants. *McKaskle v. Wiggins*, 465 U.S. 168, 170 (1984). When a jury is present,

standby counsel may not "interfere[] with [the defendant's] actual control over his defense" or "undermine[] [his] appearance before the jury." *See id.* at 185. And when it comes to standby counsel's participation outside the jury's presence, "*Faretta* rights are adequately vindicated . . . if the pro se defendant is allowed to address the court freely on his own behalf." *Id.* at 179 (citation modified).

Defendants can also "acquiesce[]" in standby counsel's "substantial participation." *Id.* at 183. "[A] pro se defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably." *Id.* at 182 (citation modified). Indeed, if the defendant "invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Id.* at 183.

**D. Analysis**

**1. Bench Conferences**

Lucas and Siraj argue that the court violated their Sixth Amendment right to self-representation by categorically excluding them from bench conferences. But they haven't shown that the court plainly erred by adopting the modified bench-conference procedures.

For this challenge, Defendants largely rely on *McDermott*, 64 F.3d 1448. Again, the defendant in that case proceeded pro se with standby counsel. *Id.* at 1451. The court held that the defendant "would not be allowed to participate in bench conferences, the jury instruction conference, or the purely legal matters of the case." *Id.* (citation modified). The court reasoned that the defendant "was not equipped to handle purely legal matters and bench conferences centered on them." *Id.* at 1452. The defendant ultimately missed thirty bench conferences. *Id.*

Relying on *McKaskle*, we held that the district court's restrictions improperly let standby counsel "make or substantially interfere with . . . significant tactical decisions" and "speak instead of the defendant on . . . matter[s] of importance." *See id.* at 1454 (citation modified). Though "some minor incursions . . . will fall short of a Sixth Amendment violation," we concluded that the defendant's "exclusion, over his objection, from thirty bench conferences during a six-day trial was [not] an insignificant incursion on his *Faretta* right." *Id.* So we "reluctantly" granted a new trial. *Id.*

In Defendants' view, *McDermott* is "dispositive" and "compels a new trial here." Lucas Op. Br. at 30–31. But for our plain-error review, *McDermott* isn't directly on point. *See Egli*, 13 F.4th at 1146. There, standby counsel handled all "purely legal matters and bench conferences centered on them." *McDermott*, 64 F.3d at 1451–52. So the defendant had no say in "significant

tactical decisions," and standby counsel spoke on his behalf on "matter[s] of importance." *See id.* at 1454 (citation omitted).

The record before us shows no such violation. Courts "may use standby counsel to facilitate the orderly functioning of the proceedings so long as the defendant retains control over significant tactical decisions and on any matter of importance." *United States v. Gomez-Rosario*, 418 F.3d 90, 102 (1st Cir. 2005) (citation modified). Lucas and Siraj don't show that—over their objection—the district court's modified procedures let standby counsel speak or decide for them. The court ensured that standby counsel had time to discuss the bench conferences with Lucas and Siraj and get their input. At least once, the court excused the jury so the court could directly discuss an important matter with them.

Again, "[o]nce a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *McKaskle*, 465 U.S. at 183 (citation modified). And Lucas and Siraj never told the court that its modified procedures kept them from speaking or making important decisions for themselves. Because they never "renew[ed] [their] request that standby counsel be silenced" during bench conferences, *id.*, standby counsel's participation wasn't "over [their] objection," *id.* at 178; *see*

*McDermott*, 64 F.3d at 1454. Thus, Lucas and Siraj haven't shown that the district court plainly erred by adopting the modified procedures.

**2. Jury-Note Conference**

*McKaskle* and *McDermott* compel the opposite conclusion on Lucas and Siraj's exclusion from the jury-note conference. Here, too, Lucas and Siraj argue that when the district court excluded them from the conference, it prevented them from speaking on important matters.

We agree. By excluding Lucas and Siraj from the jury-note conference, the district court let standby counsel interfere with the pro se defendants' right to make substantial tactical decisions and speak for themselves on important matters. *See McKaskle*, 465 U.S. at 178; *McDermott*, 64 F.3d at 1453.

The Ninth Circuit's opinion in *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc), is instructive. *Frantz* held that where a jury-note conference concerned a matter of tactical importance, the district court couldn't exclude the pro se defendant. *Id.* at 741–42. The Ninth Circuit explained that "because the conference involved discussions that [the defendant and standby counsel] could not have accurately predicted or rehearsed in advance, [the defendant's] exclusion resulted in a complete silencing of [his] voice on the matters." *Id.* at 741.

Granted, the jury note in *Frantz* was unique—the jury asked the court to introduce evidence that the pro se defendant had repeatedly asked the court to admit. *Id.* at 729, 741–42. But the Ninth Circuit also held "that the conference

triggered [the defendant's] *Faretta* rights because it resolved the content of the judge's response to the jurors' request," thus "shap[ing] the jury's interpretation of an important tactical decision." *Id.* at 742. The circuit also emphasized that "[t]he defendant's . . . presence may also be an important opportunity to try and persuade the judge to respond."[32] *Id.* at 743 (citation modified).

Here, the jury asked a question about the requirements for rendering a guilty verdict. Discussing and crafting a response to that question involved significant tactical decisions implicating Lucas and Siraj's *Faretta* rights. In particular, the second jury note expressed confusion about whether the jury had to find Lucas and Siraj guilty if they took an action in furtherance of the conspiracy. Siraj and Lucas could have offered input about how best to respond to this important question. In fact, as counsel noted at oral argument, one answer to the jury note could have been a simple "No." But we need not decide whether Lucas and Siraj could have persuaded the court to do more than simply refer the jury back to the instructions. By never giving them the chance, the district court violated their self-representation rights.

[32] The Ninth Circuit has held that "defendants or their attorneys have a due process right to be present in conferences when jurors' notes are discussed." *Frantz*, 533 F.3d at 743. Though we've held that a defendant *doesn't* have this due process right when the question concerns "a legal issue," those cases didn't involve pro se defendants. *See United States v. Hardy*, 149 F.4th 1153, 1160 (10th Cir. 2025); *United States v. Gonzales*, 596 F.3d 1228, 1243–44 (10th Cir. 2010); *Esnault v. Colorado*, 980 F.2d 1335, 1337 (10th Cir. 1992).

The government argues that Lucas and Siraj acquiesced in standby counsel's representation on the jury instructions. And true enough, Lucas and Siraj let standby counsel take the lead on the pretrial conference for the instructions. But Defendants still attended that conference, and they could confer with standby counsel throughout. Plus, because jury-instruction conferences "traditionally encompass[] purely legal issues," *Larson v. Tansy*, 911 F.2d 392, 395 (10th Cir. 1990), standby counsel could assist without causing Siraj or Lucas to relinquish control over their own defenses, *see McDermott*, 64 F.3d at 1453 (holding that defendant did not acquiesce to standby counsel by letting counsel "d[o] nothing more than what standby counsel might be expected to do: consult, make some objections, help with the admission and admissibility of exhibits, and make some motions").

The government next directs us to *United States v. Mills*, 895 F.2d 897 (2d Cir. 1990). There, the Second Circuit concluded that reversal wasn't required after the district court excluded a pro se defendant from sidebar conferences. *Id.* at 905. Though *Mills* concluded that the district court should have allowed the defendant to attend the conferences, it also concluded that "in the context of the trial as a whole," the district court didn't violate the defendant's *Faretta* rights, because he still "control[led] and guide[d] his defense." *Id.*

We aren't convinced by *Mills*. In fact, in *McDermott*, we suggested that *Mills* read *McKaskle* too narrowly. *See* 64 F.3d at 1452–54. The self-

representation question isn't merely whether the pro se defendant "ha[d] a fair chance to present his case in his own way." *Mills*, 895 F.2d at 905. It's also whether standby counsel interfered with important tactical decisions or spoke for the defendant on matters of importance. *McDermott*, 64 F.3d at 1454. And that's where the district court went wrong here.

Relatedly, the government emphasizes that the district court simply told the jury to reread the instructions. But the court's response to the notes doesn't impact our Sixth Amendment analysis. Defendants may base *Faretta* challenges like this one "on principle, not specific content or result." *Id.* at 1453. In other words, it doesn't matter what the response said or whether Lucas or Siraj "would have done anything differently" than standby counsel. *See id.* Indeed, the government's argument rings of harmless-error review, which doesn't apply here. *See id.* at 1454.

Because the district court violated Lucas's and Siraj's *Faretta* rights by excluding them from the jury-note conference, we vacate their convictions and remand for a new trial.

## IX. Remaining Issues

### A. Issues 9, 10, 11, & 12

Because we reverse Hujrah's and Subhanah's convictions for insufficient evidence, we need not reach Hujrah's Sixth Amendment challenge, nor the pair's Eighth Amendment and prosecutorial-misconduct challenges. And because we either reverse or vacate Siraj's and Lucas's convictions, we need

not consider their prosecutorial-misconduct or cumulative-error challenges, either.

### B. Unsealing Portions of the Appellate Record

The clerk's office referred several procedural matters to us for disposition.

In July 2024, the clerk's office sua sponte ordered the parties to brief whether certain volumes of the joint record on appeal should stay sealed. After briefing, the clerk's office referred to the merits panel whether to unseal volume IV.

Because the parties agree that volume IV need not remain sealed, we direct the clerk's office to unseal it.

In September 2024, the clerk's office sua sponte ordered the parties to address whether volumes II and IV of the supplemental joint record on appeal should remain sealed.[33] After briefing, the clerk's office referred to the merits panel whether to unseal the volumes.

The parties agree to unsealing volume II with certain redactions on pages 298–431. So we direct the clerk's office to unseal volume II, but with the information identified on pages 2–5 of the government's brief redacted. The

[33] The clerk's office also directed the parties to address why volume V of the supplemental joint record should remain ex parte. In June 2025, the government asked us to rule on the matter. We granted the motion in part and unsealed volume V.

parties also agree to unsealing volume IV, so we direct the clerk's office to unseal that volume, too.

In October 2024, the clerk's office sua sponte ordered the government and Hujrah to address whether volumes I and IV of her individual record on appeal should stay sealed. It also ordered Hujrah to address whether volumes II and V should remain sealed and/or ex parte. After briefing, the clerk's office referred to the merits panel whether to unseal these volumes.[34]

Because the parties agree that volumes I and IV shouldn't stay sealed, we order the clerk's office to unseal them. As for volumes II and V, because Hujrah filed them ex parte, the government can't access them. But the government is concerned that these volumes may contain pleadings or transcripts protected by the Classified Information Procedures Act. *See* 18 U.S.C. app. 3 § 4. If so, the government says those documents should stay sealed and ex parte. Hujrah doesn't object to unsealing these volumes and asks that we receive all CIPA-related filings.

There's a strong presumption in favor of open judicial records. *See United States v. Bacon*, 950 F.3d 1286, 1293 (10th Cir. 2020). But "upon a sufficient showing," CIPA lets the government protect classified information from discovery. 18 U.S.C. app. 3 § 4. If a district court grants the government's

[34] In its June 2025 motion, the government also asked us to decide whether to unseal volumes II and V of Hujrah's individual record on appeal. We denied the motion in part and reserved for the merits panel whether to unseal the rest of those volumes.

motion for a CIPA protective order, "the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court." *Id.*

The district court granted the government's request for a CIPA protective order. But we don't see any CIPA-protected documents in either volumes II or V of Hujrah's individual record on appeal. So we provisionally direct the clerk's office to unseal both volumes. Before making the volumes publicly available, the clerk's office should release them to the government. Upon review, if the government believes that the volumes contain CIPA-protected information, the government may move within fourteen days to keep specific portions of the record sealed. If the government doesn't move for such relief, the clerk's office may release volumes II and V to the public after the fourteen-day deadline has passed.

Finally, in December 2025, the United States moved to file and seal certain supplemental trial exhibits. The clerk's office provisionally granted the motion, subject to reconsideration by the merits panel. We agree with the clerk's office's order, and we direct the clerk's office to keep those exhibits sealed.

## CONCLUSION

For these reasons, we reverse Hujrah's, Subhanah's, and Lucas's convictions for conspiracy to kidnap and kidnapping resulting in death. We vacate Siraj's and Lucas's convictions for conspiracy to provide material

support to kill federal officers, providing material support to kill federal officers, and conspiracy to kill federal officers. We remand to the district court for retrial on the conspiracy-to-kill and material-support charges against Siraj and Lucas and for any further proceedings consistent with this opinion.